## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE #1 )<br>JOHN DOE #2 )<br>and others similarly situated )<br>)<br>ANNETTE WELLS )<br>and other AFGE members similarly situated )<br>8630 Beekman Place, )<br>Alexandria, VA 22309 )<br>)<br>PAUL VAUGHAN )<br>8630 Beekman Place, )<br>Alexandria, VA 22309 )<br>)<br>WAQAS KALYAR )<br>9521 Georgia Avenue )<br>Silver Spring, MD. 20910 )<br>)<br>FAHIM JAVED )<br>5524 Hempstead Way, B350 )<br>Springfield, VA. 22151 )<br>)<br>JOCELYNN JOHNSON )<br>807 Tewkesbury Place, N.W. )<br>Washington, D. C. 20012 )<br>)<br>Plaintiffs )<br>v. )<br>)<br>AMERICAN FEDERATION OF GOVERNMENT )<br>EMPLOYEES ("AFGE") )<br>80 F Street, N. W. )<br>Washington, D. C. 20001 )<br>)<br>JEFFERY DAVID COX, SR., in his official and )<br>personal capacity )<br>1227 Beagle Run )<br>Salisbury, North Carolina 28146 )<br>)<br>EVERETT KELLEY, in his official and personal )<br>capacity )<br>2000 Friar Tuck Lane )<br>Oxford, Alabama 36203 )<br>)<br>ERIC BUNN, in his official and personal capacity )<br>13804 Pine Needle Ct. | COMPLAINT FOR DAMAGES<br>AND INJUNCTIVE AND<br>DECLARATORY RELIEF<br><br><br>Civ. No.<br><br><br><br><br><br>PLAINTIFFS DEMAND A<br>TRIAL BY JURY |

Upper Marlboro, Maryland 20774                    )
                                                  )
VINCENT CASTELLANO, in his official and           )
personal capacity                                 )
40 Locker Street,                                 )
Bayville, New Jersey 08721                        )
                                                  )
PHIL GLOVER, in his official and personal         )
capacity                                          )
80 F Street, N. W.                                )
Washington, D. C. 20001                           )
                                                  )
DANNY DOYLE, in his official and personal         )
capacity                                          )
80 F Street, N. W.                                )
Washington, D. C. 20001                           )
                                                  )
ARNOLD SCOTT, in his official and personal        )
capacity                                          )
293 Red Oak Lane                                  )
Carmel, Indiana  46033                            )
                                                  )
CHERYL ELIANO, in her official and personal       )
capacity                                          )
4908 Chad Drive                                   )
Killen, Texas  76542.                             )
                                                  )
GERALD SWANKE, in his official and personal       )
capacity                                          )
464 E. Thurman Mill Street                        )
Garden City, Idaho 83714                          )
                                                  )
GEORGE MCCUBBIN, in his official and personal )
capacity                                          )
80 F Street, N. W.                                )
Washington, D. C. 20001                           )
                                                  )
JOSEPH FLYNN, in his official and personal        )
capacity                                          )
6900 Bugledrum Way                                )
Columbia, MD 21045                                )
                                                  )
DAVID BORER, in his official and personal         )
capacity                                          )
80 F Street, N. W.                                )
Washington, D. C. 20001                           )

BRIAN DEWYNGAERT, in his official and         )
personal capacity                              )
80 F Street, N. W.                             )
Washington, D. C. 20001                        )
and                                            )
                                               )
JOHN and JANE DOES AFGE Officers,              )
Employees and Agents                           )
                        Defendants.            )
_____)

## COMPLAINT

### INTRODUCTION

1.      For years, former AFGE National President Jeffery David Cox, Sr. committed

shocking and outrageous acts of sexual abuse and sexual harassment against Plaintiffs John Doe

#1, John Doe #2 and others, racially discriminated against Plaintiffs Waqas Kalyar, Fahim

Javed, and Jocelynn Johnson, and harmed and caused all Plaintiffs severe emotional distress.

2.      Plaintiffs file this human rights action for compensatory damages, punitive

damages, injunctive relief, declaratory judgment and money damages to remedy sexual

assault, sexual battery, sexual harassment, racial discrimination, religious discrimination,

retaliation, intentional infliction of emotional distress and other misconduct by Defendants.

3.      On behalf of AFGE, herself and other AFGE members, Plaintiff Wells files the

accompanying *ex parte* application for leave to file this complaint pursuant to Section 501 of the

Labor Management Reporting and Disclosure Act of 1959 ("LMRDA"), as amended, 29 U.S.C.

§§401 *et. seq*. against Defendant Cox for violating his oath of office and his fiduciary duties by

using union-provided limousine services to go to strip clubs and bars and procure male

prostitutes and to sexually assault, sexually harass and racially discriminate against Wells' son,

Plaintiff John Doe #1, and Plaintiff John Doe #2, and to engage in other unlawful misconduct.

4.      Plaintiff Wells files the accompanying *ex parte* application for leave to file this complaint pursuant to Section 501 of the LMRDA  against Defendants Everett Kelley, Eric Bunn, Vincent Castellano, Phil Glover, Danny Doyle, Arnold Scott, Cheryl Eliano, Gerald Swanke, George McCubbin, Joe Flynn, David Borer, and Brian DeWyngaert  ("AFGE officials") who are officers of AFGE and who occupied a position of trust in relation to AFGE and its members as a group.  As officers, Cox and the named AFGE elected officials took an oath and had a responsibility to act in utmost good faith in managing the affairs of the organization. AFGE officials breached their fiduciary duties to the labor organization by failing to report, investigate and take disciplinary action after receiving numerous sexual and other misconduct complaints filed against Cox;  failing to process internal disciplinary charges filed against Cox by Wells on February 13, 2020, related to Cox's sexual and other misconduct; failing to file a lawsuit against Cox  to account for and recover all AFGE funds that Cox improperly used to go to strip clubs and bars, procure male prostitutes and sexually abuse others.  Cox and the named AFGE officials violated their fiduciary responsibilities set forth in Section 501 of the LMRDA, 29 U.S.C. § 401, et seq. and greatly damaged AFGE.  As a member of AFGE, Plaintiff Wells seeks  compensatory and punitive damages for AFGE's losses sustained as a result of Defendants' breach of their fiduciary duties.

5.      Plaintiffs seek a Court order appointing an independent, neutral federal monitor selected by the Plaintiffs to oversee and implement an anti-discrimination education, training, monitoring and enforcement program that will build a culture of respect, safety, inclusion and accountability among the AFGE National Executive Council, the Office of the General Counsel, the AFGE Executive staff and AFGE Officers, employees, contractors and members.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.

§1332, diversity jurisdiction; the District of Columbia Human Rights Act of 1977, Title 2,

Chapter 14 – Human Rights District of Columbia Code, *et seq,* and D.C. Law 22-311, the

Sexual Abuse Statute of Limitations Amendment Act of 201 and the District of Columbia

statutes;  42 U.S.C. 1981; the Declaratory Judgment Act, 28 U.S.C. §2201, jurisdiction being

conferred in accordance with 28 U.S.C. §1331, Title I- § 101(a)(2) and (5) of the Labor

Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C.A. § 411(a)(2) and (5),

Title V- § 501(b) of the LMRDA; 29 U.S.C.A. § 501(b), which confer jurisdiction on this Court

to hear the claims of Plaintiff Annette Wells, an AFGE member, and other similarly situated

AFGE members that Defendants AFGE officials breached their fiduciary duty.   Jurisdiction for

the claims made under District of Columbia law is conferred in accordance with the Court's

supplemental jurisdiction pursuant to 28 U.S.C. §1367.

7.      The amount of all Plaintiffs' claims exceeds the minimum Seventy-Five Thousand

Dollars ($75,000) required to meet the federal requirement.

8.       Defendant AFGE is an employer within the meaning of 42 U.S.C. § 2000e(b).

Defendant AFGE is engaged in commerce within the meaning of 42 U.S.C. § 2000e(g) and its

headquarters and primary place of business is located in Washington, D. C.  This Court has

personal jurisdiction over Defendants under D. C. Code §13-423 because the claims for

relief arise from Defendants' transaction of business in the District of Columbia.

9.      Venue is proper under 28 U.S.C. 1391(b) because a substantial part of the events

giving rise to the claims alleged herein occurred in the District of Columbia.

**PARTIES**

10.      Plaintiffs "John Doe #1," "John Doe #2," and others similarly situated are described herein by Pseudonym because of the severe, complex and personal nature of their injuries, and the extreme emotional distress they suffered as a result of Cox's sexual abuse and battery. These factors are sufficient to establish that a substantial privacy interest is involved thereby warranting anonymity on the parts of the  Plaintiffs John Doe #1 and John Doe #2.   Their identities will, of course, be disclosed to the Court.

11.      Plaintiff John Doe #1 is a 48-year-old divorced father of six (6) children who served as Cox's principal limousine driver for over a decade.  Cox sexually assaulted, sexually harassed, racially discriminated against and caused serious medical injury to Plaintiff Joe Doe #1 beginning approximately 2009 through 2019 and during a period that Defendants knew or certainly should have known about Cox's misconduct and took no remedial action. Plaintiff John Doe #1 resides in the Commonwealth of Virginia.

12.      Plaintiff John Doe #2 is a 30-year-old man who served as Cox's principal driver for nearly two (2) years.  Cox sexually assaulted, sexually harassed, and discriminated against Plaintiff Joe Doe #2 on the basis of his religion beginning approximately February 2018 through October 2019 during a period that Defendants knew or certainly should have known about Cox's misconduct and took no remedial action. Plaintiff John Doe #2 resides in the Commonwealth of Virginia.

13.      Plaintiff Annette Wells ("Wells") is Plaintiff John Doe #1's biological mother and an AFGE member.   She resides in the Commonwealth of Virginia.

14.      Plaintiff Paul Vaughan ("Vaughan") is the stepfather of Plaintiff John Doe #1 and resides in the Commonwealth of Virginia.

15.      Plaintiff Waqas Kalyar ("Kalyar") is the owner of Capitol Chauffeur Services ("CCS Limo") who was contracted for employment with Defendant AFGE to provide

transportation services.  Cox sexually harassed Plaintiff Kalyar and discriminated against him on the basis of his religion during a period that Defendants knew or certainly should have known about Cox's misconduct and took no remedial action.  Mr. Kalyar resides in the State of Maryland.

16.     Plaintiff Jocelynn Johnson ("Johnson") worked for Defendant AFGE for 13 years before Cox terminated her in January 2018 for violating the AFGE "No Politics Rule" for allegedly making a $10 campaign contribution to his opponent.  Defendant AFGE and Cox discriminated against Plaintiff Johnson on the basis of her race by terminating her while not terminating a similarly situated, Caucasian employee who violated the same "No Politics Rule."  Plaintiff Johnson resides in Washington, D. C.

17.     Plaintiff Fahim Javed ("Javed"), the owner of Limo Network Nationwide ("Limo Network"), purchased CCS Limo in February 2018 and currently provides transportation services to Defendant AFGE.  Cox sexually harassed Plaintiff Javed and discriminated against him on the basis of his religion beginning approximately February 2018 through 2019 during a period that Defendants knew or certainly should have known about Cox's misconduct and took no remedial action.  Mr. Javed resides in the Commonwealth of Virginia.

18.     Defendant AFGE is a 501(c)(3) nonprofit corporation with its principal place of business located at 80 F Street, NW, Washington, D.C.

19.     Defendant AFGE is the nation's largest federal employee union, representing roughly 600,000 federal and D. C. government workers.

20.     Defendant AFGE is governed by the AFGE National Constitution and the 15-member AFGE Defendant National Executive Council ("NEC").

21.     Defendant Jeffery David Cox, Sr., is the former National President of Defendant AFGE.  He resides in the State of North Carolina.

22.     The NEC is currently composed of the following 14 members:  Defendant National President Everett Kelley, Defendant National Secretary Treasurer Eric Bunn, National Vice President for Women and Fair Practices Jeremy Lannan, and the following National Vice Presidents: Defendant NVP Vincent Castellano (District 2),  Defendant NVP Phil Glover (District 3),  Defendant NVP Danny Doyle (District 4), NVP David Mollett (District 5), Defendant NVP Arnold Scott (District 6),  NVP Dorothy James (District 7), NVP Greg James (District 8), NVP Mike Kelley (District 9), Defendant NVP Cheryl Eliano (District 10), Defendant NVP Gerald Swanke (District 11), Defendant NVP George McCubbin (District 12), and NVP District 14 [vacant].

23.     Defendant Joseph Flynn is the former National Secretary Treasurer of Defendant AFGE.  He resides in the State of Maryland.

24.     Defendants Kelley, Bunn, Castellano, Glover, Doyle, Scott, Eliano, Swanke, McCubbin and Flynn were among eleven (11) NEC members[1] who signed a letter in or about 2018 strongly encouraging AFGE members to re-elect Cox at a time when they knew (or certainly should have known) that numerous AFGE employees, contractors and others had accused Cox of sexual abuse, sexual harassment, racial discrimination, religious discrimination, and other violations of the AFGE National Constitution. *(Exh. 1: J. David Cox, Sr. 2018 Campaign Re-election Endorsement Letter signed by AFGE NEC members).*

25.     Defendant David Borer is Defendant AFGE's General Counsel, has held the position since October 2010 and supervises Deputy General Counsel Gony Goldberg and a large staff of in-house AFGE attorneys and outside counsel.

---

[1] The 11th National Executive Council member who signed the letter endorsing Defendant Cox's 2018 re-election was National Vice President for Women and Fair Practices Augusta Thomas who was defeated by Jeremy Lannan in the 2018 election.  Ms. Thomas is deceased.

26.     Defendant Brian DeWyngaert is Defendant AFGE's Chief of Staff, has held that position for decades and supervises all AFGE headquarters staff and contractors.

## FACTS

**Kelley, Bunn, Swanke, General Counsel David Borer, Chief Of Staff Brian DeWyngaert And Other Defendants Were Aware Of Cox's Misconduct And Took No Action To Stop It**

27.     In October 2019, Bloomberg News quoted a former AFGE staff member as stating that Cox's sexual misconduct "was the worst-kept secret at AFGE." *(Exh. 2: Bloomberg News Article "President of Major U.S. Union Accused of Sexual Harassment," dated October 27, 2019).*

28.     Defendants Cox, Kelley, Bunn, Castellano, Glover, Doyle, Scott, Eliano, Swanke, McCubbin, Flynn, Borer and DeWyngaert knew (or certainly should have known) that AFGE employees, contractors and others had accused Cox of sexual abuse, sexual harassment, racial discrimination, religious discrimination and other violations of federal law and the AFGE National Constitution.

29.     Defendants Cox, Kelley, Bunn, Castellano, Glover, Doyle, Scott, Eliano, Swanke, McCubbin, Flynn, Borer and DeWyngaert did not document, report or investigate the complaints and took no disciplinary action to stop Cox's unlawful misconduct.

30.     Upon information and belief, Defendant AFGE member John Rohton threatened to kill Cox for having sex with his son when Cox was an AFGE Veterans Council official.

31.     In 2012, African American AFGE contractor Larry Burnett complained that Cox sexually harassed and racially discriminated against him.

32.     Defendants Cox, Kelley, Bunn, Scott, Swanke, McCubbin, Flynn, Borer and DeWyngaert (collectively "AFGE officials") failed to investigate his complaints, and Mr. Burnett sued AFGE.  [*Larry Burnett v. AFGE* Case 1:13-cv-02047].

33.      Defendant AFGE, Defendant Borer and his deputy, Gony Goldberg, defended Cox in the Burnett lawsuit and later entered into a confidential nondisclosure settlement agreement with Mr. Burnett to secure his silence.

### In 2014 And 2016, Defendants Did Not Question Cox's Excessive CCS Limo Invoices And Disciplined AFGE's National Secretary Treasurer After He Tried To Do So

34.      In 2014, National Secretary Treasurer ("NST") Eugene Hudson, Defendant's second highest ranking officer, was responsible for reviewing and approving all expense vouchers submitted by AFGE Defendant National Executive Council members.

35.      It is a violation of AFGE policy and rules for an elected officer to use union resources for the officer's personal use.

36.      In 2014, NST Hudson noticed that Cox was regularly submitting unusually large requests for reimbursement for CCS Limo invoices, an AFGE-provided car service, for car services ordered by Cox that extended after 8 p.m. and late into the night.

37.      NST Hudson questioned Cox about the unusually large CCS Limo invoices, and Cox told Mr. Hudson that he was the National President, that he was using the CCS Limo car services for AFGE business and that Mr. Hudson had no right to question his expenditures.

38.      In 2014, Cox used the CCS Limo car services provided by Defendant AFGE to frequent strip clubs and bars and to procure male prostitutes -- misconduct that Mr. Hudson was unaware of when he questioned Cox's CCS invoices.

39.      In 2014, Cox used the CCS Limo car services provided by Defendant AFGE to sexually assault, sexually harass and racially discriminate against Plaintiff John Doe #1 and to sexually harass and discriminate against Plaintiff Kalyar -- misconduct that Mr. Hudson was unaware of when he questioned Cox's CCS invoices.

**In 2014, Then-NVP Everett Kelley Covered Up The First Of Two Sexual Harassment Complaints Filed Against Cox By A Male Hotel Employee In Kelley's District**

40.     In 2014, Defendant Everett Kelley, then National Vice President for AFGE District 5, hosted an AFGE event at a Myrtle Beach, South Carolina hotel in his district.

41.     The hotel management informed Defendant Kelley's administrative assistant, Traci St. John[2], that Cox had sexually harassed and propositioned a male employee of the hotel.

42.     The hotel told Ms. St. John that for that reason Cox, a hotel guest attending the AFGE event, was being asked to leave the hotel.

43.     Ms. St. John immediately notified Defendant Kelley, who intervened, and convinced the hotel manager not to evict Cox but to allow him to remain at the hotel.

44.     Defendant Kelley did not interview the hotel employee who filed the sexual harassment complaint against Cox, did not document the complaint and did not report the hotel employee's complaint against Cox to the NEC or the AFGE Human Resources Manager Keith Wright.

45.     Defendant Kelley did not take any disciplinary action against Cox in response to the Myrtle Beach hotel employee's sexual harassment complaint.

46.     Defendant Kelley covered up the Myrtle Beach hotel employee's sexual harassment complaint filed against Cox.

47.     Like her supervisor, Defendant Kelley, Ms. St. John, who initially received the hotel's sexual harassment complaint against Cox, did not investigate, document or report the complaint to AFGE.

48.     Ms. St. John was Defendant Kelley's administrative assistant, earning approximately $45,000 per year when the 2014 South Carolina hotel incident occurred.

---

[2] formerly Traci Murray.

49.     As AFGE National President, Cox had sole authority to recommend promotions and salary increases for all AFGE staff, including Ms. St. John.

50.     Over the four-year period immediately following the Myrtle Beach incident, on Defendant Kelley's recommendation, Ms. St. John received the following unusually large pay raises and promotions:

i)      In 2015, Defendant Kelley recommended and Defendant Cox promoted Ms. St. John to the position of District Officer Manger for District 5 earning $71,000 per year – a $26,000 salary increase over her 2014 income;

ii)     In 2016, Defendant Kelley recommended and Defendant Cox promoted Ms. St. John to the position of Supervisory National Representative earning $88,000 per year – a $17,000 salary increase over her 2015 income;

iii)    In 2017, Defendant Kelley recommended and Defendant Cox gave Ms. St. John a $14,000 pay increase, raising her annual salary to $102,000; and

iv)     In 2018, Defendant Kelley recommended and Defendant Cox gave Ms. St. John a $2,000 pay increase, raising her salary from $102,000 to $104,000.

51.     Defendant Kelley recommended and Defendant Cox approved these unusually large pay raises and promotions in an apparently successful attempt to ensure Ms. St. John's silence regarding the Myrtle Beach hotel's sexual harassment complaint filed against Cox.

52.     In 2015, AFGE member Amber Westbrook complained to Defendant General Counsel Borer's office that her local president told her that sex was the way for women to get ahead at the union and demanded to have adjoining hotel rooms with her during a union conference.

53.     Defendant Borer and his staff of attorneys did not investigate or take any disciplinary action in response to Ms. Westbrook's complaint.

54.     In 2016, then-National Secretary Treasurer Eugene Hudson was responsible for reviewing and approving all expense vouchers submitted by NEC members.

55.     As he did in 2014, NST Hudson again questioned Cox in 2016 about his unusually large requests for reimbursement for CCS Limo invoices, an AFGE-provided car service, for services extending beyond 8 p.m. and late into the night.

56.     Cox told NST Hudson that he was the National President, that he was using the CCS Limo car services for AFGE business and that Mr. Hudson had no right to question his expenditures.

57.     In 2016, Cox used the CCS Limo car services provided by Defendant AFGE to frequent strip clubs and bars, and to procure male prostitutes -- misconduct that Mr. Hudson was unaware of when he questioned Cox's CCS invoices.

58.     In 2016, Cox used the CCS Limo car services to sexually assault, sexually harass and racially discriminate against Plaintiff John Doe #1 and to sexually harass and discriminate against Plaintiff Kalyar -- misconduct that Mr. Hudson was unaware of when he questioned Cox's CCS invoices.

59.     In 2016, NST Hudson questioned invoices submitted by Defendant Everett Kelley and Defendant Eric Bunn for expenses incurred and gifts purchased during an AFGE-sponsored trip to the Virgin Islands.

60.     In 2016, NST Hudson questioned Defendant Eric Bunn's invoices for reimbursement for over $1400 worth of clothing purchased at Nordstrom and for a restaurant bill for dinner for Defendant Bunn and four (4) guests of approximately $500.

61.     In approximately 2016, NST Hudson questioned invoices submitted by Defendant Gerald Swanke for approximately $800 worth of artwork for his home.

62.     Cox previously served as NST from 2006 to 2012 and, like his predecessor before him, Cox had authority to approve all NEC members' expense vouchers.

63.     When Mr. Hudson was elected NST in 2012, he took over the responsibility for approving NEC members' expense vouchers from Cox.

64.     When NST Hudson refused to approve questionable expenditures, it caused rancor among certain NEC members.

65.     In 2016, Defendant Everett Kelley and Defendant Eric Bunn complained to Defendant Cox that NST Hudson was questioning his and other NEC members' expense vouchers, and Kelley demanded that Cox intervene.

66.     In response, Cox stripped NST Hudson of his authority to review and approve NEC members' expense vouchers in 2016 but allowed Hudson to continue to review expense vouchers submitted by the National President [Cox].

67.     After stripping National Secretary Treasurer of his authority to review and approve NEC members' expense vouchers, Cox's use of the AFGE-provided CCS Limo car service to frequent strip clubs, bars and to procure male prostitutes increased in 2017 and 2018.

68.     On January 1, 2018, AFGE member Lawrence Tomscha filed a written complaint with the AFGE National Executive Council that in 2017, Cox had improperly spent $90,000 in membership dues for personal limousine services and requested that Defendants provide Tomscha with an explanation. *(Exh. 3: Lawrence Tomscha Complaint, dated January 1, 2018)*

69.     Defendants refused to investigate or take any action on AFGE member Tomscha's complaint that Cox violated AFGE policy and rules by using $90,000 of AFGE resources (the CCS Limo services) for his personal use in 2017.

70.     Had Defendants investigated AFGE member Tomscha's complaint that Cox improperly used the CCS Limo services, Defendants might have uncovered the fact that Cox was using the union's car service to frequent strip clubs and bars, to procure male prostitutes and to sexually harass Plaintiffs John Doe #1 and John Doe #2, and Plaintiff Kalyar.

**Defendants Approved Cox's Decision To Take Over The Human Resources Department, Which Was Responsible For Handling All EEO Complaints, Including Sexual Harassment And Racial Discrimination Complaints Filed Against Cox**

71.     Around the same time in 2016 that Cox stripped NST Hudson of his expense voucher review authority, Defendants approved Cox's decision to take away from NST Hudson his authority over the Human Resources Department ("HR") which had responsibility to investigate and process all EEO complaints.

72.     After assuming authority over HR, Cox assigned General Counsel David Borer the authority to handle all EEO complaints. Borer reported directly to Cox and was seen as an "arm of the National President." Working Ideal attorneys concluded:

> "The AFGE EEO policy provides for three channels of reporting. The first two are reporting to individuals in the General Counsel's Office, or to the head of HR [Human Resources], who **both** report to the President.

> "As a practical matter, **the General Counsel's Office handles all internal EEO complaints,** and we believe that staff rarely, if ever, utilized the reporting channels through either the Women's and Fair Practices Department or HR.

> "**Many individuals we spoke with reported that the General Counsel's Office is seen as an arm of the National President's Office, tasked with representing the interests of the President and the organization, not assisting employees with their EEO concerns and complaints, which affected how willing individuals were to come forward**.

> "A number of employees also described having low trust in the option to report outside the Presidential chain of command through the Women's and Fair Practices Department.

> "While it is undisputed that several EEO complaint procedures existed – the EEO policy, the constitutional process, and the CBA [Collective Bargaining Agreement] grievance procedures – in practice, these processes did not meet the organization's needs. Current and former employees described a lack of transparency and …stated that they were not aware of the procedure for raising EEO complaints or had never known that an EEO policy existed …Many of those who did know about the policy believed any complaints would not be taken seriously." *(Exh. 4: Working Ideal report, at pp. 22-23) [Emphasis Added]*

73.     In 2016 and 2017, NST Eugene Hudson filed multiple racial discrimination complaints against Cox with Human Resources Manager Keith Wright.

74.     In July 2017, NST Hudson filed a formal complaint with the Equal Employment Opportunity Commission ("EEOC") that Cox racially discriminated against him.

75.     Defendant Borer and his team of attorneys did not investigate or take any disciplinary action in response to NST Hudson's racial discrimination complaints filed against Cox with Human Resources Manager Wright or with the EEOC.

**Defendants Did Not Investigate Rocky Kabir And Brett Copeland's
2017 Sexual Harassment Complaints Against Cox**

76.     At the end of December 2016, Cox hired Rocky Kabir as his Confidential Secretary, and Mr. Kabir traveled with Cox across the United States on AFGE-related business approximately 80% of the time.

77.     Beginning in mid-January 2017, Cox began sexually abusing Mr. Kabir.

78.     In approximately April 2017, Mr. Kabir complained to Cox's and Defendant DeWyngaert's executive staff that Cox was sexually harassing and touching him inappropriately, demanding that Mr. Kabir accompany him to strip clubs and bars  and demanding that he help Cox procure male prostitutes.

79.      Mr. Kabir also complained that whenever they traveled on AFGE-related business, Cox regularly made sexual advances toward him and toward other random men that they encountered, including hotel waiters and bellboys, and demanded that he help Cox procure male prostitutes.

80.     Mr. Kabir complained that Cox regularly referred to him as a "Fucking Muslim" or a "Goddamned Muslim."

81.     Cox's staff did not investigate, document, report or take any disciplinary action against Cox in response to Mr. Kabir's complaints.

82.     Defendant DeWyngaert and his staff did not investigate, document, report or take any disciplinary action against Cox in response to Mr. Kabir's complaints.

83.     In April 2017,  AFGE Communications Director Brett Copeland filed a complaint with Chief of Staff DeWyngaert's deputy, Corey Bythrow, that Cox stuck his tongue in his ear, repeatedly told him he loved him and invited Mr. Copeland to share his hotel jacuzzi during a union event in Palm Springs, California.

84.      Mr. Copeland informed Mr. Bythrow that he heard Cox refer to his Confidential Secretary Rocky Kabir, who was present during the incident, as a "Goddamned Muslim."

85.      Mr. Bythrow referred Copeland to General Counsel Borer.

86.     Less than a year earlier, Cox had stripped NST Hudson of his independent authority over HR and had given NST Hudson's authority to investigate all EEO complaints to General Counsel David Borer and his deputy, Gony Goldberg.

87.     Unlike NST Hudson, General Counsel Borer and his deputy, Gony Goldberg, were not independent.  According to Working Ideal, they served as the arm of the President.

88.     Borer met with Copeland to discuss the Cox incident.  Copeland submitted his detailed timeline to Bythrow and Borer.  This timeline identified both Copeland and Kabir as targets of Cox's harassment. *(Exh. 4:  Working Ideal Report, dated March 16, 2020, at. p. 11)*

89.     Because Mr. Copeland had filed a discrimination complaint against Cox, an elected AFGE officer, Borer was required by the EEOC policy to retain a neutral, outside law firm to conduct an investigation into Mr. Copeland's complaint.  Borer did not do this.

90.     Instead, shortly after Copeland filed his complaint, Borer interviewed Cox who largely denied the conduct.  *(Ibid.)*

91.     General Counsel Borer then discussed Mr. Copeland's complaint against Cox with Chief of Staff DeWyngaert, but Borer and DeWyngaert did not interview Mr. Kabir, the primary witness to the incident, who was also identified as a potential victim of Cox's harassing behavior in Mr. Copeland's timeline. *(Ibid., p. 12)*

92.     On April 14, 2017, Mr. Copeland submitted his resignation in writing to Mr. Bythrow, David Borer, DeWyngaert and Human Resources Keith Wright. *(Ibid., p. 11)*

93.     It was not until November 2019, that Mr. Copeland and Mr. Kabir were interviewed by Working Ideal attorneys and disclosed what occurred during the April 2017 incident involving Mr. Copeland and Cox.

94.     Mr. Kabir stated that Cox was speaking to Mr. Copeland, and somehow the conversation shifted, and Cox made one of his usual derogatory comments: "Rocky, you Goddamned Muslim."

95.     Mr. Copeland said to Cox: "Don't speak to Rocky that way," and Mr. Kabir told him, "Hey, don't worry about it."

96.     Mr. Copeland then said he had to use the restroom, and Mr. Kabir heard Cox demand that Brett urinate in the bushes and said: "Rocky, you watch our backs if people are walking by."

97.     Mr. Kabir stated that he observed Cox put his arm on Mr. Copeland's shoulder, and Cox and Copeland urinated in the bushes.

98.     Mr. Kabir was close enough to hear Cox repeatedly invite Mr. Copeland to his hotel room and that Cox told Brett: "I love you.  I love the work you do.  I love you.  I love you."

99.     Mr. Kabir heard Mr. Copeland say: "Thank you President Cox, we love you too," but Cox was insistent, and Mr. Kabir heard him say to Mr. Copeland: "I have this beautiful jacuzzi in my room and no one to use it."

100.     Mr. Kabir stated that after they returned to Washington, D. C. in April 2017, Cox told him that Mr. Copeland had reported the incident to Defendant General Counsel David Borer.

101.     Mr. Kabir asked Cox: "Is General Counsel Borer going to speak to me about this?"

102.     Cox responded: "No, he's not going to speak to you about this."

103.     Defendant Borer did not interview Mr. Kabir and did not recommend that the NEC investigate or take disciplinary action against Cox in response to Mr. Copeland's complaint.

104.     Defendant DeWyngaert did not interview Mr. Kabir and did not recommend that the NEC investigate or take disciplinary action against Cox in response to Mr. Copeland's complaint.

105.     Mr. Copeland's resignation became effective about two weeks after the incident.

106.     On or about August 8, 2017, on the recommendation of Defendant Borer, the NEC met to vote on a recommendation by the Committee of Investigation chaired by Defendant Swanke to remove NST Hudson from office for allegedly violating the Hatch Act and the AFGE rule that prohibits elected officers from using union resources to promote their candidacy.

107.     The NEC voted by a margin of 12 to 1 to remove Mr. Hudson from office for

writing a November 2016 email warning AFGE leaders of the dangers to the union presented by

the recent election of President Donald Trump and allegedly improperly using AFGE resources.

### In 2017, Defendant Everett Kelley Covered Up A Second Sexual Harassment Complaint Filed Against Cox By A Male Hotel Employee In Kelley's District

108.     In August 2017,  Defendant Everett Kelley, then-National Vice President for

AFGE District 5,  hosted the annual AFGE Human Rights Training conference in Kelley's

district at the Hotel Caribe in San Juan, Puerto Rico.

109.     AFGE District 11 Women's Advisory Coordinator and member of the AFGE

National Human Rights Committee Pam Baca attended the conference from August 10, 2017

through August 17, 2017.

110.      Upon information and belief, Defendant Cox, Defendant Kelley, Defendant

Bunn, Defendant Swanke, Defendant Glover, Defendant Scott, Defendant Doyle, Defendant

Castellano, Defendant McCubbin, Defendant Eliano, NVP Greg James and the late NVP

Augusta Thomas attended the conference in Puerto Rico.

111.     In a sworn statement, Ms. Baca attested that Defendant Everett Kelley told her in

the presence of Defendant Eric Bunn that Hotel Caribe management had informed Kelley that it

had received a complaint from a male pool bar attendant that Cox had sexually harassed and

inappropriately touched the bar attendant in the pool.  *(Exh. 5: Declaration under Penalty of

Perjury of Pam Baca, dated April 28, 2020)*

112.     Defendant Kelley told Ms. Baca in the presence of Defendant Bunn that she was

"lucky that she wasn't sleeping on a bench in Old San Juan." *(Ibid., p.4)*

113.     When Ms. Baca asked Defendant Kelley why, he stated that AFGE was almost

"kicked out" of the hotel because of Cox's behavior. *(Ibid.)*

114. According to Ms. Baca, Defendant Bunn was present the entire time, listening to the entire conversation. *(Ibid.)*

115. Ms. Baca stated that Defendant Kelley told her that "Cox had arrived at the hotel two nights before with his entire family, which usually includes his wife, two sons, their wives and children… and the hotel staff had not personally greeted Cox and had not given him adequate accommodations because they had not expected his family." *(Ibid., p.4)*

116. Defendant Kelley told Ms. Baca that Cox was enraged by this, and he very harshly berated the hotel staff, yelling at them and making unreasonable demands.  The staff, according to Kelley, was very upset by Cox's behavior and complained to the hotel management. *(Ibid., pp.4-5)*

117. Kelley told Ms. Baca that the next day, Cox went to the pool bar and got drunk and made sexually inappropriate acts multiple times to one of the male attendants who was wearing only swim trunks. *(Ibid., p. 5)*

118. Kelley told Ms. Baca that Cox attempted to touch the attendant under the water.

119. Kelley told Ms. Baca that the attendant complained to the managers, that the hotel contacted Kelley and told him they wanted AFGE and Cox to leave and threatened to cancel all the rooms on the master bill being paid for by AFGE, which included Ms. Baca's room. *(Ibid., p. 5)*

120. Defendant Kelley told Ms. Baca that he had to do some "fast talking" to get the hotel to allow Cox and the AFGE delegation to remain at the hotel. *(Ibid., p. 5)*

121. Ms. Baca asked Defendant Kelley why the hotel had contacted him, and he stated that he was the "point person" with AFGE for the hotel because he used the hotel for District 5

training conferences.  Kelley told Ms. Baca that he wanted to use the hotel again for future District 5 conferences. *(Ibid., p. 5)*

122.     Defendant Kelley stated the hotel would allow AFGE to stay only if Cox agreed to stay in his room and leave the hotel as soon as possible. *(Ibid., p. 5)*

123.     Ms. Baca asked Kelley and Bunn why the union allowed Cox's misconduct to continue.  *(Ibid., p. 5)*

124.     Defendant Kelley and Defendant Bunn told Ms. Baca they knew Cox's behavior was problematic, but they could do nothing "because it was Cox." *(Ibid., p. 5)*

125.     Ms. Baca attested that she did not recall seeing Cox much after that;  she recalled that Cox was not present at a private rum tasting social for the NEC and Human Rights Committee held earlier that evening and that during the rum social she recalled hearing  "jokes that Cox was banished to his room." *(Ibid., pp. 5-6)*

126.     Ms. Baca attested that "it was very strange that Cox was not at the rum social because it was one year before the AFGE National Convention, and the rum social would have been the perfect time for Cox to connect with the elected AFGE leaders from each district." *(Ibid., p. 6)*

127.      This was the second time in three years that a hotel in Defendant Kelley's district had filed a complaint with Kelley that Cox had sexually harassed a hotel employee and demanded that Cox leave the hotel.

128.     Defendant Kelley did not appear to be alarmed or even surprised by the second Cox sexual misconduct complaint.  In fact, Defendant Kelley's response to Ms. Baca concerning the news was casual and even jocular.

129.     After receiving this second report of Cox's sexual misconduct, as before, Defendant Kelley did not investigate, document, or report the hotel employee's complaint.

130.     Defendant Kelley did not file disciplinary charges against Cox related to the Puerto Rico sexual harassment complaint.

131.     Instead, as before with the 2014 Myrtle Beach incident, Defendant Kelley covered up the 2017 sexual harassment complaint filed against Cox by the Hotel Caribe pool bar attendant in Puerto Rico.

132.     Ms. Baca stated that soon after speaking with Defendant Kelley she "made it a point" to discuss Cox's inappropriate sexual behavior with Defendant Gerald Swanke, the National Vice President representing her district. *(Ibid., at p. 6)*

133.     Ms. Baca stated that she discussed with Defendant Swanke everything that Defendant Kelley had stated to her and that she told Defendant Swanke that "this type of behavior by Cox was not acceptable and that the NEC needed to do something about it."

134.     Ms. Baca attested that she told Defendant Swanke that "Cox's misconduct reflected negatively upon AFGE and left us open to attacks from our enemies." *(Ibid., at p. 6)*

135.     Ms. Baca stated that Defendant Swanke agreed that the behavior, if it happened, was not acceptable and put AFGE at risk, and Ms. Baca asked whether Defendant Swanke doubted what Defendant Kelley had told her. *(Ibid., at p. 7)*

136.     Ms. Baca stated that Defendant Swanke said he didn't doubt what Kelley had told her about Cox, but he wasn't there personally so he couldn't comment on second-hand information.  Ms. Baca said that Swanke needed to talk to Kelley so he would have the information first-hand. *(Ibid. at p. 7)*

137.     Ms. Baca stated that Defendant Swanke nodded and said he would discuss it with Kelley.  Defendant Swanke told Ms. Baca that he was concerned about Cox's sexual misconduct as well.  *(Ibid. at p. 7)*

138.     Presumably, Defendant Swanke spoke with Defendant Kelley and confirmed that Cox had sexually harassed the Hotel Caribe pool attendant and was confined to his room by the hotel.

139.     Thus, Defendants Kelley, Bunn and Swanke were fully aware of the 2017 sexual harassment complaint filed against Cox by the Hotel Caribe in Puerto Rico.

140.     Defendant Kelley was also fully aware of the prior 2014 sexual harassment complaint filed against Cox by the Myrtle Beach hotel in his district.

**Everett Kelley Concealed Evidence Of Cox's Sexual Misconduct From Investigators**

141.     In 2019, Working Ideal attorneys asked Defendant Everett Kelley why he did not act after learning about the 2014 sexual harassment complaint filed against Cox by the Myrtle Beach hotel in his district.  *(Exh. 4: Working Ideal Report, March 16, 2020, p. 18)*.

142.     Defendant Kelley responded that he had asked Cox about it; Cox denied it, and Kelley believed him.   *(Ibid.)*.

143.     In response to the same question from Bloomberg News a year later, in March 2020, Defendant Kelley gave the same response, adding that Cox was a "liar," and stating that had Kelley known then what he knows now, he would have "handled the situation differently." *(Exh. 6: Bloomberg News Article, Report Finds Pattern of Misconduct and Faulty Safeguards at Major Union," dated March 19, 2020)*

144.     During his Working Ideal and Bloomberg News interviews, Defendant Kelley concealed the fact that in 2017 he had received a *second* complaint that Cox sexually harassed a male hotel employee in his district.

145.     Defendant Kelley also concealed from Working Ideal investigators and from the Bloomberg News reporter the fact that he did not handle the 2017 sexual harassment complaint against Cox any differently than he handled the 2014 sexual harassment complaint.

146.    Defendant Kelley handled the 2014 and 2017 sexual harassment complaints filed by hotels in his district against Cox exactly the same.

147.    Defendant Kelley did not investigate, document or report either complaint filed against Cox in 2014 and 2017; instead Kelley covered up both complaints.

148.    Aware of complaints of Cox's sexual harassment and other misconduct, in or about July 2018, Defendants Kelley, Bunn, Swanke, Castellano, Glover, Doyle, Scott, Eliano, McCubbin and Flynn signed a letter endorsing Cox and strongly encouraging AFGE members to re-elect him to a third term.  *(Exh. 1:  J. David Cox, Sr. 2018 Campaign Re-election Endorsement Letter)*

**AFGE Did Not Investigate Mr. Kabir's 2018 Sexual Harassment Complaints Against Cox**

149.    Rocky Kabir filed sexual harassment and racial discrimination complaints against Cox with General Counsel David Borer and Chief of Staff Brian DeWyngaert's staff in 2017 and 2018, and Defendants refused to investigate or take any action on the complaints.

150.    In June 13, 2018, Cox and his Confidential Secretary Rocky Kabir left Washington, D. C. to attend a June 14, 2018 Bureau of Prisons meeting in San Antonio, Texas.

151.    They left San Antonio on June 15, 2018, and landed in Charlotte, North Carolina and spent Friday, June 15th and Saturday June 16th at Cox's home.

152.    As usual, Mr. Kabir stayed in the second bedroom of the Cox North Carolina home and while in North Carolina, Cox ordered Mr. Kabir to perform personal errands and tasks for Cox like blowing leaves in his yard, working on Cox's re-election campaign and going grocery shopping for Cox and his wife.

153.    They were scheduled to leave on Father's Day evening, but Cox got into an argument with his wife and rescheduled the flight to an earlier flight.

154.     Cox and Mr. Kabir left Charlotte, North Carolina early in the morning on Father's Day, Sunday, June 17, 2018.

155.     While waiting for the flight in North Carolina, Cox flew business class, received free drinks and drank lots of alcohol on the plane.

156.     While on the flight, Cox demanded that Mr. Kabir help him procure male prostitutes when they returned to D. C., and Mr. Kabir refused, stating that this was not part of his job.   Cox and Mr. Kabir continued to argue about this until the flight arrived in D. C.

157.     On or about June 17, 2018, Plaintiff John Doe #2 of the CCS Limo Service was booked to pick up Cox and his Confidential Secretary Mr. Kabir from the airport and take them to Defendant's Silver Spring, MD apartment.

158.     After picking them up, Cox told John Doe #2 that he wanted to keep the CCS reserved SUV and driver all day and ordered John Doe #2 to also pick up a friend of his in Washington, D. C. and then take them all to a restaurant in Silver Spring.

159.     Cox started cursing and threatening Mr. Kabir in front of John Doe #2.

160.     After leaving the restaurant, Cox demanded that John Doe #2, Mr. Kabir and the friend all go to the barber shop together.

161.     At the barber shop, Cox started cursing Mr. Kabir, stating that he was too busy "fucking" his girlfriend (and now wife) to attend to his needs.   Mr. Kabir told Cox he was being very disrespectful to women and to cut it out.

162.     Cox was under the influence of alcohol and again threatened Mr. Kabir, in front of John Doe #2, that he was "going to fuck his life up."

163.     Cox's hostility continued.   Around 8 p.m. Mr. Kabir was working on Cox's campaign and as well as his other AFGE duties.

164.     Cox demanded that Mr. Kabir go with him to find male prostitutes for sex.  Mr. Kabir refused.

165.     Cox used a motorized wheelchair because he had a knee injury, and he called it his "knee scooter."

166.     An inebriated Cox got on his knee scooter and started riding down the streets near his apartment searching for a male prostitute for sex.  Cox fell onto East West Highway in Silver Spring, MD, and a passerby called an ambulance which took him to Suburban Hospital where he was kept overnight.

167.     In the following days, Cox and Mr. Kabir continued to argue as Mr. Kabir refused Cox's unreasonable demands that Mr. Kabir procure male prostitutes and go to strip clubs and bars with him.

168.     In or about July 2018, Mr. Kabir removed his property from Cox's house.

169.     In or about July 2018, Mr. Kabir moved into a residence with his fiancée.

170.     The next day, Cox called Mr. Kabir and said he could not do the job as his Confidential Secretary unless Mr. Kabir was around him 24 hours a day, seven days a week as before.

171.     Mr. Kabir told Cox that he refused his unreasonable demand that he continue to work for him 24 hours a day, seven days a week.

172.     Mr. Kabir also told Cox that he liked his job but that he did not like  having to live with Cox, endure his constant sexual harassment and drunken behavior, and comply with Cox's demands to help him procure male prostitutes and with Cox's other sexual demands.

173.     Cox continued to send cell phone text messages to Mr. Kabir on his personal cell phone.

174.     On or about July 26, 2018, Cox ordered Kabir to return his AFGE-issued iPad. Mr. Kabir brought it in, and Cox personally took it away from him.

175.     At the August 2018 AFGE National Convention, Defendants Kelley, Bunn, Castellano, Glover, Doyle, Scott, Eliano, Swanke, McCubbin and Flynn urged their delegates to vote for Cox.  With their help, Cox was re-elected for a third term as AFGE National President.

176.     Shortly after winning the election, Cox forced Mr. Kabir to resign from AFGE and Cox immediately cut off Mr. Kabir's health benefits.

**Defendants Authorized And Paid For A Sham Investigation Into NVP Lannan's July 2019 Sexual Harassment Complaints Against Cox**

177.     In or about July 2019, National Vice President ("NVP") for Women and Fair Practices Jeremy Lannan,  AFGE's third highest ranking elected officer and a member of the AFGE governing body, complained to Defendant Borer's deputy general counsel, Gony Goldberg, that Cox had sexually harassed him and Mr. Kabir.

178.     NVP Lannan asked Ms. Goldberg to retain a neutral investigator to conduct an independent investigation of his discrimination complaints against Cox as required by the union's EEO policy.

179.     Ms. Goldberg agreed, and with Cox's approval, AFGE retained the law firm of Bredhoff and Kaiser to investigate Mr. Lannan's sexual harassment complaints.

180.     The Bredhoff and Kaiser investigation was a sham.

181.     With the apparent knowledge and approval of Defendant Cox, General Counsel Borer and Deputy General Counsel Gony Goldberg, Bredhoff and Kaiser never interviewed Mr. Kabir, a key witness, during Bredhoff and Kaiser's three-month investigation of NVP Lannan's sexual harassment complaints against Cox.

182.     Defendants took no disciplinary action against Cox in response to NVP Lannan's July 2019 discrimination complaints.

183.     In July 2019, Defendants knew (or certainly should have known) about the sexual abuse and sexual harassment complaints filed against Cox by Larry Burnett, Brett Copeland, Rocky Kabir, and NVP Jeremy Lannan.

184.     In July 2019, Defendants knew (or certainly should have known) about the racial discrimination complaints filed against Cox by Larry Burnett, Eugene Hudson, and Rocky Kabir.

185.     In July 2019, Defendants refused to investigate or take disciplinary action against Cox for any of the sexual harassment and racial discrimination complaints filed against him.

**Defendants Authorized An Independent Investigation Of Cox By A Neutral Law Firm Only <u>After</u> The Press Reported Cox's Alleged Sexual Misconduct In October 2019**

186.     In or about September 2019, Bloomberg News called AFGE and asked to interview Cox about the sexual harassment and misconduct complaints filed against him.

187.     Around the same time, Bloomberg News called Rocky Kabir and Brett Copeland and requested to interview them concerning their sexual harassment and discrimination complaints against Cox.

188.     Cox attempted to intimidate Mr. Kabir by traveling to New York in October 2019 and telling his family and former co-workers that he would harm Rocky if he spoke to the press. Mr. Kabir gave the interview to Bloomberg News in the face of Cox's threats.

189.     On October 27, 2019, Bloomberg News reported that Cox sexually abused and harassed AFGE staff members and engaged in other misconduct. *(Exh. 2: Bloomberg News Article "President of Major U.S. Union Accused of Sexual Harassment, dated October 27, 2019)*

190.    Cox denied the charges.  Nevertheless, Cox immediately took a leave of absence in October 2019, and Defendant Everett Kelley took over his duties.

191.    On November 14, 2019. Bloomberg News reported that at least ten (10) present and former AFGE employees confirmed that a culture of harassment and fear flourished for years at AFGE among people in positions of power that resulted in their refusal to investigate sexual abuse and harassment complaints filed against Cox and other AFGE officials. *(Exh. 7: Bloomberg News Article "Harassment, Culture of Fear Flourish at Federal Workers Union, Staff Say," dated November 14, 2019)*

192.    In response to mounting public pressure, AFGE hastily retained Working Ideal, a law firm headed by former EEOC Chair Jenny Yang, to conduct an independent investigation into Cox's alleged sexual abuse and perform a broad, system-wide evaluation of the culture, climate, discrimination policies and practices at AFGE.

193.    The Working Ideal investigation lasted from November 2019 through March 16, 2020.

194.    In or about February 2020, Plaintiff John Doe #1, Cox's limousine driver, filed a complaint with AFGE that from approximately 2009 through 2019, Cox sexually assaulted, sexually harassed and racially discriminated against him.

195.    On February 13, 2020, AFGE members Annette Wells, Judith Weinberg and Stephanie Graf  filed disciplinary charges against Cox for unlawfully using AFGE-provided limousine services to sexually assault, sexually harass and racially discriminate against Ms. Wells' adult son, Plaintiff John Doe #1, and to frequent strip clubs, bars and procure male prostitutes.  *(Exh. 8: Wells, Weinberg and Graf Charges, dated February 13, 2020)*

196.    Wells, Weinberg and Graf demanded that AFGE conduct a forensic accounting of Cox's limousine service invoices to ascertain the value of the union-paid car services that Cox

appropriated for his personal use.  The three AFGE members also asked that AFGE file suit

against Cox to recover all of his misappropriated CCS Limo expenditures.  *(Ibid.)*

197.      In related case  number 18-1230,  *AFGE v. Eugene Hudson* (KBJ), AFGE filed a

lawsuit in September 2018 against former National Secretary Treasurer Eugene Hudson falsely

accusing him of "stealing" AFGE emails that were provided to him by another AFGE official,

Ryan Gurganious, who has stated under oath that Gurganious lawfully obtained the allegedly

stolen emails from AFGE.  In that case, AFGE seeks to recover the value of the allegedly stolen

AFGE resources from the former AFGE official Eugene Hudson in his personal capacity.

198.      Yet, to date, AFGE has *not* filed a lawsuit against Cox, requested by AFGE

member Wells, Weinberg and Graf,  to recover the more than $90,000 in CCS Limo

expenditures that Cox purportedly misappropriated when he improperly used the AFGE-paid car

service to go to strip clubs and bars and to procure male prostitutes.

199.      On February 28, 2020,  Defendant Kelley issued a public statement that "the

AFGE National Executive Council  made a commitment to being transparent with our members

and our employees on any development related to the serious allegations of misconduct that

have been made against J. David Cox."-*(Exh. 9: AFGE National Secretary Treasurer Everett

Kelley's Letter announcing Cox's resignation, dated February 28, 2020).*

200.      The same date that Defendant Everett Kelley made the announcement that the

NEC would be "transparent" regarding its response to Cox's misconduct, on February 28, 2020,

Defendant Everett Kelley signed a secret separation agreement paying Cox cash and allowing

Cox to resign in lieu of being removed from office for sexual abuse and harassment.

201.      In spite of assuring AFGE members and the public that the NEC would be

transparent, to date, Kelley and the other Defendant members of the AFNEC have ***not*** disclosed

to AFGE members and the public the fact that they signed the secret separation agreement  with Cox, nor have they released its details to the public.

202.     On March 16, 2020, Working Ideal released its public report.  Among other things, the Working Ideal report concluded that Rocky Kabir and Brett Copeland were credible and their sexual abuse and sexual harassment charges against Cox were supported by the evidence.  *(Exh. 4: Working Ideal Report, dated March 16, 2020)*

203.     A third Bloomberg article reported the Working Ideal findings. *(Exh. 6: Bloomberg News article "Report Finds Pattern of Misconduct and Faulty Safeguards at Major Union," dated March 19, 2020).*

204.     In response, Defendant AFGE National Executive Council posted a March 19th letter to the public on the AFGE website commending Working Ideal and its report and praising as courageous heroes former AFGE employees, Mr. Kabir and Mr. Copeland, who came forward with their complaints against Cox.  *(Exh. 10: AFGE National Executive Council Letter posted on the AFGE website on March 19, 2020).*

205.     In the same letter, the NEC assured the public that it would promptly and fully investigate the February 16, 2020, Wells, Weinberg and Graf charges filed against Cox  *(Ibid.)*

206.     Defendant AFGE's EEO policy states that whenever an elected officer is charged with discrimination, Defendants shall retain a neutral firm to conduct an independent investigation of the charges. *(Exh. 4: Working Ideal Report dated March 16, 2020, p. 14) (Exh. 11:  AFGE Equal Employment Statement for Employees and Applicants, dated May 2015)*

207.     Wells, Weinberg and Graf filed charges that while he was the AFGE National President and an elected officer, Cox sexually assaulted, sexually harassed and racially discriminated against Wells' son,  Plaintiff John Doe #1. *(Exh. 8:  Wells, Weinberg and Graf Charges, dated February 13, 2020)*

208.     Therefore, the AFGE EEO policy required Defendant AFGE to retain a neutral firm to conduct an independent investigation of the February 2020 Wells, Weinberg and Graf discrimination charges filed against Cox.

209.      Nearly four months have passed, and Defendant AFGE has not retained a neutral firm to conduct an independent investigation of the Wells, Weinberg and Graf charges filed against Cox.

210.     Working Ideal determined that Defendant AFGE National Executive Council members had "formal power to check the President by bringing charges under the Constitution." *(Exh. 4: Working Ideal Report, at p.21-22).*    They failed to do so.

211.     The Working Ideal report exposed structural and systemic weaknesses within AFGE that enabled Cox to wield inordinate, autocratic and unchallenged power.

212.     "These structural weaknesses and lack of reporting information about potential EEO concerns…were particularly problematic in light of the organization's deferential attitude toward the National President's Office. *(Exh. 4: Working Ideal Report, at p. 21)*

213.     "Some described the power of the President as 'absolute' and that Cox was 'beyond reproach'." *(Ibid.)*

214.     Working Ideal concluded that: "[w]itnesses – even those in senior staff positions – expressed the feeling that they were not in a position to stand up to Cox." *(Ibid., at pp. 26-27).*

215.      Working Ideal attorneys found that "[i]ndividuals who worked closely with the National President's office, including … [General Counsel] Borer, witnessed Cox's verbal abuse and anger." *(Ibid., at p. 18)*

216.     Defendant Borer told Working Ideal attorneys **"**that he *suffered a stroke* during an incident in which Cox was verbally abusive" to him.  *(Ibid., at p.25).*

217.     Working Ideal found that "[m]ultiple witnesses relayed accounts of Cox personally 'going after people' he saw as challenging his authority." *(Ibid., at, p.24).*

218.     "In addition, the President also had a role in allocating staff to support each NVP's District and their District events, and this affected whether and how at least some NEC members raised concerns that challenged the President." *(Ibid., at p.21-22)*

219.     During his tenure,  Cox ensured the loyalty of  Defendants Everett Kelley, Eric Bunn, Vincent Castellano, Phil Glover, Danny Doyle, Arnold Scott, Cheryl Eliano, Gerald Swanke, George McCubbin, Joseph Flynn, General Counsel David Borer and Chief of Staff Brian DeWyngaert through a combination of cronyism and fear – rewarding his allies with bonuses and extravagant trips at union members' expense, while threatening to destroy anyone who challenged his authority.

220.     For these reasons, although they were aware of Cox's sexual misconduct, Defendants Everett Kelley, Eric Bunn, Vincent Castellano, Phil Glover, Danny Doyle, Arnold Scott, Cheryl Eliano, Gerald Swanke, George McCubbin, and Joseph Flynn, signed a letter endorsing Cox's 2018 re-election for a third term as president. *(Exh. 1:  J. David Cox, Sr. 2018 Campaign Re-election Endorsement Letter)*

221.     Defendants Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin, and Flynn, actively encouraged local presidents and delegates in their District to vote for Cox in 2018. As a result of their strong support, Cox was re-elected National President or a third term.

222.      Fearing Cox's reprisals and wanting to remain in his good graces, Defendants failed to report, document, investigate or make any effort to curb Cox's sexual abuse, sexual harassment, racial discrimination and other misconduct.

223.     Together with Cox, Defendants Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin, Flynn, Borer and DeWyngaert created and maintained a toxic culture a of sexual harassment and racial discrimination at AFGE.

224.     While Cox has left AFGE, the toxic, discriminatory culture that Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin, Flynn, Borer and DeWyngaert allowed to flourish under Cox's leadership for the past decade, remains.

**AFGE General Counsel David Borer And His Deputy General Counsel, Gony Goldberg, Were Aware Of Cox's Sexual And Racial Misconduct And Took No Action To Stop It**

225.     Defendant General Counsel David Borer and his deputy, Gony Goldberg, were responsible for handling EEO discrimination complaints. *(Ibid., p.14).*

226.     Working Ideal attorneys reported that General Counsel Borer and his Office "were seen as an arm of the National President's Office" and that Borer and his staff represented Cox's interests and *not* the interests of AFGE employees.  *(Ibid. at. p.25)*

227.     Defendant Borer and his deputy, Gony Goldberg, were aware of discrimination complaints filed against Cox by Larry Burnett (2012), Eugene Hudson (2016, 2017), Brett Copeland (2017), Rocky Kabir (2017, 2018, 2019),  Jeremy Lannan (2019) and Plaintiff John Doe #1 (2020),

228.     The AFGE National Constitution, and Equal Employment Opportunity ("EEO") policy prohibit sexual abuse and other discrimination.  *(Exh. 11: AFGE Equal Employment Opportunity Statement for Employees and Applicants dated May 2015).*

229.     The AFGE EEO policy requires Defendants to retain a neutral investigator to conduct an independent investigation whenever a discrimination complaint is filed against an elected officer. *(Exh. 4: Working Ideal Report dated March 16, 2020, p. 14)*

230.     Defendant Borer and Ms. Goldberg did not investigate or retain a neutral investigator to investigate any of these discrimination complaints filed against Cox.

231.     Bloomberg News reported that when AFGE staff complained about Cox's sexual abuse and harassment to Defendant General Counsel David Borer and Defendant Chief of Staff Brian DeWyngaert, "their response amounted to a 'pat on the head'." *(Exh. 7:  Bloomberg News Article "Harassment, Culture of Fear Flourish at Federal Workers Union, Staff Say," dated November 14, 2019)*

232.     Defendant Borer told Working Ideal that he recommended no disciplinary action against Cox for using union resources to frequent strip clubs, bars and to procure male prostitutes because Defendant Borer did not believe that his office "had the ability to address conduct occurring outside official work activities or hours in the absence of an explicit AFGE policy governing such behavior." *(Ibid., at p. 27)*

233.     Working Ideal found that the Human Resources Department and the National Vice President for Women and Fair Practices Department were "beholden to Cox" and did not investigate discrimination complaints filed against Cox. *(Ibid., at p. 24)*

234.     Working Ideal also found that "[m]ultiple witnesses raised concerns about bringing problems to HR and the General Counsel's Office, given that they were tasked with AFGE's legal defense, or were seen as beholden to Cox." *(Ibid., at p.25).*

235.     Since 2012, Defendant Borer and his legal staff have *defended* Cox against those who complained about Cox's sexual, racial discrimination and other misconduct.

236.     Defendant AFGE has paid, upon information and belief, well over $1 million to in-house counsel and outside law firms to defend Cox's misconduct.

237.     Additionally, over the years, AFGE has paid undisclosed amounts of money to silence victims of Cox's sexual abuse through the use of confidential nondisclosure agreements.

**All Defendants Received Mandatory EEOC Anti-Discrimination Training In 2015, Yet, They Still Permitted Cox To Discriminate Against Plaintiffs With Impunity**

238.     In May 2015, AFGE revised its EEO Policy which prohibits racial, sexual and other discriminatory misconduct and requires AFGE to hire an outside, neutral firm to investigate discrimination complaints filed against an elected officer. *(Exh.11: AFGE Equal Employment Opportunity Statement for Employees and Applicants, dated May 2015)*

239.     In June 2015, Plaintiff Jocelynn Johnson, who is African American, filed a complaint with the EEOC alleging that Defendant AFGE engaged in racial, sex, religious and age discrimination. *(Exh. 12: Jocelynn Johnson EEOC Discrimination Complaint, dated June 19, 2015).*

240.     The EEOC investigated and found probable cause for Plaintiff Johnson's complaint.  In exchange for Plaintiff Johnson's agreement not to sue AFGE, Cox and Plaintiff Johnson signed an EEOC-approved Mediation Settlement Agreement requiring anti-discrimination training for AFGE managers.  *(Exh. 13: EEOC Mediation Settlement Agreement entered into with AFGE President J. David Cox and Jocelynn Johnson, dated August 27, 2015).*

241.     Cox ordered all Defendant AFGE National Executive Council members (including himself) and all AFGE General Counsel and Executive staff to take the EEOC anti-discrimination training.  *(Exh. 4:  Working Ideal Report, dated March 16. 2020, at p. 23)*

242.     Between August 27 and December 31, 2015, all Defendants and AFGE executive staff received mandatory EEOC anti-discrimination training.

243.     Between August 27 and December 31, 2015, Defendant Borer, Deputy General Counsel Gony Goldberg and all AFGE attorneys received the mandatory EEOC anti-discrimination training.

244.     Between August 27 and December 31, 2015, Defendant DeWyngaert and his staff, including Human Resources Manager Keith Wright, received the mandatory EEOC anti-discrimination training.

245.     Defendants were aware that they were required to retain a neutral investigator to investigate all discrimination complaints filed against an elected officer.

246.     After taking the mandatory EEOC training, Cox sexually harassed Rocky Kabir, Brett Copeland, Plaintiff John Doe # 1, Plaintiff John Doe #2, Plaintiff Waqas Kalyar, Plaintiff Fahim Javed and racially discriminated against Hudson, Plaintiff Johnson and others.

247.

248.     After receiving the 2015 anti-discrimination training, Cox,  Defendant Borer and Defendant DeWyngaert refused to hire a neutral investigator to conduct an independent investigation of every discrimination complaint filed with them against Cox as required by the EEO policy.

249.      Instead, Cox and Defendant Borer quietly negotiated confidential nondisclosure agreements to ensure complaining witnesses' silence, including, among others, Larry Burnett.

250.      National Vice President Dorothy James testified that Cox and Defendant Borer did **not** notify the NEC or obtain NEC approval before entering into the confidential nondisclosure agreement with Mr. Burnett and that she was unaware of its terms.

251.     In March 2020, Working Ideal attorneys released the first of a two-part report that reached the following conclusions:

1)   Brett Copeland's allegations of sexual harassment and racial discrimination by Cox against himself and Rocky Kabir are credible and consistent with other witness statements and documents;

2)  Rocky Kabir's allegations are credible and supported by substantial evidence;

3)  There is substantial evidence that Cox subjected additional Defendant AFGE employees to conduct of a sexual nature and other misconduct, including racial and religious discrimination, verbal abuse, bullying and belligerent behavior;

4)  While Defendant AFGE took some steps to prevent and address harassment and misconduct, its written policies and constitutional procedures – and their implementation – left few checks on the power of the President.  These organizational shortcomings hindered Defendant AFGE's ability to learn the full picture of Cox's misconduct and to hold him accountable;

5)  Current and former employees were reluctant to raise concerns about Cox's misconduct due to fears of retaliation and a lack of organizational response when concerns were raised, creating an environment that chilled reporting and made it harder for Defendant AFGE to learn about and respond appropriately to allegations of harassment by Cox." *(Exhibit 4: Working Ideal Report, dated March 16, 2020, pp. 4).*

**Plaintiff John Doe #1**

252.    From in or about 2009 to July 2019, Cox sexually abused, assaulted and harassed Plaintiff John Doe #1.

253.    CCS Limo, a private company owned by Plaintiff Kalyar, provided transportation services, contracting primarily with international unions, including Defendant AFGE, from approximately in or about 1998 to in or about February 2018.

254.    Plaintiff John Doe #1 has been employed as a professional driver for CCS Limo (and its new owner Limo Network) for 12 years, from 2008 to the present.

255.    Beginning in approximately 2009, Cox demanded that Plaintiff Kalyar assign Plaintiff John Doe #1 as Cox's primary driver.

256.    Cox always sat in the back seat of the limo and insisted that Plaintiff John Doe #1 exit the vehicle and come around and open the rear door for him.

257.    Cox initially made small talk with Plaintiff John Doe #1, but he soon began to ask inappropriate and offensive questions about Plaintiff John Doe #1's personal life.

258.     Cox asked Plaintiff John Doe #1 whether he had ever had sex with a man. Plaintiff responded that he had not and that he was a husband and father of six (6) children and that he was not homosexual or bisexual.

259.     Cox regularly boasted to Plaintiff John Doe #1 that he knew Speaker of the House Nancy Pelosi, Senator Chuck Schumer, AFL-CIO President Richard Trumka and other international union leaders.

260.     Cox regularly bragged to Plaintiff John Doe #1: "I have more money than God."

261.     On one occasion, in or about 2010, Plaintiff John Doe #1 picked Cox up from the airport in Washington, D.C., and instead of sitting in the back seat of the limo, Cox sat in the front seat.

262.     While Plaintiff John Doe #1 was driving, Cox reached over and rubbed Plaintiff John Doe #1's groin and crotch area, causing Plaintiff John Doe #1 such alarm that he nearly ran off the road.  Plaintiff John Doe #1 gained control of the limo and angrily rebuffed Cox.

263.     Cox warned Plaintiff John Doe #1 not to tell anyone what Defendant had done to him.

264.     Cox threatened to file a complaint against Plaintiff John Doe #1 with his employer and with other international union presidents and told him that he would cut off all of his company's union contracts if Plaintiff told anyone what he had done.

265.     Plaintiff John Doe #1 did not own a vehicle and relied on his company car that CCS Limo allowed him to take home and use for personal purposes as his only source of transportation.

266.     Plaintiff John Doe #1 was in his 30's and needed his job to support his family. Plaintiff John Doe #1 could not afford to lose his job.  Plaintiff John Doe #1 did not report Cox's unwanted touching.

267.     Cox began to demand that Plaintiff John Doe #1 drive Cox to bars and strip clubs in the CCS vehicles paid for by Defendant AFGE and go inside the bars and strip clubs with him.

268.     Plaintiff John Doe #1 drove Cox to strip clubs and bars but told Cox that Plaintiff John Doe #1 preferred to wait for Cox outside of these places in the car.

269.     Cox insisted that Plaintiff John Doe #1 join Cox inside the strip clubs and bars. Fearful of Cox's threats, Plaintiff John Doe #1 reluctantly agreed.

270.     Once inside the strip clubs and bars, Cox demanded that Plaintiff John Doe #1, a professional driver, drink alcohol with him.  Plaintiff John Doe #1 always refused to drink alcohol with Cox.

271.      Plaintiff John Doe #1 often complained to his employer, Plaintiff Kalyar, that he did not want to drive Cox in the evenings or when Cox was alone in the vehicle and had been drinking alcohol.

272.     Cox continued to insist that CCS Limo assign Plaintiff John Doe #1 as his primary driver, and Plaintiff Kalyar acquiesced.

273.     On one occasion, Cox insisted that Plaintiff John Doe #1 and Plaintiff Kalyar accompany him to Archibald's strip club on K Street, N. W. in Washington, D. C.

274.     On that occasion, Cox got drunk and as he was leaving Archibald's shouted in a loud voice, "Can anybody get me a straight Black cock?" humiliating Plaintiff John Doe #1.

275.    On another occasion, Cox demanded Plaintiff John Doe #1 drive him and his wife, Lynn Cox, to dinner.  When they arrived, Cox invited Plaintiff John Doe #1 to join Cox and his wife for dinner at the Washington Court Hotel.  Plaintiff John Doe #1 said he preferred to wait in the car, but Cox insisted. Plaintiff John Doe #1 reluctantly agreed.

276.    Plaintiff John Doe #1 excused himself to go to the restroom, and Cox followed him into the men's room, rushed up to him and kissed him on the mouth.

277.    Plaintiff John Doe #1 pushed Cox away and immediately left the restaurant shocked and appalled.

278.    Cox regularly began to sit in the front seat of the limo instead of in the back seat of the limo, and Cox demanded that Plaintiff John Doe #1 allow Cox to perform oral sex on Plaintiff John Doe #1 in the limo.  Plaintiff John Doe #1 acquiesced and allowed Cox to perform oral sex on Plaintiff John Doe # 1 in the limo on numerous occasions.

279.    Cox repeatedly threatened Plaintiff John Doe #1.  Cox told  Plaintiff John Doe #1 that if Plaintiff John Doe #1 did not allow Cox to perform fellatio on Plaintiff John Doe #1 in the limo, then Cox would cancel Defendant AFGE's contract with CCS Limo and tell all his union leader friends to do the same.  In that way, Cox threatened Plaintiff John Doe #1's livelihood, forcing Plaintiff John Doe #1 to allow Cox to perform fellatio on Plaintiff John Doe #1.  So, Plaintiff John Doe #1 acquiesced to Cox's demands.

280.    Cox thereby repeatedly sexually assaulted Plaintiff John Doe #1 by forcing him, under threat of losing his job, to allow Cox to perform oral sex on Plaintiff John Doe #1 against his will and without his consent.

281.    On another occasion, Cox booked a CCS vehicle to pick him up from his residence and take him to the airport. Cox specifically asked CCS Limo to send Plaintiff John Doe #1.

282.     Upon arriving at Cox's residence, Cox called and asked Plaintiff John Doe #1 to come upstairs to his apartment and help him bring his luggage down to the limo.

283.     When Plaintiff John Doe #1 entered Cox's apartment, Cox demanded Plaintiff John Doe #1 allow Cox to perform fellatio on Plaintiff John Doe #1.

284.     Cox again threatened Plaintiff John Doe #1 that if he did not allow Defendant to perform oral sex on Plaintiff, Cox would file a complaint with Plaintiff's employer against him and demand that he be terminated.   Plaintiff John Doe #1 acquiesced.

285.     On another occasion, Cox offered Plaintiff John Doe #1 $2,000 if he would agree to have sex with a woman in front of Cox while he masturbated and watched. Plaintiff John Doe refused.

286.     Plaintiff John Doe #1 asked his supervisor not to assign him to Cox, but he did not report Cox's sexual assaults and sexual harassment because of his ongoing fear of Cox's threats.

287.     During Plaintiff John Doe #1's employment, other CCS Limo drivers were aware of Cox's sexually predatory propensities.

288.     It became a joke among the CCS Limo drivers who would often say – "Hey, [ John Doe #1] Cox just called for a driver, you want to pick him up?" and they all would laugh and mock Plaintiff.

289.     Working Ideal attorneys reported that Cox used racial and religious slurs. *(Exh. 4: at p. 16).*

290.     Cox regularly addressed National Secretary Treasurer Eugene Hudson, who is African American and the union's second highest-ranking officer at the time, using the racial slurs "boy" and "son" over Mr. Hudson's strong objections**.**

291.     Cox referred to Mr. Hudson's staff assistant, Willie Hope, who is African American, and President Obama, using the racial slur "boy."

292.     Cox often referred to his Confidential Secretary Mr. Kabir, a person of color, using the racially pejorative terms "boy" and "son" over Mr. Kabir's objections.

293.     Cox often called Plaintiff John Doe #1, who is African American, the racial slur "boy" by saying, "Isn't that right, boy?" or when he got out of the car, Cox would say "Thank you, boy" and then laugh.

294.     CCS Limo employed several Pakistani drivers, and Plaintiff John Doe #1 heard Cox refer to the Pakistani drivers as "sand niggers," remarking that he did not want those "sand niggers" driving him around.

295.     On another occasion, Cox took Plaintiff John Doe #1 to a restaurant, drank alcohol and said loudly: "You know we white folks are going to hang you black people."

296.     Combined with his constant sexual harassment and sexual assaults, Cox's racist remarks created a hostile, shocking and humiliating work environment for Plaintiff John Doe #1.

297.     Cox's misconduct caused Plaintiff John Doe #1 tremendous physical distress leading to stroke-level high blood pressure and other life-threatening illnesses and emotional distress.

298.     Around this time, due to the physical and emotional stress of Cox's sexual and racial abuse and harassment, Plaintiff John Doe #1's marriage fell apart resulting in divorce.

299.     On or about July 28, 2010, at 2:00 a.m., Plaintiff John Doe #1 was rushed to the Emergency Room at the Holy Cross Hospital located in Silver Spring, MD because of shortness of breath. X-rays showed his lungs were filled with fluid.

300.     Because of his physical symptoms, including the fact that his blood pressure was dangerously high - 230/140, (stroke level) — Plaintiff John Doe #1 was admitted to the hospital.

301.     The next day, Plaintiff John Doe #1 had to undergo dialysis treatment. He was ultimately discharged from Holy Cross Hospital on or about July 31, 2010.

302.     In or about August 2010, Plaintiff John Doe #1 suffered total kidney failure and was on dialysis for about eight (8) months and his condition improved.

303.     Before driving for Cox, Plaintiff John Doe #1 had no prior kidney problems or family history of kidney problems.

304.     In or about January 2016, Plaintiff John Doe #1's kidneys failed again, and he was put back on dialysis, however, this time he remained on dialysis for 1½ years.

305.     Plaintiff John Doe #1 received dialysis for his failing kidneys while he continued driving the limo for Cox who continued to demand him as his driver.

306.     Cox became aware that Plaintiff John Doe #1 had gotten sick again and told Plaintiff that he was once a nurse so he understood his medical ailments, leading Plaintiff John Doe #1 to believe that Cox would stop sexually harassing him.

307.     Cox stopped demanding that Plaintiff John Doe #1 allow him to perform oral sex on Plaintiff John Doe #1 for about two (2) months and waited for him to get better.

308.     In or about March 2016, Cox resumed his threats and resumed his demands to perform oral sex on Plaintiff John Doe #1.

309.     In or about June 2017, both of Plaintiff John Doe #1's kidneys failed and were removed.   Plaintiff John Doe #1 was placed back on dialysis treatment.

310.     CCS Limo took their company car back from Plaintiff John Doe #1, and he was left with no vehicle to go to dialysis, rehabilitation, and other medical appointments.

311.     Around this time, with help from his mother, Plaintiff Annette Wells, Plaintiff John Doe #1 purchased his own personal vehicle in or about July 2017.

312.     On or about September 20, 2017, Plaintiff John Doe underwent a kidney transplant from a cadaver at Georgetown Hospital.

313.     During the diagnosis, kidney transplant and his rehabilitation, Plaintiff John Doe #1 was unable to work for 30 days and was forced to move in with his parents, Plaintiffs Wells and Vaughan, who took care of Plaintiff John Doe #1 and assisted him financially with his living and medical expenses.

314.     After his recovery, Plaintiff John Doe #1 returned to work at CCS Limo in or around October 2017 and remained there until February 2018.

315.     In or about February 2018, Plaintiff John Doe #1 left CCS Limo and went to work for another limousine company, Reston Limousine.

316.     In February 2019, Plaintiff John Doe #1 returned to work for CCS Limo, which was now owned by new owner, Plaintiff Javed, and was operating under the new name Limo Network Nationwide.  Limo Network Nationwide had all of CCS Limo's union clients, including Defendant AFGE.

317.     Limo Network Nationwide asked Plaintiff John Doe #1 to pick up Cox.

318.     Plaintiff John Doe # 1 refused, telling his new employer that he would not drive for Cox under any circumstances because Plaintiff John Doe #1 had an issue with Cox when he was driving for him with CCS Limo.

319.     After hearing Plaintiff John Doe #1's refusal to drive for Cox, Limo Network Nationwide did not assign Plaintiff John Doe #1 to pick up Cox.

320.     For months after Limo Network Nationwide stopped assigning Plaintiff John Doe #1 to pick him up, Cox called Plaintiff John Doe #1 on his personal cell phone, harassing him

and demanding that he drive for him "off the books," meaning he would pay Plaintiff directly without his supervisors' knowledge.

321.     Plaintiff John Doe #1 told Cox he would not drive for him "off the books" because that would be stealing from his employer, and Plaintiff John Doe #1 wasn't going to do that.

322.     Plaintiff John Doe #1's kidney transplant recently failed, and he currently awaits a second kidney transplant.

323.     At all times relevant, Plaintiff John Doe # 1 was neither contributorily negligent nor did he assume the risk of his injuries or consent to the inappropriate physical contact, sexual assault and sexual harassment by Cox.

324.     By reason of these acts, Plaintiff John Doe #1 has been seriously damaged.

### Plaintiffs Annette Wells and Paul Vaughan

325.     Plaintiff Wells is Plaintiff John Doe #1's mother and a longstanding AFGE member in good standing. Plaintiff Vaughan is Plaintiff John Doe #1's stepfather.

326.     During the time Cox sexually abused and mentally tortured Plaintiff John Doe #1, Plaintiff Wells noticed her son had become withdrawn and seemed depressed.

327.     During his diagnosis, medical treatment and rehabilitation, Plaintiff John Doe #1 was unable to work and began residing with his parents, Plaintiffs Wells and Vaughan, who took care of him and assisted him financially with his living and medical expenses.

328.     Plaintiff Wells did not learn until early 2020 that the president of her union had been sexually abusing and sexually harassing her son for nearly a decade.

329.      Plaintiff Wells immediately exercised her right as an AFGE member and filed internal disciplinary charges against Cox on February 13, 2020, two weeks before Cox left.

330.    To date, AFGE has not investigated Plaintiff Wells' charges against Cox causing Plaintiff Wells emotional distress and providing further evidence that the toxic environment that existed under Cox continues unabated after his departure and under Defendants' leadership.

**Plaintiff Waqas "Vic" Kalyar**

331.    Plaintiff Kalyar owned CCS Limo, a company that provided transportation services to international unions, including Defendant AFGE, all over the world. Plaintiff Kalyar's primary AFGE client was Cox, and Plaintiff Kalyar drove Cox from 1998 until approximately 2019.

332.    Plaintiff Kalyar became a close confidante of Cox and often drove Cox after other drivers refused to drive the union president.

333.    Cox often bragged to Plaintiff Kalyar that he was personal friends with Nancy Pelosi and Chuck Schumer.

334.    Cox regularly told Plaintiff Kalyar: "I have more money than God."

335.    On numerous occasions, Cox demanded that Plaintiff Kalyar take Cox to strip clubs, bars and help him procure male prostitutes.

336.    On one occasion, Cox ordered Plaintiff Kalyar to drive Cox, Cox's pastor, Reverend Joey, and Reverend Joey's partner (who is male) from a holiday party at Charlie Palmers' restaurant in Washington, D.C.to Archibald's strip club also in D.C..

337.    Plaintiff Kalyar waited in the car and observed Reverend Joey and his partner come over to the car and explain that they were uncomfortable in the strip club and were leaving.

338.    A bouncer came outside later and told Plaintiff Kalyar that he needed to take Cox out of the strip club or the bouncer would throw Cox out because Cox was intoxicated and obnoxious. Plaintiff Kalyar went inside and convinced Cox to leave.

339.    Once outside, Plaintiff Kalyar went to get the limo, pulled it to the front of the strip club, walked around and opened the rear limo car door for Cox, as he usually demanded.

340.    Instead of getting in the limo, Defendant Cox went to the same big, bouncer who was now standing outside, handed him a $20 bill and shouted in a loud voice for everyone passing by to hear, "I want a straight Black guy so I can suck his cock."

341.    Plaintiff Kalyar then observed Cox begin handing out $20 bills to random people passing on the street shouting, "Can anybody find me a straight Black dick I can suck?"

342.    Plaintiff Kalyar observed Cox hand out approximately $300 worth of $20 bills to random people while repeatedly shouting, "Can anybody find me a straight Black dick that I can suck?"

343.    Plaintiff Kalyar was very embarrassed and humiliated. He kept asking Cox to stop shouting and get into the car, but Cox continued to yell and hand out money to strangers for about a half hour, making the same loud request.

344.    Cox was wearing a white dress shirt that had an AFGE insignia on it and an AFGE jacket, and Plaintiff Kalyar pointed this out to Cox and told him that "someone is going to capture you on video wearing the AFGE labels handing out bills and shouting like this, and you're going to get the union and yourself in trouble. You'd better get in the car now so we can go, or I'm leaving you here."

345.    Cox then got in the limo, and Plaintiff Kalyar took Cox to his Silver Spring apartment.

346.    Plaintiff Kalyar often observed Cox spend large sums of money on alcohol, strip clubs, bars and male prostitutes while using CCS Limo car transportation services in his official capacity as AFGE National President.

347.     Cox complained to Plaintiff Kalyar that AFGE National Secretary Treasurer Eugene Hudson had questioned him about his unusually large CCS Limo invoices and had asked Cox why he was using the CCS Limo services so late at night.

348.     Cox pressured Plaintiff Kalyar to split the billing amounts charged on CCS limo invoices by billing some of the hours on later CCS Limo invoices to conceal from National Secretary Treasurer Hudson the fact that Cox was running up unusually large personal CCS Limo bills.

349.     Cox also ordered his AFGE staff to charge some of his excessive CCS Limo bills to their AFGE-issued credit cards to conceal Cox's unusually large personal CCS Limo bills from AFGE National Secretary Treasurer Hudson.

350.     Because of the  extreme stress he experienced in dealing with Cox, Plaintiff Kalyar sold his CCS Limo business to Plaintiff Javed, owner of Limo Network Nationwide ("Limo Network") in or about February 2018.

351.     Plaintiff Javed assigned his younger brother, Plaintiff John Doe #2, as Cox's primary driver.

352.     On or about June 17, 2018, Cox called Plaintiff John Doe #2 and told him he was at the Suburban Hospital in Bethesda, Maryland.

353.     Cox told Plaintiff John Doe #2 that his Confidential Secretary Mr. Kabir was not answering his calls, and he wanted someone to be with him at the hospital.

354.     Cox instructed Plaintiff John Doe #2 to pick up Plaintiff Kalyar from his home in Maryland and bring Kalyar to the hospital to be with him.

355.     When Plaintiff Kalyar arrived at the hospital, Cox informed him that he had been drinking, had gone out on his knee scooter riding down the streets near his apartment and that he had fallen onto East West Highway in Silver Spring, MD.

356.     Cox told Plaintiff Kalyar that someone had called an ambulance which took him to Suburban Hospital, and that he wanted to leave the hospital and go home.

357.     When the nurse came to check on Cox, in Plaintiff Kalyar's presence, Cox demanded to be released from the hospital. The nurse told Cox he could not be released in his present condition.

358.     In Plaintiff Kalyar's presence, Cox cursed and screamed at the nurse until she was nearly in tears, and at that time, an Emergency Room doctor entered the room.

359.     In Plaintiff Kalyar's presence, Cox cursed and screamed at the ER doctor, informing the doctor that he knew Nancy Pelosi and Chuck Schumer and that unless the hospital released him, Cox was going to call his personal lawyer, Defendant AFGE General Counsel David Borer, who would make things bad for them.

360.     In Plaintiff Kalyar's presence, four (4) security guards were then called in to hold Cox down so he could be given an injection to make him pass out.

361.     After Cox passed out, Plaintiff John Doe #2 took Plaintiff Kalyar back to his home.

362.     When he came to, Cox called Plaintiff John Doe #2 and ordered him to pick him up at Suburban Hospital at 5:30 a.m. to take him to his apartment, wait for him and at 9:30 a.m. then take him to the rest of his day's scheduled meetings.

363.     When Cox received the CCS invoice that included the  trip to Suburban Hospital, he was infuriated.   Cox called Plaintiff Kalyar demanding that he delete this billing from the invoice showing Cox's pickup from the Suburban Hospital.

364.     Plaintiff Kalyar told Cox he could not change Limo Network's bill because it was no longer his company.

365.     Cox then told Plaintiff Kalyar to change the invoice to read "as-directed" and instead of showing the pick-up point as Suburban Hospital in Bethesda, MD and to combine that billing entry on the invoice with the rest of Cox's modified AFGE itinerary.  Plaintiff Kalyar again refused.

366.     Cox insisted that Plaintiff Kalyar instruct the new owners to change the billing details to delete the Suburban Hospital run. Plaintiff Kalyar agreed but did not do so.

367.     Plaintiff Kalyar's out of town drivers also often refused to pick up Cox because of his sexual misconduct, threats, cursing and bullying.

368.     On one occasion, a contract driver who was Muslim picked Cox up in New York, and Cox ordered the driver to take him to a strip club and insisted that he go inside with him.

369.     The driver drove to the strip club as ordered and informed Plaintiff Kalyar that he was quitting the company the following day.

370.     In Las Vegas, Cox invited a CCS Limo subcontract driver to come up to his hotel room. The driver refused, and Cox cursed and verbally abused the driver.

371.     The next day, the Las Vegas driver informed Plaintiff Kalyar that he was quitting the company.

372.     Plaintiff Kalyar observed Cox's repeated sexual harassment, verbal abuse and regular use of religious slurs toward Mr. Rocky Kabir.

373.     Plaintiff Kalyar often heard Cox call him and Mr. Kabir a "Goddamned Muslim" or a "Fucking Muslim."

374.     Cox told Plaintiff Kalyar: "I'm surrounded by these Goddamned Jews and these Goddamned Muslims."

375.       Cox also demanded that Plaintiff Kalyar perform personal duties for him, including helping him procure male prostitutes and working on Defendant's Cox's 2018 re-election campaign.

376.       Cox repeatedly threatened Plaintiff Kalyar that if he did not do what Cox "needed," Cox would terminate his contract with AFGE and use his contacts to have all of CCS Limo's other international union contracts severed.

**Plaintiff Fahim Javed**

377.       In or about February 2018, Plaintiff Javed acquired CCS Limo from Plaintiff Kalyar, assumed all of its clients, including AFGE, and started serving them under his business, Limo Network.

378.       CCS Limo's clients were international unions, including the Machinists, AFL-CIO, Postal Workers, LIUNA, among others, and their presidents and top officials.

379.       Plaintiff Kalyar worked with Plaintiff Javed to transition the billing, bookings, hiring subcontractor drivers and driving for Limo Network.

380.       Plaintiff Javed met Cox for the first time in mid-2018 and drove Cox about 10 times over the period February 2018 through October 2019.

381.       After one (1) or two (2) trips, Cox asked Plaintiff Javed "what kind of sex" he liked and other sexually inappropriate questions.

382.       On one occasion, Plaintiff Javed picked Cox up from Reagan Airport, and Defendant started talking about sex, asking him how many times a week he "fucked" and what type of girls he liked to "fuck," how big was his "dick" and how long he lasted when he "fucked."

383.     Cox stated to Plaintiff Javed, "I heard you Middle Eastern guys have big dicks," and "You fucking Muslims are lucky, you can have and fuck four wives." as well as many other racist and offensive comments.

384.     Plaintiff Javed found Cox's comments about sex and his faith very offensive and perceived Cox as sexually depraved, bullying, mean-spirited, foul-mouthed and extremely disrespectful.

385.     Most of Cox's bookings with Limo Network were from or to airports in Washington, D. C. and to and from other airports in various cities.

386.     Cox often cursed at Plaintiff Javed's drivers, belittling them with abusive and foul language.

387.     Cox would then call Plaintiff Javed and, as usual, threaten to cancel his company's contract, telling Plaintiff that he knew all the other international union leaders and that he would tell them to take away their business from him. Cox made these threats while cursing and shouting at Plaintiff.

388.     Although he found Cox's behavior deplorable, Plaintiff Javed tried to ignore Cox's abuse because he feared losing the business. He and his family had invested substantially to obtain CCS Limo's clients, especially union clients, and he could not afford to lose them.

389.     In or about June 2018, Cox telephoned Plaintiff Javed several times demanding his Limo services on a date that AFGE had not booked.

390.     Cox informed Plaintiff Javed that he was hungry and asked him to bring him a chicken Caesar salad. Plaintiff responded that his company only provided transportation services – not food delivery.   Plaintiff Javed suggested that Cox call a food delivery service.

391.     Cox telephoned Plaintiff Javed back several times demanding that Plaintiff bring him a chicken Caesar salad, complaining that Plaintiff was not "helping" him and that if he didn't bring him the food he wanted, he would take all union business away from Plaintiff's company.

392.     Plaintiff Javed called Shannon Harvey, Cox's Executive Assistant, and told her that Cox was demanding that he bring him food.

393.     Ms. Harvey told Plaintiff Javed that she would call Cox. Ms. Harvey telephoned back and told Plaintiff Javed that she had offered to order the food for Cox and have it delivered to his apartment, but Cox refused and informed her he did not need food.

394.     Cox telephoned Plaintiff Javed repeatedly and instructed Plaintiff Javed. that he didn't ask Ms. Harvey for food and that he wanted Plaintiff Javed to bring food to him.

395.     Plaintiff Javed telephoned Ms. Harvey again, and she informed him that she was calling the police.  Ms. Harvey told Plaintiff Javed: "He sounds violent, so don't go there because he might hurt you."

396.     Three months later, in or about September 2018, Plaintiff Javed picked Defendant Cox up at Reagan Airport. As soon as he got in the SUV, Cox told Plaintiff Javed, "I remember you. You did not come to my house when I needed you a few months ago."  Plaintiff Javed again explained that it was against company policy to deliver food.

397.     Inebriated, Cox got in the back seat of the car and swung his fist to punch Plaintiff Javed in the face. Plaintiff dodged the blow, but Cox struck Plaintiff Javed's shoulder instead.

398.     Plaintiff Javed saw a police officer and flagged him down for assistance with Cox, who was shouting and cursing at him. The officer asked Cox to calm down, and he agreed. As Plaintiff Javed was driving on the Memorial Bridge, Cox, while continuing to shout and curse at him for not coming to his place when he "needed" him, Cox suddenly began to open the

car door while he was driving in traffic. Plaintiff had to slam on the brakes, barely avoiding an accident.

399.     In or about February 2019, Cox requested a "personal pickup" from his Silver Spring, Maryland apartment to take him to the airport.

400.     This personal Limo pickup had not been booked by Defendant AFGE, but directly by Cox himself.

401.     Upon Plaintiff Javed's arrival, Cox was with a person that he described as his "roommate." In front of the roommate, Cox started speaking about sex. Defendant stated to Plaintiff that his roommate "had a big cock."

402.     Plaintiff Javed found Cox's remarks highly offensive but did not verbally object for fear of antagonizing Cox.

403.     This was the first time that Cox had made lewd, sexual comments to Plaintiff Javed in front of another person.

404.     A few weeks later, on or about April 14, 2019, Plaintiff Javed picked Cox up from the Reagan Airport, and Cox told him that he and his same roommate/friend "fuck girls together."

405.     Cox stated to Plaintiff Javed that he enjoyed watching his roommate/friend "fuck girls," and that Defendant thought Plaintiff would also love seeing his roommate/friend "fucking girls with his big cock."

406.     While Plaintiff Javed was driving Cox, Defendant touched his shoulder while talking about sex, asked Plaintiff how many times he "fucked," and stated that he gets "horny every night" and likes to "fuck." Defendant asked Plaintiff if he planned to "fuck" tonight.

407.     Plaintiff Javed's younger brother, Plaintiff John Doe #2, recently told Plaintiff Javed about the sexual harassment and sexual abuse that Plaintiff John Doe # 2 endured for almost two (2) years while driving Cox.

408.     Plaintiff John Doe #2 told Plaintiff Javed that he did not tell him about Cox's abuse earlier because Plaintiff John Doe #2 was too traumatized, fearful and embarrassed to share the details with him.

**Plaintiff John Doe #2**

409.     From in or about February 2018 to October19, 2019, Cox sexually abused and harassed Plaintiff John Doe #2.

410.     After Plaintiff Javed purchased CCS Limo from Plaintiff Kalyar, he assigned his younger brother, Plaintiff John Doe #2, as Cox's primary driver.

411.     Plaintiff John Doe #2 was in his mid-20's when he started driving Defendant Cox in or about February 2018.

412.     As soon as he began driving for Cox, Cox began talking about sex with  Plaintiff John Doe #2, such as "I am sure you have a big cock," "Did you fuck someone last night?" "How long did you last," or "You are young, you must fuck good."

413.     Plaintiff John Doe #2 tried to ignore Cox's sexual harassment and inappropriate sexual comments.  Plaintiff John Doe #2 did not tell anyone at that time about the sexual harassment he was experiencing at the hands of Cox because he was too embarrassed and found it difficult to discuss.

414.     In or about mid-2018, Cox started insisting that Plaintiff John Doe #2 go to restaurants and bars with him during the trips.

415.     Plaintiff John Doe #2 informed Cox that he is a Muslim and does not drink alcohol.

416.     Nevertheless, Cox often pressured Plaintiff John Doe #2 to go bars and restaurants, keep him company and always insisted that Plaintiff John Doe #2, a professional driver, drink alcohol with him.

417.     Plaintiff John Doe #2 went inside the bars and restaurants with Cox about five (5) or six (6) times, at Cox's insistence, but Plaintiff always refused to drink alcohol.

418.     On or about June 17, 2018, Plaintiff John Doe #2 was booked to pick up Cox and his Confidential Secretary Mr. Kabir from the airport around 12 p.m. and take them to Defendant's Silver Spring, MD apartment.

419.     After Plaintiff John Doe #2 picked up Cox and Mr. Kabir, Cox told Plaintiff John Doe #2 that Cox wanted to keep the reserved SUV and Plaintiff John Doe #2 as his driver for the whole day.  Cox then ordered Plaintiff John Doe #2 to also pick up a friend of  Cox in Washington, D. C. and take them all to a restaurant in Silver Spring, Maryland.

420.     Cox asked Plaintiff John Doe #2 to join them inside the restaurant. Plaintiff John Doe #2 said he preferred to wait in the car.  Cox insisted, so Plaintiff John Doe #2 went inside the restaurant.

421.     Inside the restaurant, Cox again began to talk loudly about sex, and Plaintiff John Doe #2 informed him that he was going outside. Defendant insisted that Plaintiff John Doe #2 stay inside the restaurant because Cox had booked the SUV for the whole day and had left his luggage in the SUV.

422.     After leaving the restaurant, Cox directed Plaintiff John Doe #2 to take the group to a barbershop and insisted that the driver come inside. When inside the barber shop, Cox told Plaintiff John Doe #2 that Cox needed Plaintiff John Doe #2 to assist Cox as Cox used the restroom because Cox had a knee problem.

423.     Plaintiff John Doe #2 refused, and Cox asked his friend to take him to the restroom instead.

424.     Cox then asked Plaintiff John Doe #2 to get Plaintiff John Doe #2's haircut and his beard trimmed. Plaintiff John Doe #2 refused, but Cox ordered his barber to cut Plaintiff John Doe #2's hair.

425.     After the haircut, Cox leaned in close to Plaintiff John Doe #2 and stated: "You look cute and sexy." Plaintiff was offended and embarrassed.

426.     When they left the barbershop, Cox directed Plaintiff John Doe #2 to drive to a bar where Cox ordered alcohol and began speaking to his friend in front of Plaintiff John Doe #2 about having sex with men and how Cox liked to have sex with men and the size of male genitalia. This went on until they left the bar, and Cox ordered Plaintiff John Doe #2 to drop the group at Cox's Silver Spring, Maryland apartment.

427.     When they arrived, Cox told Plaintiff John Doe #2 to park the car and come upstairs. Plaintiff John Doe #2 responded, "No. I am going home."

428.     Cox then hugged Plaintiff John Doe #2 and stated, "I like you," and Cox kissed Plaintiff John Doe #2 on his cheek.

429.     Plaintiff John Doe #2 was shocked, humiliated and angered by Cox's unwanted touching of him.

430.     Cox then instructed Plaintiff John Doe #2 to wait and to take his friend home when he was ready to go. While waiting, Plaintiff John Doe #2 told Mr. Kabir that he was very upset and offended by the day's events, but Plaintiff John Doe #2 did not mention that Cox had kissed him. Plaintiff John Doe #2 dropped off Cox's friend at his home at around 7 p.m.

431.     Later that evening, Cox called Plaintiff John Doe #2 on his personal cell phone multiple times. Cox told Plaintiff John Doe #2 that he was at the Suburban Hospital in Bethesda,

Maryland and that Cox's Confidential Secretary, Rocky Kabir, was not answering Cox's phone calls.

432.     Cox demanded that Plaintiff John Doe #2 pick up Plaintiff Kalyar from his home, bring Plaintiff Kalyar to the Suburban Hospital to be with Cox and wait for Plaintiff Kalyar and take him back home -- which Plaintiff John Doe #2 did.

433.     The next day, on or about June 18, 2018, Plaintiff John Doe #2 was scheduled to pick Cox up from his Silver Spring apartment. Defendant called Plaintiff John Doe #2 and told him he was still at Suburban Hospital and needed a Limo pickup from the Suburban Hospital.

434.     Plaintiff John Doe #2 picked Cox up from the hospital at around 5:30 a.m. When they arrived at his apartment building, Cox asked Plaintiff John Doe #2 to help him upstairs, and Plaintiff John Doe #2 helped Cox upstairs.  Cox's Confidential Secretary Mr. Kabir opened the door.

435.     Cox asked Plaintiff John Doe #2 to help him fix his shower chair, saying he could not do it himself because of a knee problem.

436.     Plaintiff John Doe #2 fixed the shower chair, and Cox came from his room naked and asked Plaintiff to put his shower chair inside the shower for him.

437.     Plaintiff John Doe #2 was shocked.  Plaintiff John Doe #2 quickly turned around, told Cox that he would wait for him outside, and Plaintiff John Doe #2 then left Cox's apartment.

438.     When Cox came downstairs, Plaintiff John Doe #2 took Cox to his scheduled meetings in D. C. During a separate incident, on or about December 1, 2018, Cox began calling Plaintiff John Doe #2 on his personal cell phone incessantly. Finally, after several calls, Plaintiff John Doe #2 answered. Cox asked Plaintiff John Doe #2 to come to Cox's home and get him.

439.     Plaintiff John Doe #2 advised him he could not do that because Cox did not have a booking scheduled and that if Cox wanted a ride; he should call the office and arrange a pickup. Cox responded loudly, "No, I want you to come."  Plaintiff John Doe #2 refused.

440.     Cox started calling Plaintiff John Doe #2's cell phone nonstop, until Plaintiff John Doe #2 answered. Cox told John Doe #2 that if he did not come, Cox would make sure that Plaintiff John Doe #2's company did not get any more business from Defendant AFGE or from any other unions.

441.     Plaintiff John Doe #2 hung up, and Cox kept calling him until around 4 a.m., requiring Plaintiff John Doe #2 to put his phone on "silent."

442.     Cox left a threatening voicemail message on Plaintiff John Doe #2's personal cellphone demanding that Plaintiff John Doe #2 come to get him and repeated that if Plaintiff John Doe #2  did not come as he ordered, Cox would take away all union business from Plaintiff John Doe #2's company.

443.     Cox left another voicemail saying "[John Doe #2], call me please, I am begging you from all my Goddamn heart."  Plaintiff John Doe #2 refused Cox's request.

444.     On or about April 27, 2019, Plaintiff John Doe #2 was assigned to pick up Cox at his home and drop him at the Hilton Hotel in Washington, D. C., wait for him and take him back to his home.  After Cox left the Hilton Hotel, he ordered Plaintiff John Doe #2 to take him to a bar in Silver Spring, MD, which Plaintiff John Doe #2 did.

445.     Cox ordered Plaintiff John Doe #2 to come into the bar with him, and as usual, Plaintiff John Doe #2 declined.  Cox insisted, and when they went into the bar, Cox began talking about sex in a loud voice and put his hand on Plaintiff John Doe #2's shoulder.

446.     Plaintiff John Doe #2 was horrified. Many people in the bar were looking at Cox talking loudly about sex to him.

447.     When they left the bar, Cox sat in the front seat with Plaintiff John Doe #2 and stated: "I'm horny."  Plaintiff John Doe #2 started driving, and Cox reached over and touched him on his shoulder. Plaintiff John Doe #2 instructed Cox to "please stop touching me and let me drive."

448.     On or about June 7, 2019, Plaintiff John Doe #2 picked Cox up from the airport to be dropped at his Silver Spring apartment. In the car, Cox called Charlie Palmer's Steakhouse in D.C., ordered a table by the window and ordered Plaintiff John Doe #2 to take him to the restaurant.

449.     Plaintiff John Doe #2 took Cox to Charlie Palmer's restaurant and, as usual, Cox ordered him to come in and join him. Plaintiff John Doe #2 told Cox that he was not hungry and would wait for Cox in the car. Cox went inside and started calling Plaintiff John Doe #2 on his personal cell phone demanding and pressing  him to come inside the restaurant. Plaintiff John Doe #2 refused, but Cox continued to insist.

450.     Plaintiff John Doe #2 told Cox there was no parking nearby, but Cox kept calling, requesting Plaintiff John Doe #2 to come inside the restaurant.  Cox told Plaintiff John Doe #2 that he did not want to eat alone. Cox reminded Plaintiff John Doe #2 that Cox had left his luggage in the car.  Plaintiff John Doe #2 knew he could not leave without Cox, so he went inside.

451.     Cox said to Plaintiff John Doe #2: "I am lonely. No one loves me. I need love.  I have a lot of money. I have more money than God.  I have a nice house, but I don't have no one to love me."

452.     Cox was speaking very loudly, and there were people dining at nearby tables who could hear him.  The other patrons were looking at them, and Plaintiff John Doe #2, embarrassed and uncomfortable, left to get the car.

453.     When they got back in the car, Cox continued to complain that he was very lonely, and that he needed love. Cox then brought up sex again and said to Plaintiff John Doe #2, "You must have a big cock."

454.     Cox kept telling Plaintiff John Doe #2 he hadn't had sex for a long time and that he was "horny."

455.     Cox asked Plaintiff John Doe #2, "When was the last time you had sex?" and "Are you going to go fuck someone tonight?" Defendant then started touching Plaintiff John Doe #2's shoulder, which made the driver feel very uncomfortable.  Plaintiff John Doe #2 told Cox, "Sir, please stop touching me and let me drive."

456.     On another occasion, Cox told Plaintiff John Doe #2 that if he wanted to "fuck someone," he could bring them to Cox's place and have sex with them there.

457.     Cox again asked Plaintiff how big his "cock" was.  Cox told Plaintiff John Doe #2 that he had a "small cock," was "fat" and that Cox "couldn't see his own cock" when he stood up.   Cox asked Plaintiff John Doe #2: "How can you handle Ramadan when you guys are not allowed to eat or drink and can't have sex? I can't even sleep without jerking off every night."

458.     Cox often referred to Plaintiff John Doe #2 as a "fucking Muslim."

459.     Cox continued to sexually harass Plaintiff John Doe #2 from approximately February 2019 until October 2019, when Cox took a leave of absence from AFGE after the Bloomberg article appeared.

460.     Cox's unwanted touching and sexual harassment of Plaintiff John Doe #2 caused Plaintiff John Doe #2 stress, embarrassment and severe discomfort.

**Plaintiff Jocelynn Johnson**

461.     Plaintiff Johnson is an African American woman who worked at Defendant AFGE for 13 years before she was fired for allegedly violating the Defendant AFGE "No

Politics Rule" which prohibits AFGE staff from contributing money or in-kind services to the campaigns of Defendant AFGE officers.

462.     On or about November 27, 2017, AFGE General Counsel attorney Rushab Sangvhi called to inform Plaintiff Johnson that while he was monitoring social media websites, Mr. Sangvhi saw Plaintiff Johnson's name alongside a $10 contribution to Eugene Hudson's campaign for AFGE President.

463.     Plaintiff Johnson denied making the contribution and told Sanghvi that her bank must have made an error or someone had hacked her account.

464.     On or about December 6, 2017, the bank confirmed that following an investigation, it concluded that Plaintiff Johnson's account had been erroneously charged for the $10 contribution and that the bank had credited the $10 back to her account.  On December 10, 2017, Plaintiff Johnson gave AFGE a copy of the bank's letter.

465.     On the afternoon of January 12, 2018, Cox terminated Plaintiff Johnson effective immediately for violating the "No Politics Rule."

466.     A few months later, Cox ordered his Confidential Secretary, Rocky Kabir, to violate the same "No Politics Rule" by uploading an endorsement letter signed by ten (10) National Vice Presidents:  Kelley, Bunn, Castellano, Glover, Doyle, Scott, Eliano, Swanke, McCubbin, and Flynn; and by providing other campaign services.

467.     Cox ordered his Confidential Secretary Rocky Kabir to provide these campaign services both during and after Mr. Kabir's official AFGE work hours.

468.     Mr. Kabir designed, uploaded and managed Cox's 2018 campaign website *jdavidcox.com*, and Mr. Kabir designed, uploaded and maintained Cox's 2018 election GoFundMe page among other services.

469.     Mr. Kabir estimates that the time he spent outside his official AFGE work hours providing these campaign services to Cox, had he been paid at his official AFGE pay rate, would have cost Cox approximately $20,000.  Of course, Cox ordered Mr. Kabir to provide these services to Cox's campaign without compensation.

470.     Cox's violation of Defendant AFGE's "No Politics Rule" was far more egregious than Plaintiff Johnson's alleged $10 donation to Cox's political opponent.

471.     In November 2019, four (4) AFGE Emeritus Officers filed charges against Cox for violating the "No Politics Rule" by ordering Mr. Kabir and AFGE Policy Director Jacqueline Simon to work on his 2018 re-election campaign. *(Exh. 14: Charges Filed by Four Emeritus Officers, dated November 15, 2019).*

472.     In November 2019, AFGE established a Committee, chaired by AFGE National Vice President David Mollett ("Mollett Committee")  to investigate the four (4) AFGE Emeritus Officers' charges that Cox violated the "No Politics Rule" by ordering Mr. Kabir and AFGE Policy Director Jacqueline Simon to secretly work on his 2018 re-election campaign. *(Exh. 15: Mollett Committee Report, dated February 13, 2020).*

473.     On or about January 23, 2020, the Mollett Committee interviewed Ms. Simon, who denied working on Cox's campaign. The Committee exonerated Ms. Simon of any wrongdoing based solely on her unsubstantiated denial. *(Ibid).*

474.     Plaintiff Johnson, who is African American, denied making the $10 contribution and produced a letter from her bank corroborating that she had not authorized the $10 campaign contribution that she gave to Defendant AFGE.

475.     Even though Plaintiff Johnson, who is African American, proved, through her bank's letter, that she had not authorized the $10 campaign contribution,  AFGE refused to

exonerate Plaintiff Johnson as justice demanded.  Instead, Cox terminated Plaintiff Johnson after her 13 years of service as a dedicated AFGE employee.

476.     On February 13, 2020, the Mollett Committee found probable cause that Cox ordered Mr. Kabir to upload the endorsement letter and do other work on his campaign in violation of the "No Politics Rule."

477.     The same date, February 13, 2020, as required by the AFGE National Constitution, the Mollett Committee forwarded its report for a vote by the National Executive Council, which included the following Defendants who signed the 2018 Cox endorsement letter: National Vice Presidents Kelley, Bunn, Castellano, Glover, Doyle, Scott, Eliano, Swanke, and McCubbin.

478.     On February 28, 2020, the National Executive Council (which includes the following Defendants who signed the 2018 Cox endorsement letter: National Vice Presidents Kelley, Bunn, Castellano, Glover, Doyle, Scott, Eliano, Swanke, and McCubbin) voted **not** to process the four Emeritus Officers' charges filed against Cox as recommended by the  February 13, 2020, Mollett Committee report.

479.     Instead, the National Executive Council (which includes the following Defendants who signed the 2018 Cox endorsement letter: National Vice Presidents Kelley, Bunn, Castellano, Glover, Doyle, Scott, Eliano, Swanke, and McCubbin) entered into a **secret** February 28, 2020 separation agreement permitting Cox to resign in lieu of being removed from office for misconduct.

480.     Defendants terminated Plaintiff Johnson, who is African American, but did not terminate or even discipline Cox and AFGE Policy Director Jacqueline Simon, both of whom are Caucasian, for violating the same "No Politics Rule."

481.     Cox's termination of Plaintiff Johnson was motivated by racial animus, violates

42 U.S.C. 1981 and the AFGE National Constitution and damaged Plaintiff Johnson.

## FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS
### Sexual Assault and Battery of Plaintiffs John Doe #1 and John Doe #2

482.     Plaintiffs reallege and incorporate by reference each allegation contained in the

foregoing paragraphs set forth herein.

483.     The sexual misconduct and actions of Cox, including the sexual assault and

battery and sexual harassment of Plaintiffs John Doe #1 and John Doe #2, constitute intentional

and offensive actions to which they did not consent.

484.     Defendants are responsible in their official and personal capacities for Cox's

sexual assault and battery of Plaintiffs John Doe #1 and John Doe #2.

485.     Defendants knew or should have known of Cox's misconduct.

486.     As a direct and proximate result of the intentional acts of Cox, Plaintiffs John Doe

#1 and John Doe #2 experienced pain, suffering, mental anguish and emotional distress.

487.     Wherefore, Plaintiffs John Doe #1 and John Doe #2 claim compensatory and

punitive monetary damages in excess of the jurisdiction of this Court ($75,000.00) against

Defendants in an amount to be determined at trial, plus costs and post judgment interest at the

legal rate of ten percent (10%) per annum from the date of judgment, and any further relief that

this Honorable Court deems necessary and appropriate.

## SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS
### For Intentional Infliction of Emotional Distress Upon
### Plaintiffs John Doe #1, John Doe #2, Kalyar, Javed and Johnson

488.     Plaintiffs reallege and incorporate by reference each allegation contained in the

foregoing paragraphs set forth herein.

489.     Cox's sexual assault on Plaintiffs John Doe #1 and John Doe #2 was intentional, extreme, outrageous and in deliberate disregard for the high degree of probability that Plaintiffs John Doe #1 and John Doe #2 would suffer emotional distress as a result.

490.     Cox's sexual harassment of Plaintiffs Kalyar and Javed was intentional, extreme and outrageous and in deliberate disregard for the high degree of probability that Plaintiffs Kalyar and Javed would suffer emotional distress as a result.

491.     Cox's conduct in wrongfully terminating Plaintiff Johnson, a 13-year AFGE employee, for allegedly donating $10 to a campaign, was intentional, extreme and outrageous and in deliberate disregard for the high degree of probability that Plaintiff Johnson  would suffer emotional distress as a result.

492.     Cox's actions were the direct and proximate cause of severe emotional distress to Plaintiffs John Doe #1, John Doe #2, Kalyar, Javed and Johnson.

493.     As a direct and proximate result of the intentional acts of Cox, Plaintiffs John Doe #1, John Doe #2, Kalyar, Javed and Johnson experienced pain and suffering, mental anguish, emotional distress and were otherwise injured and damaged.

494.     Defendants are responsible for Cox's actions that were the direct and proximate cause of Plaintiffs' severe emotional distress.

495.     Wherefore, Plaintiffs John Doe #1, John Doe #2, Kalyar, Javed and Johnson claim compensatory and punitive monetary damages in excess of the jurisdiction of this Court ($75,000.00) against Defendants, in an amount to be determined at trial, plus costs and post judgment interest at the legal rate of ten percent (10%) per annum from the date of judgment, and for any further relief that this Honorable Court deems necessary and appropriate.

### THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS
### For Intentional Infliction of Emotional Distress Upon
### Plaintiffs Annette Wells and Paul Vaughan

496.     Plaintiffs reallege and incorporate by reference each allegation contained in the foregoing paragraphs set forth herein.

497.     Cox's sexual assault and battery of Plaintiff John Doe #1, Plaintiff Wells' and Plaintiff Vaughan's son, was intentional, extreme, outrageous and in deliberate disregard for the high degree of probability that Plaintiffs Wells and Vaughan would suffer injury including emotional distress.

498.     As a direct and proximate result of the intentional acts of Cox, Plaintiffs Wells and Vaughan had to care for their son financially and medically.

499.     Plaintiff John Doe #1 underwent one kidney transplant surgery as a result of Cox's second misconduct, and he is scheduled to undergo a second kidney transplant surgery. Plaintiffs Annette Wells and Paul Vaughan will need to take care of their son again, because he will not be able work and care for himself.

500.     Defendants are responsible for Cox's actions that were the direct and proximate cause of severe emotional distress to Plaintiffs Wells and Vaughan.

501.     Wherefore, Plaintiffs Wells and Vaughan claim compensatory and punitive monetary damages in excess of the jurisdiction of this Court ($75,000.00) against Defendants, in an amount to be determined at trial, plus costs and post judgment interest at the legal rate of ten percent (10%) per annum from the date of judgment, and for any further relief that this Honorable Court deems necessary and appropriate.

### FOURTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### For Physical Injury Of Plaintiff John Doe #1

502.     Plaintiffs reallege and incorporate by reference each allegation contained in the foregoing paragraphs set forth herein.

503.     At all times relevant hereto, Cox was acting in the course and scope of his employment with and agency for Defendant AFGE when he sexually harassed, sexually assaulted and sexually battered Plaintiff John Doe #1.

504.     Cox regularly and wrongfully committed acts of sexual harassment, sexual assault and battery against Plaintiff John Doe #1 and other Plaintiffs from approximately 2009 through 2019, over a decade.

505.     The actions of Cox, including the assault and battery on Plaintiff John Doe #1, constitute intentional, forcible and offensive touching to which Plaintiff John Doe #1 did not consent.

506.     The actions of Cox, including the assault and battery on Plaintiff John Doe #1, were intentional and unlawful.

507.     Cox regularly and wrongfully committed these unlawful and egregious acts in the CCS Limo Services vehicles procured and paid for by Defendant AFGE under contract, including the CCS vehicles in which Plaintiff John Doe #1 was sexually assaulted and battered by Cox.

508.     From approximately 2012 through 2020, Defendants received reports that Cox sexually harassed and sexually assaulted AFGE employees, contractors and others.

509.     From approximately 2012 through 2020, Defendants did not report, investigate or discipline Cox after receiving complaints that Cox sexually harassed and sexually assaulted AFGE employees, contractors and others,

510.     Cox's repeated sexual abuse of Plaintiff John Doe #1 was a proximate cause of Plaintiff John Doe #1 suffering stroke level high blood pressure, life-threatening kidney failure and other medical injury.

511.     As a result of this stress, Plaintiff John Doe #1 lost both his kidneys, has undergone one (1) kidney transplant and is scheduled to undergo a second kidney transplant.

512.     As a result, Plaintiff John Doe #1 was required to undergo a kidney transplant and endured pain, suffering, physical injury, unnecessary and life-threatening medical care and expenses, mental anguish, emotional distress, lost wages, lost future wages, loss of future earning capacity and was otherwise injured and damaged.

513.     Plaintiff John Doe #1 is scheduled to undergo a second kidney transplant surgery, and Plaintiffs Annette Wells and Paul Vaughan will need to take care of him again, because he will not be able to work and care for himself.

514.     Defendant Cox is liable for his own actions and misconduct.

515.     As the employer of and principal for Cox, Defendant AFGE is liable for the actions of Cox within the course and scope of his employment and agency.

516.     As the employer and principal responsible for the actions of its employees and agents including, but not limited to Cox, Defendant AFGE caused Plaintiff John Doe #1 to experience stress that led to stroke level high blood pressure and subsequent life-threatening kidney failure, physical injury, pain and suffering, unnecessary and life-threatening medical care and expenses, mental anguish, emotional distress, lost wages, lost future wages, loss of future earning capacity and other injuries and damages.

517.     Defendant AFGE and the other Defendants AFGE officials are responsible for Cox's actions that were the direct and proximate cause of severe physical injury to Plaintiff John Doe #1.

518.     Wherefore, Plaintiff John Doe #1 claims compensatory and punitive monetary damages in excess of the jurisdiction of this Court ($75,000.00) against all Defendants in an amount to be determined at trial, plus costs and post judgment interest at the legal rate of ten

percent (10%) per annum from the date of judgment, and for any further relief that this

Honorable Court deems necessary and appropriate.

### FIFTH  CLAIM FOR RELIEF AGAINST DEFENDANTS
**For Racial And/or Religious Discrimination On Behalf Of Plaintiffs John Doe #1, John Doe #2, Jocelynn Johnson, Waqas Kalyar And Fahim Javed**

519.     Plaintiffs reallege and incorporate by reference each allegation contained in the

foregoing paragraphs set forth herein.

520.     Cox discriminated against Plaintiffs John Doe #1and John Doe #2, Johnson,

Kalyar and Javed on the basis of their race in violation of 42 U.S.C. 1981, which was the direct

and proximate cause of the racial discrimination, pain and suffering and damages suffered by

Plaintiffs John Doe #1 and John Doe #2, Johnson, Kalyar and Fahim Javed.

521.     Defendants are responsible for Cox's actions that were the direct and proximate

cause of the racial discrimination, pain and suffering and damages suffered by Plaintiffs John

Doe #1, John Doe #2, Johnson, Kalyar and Javed.

522.     Wherefore, Plaintiffs John Doe #1, John Doe #2, Johnson, Kalyar and Javed claim

compensatory and punitive monetary damages in excess of the jurisdiction of this Court

($75,000.00) against Defendants in an amount to be determined at trial, plus costs and post

judgment interest at the legal rate of ten percent (10%) per annum from the date of judgment,

and for any further relief that this Honorable Court deems necessary and appropriate.

### SIXTH CLAIM FOR RELIEF AGAINST DEFENDANTS
**COX, KELLEY, BUNN, CASTELLANO, GLOVER, DOYLE, SCOTT, ELIANO, SWANKE, MCCUBBIN, FLYNN, BORER AND DEWYNGAERT**
**For Breach Of Fiduciary Duty**

523.     Plaintiff realleges and incorporates by reference each allegation contained in the

foregoing paragraphs as set forth herein.

524.     Cox served as a constitutional officer of AFGE, authorized to perform the

functions of National President of a labor organization and to serve as chairman and presiding

officer of the National Executive Council, the governing body of AFGE.  Thus, Cox qualified as an "officer" for purposes of the LMRDA during his time as National President of AFGE.

525.     Defendants Kelley, Bunn, Castellano, Glover, Doyle, Scott, Eliano, Swanke, McCubbin and Flynn, served as constitutional officers of AFGE, authorized to perform the functions of National Vice Presidents of a labor organization and to serve as members of the National Executive Council, the governing body of AFGE,  thus qualified as "officers" for purposes of  the LMRDA during their time as National Vice Presidents of AFGE.

526.     Defendant Borer served as a constitutional officer of AFGE, authorized to perform the functions of General Counsel of a labor organization, thus qualified as an "officer" for purposes of the LMRDA during his time as General Counsel of AFGE.

527.     Defendant DeWyngaert served as a constitutional officer of AFGE, authorized to perform the functions of Chief of Staff of a labor organization, thus qualified as an "officer" for purposes of the LMRDA during his time as Chief of Staff of AFGE.

528.     As officers of AFGE, Defendants Cox, Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin, Flynn, Borer and DeWyngaert occupied a fiduciary relationship to the organization and its members, including Plaintiff Annette Wells, and had a responsibility to act in utmost good faith in managing the affairs of the organization.

529.     Cox breached his duties to the labor organization and violated his oath as an AFGE officer that he owed to AFGE, AFGE member Annette Wells and other AFGE members, when the AFGE President sexually harassed, sexually assaulted and battered Plaintiff Wells' son, Plaintiff John Doe #1, Plaintiff John Doe #2, and sexually harassed Plaintiffs Kalyar, Javed and other AFGE staff, contractors, among others.

530.     On information and belief, Cox's breach of his fiduciary duties through his sexual and other misconduct toward Plaintiffs and others was committed deliberately, intentionally,

willfully, and in bad faith,  with knowledge of the duties required of an officer of a labor

organization.

531.    Cox's acts constitute a violation of the fiduciary responsibilities of officers of

labor organizations in violation of Section 501(a) of the LMRDA, 29 U.S.C. § 401, *et seq.*

532.    Cox's acts have greatly damaged AFGE, AFGE member Annette Wells and other

AFGE members.

533.    Accordingly, Plaintiff Annette Wells seeks on behalf of AFGE, herself and other

AFGE members, compensatory and punitive damages for, among other things, AFGE's losses

sustained as a result of Cox's misconduct, reasonable attorneys' fees and any other remedies

provided by 29 U.S.C. § 401, *et. seq.*

534.    Defendants Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin,

Flynn, Borer and DeWyngaert breached their duties to the labor organization and violated their

oaths as AFGE officers when they failed to report, document,  and investigate complaints filed

against Cox for committing sexual harassment, sexual assault, sexual battery, racial

discrimination, bullying, threats and other misconduct; and, aware of Cox's egregious

misconduct, failed to take disciplinary or remedial action against Cox after receiving those

complaints.

535.    On information and belief, Defendants Kelley, Bunn, Castellano, Glover, Doyle,

Eliano, Swanke, McCubbin, Flynn, Borer and DeWyngaert's breach of their fiduciary duties in

failing to report, document,  and investigate complaints filed against Cox for committing sexual

harassment, sexual assault, sexual battery, racial discrimination and other misconduct; and by

failing to take and disciplinary or remedial action against Cox after receiving those complaints,

was committed deliberately, intentionally, willfully, and in bad faith with knowledge of the

duties required of an officer of a labor organization.

536.     Aware of sexual harassment and sexual assault complaints filed against Cox by a Myrtle Beach, South Carolina hotel employee in 2014, by a Hotel Caribe employee in 2017, by Brett Copeland in 2017 and by Rocky Kabir in 2017 and 2018, Defendants Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin, and Flynn breached their duties to the labor organization and violated their oaths as AFGE officers by endorsing Cox's 2018 re-election to a third term as AFGE National President and encouraging AFGE members to re-elect Cox.

537.     After AFGE National President Everett Kelley publicly called Cox,  a "liar," during a 2020  interview with Bloomberg News, Defendants Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, and McCubbin breached their duties to the labor organization and violated their oaths as AFGE officers by refusing to process the Mollett Committee of Investigation's February 13, 2020,  report finding probable cause that Cox ordered his Confidential Secretary Rocky Kabir to secretly work on Cox's 2018 re-election campaign as charged by four AFGE Emeritus Officers in November 2019 – a violation of the LMRDA and the AFGE National Constitution –  and by refusing to vote on Cox's guilt and refusing to remove Cox from office for engaging in such unlawful misconduct.

538.     Defendants Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, and McCubbin,  breached their duties to the labor organization and violated their oaths as AFGE officers by cancelling the scheduled March 1, 2020, National Executive Committee meeting scheduled by Defendant Kelley, as required by Article XIII of the AFGE National Constitution, to vote on the Mollett Committee's February 13, 2020 report finding Cox guilty of ordering his staff to work on his 2018 re-election campaign.

539.     Defendants Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, and McCubbin,  breached their duties to the labor organization and violated their oaths as AFGE

officers by executing a secret February 28, 2020, separation agreement permitting Cox to resign from office in lieu of removal for misconduct and, upon information and belief, paying Cox cash.

540.     Aware of Cox's misconduct as detailed in the March 16, 2020 Working Ideal report and after publicly calling Cox, a "liar," Defendant Kelley executed the February 28, 2020, separation agreement with Cox, upon information and belief, giving Cox cash in exchange for Cox's agreement to testify against other AFGE members.

541.     The acts of Cox, Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin, Flynn, Borer and DeWyngaert constitute a violation of the fiduciary responsibilities of officers of labor organizations in violation of Section 501(a) of the LMRDA, 29 U.S.C. § 401, *et seq.*

542.     The acts of Cox, Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin, Flynn, Borer and DeWyngaert have greatly damaged AFGE, AFGE member Annette Wells and other AFGE members.

543.     On behalf of AFGE, herself and other AFGE members, Plaintiff Annette Wells seeks compensatory and punitive damages for, among other things, AFGE's losses sustained as a result of Defendants Cox, Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin, Flynn, Borer and DeWyngaert's misconduct and breach of their fiduciary duties, reasonable attorneys'' fees and any other remedies provided by 29 U.S.C. § 401, *et. seq.*

544.     Wherefore, Plaintiff Wells claims compensatory and punitive monetary damages in excess of the jurisdiction of this Court ($75,000.00) against Defendants, in an amount to be determined at trial, plus costs and post judgment interest at the legal rate of ten percent (10%) per annum from the date of judgment, and for any further relief that this Honorable Court deems necessary and appropriate.

## SEVENTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### For Breach Of Fiduciary Duty By Defendants Cox, Kelley, Bunn, Castellano, Glover, Doyle, Scott, Eliano, Swanke, McCubbin, Flynn, Borer and DeWyngaert

545.     Plaintiffs reallege and incorporate by reference each allegation contained in the foregoing paragraphs as set forth herein.

546.     Defendants Everett Kelley, Eric Bunn, Vincent Castellano, Phil Glover, Danny Doyle, Arnold Scott, Cheryl Eliano, Gerald Swanke, George McCubbin, Joseph Flynn, David Borer and Brian DeWyngaert breached their fiduciary duty to Plaintiff Wells and other AFGE members, by permitting Cox to improperly use CCS Limo services, hotels and other union resources to frequent bars and strip clubs and to solicit male prostitutes.

547.     Defendants Everett Kelley, Eric Bunn, Vincent Castellano, Phil Glover, Danny Doyle, Arnold Scott, Cheryl Eliano, Gerald Swanke, George McCubbin, Joseph Flynn, David Borer and Brian DeWyngaert have refused Plaintiff Wells' demand for an accounting of funds improperly expended by Cox on CCS Limo services, hotels and other union resources, to frequent bars, strip clubs and to solicit male prostitutes.

548.      The acts of Defendants Everett Kelley, Eric Bunn, Vincent Castellano, Phil Glover, Danny Doyle, Arnold Scott, Cheryl Eliano, Gerald Swanke, George McCubbin,  Joseph Flynn, David Borer and Brian DeWyngaert constitute a violation of the fiduciary responsibilities of officers of labor organizations in violation of Section 501(a) of the LMRDA, 29 U.S.C. § 401, *et seq.*

549.      On behalf of AFGE, herself, and other AFGE members, Plaintiff Wells seeks injunctive relief in the form of an Order directing Defendants to conduct an independent accounting of Cox's use of union resources to frequent bars, strip clubs and solicit male prostitutes and to order AFGE to retain an outside, neutral law firm selected by Plaintiffs to

investigate the February 13, 2020, charges filed by Wells, Weinberg and Graf against Cox,  and

for other relief as the Court deems necessary.

550.      On behalf of AFGE, herself and other AFGE members, Plaintiff Annette Wells

seeks compensatory and punitive damages for, among other things, AFGE's losses sustained as

a result of  Defendants Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin,

Flynn, Borer and DeWyngaert's misconduct and breach of their fiduciary duties, reasonable

attorneys'' fees and any other remedies provided by 29 U.S.C. § 401, *et. seq.*

551.      Wherefore, Plaintiff Wells, on behalf of AFGE, herself and other AFGE

members, seeks damages in an amount to be determined at trial, plus costs and post judgment

interest at the legal rate of ten percent (10%) per annum from the date of judgment, and for any

further relief that this Honorable Court deems necessary and appropriate.

## EIGHTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### Sexual Harassment, *Quid Pro Quo*

552.      Plaintiffs John Doe #1 and John Doe #2 reallege and incorporate by reference

each allegation contained in the foregoing paragraphs set forth herein.

553.      Defendant Cox's acts occurred during Plaintiffs John Doe #1 and John Doe #2's

employment, and John Doe #1 and John Doe #2 were unlawfully subjected to *quid pro quo*

sexual harassment and abuse by Cox.

554.      As a result of Plaintiffs' John Doe #1 and John Doe #2's rebuffs to Cox's sexual

harassment and abuse, they suffered adverse effects to the terms and conditions of their

employment.

555.      As a result of Cox's sexual harassment and abuse, Plaintiffs suffered damages

including, but without limitation, deprivation of income and benefits, loss of opportunity, severe

emotional distress, personal injury (in the case of Plaintiff John Doe #1) pain, suffering, mental anguish, humiliation and damage to reputation and career.

556.     By failing to report, document, investigate sexual harassment complaints filed against Cox over a period of years and failing to discipline Cox for his sexual and other misconduct, Defendants AFGE, Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin, Flynn, Borer and DeWyngaert are responsible for Cox's sexual harassment and abuse of Plaintiffs John Doe #1 and John Doe #2.

557.     Wherefore Plaintiffs John Doe #1 and John Doe #2 claim compensatory and punitive monetary damages in excess of the jurisdiction of this Court ($75,000.00) against Defendants in an amount to be determined at trial, plus costs and post judgment interest at the legal rate of ten percent (10%) per annum from the date of judgment, and for any further relief that this Honorable Court deems necessary and appropriate.

### NINTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### Hostile Work Environment Based On Sex, Race and Religion

558.     Plaintiffs John Doe #1 and John Doe #2 reallege and incorporate by reference each allegation contained in the foregoing paragraphs set forth herein.

559.     Cox's persistent, frequent and pervasive sexual harassment and racial and religious discrimination created an atmosphere in which Plaintiff John Doe #1,  Plaintiff John Doe  #2 and Plaintiffs Kalyar, Javed and Johnson performed their duties that was hostile, abusive, humiliating and degrading.

560.     Cox subjected these Plaintiffs to a hostile work environment permeated with harassment based on sex, race and religion sufficiently severe and pervasive to alter the conditions of Plaintiffs' employment in violation of the District of Columbia Human Rights Act of 1977, Title 2, Chapter 14 – Human Rights District of Columbia Code, *et seq.*

561.     By failing to report, document, investigate racial discrimination complaints filed against Cox over a period of years and failing to discipline Cox for his racial discriminatory behavior and other misconduct, Defendants AFGE, Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin, Flynn, Borer and DeWyngaert are responsible for Cox's racial and religious discrimination against Plaintiffs  and Cox's creation of a hostile work environment at AFGE.

562.     As a result of Defendants' creation of a hostile work environment, these Plaintiffs suffered damages including, but without limitation, deprivation of income and benefits, loss of opportunity, severe emotional distress, personal injuries, pain, suffering, mental anguish, humiliation and damage to reputation and career.

563.     Wherefore Plaintiffs John Does # 1 and #2, Kalyar, Javed and Johnson claim compensatory and punitive monetary damages in excess of the jurisdiction of this Court ($75,000.00) against Defendants in an amount to be determined at trial, plus costs and post judgment interest at the legal rate of ten percent (10%) per annum from the date of judgment, and for any further relief that this Honorable Court deems necessary and appropriate.

**TENTH CLAIM FOR RELIEF AGAINST DEFENDANTS**
**Intentional Tort**

564.     Plaintiffs John Doe #1 and John Doe # 2 reallege and incorporate by reference each allegation contained in the foregoing paragraphs set forth herein.

565.     Defendant J. David Cox's intentional, persistent, frequent and tortious misconduct caused injury to Plaintiffs John Doe #1 and John Doe #2 in violation of the District of Columbia intentional tort statute.

566.     By failing to report, document, investigate sexual harassment complaints filed against Cox over a period of years and failing to discipline Cox for his sexual and other misconduct, Defendants AFGE, Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke,

McCubbin, Flynn, Borer and DeWyngaert are responsible for Cox's intentional, persistent, frequent and tortious misconduct that caused injury to Plaintiffs John Doe #1 and John Doe #2.

567.    Wherefore Plaintiffs John Doe #1 and John Doe #2 claim compensatory and punitive monetary damages in excess of the jurisdiction of this Court ($75,000.00) against Defendants in an amount to be determined at trial, plus costs and post judgment interest at the legal rate of ten percent (10%) per annum from the date of judgment, and for any further relief that this Honorable Court deems necessary and appropriate.

### ELEVENTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### Negligent Hiring, Supervision And Retention Of Defendant Cox

`

568.    Plaintiffs reallege and incorporate by reference each allegation contained in the foregoing paragraphs as set forth herein.

569.    For years, Defendants knew or reasonably should have known of Cox's propensities to sexually batter, sexually assault, sexually harass, discriminate on the basis of race threaten, harm and otherwise mentally, emotionally, physically injure AFGE members, employees, agents, contractors and others.

570.    For years, Defendants knew that Cox was being placed in a position of employment where he would have unfettered access to vulnerable AFGE staff and contractors without direct supervision, oversight or monitoring.

571.    Cox engaged in unlawful sexual harassment, sexual assault, sexual battery, racial discrimination, threatening, bullying, cursing and retaliation against others before his contact with Plaintiffs, a fact that was known to Defendants who took no remedial action.

572.     Defendants had a duty of care to Plaintiffs, when hiring, retaining, supervising and evaluating Cox, to timely, adequately, and appropriately report, investigate, heed and act on all reasonable suggestions, complaints and information that Cox had the propensity to, and/or had actually, threatened, inappropriately sexually harassed, sexually assaulted and battered,

racially discriminated and retaliated against and otherwise mentally, physically and emotionally injured AFGE employees, contractors and others.

573. Defendants continued to permit Cox unfettered access to vulnerable AFGE staff and contractors without supervision, training or discipline.

574. Defendants had a duty of care to Plaintiffs to ensure the safety of its employees, contractors and others, including Plaintiffs from being discriminated against, sexually harassed, assaulted, and battered, cursed, threatened, and retaliated against by AFGE members, employees, agents and/or contractors, including Cox.

575. Sexual harassment, sexual assaults, sexual batteries, physical injury, unwanted sexual touching, racial and religious discrimination, threats and retaliation of the sort suffered by Plaintiffs were entirely preventable had Defendants timely, adequately and appropriately reported and investigated the complaints filed against Cox and intervened by taking disciplinary action against Cox.

576. Defendants failed to investigate numerous complaints that Cox discriminated against, harassed, assaulted, battered, threatened, bullied, inappropriately touched and retaliated against AFGE staff and contractors from in or about 2012 through 2020 and failed to properly supervise and discipline Cox.

577. In breach of its duty of care, AFGE negligently retained Cox as National President when AFGE knew or should have known of Cox's propensity to discriminate against, harass, sexually assault, batter, physically injure, threaten and otherwise harm and injure vulnerable AFGE members, employees, agents and/or contractors, including Plaintiffs.

578. In breach of their duty of care, Defendants were negligent in supervising Cox by:

1) failing to stop Defendant Cox from ordering CCS Limo and Limo Networks Nationwide drivers and AFGE staff and contractors to frequent bars and strip clubs and to assist him in procuring male prostitutes for his sexual enjoyment;

2) failing to stop Defendant Cox from using AFGE expense accounts to procure hotel rooms, go to bars, strip clubs and hire prostitutes, misuse AFGE-paid CCS Limo services to sexually assault, batter, harass and threaten CCS Limo and Limo Networks Nationwide drivers; and

3) failing to stop Defendant Cox from engaging in racial discrimination after receiving numerous complaints about his misconduct.

579.     Defendants' negligent and careless acts and omissions include:

1) failing to establish reasonable criteria for the use of AFGE resources, including AFGE staff, AFGE contractors, CCS Limo drivers, Limo Network Nationwide drivers, hotel rooms and other resources provided by Cox in his capacity as National President;

2) failing to report and investigate Cox's repeated incidents of sexual misconduct, racial discrimination, public inebriation, threatening, bullying and retaliatory misconduct;

3) failing to implement and enforce AFGE's policies and procedures, including EEO written policies, by retaining a neutral, outside, independent investigator to investigate such charges filed against Cox by AFGE staff, contractors and others from in or about 2012 through 2020;

4) failing to exercise reasonable care to detect when Cox's actions were adverse and detrimental;

5) failing to investigate and process disciplinary charges against Cox after receiving complaints about his misconduct described here and being otherwise careless and negligent.

580.     As the employer/principal responsible for the actions of its employees/agents, Defendant AFGE and the other Defendants' negligent hiring, negligent retention, negligent supervision and negligent failure to discipline Defendant Cox was a proximate cause of Plaintiffs' pain, suffering, severe mental anguish, physical injury, unnecessary medical care and expense, lost wages, lost future wages, loss of future earning capacity and other injuries and damages.

581.     Wherefore, Plaintiffs seek damages in an amount to be determined at trial, plus costs and post judgment interest at the legal rate of ten percent (10%) per annum from the date of judgment, and for any further relief that this Honorable Court deems necessary and appropriate.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for relief and judgment against Defendants jointly and severally, as follows:

a.  Enter Judgment declaring that AFGE, Cox, Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin, Flynn, Borer and DeWyngaert have violated t the District of Columbia Human Rights Act of 1977, Title 2, Chapter 14 – Human Rights District of Columbia Code, *et seq,* and D.C. Law 22-311, the Sexual Abuse Statute of Limitations Amendment Act of 201 and the District of Columbia statutes;  42 U.S.C. 1981; Title I- § 101(a)(2) and (5) of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C.A. § 411(a)(2) and (5),  Title V- § 501(b) of the LMRDA; 29 U.S.C.A. § 501(b) and the common law of the District of Columbia.

b.  Require Defendants and all others in active concert or participation with Defendants, to reimburse Plaintiffs for all lost wages and benefits and interest thereon.

c.  Require Defendants and all others in active concert or participation with Defendants, to pay Plaintiffs' litigation costs and reasonable attorneys' fees.

d.  Require Defendants and all others in active concert or participation with Defendants, to reimburse Plaintiffs for their pain and suffering.

e.  Require Defendants and all others in active concert or participation with Defendants, to pay punitive damages to Plaintiffs.

f.  Grant Plaintiff Annette Wells' *ex parte* application to file a Complaint in this Court pursuant to Section 501 of the LMRDA on behalf of herself and other AFGE members to obtain the relief requested in the February 13, 2020 Wells/Weinberg/Graf charges.

g.  Require Defendants and all others in active concert or participation with Defendants, to account for and pay over to AFGE all AFGE union resources improperly used by Cox for his personal use or to promote his 2018 candidacy, including, but not limited to, Cox's use of the CCS Limo and Limo Network car services paid and provided to Cox by AFGE to go to strip clubs and bars, to procure male prostitutes and to sexually harass and sexually assault Plaintiff John Doe #1 and John Doe #2, and to sexually harass Plaintiffs Kalyar and Javed.

h.  Require AFGE to pay and retain an independent attorney to oversee and monitor policy changes and require AFGE to allow Plaintiffs to select the lawyer retained to oversee and monitor the implementation of those and other policy changes.

i.    Require Defendants and all others in active concert or participation with
      Defendants, to account for and pay over to AFGE all AFGE union resources
      improperly used by Cox for his personal use or to promote his 2018 candidacy,
      including, but not limited to, Cox's unlawful use of the services of AFGE
      employees, Rocky Kabir and Jacqueline Simon, to promote Cox's 2018 AFGE
      campaign for National President in violation of the LMRDA and the AFGE
      National Constitution; and

j.    Award such other relief deemed just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable under Counts One through

Eleven.

Respectfully submitted,

/s/ Marlene (Kemi) Morten
Marlene (Kemi) Morten, D.C. Bar 272575
3825 South Capitol Street, S. W.
Washington, D. C. 20032
202-379-4806/*kemimorten@gmail.com*


/s/ Donna Clancy
Donna Clancy
The Clancy Law Firm, P.C.
Application to be filed for Admission *pro hac vice*
40 Wall Street, 61st Floor
New York, NY 10005
(212) 747-1744
dhc@dhclancylaw.com

*Counsel for Plaintiffs*


June 13, 2020