**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN DOE #1 and others similarly situated | ) |
| | ) |
| SALIM JAVED | ) |
| 5524 Georgia Avenue | ) |
| Silver Spring, MD 20910 | ) |
| | ) |
| ANNETTE WELLS | ) |
| and other AFGE members similarly situated | ) |
| 8630 Beekman Place, | ) |
| Alexandria, VA 22309 | ) |
| | ) |
| PAUL VAUGHAN | ) |
| 8630 Beekman Place, | ) |
| Alexandria, VA 22309 | ) |
| | ) |
| WAQAS KALYAR | ) |
| 9521 Georgia Avenue | ) |
| Silver Spring, MD 20910 | ) |
| | ) |
| FAHIM JAVED | ) |
| 5524 Hempstead Way, B350 | ) |
| Springfield, VA 22151 | ) |
| | ) |
| JOCELYNN JOHNSON | ) |
| 807 Tewkesbury Place, N.W. | ) |
| Washington, D. C. 20012 | ) |
| | ) |
| VALYRIA LEWIS | ) |
| 273 High Street | ) |
| Berlin, NH 03570 | ) |
| | ) |
| MECCA SCOTT | ) |
| 2855 Blue Sky Circle | ) |
| Erie, CO 80516 | ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| v. | ) |
| | ) |
| AMERICAN FEDERATION OF GOVERNMENT | ) |
| EMPLOYEES ("AFGE") | ) |
| 80 F Street, N. W. | ) |
| Washington, D. C. 20001 | ) |
| | ) |
| JEFFERY DAVID COX, SR., in his official and | ) |
| personal capacity | ) |

AMENDED COMPLAINT FOR
DAMAGES AND INJUNCTIVE
AND DECLARATORY RELIEF

Civ. No. 20-1558

PLAINTIFFS DEMAND A
TRIAL BY JURY

1227 Beagle Run )
Salisbury, NC 28146 )
)
EVERETT KELLEY, in his official and personal )
capacity )
2000 Friar Tuck Lane )
Oxford, AL 36203 )
)
ERIC BUNN, in his official and personal capacity )
13804 Pine Needle Ct. )
Upper Marlboro, Maryland 20774 )
)
VINCENT CASTELLANO, in his official and )
personal capacity )
40 Locker Street, )
Bayville, NJ 08721 )
)
PHIL GLOVER, in his official and personal )
capacity )
80 F Street, N. W. )
Washington, D. C. 20001 )
)
DANNY DOYLE, in his official and personal )
capacity )
80 F Street, N. W. )
Washington, D. C. 20001 )
)
ARNOLD SCOTT, in his official and personal )
capacity )
293 Red Oak Lane )
Carmel, IN 46033 )
)
CHERYL ELIANO, in her official and personal )
capacity )
4908 Chad Drive )
Killen, TX 76542. )
)
GERALD SWANKE, in his official and personal )
capacity )
464 E. Thurman Mill Street )
Garden City, ID 83714 )
)
GEORGE MCCUBBIN, in his official and personal )
capacity )
80 F Street, N. W. )
Washington, D. C. 20001 )
)

JOSEPH FLYNN, in his official and personal )
capacity                                    )
6900 Bugledrum Way                          )
Columbia, MD 21045                          )
                                            )
DAVID BORER, in his official and            )
personal capacity                           )
80 F Street, N. W.                          )
Washington, D. C. 20001                     )
                                            )
GONY GOLDBERG, in her official and.         )
personal capacity.                          )
80 F Street, N.W.                           )
Washington, D. C. 20001                     )
                                            )
BRIAN DEWYNGAERT, in his official and       )
personal capacity                           )
80 F Street, N. W.                          )
Washington, D. C. 20001                     )
and                                         )
                                            )
JOHN and JANE DOES AFGE Officers,           )
Employees and Agents                        )
                        Defendants.         )
_____)

## AMENDED COMPLAINT

### INTRODUCTION

1.      For years, former AFGE National President Jeffery David Cox, Sr. committed

shocking and outrageous acts of sexual abuse and sexual harassment against Plaintiff John Doe

#1, Plaintiff Salim Javed and others, racially discriminated against Plaintiffs Waqas Kalyar,

Fahim Javed, Jocelynn Johnson, Valyria Lewis, Mecca Scott and others, harmed all Plaintiffs

and caused all Plaintiffs severe emotional distress.

2.      Plaintiffs file this human rights action for compensatory damages, punitive

damages, injunctive relief, declaratory judgment and money damages to remedy sexual

assault, sexual battery, sexual harassment, racial discrimination, religious discrimination, retaliation, intentional infliction of emotional distress and other misconduct by Defendants.

3.     On behalf of AFGE and all AFGE members, Plaintiff Annette Wells, an AFGE dues paying member, asks this Court to allow her to file charges under Section 501 of the Labor Management Reporting and Disclosure Act ("LMRDA") against Defendant Cox, in his personal and official capacity as the former National President,  for violating his oath of office and his fiduciary duties by unlawfully using union-provided CCS Limousine Services to frequent strip clubs and bars, procure male prostitutes and to sexually assault, threaten, bully, humiliate and racially discriminate against Wells' son, Plaintiff John Doe #1 and others.

4.     On behalf  of AFGE and all AFGE members, Plaintiff Annette Wells asks this Court to allow her to file charges under Section 501 of the LMRDA against Defendants Everett Kelley, Eric Bunn, Vincent Castellano, Phil Glover, Danny Doyle, Arnold Scott, Cheryl Eliano, Gerald Swanke, George McCubbin, Joe Flynn, AFGE General Counsel David Borer, AFGE Deputy General. Counsel Gony Goldberg, AFGE Chief of Staff Brian DeWyngaert and other unnamed officials who occupied a position of trust in relation to AFGE and its members and took an oath to act in utmost good faith in managing the Federation's affairs  – but violated that oath by turning a blind eye to Cox's misconduct for years.

5.      These named Defendants violated their oath of office by:  i) refusing to report, investigate and take disciplinary action against Defendant Cox after receiving numerous complaints from AFGE staff and contractors that Cox sexually harassed, sexually assaulted, racially discriminated, cursed, threatened and bullied them;  ii) refusing to fully process a November 2019 charge filed by four AFGE Emeritus Officers, Jane Nygaard, Jim Davis, Kitty

Petticord and John Gage, that Cox ordered two AFGE headquarters staff to secretly work on

Cox's 2018 reelection campaign in violation of federal law– a charge that Cox never denied;

iii) refusing to process a February 2020 charge filed by three AFGE members, Annette Wells,

Judith Weinberg and Stephanie Graf, that Cox unlawfully used valuable AFGE resources (CCS

Limousine Services) to frequent strip clubs and bars, procure male prostitutes and to sexually

assault, threaten and racially discriminate others – all at AFGE members' expense;  iv)  refusing

to file a lawsuit against Cox, as AFGE members demanded, to account for and recover all

AFGE funds that Cox improperly spent to frequent strip clubs and bars, procure male prostitutes

and sexually abuse others;  v) without AFGE members' knowledge or consent,  authorizing

National Secretary Treasurer Everett Kelley to sign a secret February 28, 2020, separation

agreement allowing Cox to resign from office without being found guilty of these charges,

allowing Cox to deny all responsibility for his misconduct and refusing to share the terms of

Cox's secret separation agreement with AFGE members;  vi) refusing to allow Working Ideal to

release its findings regarding racial discrimination complaints filed against Cox by Plaintiff

Jocelynn Johnson, Plaintiff Mecca Scott, former NST Eugene Hudson and other current and

former AFGE staff ;  and vii)  refusing to release Working Ideal's most recent findings

regarding sexual harassment charges filed by National Vice President Jeremy Lannan against

Defendant Cox.

6.      Defendants violated their fiduciary responsibilities set forth in Section 501 of the

LMRDA, 29 U.S.C. § 401, *et seq*. causing financial damage to AFGE, damage to AFGE's

reputation and damage to all AFGE members.

7.      On behalf of all AFGE members, Plaintiff Wells seeks compensatory and punitive

damages from Defendants in their personal and official capacities for the losses that AFGE and

its members have suffered as a direct result of Defendants' breach of their fiduciary duties, as permitted by Section 501 of the LMRDA.

8. Although Defendant Cox has left AFGE, his legacy continues unabated. Three months have passed since Working Ideal released its report. AFGE and the other named Defendants have not interviewed Plaintiffs regarding their complaints filed with Working Ideal. To date, AFGE has not offered to reconcile with Plaintiffs regarding the damages that they suffered at the hands of Cox and other AFGE officials.

9. Plaintiffs seek a Court order appointing an independent, neutral federal monitor selected by the Plaintiffs to oversee and implement an anti-discrimination, anti-corruption, education, reconciliation, training, monitoring and enforcement program that will build a culture of respect, safety, inclusion and fiscal accountability among the AFGE National Executive Council, the Office of the General Counsel, the AFGE Executive staff and AFGE Officers, employees, contractors and members.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332, diversity jurisdiction; the District of Columbia Human Rights Act of 1977, Title 2, Chapter 14 – Human Rights District of Columbia Code, *et seq,* and D.C. Law 22-311, the Sexual Abuse Statute of Limitations Amendment Act of 201, the District of Columbia statutes and all applicable state statutes where the discriminatory acts occurred; 42 U.S.C. 1981; the Declaratory Judgment Act, 28 U.S.C. §2201, jurisdiction being conferred in accordance with 28 U.S.C. §1331, Title I- § 101(a)(2) and (5) of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C.A. § 411(a)(2) and (5), Title V- § 501(b) of the LMRDA; 29 U.S.C.A. § 501(b), which confer jurisdiction on this Court to hear the claims

of Plaintiff Annette Wells, an AFGE member, on behalf of all AFGE members that Defendants breached their fiduciary duty to AFGE and tis members.

11.     Jurisdiction for the claims made under District of Columbia law is conferred in accordance with the Court's supplemental jurisdiction pursuant to 28 U.S.C. §1367.

12.     The amount of all Plaintiffs' claims exceeds the minimum Seventy-Five Thousand Dollars ($75,000) required to meet the federal requirement.   .

13.     Defendant AFGE is an employer within the meaning of 42 U.S.C. § 2000e(b). Defendant AFGE is engaged in commerce within the meaning of 42 U.S.C. § 2000e(g) and its headquarters and primary place of business is located in Washington, D. C.  This Court has personal jurisdiction over Defendants under D. C. Code §13-423 because the claims for relief arise from Defendants' transaction of business in the District of Columbia.

14.     Venue is proper under 28 U.S.C. 1391(b) because a substantial part of the events giving rise to the claims alleged herein occurred in the District of Columbia.

## PARTIES

15.     Plaintiff "John Doe #1" is described herein by Pseudonym because of the severe, complex and personal nature of his injuries, and the extreme emotional distress that he suffered as a result of Defendant Cox's sexual abuse and battery. These factors are sufficient to establish that a substantial privacy interest is involved thereby warranting anonymity on the parts of Plaintiff John Doe #1.   His identity will, of course, be disclosed to the Court.

16.     Plaintiff John Doe #1 is a 48-year-old divorced father of six (6) children who served as Cox's principal limousine driver for over a decade.  Cox sexually assaulted, sexually harassed, racially discriminated against and caused serious medical injury to Plaintiff Joe Doe #1 beginning approximately 2009 through 2019 and during a period that

Defendants knew or certainly should have known about Cox's misconduct and took no remedial action. Plaintiff John Doe #1 resides in the Commonwealth of Virginia.

17.     Plaintiff Salim Javed is a 30-year-old man who served as Cox's principal driver for nearly two (2) years.  Cox sexually assaulted, sexually harassed, and discriminated against Plaintiff Salim Javed on the basis of his religion beginning approximately February 2018 through October 2019 during a period that Defendants knew or certainly should have known about Cox's misconduct and took no remedial action. Plaintiff Salim Javed resides in the Commonwealth of Virginia.

18.     Plaintiff Annette Wells ("Wells") is Plaintiff John Doe #1's biological mother and an AFGE member.   She resides in the Commonwealth of Virginia.

19.     Plaintiff Paul Vaughan ("Vaughan") is the stepfather of Plaintiff John Doe #1 and resides in the Commonwealth of Virginia.

20.     Plaintiff Waqas Kalyar ("Kalyar") is the owner of Capitol Chauffeur Services ("CCS Limo") who was contracted for employment with Defendant AFGE to provide transportation services.  Cox sexually harassed Plaintiff Kalyar and discriminated against him on the basis of his religion during a period that Defendants knew or certainly should have known about Cox's misconduct and took no remedial action.  Mr. Kalyar resides in the State of Maryland.

21.     Plaintiff Fahim Javed, the owner of Limo Network Nationwide ("Limo Network"), purchased CCS Limo in February 2018 and currently provides transportation services to Defendant AFGE.  Cox sexually harassed Plaintiff Fahim Javed and discriminated against him on the basis of his religion beginning approximately February 2018 through 2019 during a period that Defendants knew or certainly should have known

about Cox's misconduct and took no remedial action. Plaintiff Fahim Javed resides in the Commonwealth of Virginia.

22.     Plaintiff Jocelynn Johnson ("Johnson") worked for Defendant AFGE for 13 years before Cox terminated her in January 2018 for violating the AFGE "No Politics Rule" for allegedly making a $10 campaign contribution to his opponent.  Defendant AFGE and Cox discriminated against Plaintiff Johnson on the basis of her race by terminating her while not terminating a similarly situated, Caucasian employee who violated the same "No Politics Rule."  Plaintiff Johnson resides in Washington, D. C.

23.     Plaintiff Valyria Lewis ("Lewis") worked for Defendant AFGE from September 2011 until January 2020 under the direct supervision of Defendant Everett Kelley from 2011 through 2015 and under the direct supervision of Defendant Vincent Castellano from 2015 to 2020.   Defendant Cox and Defendant Castellano suspended Plaintiff Lewis and two other African American District 2 National Representatives after they refused Defendant Castellano's order that they falsify their weekly reports.   Defendant Castellano took **no** disciplinary action against the three Caucasian District 2 National Representatives.  Defendant Kelley also overruled Plaintiff Lewis' decision to remove from office AFGE Local 2017 official Jamie Dukes for engaging in egregious sexual harassment of women on a U.S. Army base. Plaintiff Lewis resides in the State of New Hampshire.

24.     Plaintiff Mecca Scott ("Scott") has worked for Defendant AFGE from July 2008 to the present under the direct supervision of Membership and Organizing Department Director Bill Lyons who reports to Defendant Everett Kelley.  Plaintiff Scott has been racially discriminated against by Defendant Gerald Swanke who is the National Vice President for AFGE District 11, where Plaintiff Scott has worked since 2014.  Plaintiff Scott resides in the State of Colorado.

25.     Defendant AFGE is a 501(c)(3) nonprofit corporation with its principal place of business located at 80 F Street, NW, Washington, D.C.

26.     Defendant AFGE is the nation's largest federal employee union, representing roughly 600,000 federal and D. C. government workers.

27.     Defendant AFGE is governed by the AFGE National Constitution and the 15-member AFGE Defendant National Executive Council ("NEC").

28.     Defendant Jeffery David Cox, Sr., is the former National President of Defendant AFGE.  He resides in the State of North Carolina.

29.     The NEC is currently composed of the following 14 members:  Defendant National President Everett Kelley, Defendant National Secretary Treasurer Eric Bunn, National Vice President for Women and Fair Practices Jeremy Lannan, and the following National Vice Presidents: Defendant NVP Vincent Castellano (District 2),  Defendant NVP Phil Glover (District 3),  Defendant NVP Danny Doyle (District 4), NVP David Mollett (District 5), Defendant NVP Arnold Scott (District 6),  NVP Dorothy James (District 7), NVP Greg James (District 8), NVP Mike Kelley (District 9), Defendant NVP Cheryl Eliano (District 10), Defendant NVP Gerald Swanke (District 11), Defendant NVP George McCubbin (District 12), and NVP District 14 [vacant].  Defendant Joseph Flynn is the former National Secretary Treasurer of Defendant AFGE.  He resides in the State of Maryland.

30.     On March 16, 2020, following a four-month investigation, Working Ideal attorneys issued a public report  "into allegations of sexual harassment and related misconduct by Defendant Cox."  During the investigation, Working Ideal conducted "over 70 interviews and reviewed about 3500 emails." *(Exh. 1:  Working Ideal Report, dated March 16, 2020, at p. 2)*

31.     Working Ideal attorneys concluded, among other things, that for years, Defendant Cox sexually harassed, sexually assaulted, discriminated against others on the basis of their race and religion and improperly used AFGE resources (CCS Limousine Services) to frequent strip clubs and bars.

32.     Defendants Kelley, Bunn, Castellano, Glover, Doyle, Scott, Eliano, Swanke, McCubbin and Flynn are among eleven (11) NEC members[1] who signed a letter in or about 2018 strongly encouraging AFGE members to re-elect Cox. *(Exh. 2: J. David Cox, Sr. 2018 Campaign Re-election Endorsement Letter signed by AFGE NEC members).*

33.     When Defendants Kelley, Bunn, Castellano, Glover, Doyle, Scott, Eliano, Swanke, McCubbin and Flynn endorsed Cox's 2018 re-election, they knew (or certainly should have known) that numerous AFGE employees, contractors and others had accused Cox of sexual abuse, sexual harassment, racial discrimination, religious discrimination, and other violations of the AFGE National Constitution.

34.     Working Ideal attorneys also concluded that Defendant Cox and other AFGE officials often used racial and religious slurs, cursed, threatened and bullied others.

35.     Defendants were aware of this racial and other misconduct by Cox and other AFGE officials; yet, they took no disciplinary action against Cox and the other officials.

36.     For example, in 2015, AFGE Council 220 President Witold Skwierczynski called National Secretary Treasurer Eugene Hudson, the union's highest ranking African American official, a "Nigger" for the second time during the AFGE national convention.

37.     Defendants took no remedial or disciplinary action against Skwierczynski.

---

[1] The 11th National Executive Council member who signed the letter endorsing Defendant Cox's 2018 re-election was National Vice President for Women and Fair Practices Augusta Thomas who was defeated by Jeremy Lannan in the 2018 election. Ms. Thomas is deceased.

38.     Instead, Defendant Swanke and his close ally at the time, AFGE District 11 Local President Pam Baca, filed disciplinary charges *against Mr. Hudson* for overreacting to being called the racial slur.

39.     Defendants Kelley, Scott and McCubbin were present and observed Mr. Hudson, upset, walk out of the room without incident  The NEC later dismissed Defendant Swanke's charges against Mr. Hudson as baseless.

40.     In 2014, Defendant Gerald Swanke told Plaintiff Mecca Scott, an African American AFGE National Organizer,  that  "there's enough work for your ass right here in Colorado."

41.     Defendant Swanke told Plaintiff Scott's director, Bill Lyons, that Swanke only wanted Plaintiff Scott to work in Colorado because she wouldn't be accepted in the surrounding states of his District because she was Black.

42.     In June 2018, Defendant Swanke sent a text message to Plaintiff Scott saying he didn't know what "Juneteenth" was.  Two years later, Swanke apologized to Plaintiff.

43.     In the presence of his close ally at the time, AFGE Local President Pam Baca, Defendant Gerald Swanke referred to newly elected AFGE District 11 Fair Practices Coordinator Taye Davis, who is African American, as an "SMB" – the racist code word used among Swanke, Defendant Phil Glover and certain other AFGE officials that stands for "Simple-Minded Blacks."  Swanke used the racial slur during a May 2017 AFGE victory party. *(Exh. :3 Pam Baca Affidavit, dated May 29, 2019)*

44.     During a December 2017 NEC meeting in Washington, D. C., while speaking with Defendant NVP Phil Glover and his close ally at the time, AFGE official Pam Baca,

Defendant Gerald Swanke referred to then-National Secretary Treasurer Eugene Hudson, Jr., as an "SMB."

45.     Ms. Baca testified that she observed Defendant NVP  Phil Glover "grin" in response to Swanke's use of the racial slur.

46.     Defendant Swanke and his former close ally, Pam Baca, parted ways after Ms. Baca told him that she could not support Cox's 2018 re-election based on Cox's sexual misconduct and that she would be supporting Eugene Hudson and Dana Duggins instead.

47.     After the 2018 election, Defendant Swanke and Defendant Cox retaliated against Local President Baca by consolidating Ms. Baca's local, filing bogus charges against her and taking other unfair actions against her.

48.     While working for Defendant Everett Kelley, AFGE National Representative Janese Staley complained via email that Defendant Everett Kelley engaged in racial discrimination on the basis of "colorism," for showing favoritism in work assignments, pay raises and promotions to African American women of very light complexion.

49.     Defendant Kelley gave unusually large, questionable pay raises to his female staff members Tracie St. John and Chanel White.

50.     Upon information and belief, former District 5 Officer Manager Andrea Bentley and former District 5 Officer Manager Kathrina Suarez filed sexual harassment charges against then-District 5 National Vice President Everett Kelley – the current AFGE National President.

51.     Upon information and belief, AFGE entered into confidential nondisclosure settlement agreements to settle the sexual harassment charges filed against Defendant Kelley by Ms. Bentley and Ms. Suarez.

52.    Defendant George McCubbin received a complaint from District 12 official Karina Quintana that a member of McCubbin's District 12 staff, John Rodriguez, sexually harassed her.   Defendant McCubbin took no remedial or disciplinary action.

53.    Ms. Quintana then filed her sexual harassment complaint with AFGE National which quietly settled with her by, among other things, permitting Ms. Quintana to transfer out of Defendant McCubbin's District 12.

54.    During a 2015 meeting with former AFGE National Representative Valyria Lewis, Defendant Eric Bunn's District Officer Manager Michelle Hatton entered the meeting and told Bunn that a woman was on the phone for him.   Defendant Bunn told Ms. Hatton in Plaintiff Lewis' presence,  "Tell the bitch, I'll call her back."

55.    On Defendant Castellano's recommendation, in 2019, Defendant Cox suspended three of Castellano's six National Representatives – Valyria Lewis, David Gonzalez and Frank Womack, all of whom are African American, after they refused Castellano's directive to file false weekly reports.  Cox and Castellano did **not** suspend Castellano's three Caucasian National Reps.

56.    Defendant David Borer is Defendant AFGE's General Counsel and has held the position since October 2010.

57.    Defendant Borer supervises a large staff of in-house AFGE attorneys and outside counsel, including Defendant Gony Goldberg, AFGE's Deputy General Counsel

58.    Defendant Borer, Defendant Goldberg and the General Counsel staff  of attorneys have a fiduciary duty to represent AFGE and the best interest of AFGE members.

59.    Following a four-month investigation, Working Ideal attorneys concluded: "Many individuals we spoke with reported that the General Counsel's Office is seen as an arm of the National President's Office, tasked with representing the interests of the President…"

60.     Defendant Brian DeWyngaert is Defendant AFGE's Chief of Staff, has held that

position for decades and supervises all AFGE headquarters staff and contractors.

## FACTS

**Defendants Kelley, Bunn, Swanke, General Counsel David Borer, Deputy General Counsel Gony Goldberg, Chief Of Staff Brian DeWyngaert And Other Defendants Were Aware Of Cox's Misconduct And Took No Action To Stop It**

61.     In October 2019, Bloomberg News quoted a former AFGE staff member as

stating that Cox's sexual misconduct "was the worst-kept secret at AFGE." *(Exh. 4:*

*Bloomberg News Article "President of Major U.S. Union Accused of Sexual Harassment,"*

*dated October 27, 2019).*

62.     Defendants Cox, Kelley, Bunn, Castellano, Glover, Doyle, Scott, Eliano, Swanke,

McCubbin, Flynn, Borer, Goldberg, and DeWyngaert knew (or certainly should have known)

that AFGE employees, contractors and others had accused Cox of sexual abuse, sexual

harassment, racial discrimination, religious discrimination and other violations of federal law

and the AFGE National Constitution.

63.     Defendants Cox, Kelley, Bunn, Castellano, Glover, Doyle, Scott, Eliano, Swanke,

McCubbin, Flynn, Borer, Goldberg, and DeWyngaert did not document, report or investigate

the complaints and took no disciplinary action to stop Cox's unlawful misconduct.

64.      Upon information and belief, Defendant AFGE member John Rohton threatened

to kill Cox for having sex with his son when Cox was an AFGE Veterans Council official.

65.      In 2012, African American AFGE contractor Larry Burnett complained that

Cox sexually harassed and racially discriminated against him.

66.      Defendants failed to investigate Mr. Burnett's complaints, and Mr. Burnett sued

AFGE.  [*Larry Burnett v. AFGE* Case 1:13-cv-02047].

67.      Defendant AFGE, Defendant Borer and his deputy, Gony Goldberg, defended

Cox in the Burnett lawsuit and later drafted a confidential nondisclosure settlement agreement that Cox signed with Mr. Burnett to secure his silence.

**In 2014, Defendants Did Not Question Cox's Excessive CCS Limo Invoices And Later Disciplined AFGE's National Secretary Treasurer After He Tried To Do So**

68.    In 2014, National Secretary Treasurer ("NST") Eugene Hudson, like all NST's before him, including Cox, was responsible for reviewing and approving all expense vouchers submitted by National Executive Council members.

69.    It is a violation of AFGE policy and rules for an elected officer to use union resources for the officer's personal use.

70.    In 2014, NST Hudson noticed that Cox was regularly submitting unusually large requests for reimbursement for CCS Limo invoices, an AFGE-provided car service, for car services ordered by Cox that extended after 8 p.m. and late into the night.

71.    NST Hudson questioned Cox about the unusually large CCS Limo invoices. Cox told Mr. Hudson that he was the National President, that he was using the CCS Limo car services for AFGE business and that Mr. Hudson had no right to question his expenditures.

72.    In 2014, Cox used the AFGE-paid, CCS Limo car services to frequent strip clubs and bars and to procure male prostitutes -- misconduct that Mr. Hudson was unaware of when he questioned Cox's CCS invoices.

73.    In 2014, Cox used the CCS Limo car services to sexually assault, sexually harass and racially discriminate against Plaintiff John Doe #1 and Plaintiff Salim Javed and to sexually harass and discriminate against Plaintiff Kalyar -- misconduct that Mr. Hudson was unaware of when he questioned Cox's CCS invoices.

**In 2014, Then-NVP Everett Kelley Covered Up The First Of Two Sexual Harassment Complaints Filed Against Cox By A Male Hotel Employee In Kelley's District**

74.    In 2014, Defendant Everett Kelley, then National Vice President for AFGE District

5, hosted an AFGE event at a Myrtle Beach, South Carolina hotel in his district.

75.    The hotel management informed Defendant Kelley's administrative assistant, Tracie St. John[2], that Cox had sexually harassed and propositioned a male employee of the hotel.

76.    The hotel told Ms. St. John that for that reason Cox, a hotel guest attending the AFGE event, was being asked to leave the hotel.

77.    Ms. St. John immediately notified Defendant Kelley, who intervened, and convinced the hotel manager not to evict Cox but to allow him to remain at the hotel.

78.    Defendant Kelley did not interview the hotel employee who filed the sexual harassment complaint against Cox, did not document the complaint and did not report the hotel employee's complaint against Cox to the NEC or to AFGE Human Resources Manager Keith Wright.

79.    Defendant Kelley did not take any disciplinary action against Cox in response to the Myrtle Beach hotel employee's sexual harassment complaint.

80.    Defendant Kelley covered up the Myrtle Beach hotel employee's sexual harassment complaint filed against Cox.

81.    Like her supervisor, Defendant Kelley, Ms. St. John, who initially received the hotel's sexual harassment complaint against Cox, did not investigate, document or report the complaint to AFGE.

82.    Ms. St. John was Defendant Kelley's administrative assistant, earning approximately $45,425 per year at the time that the 2014 South Carolina hotel incident occurred.

83.    As AFGE National President, Cox had sole authority to approve promotions and salary increases for all AFGE staff, including Ms. St. John.

---

[2] formerly Tracie Murray.

84.     Over the four-year period immediately following the Myrtle Beach incident, on Defendant Kelley's recommendation, Ms. St. John received the following unusually large pay raises and promotions:

i)      In 2015, Defendant Kelley recommended and Defendant Cox promoted Ms. St. John to the position of District Manager for District 5 earning $71,156 per year – a $26,000 salary increase over her 2014 income;

ii)     In 2016, Defendant Kelley officially released Ms. St. John, thereby permitting her to be promoted out of District 5. Immediately after releasing her, Kelley recommended and Defendant Cox promoted Ms. St. John to the position of Supervisory National Representative/Organizer earning $88,047 per year – a $17,000 salary increase over her 2015 income;

iii)    In 2017, Defendant Cox gave Ms. St. John a $14,000 pay increase, raising her annual salary to $102,012;

iv)     In 2018, Defendant Cox gave Ms. St. John a $2,000 pay increase, raising her salary from $102,000 to $104,092; and

v)      In 2019, Defendant Cox gave Ms. St. John a $14,000 pay increase, raising her salary from $104,000 to $112,863. *(Exh. 5: Dept. of Labor LM 2 reports)*

85.     Defendant Kelley recommended and Defendant Cox approved these unusually large pay raises and promotions in an apparently successful attempt to ensure Ms. St. John's silence regarding the Myrtle Beach hotel's sexual harassment complaint filed against Cox.

86.     In 2015, AFGE member Amber Westbrook complained to Defendant General Counsel Borer's office that her local president and an AFGE Fair Practice Coordinator, Rosendo Rocha, told her that sex was the way for women to get ahead at the union and demanded to have adjoining hotel rooms with her during a union conference. Rocha was close friends with Defendant Cox.

87.     Defendant Borer and his staff of attorneys, including Defendant Goldberg, did not investigate or take any disciplinary action in response to Ms. Westbrook's complaint.

88.     In 2016, then-National Secretary Treasurer Eugene Hudson was responsible for reviewing and approving all expense vouchers submitted by NEC members.

89.     As he did in 2014, NST Hudson again questioned Cox in 2016 about his unusually large requests for reimbursement for CCS Limo invoices, an AFGE-provided car service, for services extending beyond 8 p.m. and late into the night.

90.     Cox told NST Hudson that he was the National President, that he was using the CCS Limo car services for AFGE business and that Mr. Hudson had no right to question his expenditures.

91.     In 2016, Cox used the CCS Limo car services provided by Defendant AFGE to frequent strip clubs and bars, and to procure male prostitutes -- misconduct that Mr. Hudson was unaware of when he questioned Cox's CCS invoices.

92.     In 2016, Cox used the CCS Limo car services to sexually assault, sexually harass and racially discriminate against Plaintiff John Doe #1 and to sexually harass and discriminate against Plaintiff Kalyar -- misconduct that Mr. Hudson was unaware of when he questioned Cox's CCS invoices.

93.     In 2016, NST Hudson questioned invoices submitted by Defendant Everett Kelley and Defendant Eric Bunn for expenses incurred and gifts, including jewelry, purchased on their AFGE credit card during an AFGE-sponsored trip to the Virgin Islands.

94.     On the recommendation of his staff members, Arla Bentley and Roy Vinnick, NST Hudson questioned Defendant Kelley about $768 worth of jewelry that Kelley purchased at Cardow Jewelers in the Virgin Islands on April 21, 2016, and that Kelley billed to his AFGE credit card.

95.     Defendant Kelley submitted the expense voucher seeking approval of the necklaces as a legitimate AFGE expense.

96.     In response to NST Hudson's questions, Defendant Kelley stated that he had purchased the four necklaces as gifts for his staff members, Tracie Murray (St. John), Monica

Rice, Vera Harding and for another unnamed female member of Kelley's District 5 staff in recognition of Administrative Assistants' Day.

97.    Defendant Kelley later informed NST Hudson, in the presence of Finance Director Faye Beardsley and NST Hudson's Executive Assistant Arla Bentley, that Kelley had purchased the fourth necklace for Chanel White and given it to her.

98.    When Defendant Kelley purchased the necklace of Chanel White on April 21, 2016, Ms. White was not a clerical or administrative worker.

99.    In 2016, NST Hudson questioned Defendant Eric Bunn's invoices for reimbursement for over $1400 worth of clothing purchased at Nordstrom and for a restaurant bill for dinner for Defendant Bunn and four (4) guests of approximately $500.

100.    In approximately 2016, NST Hudson questioned invoices submitted by Defendant Gerald Swanke for approximately $800 worth of artwork for his home.

101.    Defendant Cox had previously served as NST from 2006 to 2012 and, like his predecessor before him, Jim Davis, Cox had authority to approve all NEC members' expense vouchers.

102.    When Mr. Hudson was elected NST in 2012, he took over the responsibility for approving NEC members' expense vouchers from Cox.

103.    NST Hudson's refusal to approve questionable expenditures caused rancor among certain NEC members.

104.    In 2016, Defendant Everett Kelley and Defendant Eric Bunn complained to Defendant Cox that NST Hudson was questioning NEC members' expense vouchers. The two men demanded that Cox intervene.

105.    In response, Cox stripped NST Hudson of his authority to review and approve NEC members' expense vouchers in 2016 but allowed Hudson to continue to review expense vouchers

submitted by the National President [Cox].

106.      After stripping NST Hudson of his authority to review and approve NEC members' expense vouchers, Cox's use of the AFGE-provided CCS Limo car service to frequent strip clubs, bars and to procure male prostitutes significantly increased in 2017 and 2018.

107.      On January 1, 2018, AFGE member and AFGE Local 2431 President Lawrence Tomscha filed a written complaint with the National Executive Council that in 2017, Cox had improperly spent $90,000 in membership dues for personal limousine services and requested that Defendants provide Tomscha with an explanation. *(Exh. 6: Lawrence Tomscha Complaint, dated January 1, 2018)*

108.      Defendants refused to investigate or take any action on Mr. Tomscha's complaint that Cox violated AFGE policy and rules by using $90,000 of AFGE resources (the CCS Limo services) for his personal use in 2017.

109.      Had Defendants investigated Mr. Tomscha's complaint that Cox improperly used the CCS Limo services, Defendants might have uncovered the fact that Cox was using the union's car service to unlawfully frequent strip clubs and bars, to procure male prostitutes and to sexually harass Plaintiff John Doe #1, Plaintiff Salim Javid and Plaintiff Kalyar.

110.      In 2017, the NEC and Defendant Cox merged Mr. Tomscha's union with Local 236 (which represented all GSA locals across the country) and required President Tomscha to send all of their money to AFGE National by August 29, 2017.

111.      On or about August 16, 2017, (and before the official date of the merger), Local 2431 members voted to direct President Tomscha to return $1,000 to all 100 local members (approximately $100,000) instead of returning the money to AFGE National.

112.      On Defendant Castellano's recommendation, Defendant Cox preferred charges against Local President Tomscha for not sending the money to AFGE National. AFGE convened

a Trial Committee on May 22, 2018, to investigate charges filed against Mr. Tomscha.

113.     AFGE negotiated a settlement with Mr. Tomscha that, among other things, required Mr. Tomscha to drop all complaints against AFGE.  Defendant General Counsel David Borer's staff drafted the settlement agreement which was signed by Defendant Cox and Tomscha.

114.     Because of Mr. Tomscha's efforts, all AFGE Local 2431 members were able to keep their $1,000 checks.

### Defendants Approved Cox's Decision To Take Over The Human Resources Department, Which Was Responsible For Handling All EEO Complaints, Including Sexual Harassment And Racial Discrimination Complaints Filed Against Cox

115.     Around the same time in 2016 that Cox stripped NST Hudson of his expense voucher review authority, Defendants approved Cox's decision to take away from NST Hudson his authority over the Human Resources Department ("HR") which had responsibility to investigate and process all AFGE EEO complaints.

116.     After assuming authority over HR, Cox assigned General Counsel David Borer and his deputy, Defendant Gony Goldberg, the authority to handle all EEO complaints.  Borer and Goldberg reported directly to Cox,  and the General Counsel's Office was seen as an "arm of the National President."  Working Ideal attorneys concluded:

> "The AFGE EEO policy provides for three channels of reporting.  The first two are reporting to individuals in the General Counsel's Office, or to the head of HR [Human Resources], who **both** report to the President.

> "As a practical matter, **the General Counsel's Office handles all internal EEO complaints,** and we believe that staff rarely, if ever, utilized the reporting channels through either the Women's and Fair Practices Department or HR.

> "**Many individuals we spoke with reported that the General Counsel's Office is seen as an arm of the National President's Office, tasked with representing the interests of the President and the organization, not assisting employees with their EEO concerns and complaints, which affected how willing individuals were to come forward**.

> "A number of employees also described having low trust in the option to report outside the Presidential chain of command through the Women's and Fair Practices Department.

"While it is undisputed that several EEO complaint procedures existed – the EEO policy, the constitutional process, and the CBA [Collective Bargaining Agreement] grievance procedures – in practice, these processes did not meet the organization's needs. Current and former employees described a lack of transparency and …stated that they were not aware of the procedure for raising EEO complaints or had never known that an EEO policy existed …Many of those who did know about the policy believed any complaints would not be taken seriously." *(Exh. 1: Working Ideal report, at pp. 22-23) [Emphasis Added]*

117.      In 2016 and 2017, NST Eugene Hudson filed multiple racial discrimination complaints against Cox with Human Resources Manager Keith Wright.

118.      In July 2017, NST Hudson filed a formal complaint with the Equal Employment Opportunity Commission ("EEOC") that Cox racially discriminated against him.

119.      Defendant Borer and his team of attorneys, including Defendant Goldberg, did not investigate or take any disciplinary action in response to NST Hudson's racial discrimination complaints filed against Cox with Human Resources Manager Wright or with the EEOC.

**Defendants Did Not Investigate Rocky Kabir And Brett Copeland's 2017 Sexual Harassment Complaints Against Cox**

120.      At the end of December 2016, Defendant Cox hired Rocky Kabir as his Confidential Secretary, and Mr. Kabir traveled with Cox across the United States on AFGE-related business approximately 80% of the time.

121.      Beginning in mid-January 2017, Cox began sexually abusing Mr. Kabir.

122.      In approximately April 2017, Mr. Kabir complained to Cox's executive staff and to Defendant DeWyngaert's executive staff that Cox was sexually harassing and touching him inappropriately, demanding that Mr. Kabir accompany him to strip clubs and bars  and demanding that he help Cox procure male prostitutes.

123.      Mr. Kabir also complained that whenever they traveled on AFGE-related business, Cox regularly made sexual advances toward him and toward other random men that

they encountered, including hotel waiters and bellboys, and demanded that he help Cox procure male prostitutes.

124.     Mr. Kabir complained that Cox regularly referred to him as a "Fucking Muslim" or a "Goddamned Muslim."

125.     Cox's staff did not investigate, document, report or take any disciplinary action against Cox in response to Mr. Kabir's complaints.

126.     Defendant DeWyngaert and his staff did not investigate, document, report or take any disciplinary action against Cox in response to Mr. Kabir's complaints.

127.     In April 2017,  AFGE Communications Director Brett Copeland filed a complaint with Chief of Staff DeWyngaert's deputy, Corey Bythrow, that Cox stuck his tongue in his ear, repeatedly told him he loved him and invited Mr. Copeland to share his hotel jacuzzi during a union event in Palm Springs, California.

128.      Mr. Copeland informed Mr. Bythrow that he heard Cox refer to his Confidential Secretary Rocky Kabir, who was present during the incident, as a "Goddamned Muslim."

129.      Mr. Bythrow referred Copeland to General Counsel Borer.

130.     Less than a year earlier, Cox had stripped NST Hudson of his independent authority over HR and had given NST Hudson's authority to investigate all EEO complaints to General Counsel David Borer and his deputy, Gony Goldberg.

131.     Unlike NST Hudson, General Counsel Borer and his deputy, Gony Goldberg, were not independent.  According to Working Ideal, they served as the "arm" of the President.

132.     Borer met with Copeland to discuss the Cox incident.  Copeland submitted his detailed timeline to Bythrow and Borer.  This timeline identified both Copeland and Kabir as targets of Cox's harassment. *(Exh. 1:  Working Ideal Report, dated March 16, 2020, at. p. 11)*

133.     Because Mr. Copeland had filed a discrimination complaint against Cox, an

elected AFGE officer, Borer was required by the AFGE EEO policy to retain a neutral, outside

law firm to conduct an investigation into Mr. Copeland's complaint.  Borer did not do this.

134.     Instead, shortly after Copeland filed his complaint, Borer interviewed Cox who

largely denied the conduct.  *(Ibid.)*

135.     General Counsel Borer then discussed Mr. Copeland's complaint against Cox

with Chief of Staff DeWyngaert, but Borer and DeWyngaert did not interview Mr. Kabir, the

primary witness to the incident, who was also identified as a potential victim of Cox's harassing

behavior in Mr. Copeland's timeline. *(Ibid., p. 12)*

136.     On April 14, 2017, Mr. Copeland submitted his resignation in writing to Bythrow,

Borer, Goldberg, DeWyngaert and Human Resources Keith Wright. *(Ibid., p. 11)*

137.     It was not until November 2019, that Mr. Copeland and Mr. Kabir were

interviewed by Working Ideal attorneys, and Mr. Kabir disclosed what occurred during the

April 2017 incident involving Mr. Copeland and Cox.

138.     Mr. Kabir stated that Cox was speaking to Mr. Copeland, and somehow the

conversation shifted, and Cox made one of his usual derogatory comments: "Rocky, you

Goddamned Muslim."

139.     Mr. Copeland said to Cox: "Don't speak to Rocky that way," and Mr. Kabir told

him, "Hey, don't worry about it."

140.     Mr. Copeland then said he had to use the restroom, and Mr. Kabir heard Cox

demand that Brett urinate in the bushes and said: "Rocky, you watch our backs if people are

walking by."

141.     Mr. Kabir stated that he observed Cox put his arm on Mr. Copeland's shoulder,

and Cox and Copeland urinated in the bushes.

142.     Mr. Kabir was close enough to hear Cox repeatedly invite Mr. Copeland to his hotel room and that Cox told Brett: "I love you.  I love the work you do.  I love you. I love you."

143.     Mr. Kabir heard Mr. Copeland say: "Thank you President Cox, we love you too," but Cox was insistent, and Mr. Kabir heard him say to Mr. Copeland: "I have this beautiful jacuzzi in my room and no one to use it."

144.     Mr. Kabir stated that after they returned to Washington, D. C. in April 2017, Cox told him that Mr. Copeland had reported the incident to Defendant General Counsel David Borer.

145.     Mr. Kabir asked Cox: "Is General Counsel Borer going to speak to me about this?"

146.     Cox responded: "No, he's not going to speak to you about this."

147.     Defendant Borer did not interview Mr. Kabir and did not recommend that the NEC investigate or take disciplinary action against Cox in response to Mr. Copeland's complaint.

148.     Defendant DeWyngaert did not interview Mr. Kabir and did not recommend that the NEC investigate or take disciplinary action against Cox in response to Mr. Copeland's complaint.

149.     Mr. Copeland's resignation became effective about two weeks after the incident.

150.     On or about August 8, 2017, on the recommendation of Defendant Borer, the NEC met to vote on a recommendation by the Committee of  Investigation chaired by Defendant Swanke to remove NST Hudson from office for allegedly violating the Hatch Act and the AFGE rule that prohibits elected officers from using union resources to promote their candidacy.

151.     The NEC voted by a margin of 12 to 1 to remove NST Hudson from office for writing a November 2016 email warning AFGE leaders of the dangers to the union presented by the recent election of President Donald Trump and allegedly improperly using AFGE resources.

### In 2017, Defendant Everett Kelley Covered Up A <u>Second</u> Sexual Harassment Complaint Filed Against Cox By A Male Hotel Employee In Kelley's District

152.     In August 2017,  Defendant Everett Kelley, then-National Vice President for AFGE District 5,  hosted the annual AFGE Human Rights Training conference in Kelley's district at the Hotel Caribe in San Juan, Puerto Rico.

153.     AFGE District 11 Women's Advisory Coordinator and member of the AFGE National Human Rights Committee Pam Baca attended the conference from August 10, 2017 through August 17, 2017.

154.      Upon information and belief, Defendant Cox, Defendant Kelley, Defendant Bunn, Defendant Swanke, Defendant Glover, Defendant Scott, Defendant Doyle, Defendant Castellano, Defendant McCubbin, Defendant Eliano, NVP Greg James and the late NVP Augusta Thomas attended the conference in Puerto Rico.

155.     In a sworn statement, Ms. Baca attested that Defendant Everett Kelley told her in the presence of Defendant Eric Bunn that Hotel Caribe management had informed Kelley that it had received a complaint from a male pool bar attendant that Cox had sexually harassed and inappropriately touched the bar attendant in the pool.  *(Exh. 7: Declaration under Penalty of Perjury of Pam Baca, dated April 28, 2020)*

156.     Defendant Kelley told Ms. Baca in the presence of Defendant Bunn that she was "lucky that she wasn't sleeping on a bench in Old San Juan." *(Ibid., p.4)*

157.     When Ms. Baca asked Defendant Kelley why, he stated that AFGE was almost "kicked out" of the hotel because of Cox's behavior. *(Ibid.)*

158.    According to Ms. Baca, Defendant Bunn was present the entire time, listening to the entire conversation. *(Ibid.)*

159.    Ms. Baca stated that Defendant Kelley told her that "Cox had arrived at the hotel two nights before with his entire family, which usually includes his wife, two sons, their wives and children… and the hotel staff had not personally greeted Cox and had not given him adequate accommodations because they had not expected his family." *(Ibid., p.4)*

160.    Defendant Kelley told Ms. Baca that Cox was enraged by this, and he very harshly berated the hotel staff, yelling at them and making unreasonable demands. The staff, according to Kelley, was very upset by Cox's behavior and complained to the hotel management. *(Ibid., pp.4-5)*

161.    Kelley told Ms. Baca that the next day, Cox went to the pool bar and got drunk and made sexually inappropriate acts multiple times to one of the male attendants who was wearing only swim trunks. *(Ibid., p. 5)*

162.    Kelley told Ms. Baca that Cox attempted to touch the attendant under the water.

163.    Kelley told Ms. Baca that the attendant complained to the managers, that the hotel contacted Kelley and told him they wanted AFGE and Cox to leave and threatened to cancel all the rooms on the master bill being paid for by AFGE, which included Ms. Baca's room. *(Ibid., p. 5)*

164.    Defendant Kelley told Ms. Baca that he had to do some "fast talking" to get the hotel to allow Cox and the AFGE delegation to remain at the hotel. *(Ibid., p. 5)*

165.    Ms. Baca asked Defendant Kelley why the hotel had contacted him, and he stated that he was the "point person" with AFGE for the hotel because he had used the hotel for

District 5 training conferences. Kelley told Ms. Baca that he told the hotel manager that he wanted to use the hotel again for future District 5 conferences. *(Ibid., p. 5)*

166.     Defendant Kelley stated the hotel then agreed to allow AFGE to stay, but only if Cox agreed to stay in his room and leave the hotel as soon as possible. *(Ibid., p. 5)*

167.     Ms. Baca asked Kelley and Bunn why the union allowed Cox's misconduct to continue.  *(Ibid., p. 5)*

168.     Defendant Kelley and Defendant Bunn told Ms. Baca they knew Cox's behavior was problematic, but they could do nothing "because it was Cox." *(Ibid., p. 5)*

169.     Ms. Baca attested that she did not recall seeing Cox much after that.  She recalled that Cox was not present at a private rum tasting social for the NEC and Human Rights Committee held earlier that evening and that during the rum social she recalled hearing  "jokes that Cox was banished to his room." *(Ibid., pp. 5-6)*

170.     Ms. Baca attested that "it was very strange that Cox was not at the rum social because it was one year before the AFGE National Convention, and the rum social would have been the perfect time for Cox to connect with the elected AFGE leaders from each district." *(Ibid., p. 6)*

171.      This was the second time in three years that a hotel in Defendant Kelley's district had filed a complaint with Kelley that Cox had sexually harassed a male hotel employee and demanded that Cox leave the hotel.

172.     Defendant Kelley did not appear to be alarmed or even surprised by the second Cox sexual misconduct complaint.  In fact, Defendant Kelley's response to Ms. Baca concerning the news was casual and even jocular.

173.     After receiving this second report of Cox's sexual misconduct, as before, Defendant Kelley did not investigate, document, or report the hotel employee's complaint.

174.     Defendant Kelley did not file disciplinary charges against Cox related to the Puerto Rico sexual harassment complaint.

175.     Instead, as before with the 2014 Myrtle Beach incident, Defendant Kelley covered up the 2017 sexual harassment complaint filed against Cox by the Hotel Caribe pool bar attendant in Puerto Rico.

176.     Ms. Baca stated that soon after speaking with Defendant Kelley she "made it a point" to discuss Cox's inappropriate sexual behavior with Defendant Gerald Swanke, the District 11 National Vice President representing her district.  *(Ibid., at p. 6)*

177.     Ms. Baca stated that she discussed with Defendant Swanke everything that Defendant Kelley had stated to her and that she told Defendant Swanke that "this type of behavior by Cox was not acceptable and that the NEC needed to do something about it."

178.     Ms. Baca attested that she told Defendant Swanke that "Cox's misconduct reflected negatively upon AFGE and left us open to attacks from our enemies." *(Ibid., at p. 6)*

179.     Ms. Baca stated that Defendant Swanke agreed that the behavior, if it happened, was not acceptable and put AFGE at risk.   Ms. Baca asked whether Defendant Swanke doubted what Defendant Kelley had told her. *(Ibid., at p. 7)*

180.     Ms. Baca stated that Defendant Swanke said he didn't doubt what Kelley had told her about Cox, but he wasn't there personally so he couldn't comment on second-hand information.  Ms. Baca said that Swanke needed to talk to Kelley so Swanke would have the information about Cox's misconduct first-hand. *(Ibid. at p. 7)*

181.     Ms. Baca stated that Defendant Swanke nodded and said he would discuss it with Kelley.  Defendant Swanke told Ms. Baca that he was concerned about Cox's sexual misconduct as well.  *(Ibid. at p. 7)*

182.     Presumably, Defendant Swanke spoke with Defendant Kelley and confirmed that Cox had sexually harassed the Hotel Caribe pool attendant and was confined to his room by the hotel.

183.     Thus, Defendants Kelley, Bunn and Swanke were fully aware of the 2017 sexual harassment complaint filed against Cox by the Hotel Caribe in Puerto Rico. Yet, they did not report the incident or take any disciplinary action against Cox.

184.     Defendant Kelley was also fully aware of the prior 2014 sexual harassment complaint filed against Cox by the Myrtle Beach hotel in his district.

### Everett Kelley Concealed Evidence Of Cox's Sexual Misconduct From Working Ideal Investigators And Bloomberg News

185.     In or about 2019, Working Ideal attorneys asked Defendant Everett Kelley why he did not act after learning about the 2014 sexual harassment complaint filed against Cox by the Myrtle Beach hotel in his district.  *(Exh. 1: Working Ideal Report, March 16, 2020, p. 18)*.

186.     Defendant Kelley responded that he had asked Cox about it; Cox denied it, and Kelley believed him.   *(Ibid.)*.

187.     In response to the same question from Bloomberg News in 2020, Defendant Kelley gave the same response, adding that Cox was a "liar," and stating that had Kelley known then what he knows now, he would have "handled the situation differently."  *(Exh. 8: Bloomberg News Article, Report Finds Pattern of Misconduct and Faulty Safeguards at Major Union," dated March 19, 2020)*

188.     During his Working Ideal and Bloomberg News interviews, Defendant Kelley concealed the fact that in 2017 he had received the _second_ complaint that Cox sexually harassed a male hotel employee in his district.

189.     Defendant Kelley also concealed from Working Ideal investigators and from the Bloomberg News reporter the fact that he did not handle the 2017 sexual harassment complaint against Cox any differently than he handled the 2014 sexual harassment complaint.

190.      Defendant Kelley handled the 2014 and 2017 sexual harassment complaints filed by hotels in his district against Cox exactly the same.

191.     Defendant Kelley did not investigate, document or report either complaint filed against Cox in 2014 and 2017; instead Kelley covered up both complaints.

192.     Aware of complaints of Cox's sexual harassment and other misconduct, in or about July 2018, Defendants Kelley, Bunn, Swanke, Castellano, Glover, Doyle, Scott, Eliano, McCubbin and Flynn signed a letter endorsing Cox and strongly encouraging AFGE members to re-elect Cox to a third term.  *(Exh. 2:  J. David Cox, Sr. 2018 Campaign Re-election Endorsement Letter)*

**AFGE Did Not Investigate Mr. Kabir's 2018 Sexual Harassment Complaints Against Cox**

193.     Rocky Kabir filed sexual harassment and racial discrimination complaints against Cox with AFGE Executive staff Jacqueline Simon, Shannon Harvey and Denene Colbert in 2017 and 2018. Denene Colbert reports to Defendant DeWyngaert, and Chief of Staff DeWyngaert refused to investigate or take any action on the complaints.

194.     In June 13, 2018, Cox and his Confidential Secretary Rocky Kabir left Washington, D. C. to attend a June 14, 2018 Bureau of Prisons meeting in San Antonio, Texas.

195.     They left San Antonio on June 15, 2018, and landed in Charlotte, North Carolina and spent Friday, June 15th and Saturday June 16th at Cox's home.

196.     As usual, Mr. Kabir stayed in the second bedroom of the Cox North Carolina home. While in North Carolina, Cox ordered Mr. Kabir to perform personal errands and tasks for Cox

including, blowing leaves in his yard, working on Cox's re-election campaign and going grocery shopping for Cox and his wife.

197.     They were scheduled to leave North Carolina for Washington, D. C. on Father's Day evening, but Cox got into an argument with his wife and rescheduled the flight to an earlier flight.

198.     Cox and Mr. Kabir left Charlotte, North Carolina by plane early in the morning on Father's Day, Sunday, June 17, 2018. Cox flew business class, received free drinks and drank lots of alcohol on the plane.

199.     While on the flight, Cox demanded that Mr. Kabir help him procure male prostitutes when they returned to D. C., and Mr. Kabir refused, stating that this was not part of his job.   Cox and Mr. Kabir continued to argue about this until the flight landed in D. C.

200.     On or about June 17, 2018, Plaintiff Salim Javed of the CCS Limo Service was booked to pick up Cox and Mr. Kabir from the airport.

201.     After picking them up, Cox told Salim Javed that he wanted to keep the CCS reserved SUV and driver all day and ordered Salim Javed to also pick up a friend of Cox's in Washington, D. C. and then take them all to a restaurant in Silver Spring.

202.     Cox started cursing and threatening Mr. Kabir in front of Salim Javed.

203.     After leaving the restaurant, Cox demanded that Salim Javed, Mr. Kabir and the friend all go to the barber shop together.

204.     At the barber shop, Cox again cursed Mr. Kabir, stating that he was too busy "fucking" his girlfriend (and now wife) to attend to Cox's needs.   Mr. Kabir told Cox he was being very disrespectful to women and to cut it out.

205.     Cox was under the influence of alcohol and again threatened Mr. Kabir, in front of Salim Javed, that he was "going to fuck his life up."

206.     Cox's hostility continued.   Around 8 p.m. Mr. Kabir was working on Cox's campaign and as well as his other AFGE duties.

207.     Cox demanded that Mr. Kabir go with him to find male prostitutes for sex.  Mr. Kabir refused.

208.     Cox used a motorized wheelchair because he had a knee injury.  Cox called it his "knee scooter."

209.     An inebriated Cox got on his knee scooter and started riding down the streets near his apartment searching for a male prostitute for sex.  Cox fell onto East West Highway in Silver Spring, MD, and a passerby called an ambulance which took him to Suburban Hospital where he was kept overnight.

210.     In the following days, Cox and Mr. Kabir continued to argue as Mr. Kabir refused Cox's unreasonable demands that Mr. Kabir procure male prostitutes and go to strip clubs and bars with him.

211.     In or about July 2018, Mr. Kabir removed his property from Cox's house.

212.     In or about July 2018, Mr. Kabir moved into a residence with his fiancée.

213.     The next day, Cox called Mr. Kabir and said he could not do the job as his Confidential Secretary unless Mr. Kabir was around him 24 hours a day, seven days a week as before.

214.     Mr. Kabir told Cox that he refused his unreasonable demand that he continue to work for him 24 hours a day, seven days a week.

215.     Mr. Kabir also told Cox that he liked his job but that he did not like  having to live with Cox, endure his constant sexual harassment and drunken behavior, and comply with Cox's demands to help him procure male prostitutes and comply with Cox's other sexual demands.

216.     Cox continued to send cell phone text messages to Mr. Kabir on his personal cell phone.

217.     On or about July 26, 2018, Cox ordered Kabir to return his AFGE-issued iPad.  Mr. Kabir brought it in, and Cox personally took it away from him.

218.     At the August 2018 AFGE National Convention, Defendants Kelley, Bunn, Castellano, Glover, Doyle, Scott, Eliano, Swanke, McCubbin and Flynn strongly urged their respective district delegates to vote for Cox.  With their help, Cox was re-elected for a third term as AFGE National President.

219.     Shortly after winning the election, Cox forced Mr. Kabir to resign from AFGE and Cox immediately (and prematurely) cut off Mr. Kabir's health benefits.

### Defendants Authorized And Paid For A Sham Investigation Into National Vice President Jeremy Lannan's July 2019 Sexual Harassment Complaints Against Cox

220.     In or about July 2019, National Vice President for Women and Fair Practices Jeremy Lannan,  AFGE's third highest ranking elected officer and a member of the NEC, complained to Defendant Borer and Defendant Goldberg that Cox had sexually harassed him and Rocky Kabir.

221.     NVP Lannan asked Defendant Goldberg to retain a neutral investigator to conduct an independent investigation of his discrimination complaints against Cox as required by the AFGE EEO policy.

222.     Defendant Goldberg agreed, and with Cox's approval, AFGE retained the law firm of Bredhoff and Kaiser to investigate Mr. Lannan's sexual harassment complaints.

223.     The Bredhoff and Kaiser investigation was a sham.

224.     With the apparent knowledge and approval of Defendant Cox, Defendant Borer and Defendant Goldberg, Bredhoff and Kaiser never interviewed Mr. Kabir, a key witness,

during Bredhoff and Kaiser's three-month investigation of NVP Lannan's sexual harassment complaints against Cox.

225. Defendants took no disciplinary action against Cox in response to NVP Lannan's July 2019 discrimination complaints.

226. In July 2019, Defendants knew (or certainly should have known) about the sexual abuse and sexual harassment complaints filed against Cox by Larry Burnett, Brett Copeland, Rocky Kabir, and NVP Jeremy Lannan.

227. In July 2019, Defendants knew (or certainly should have known) about the racial discrimination complaints filed against Cox by Larry Burnett, Eugene Hudson, and Rocky Kabir.

228. In July 2019, Defendants refused to investigate or take disciplinary action against Cox for any of the sexual harassment and racial discrimination complaints filed against him.

**Defendants Authorized An Independent Investigation Of Cox By A Neutral Law Firm Only <u>After</u> The Press Reported Cox's Alleged Sexual Misconduct In October 2019**

229. In or about September 2019, Bloomberg News called AFGE and asked to interview Cox about the sexual harassment and misconduct complaints filed against him.

230. Around the same time, Bloomberg News called Rocky Kabir and Brett Copeland and requested to interview them concerning their sexual harassment and discrimination complaints against Cox.

231. Defendant Cox attempted to intimidate Mr. Kabir by traveling to New York in October 2019 and telling Mr. Kabir's family and former co-workers that Cox would harm Rocky if he spoke to the press. Mr. Kabir gave the interview to Bloomberg News in the face of Cox's threats.

232. On October 27, 2019, Bloomberg News reported that Cox sexually abused and

harassed AFGE staff members and engaged in other misconduct. *(Exh. 4: Bloomberg News Article "President of Major U.S. Union Accused of Sexual Harassment, dated October 27, 2019)*

233.     Cox denied the charges.  Nevertheless, Cox immediately took a leave of absence in October 2019, and Defendant Everett Kelley took over Cox's duties.

234.     On November 14, 2019. Bloomberg News reported that at least ten (10) present and former AFGE employees confirmed that a culture of harassment and fear flourished for years at AFGE among people in positions of power.  That toxic culture, Bloomberg News reported, had resulted in AFGE's refusal to investigate sexual abuse and harassment complaints filed against Cox and other AFGE officials. *(Exh. 9: Bloomberg News Article "Harassment, Culture of Fear Flourish at Federal Workers Union, Staff Say," dated November 14, 2019)*

235.     In response to mounting public pressure, AFGE hastily retained Working Ideal, a law firm headed by former EEOC Chair Jenny Yang, to conduct an independent investigation into Cox's alleged sexual abuse and other misconduct and to perform a broad, system-wide evaluation of the culture, climate, discrimination, policies and practices at AFGE.

236.     In or about February 2020, Plaintiff John Doe #1, Cox's limousine driver, filed a complaint with AFGE that from approximately 2009 through 2019, Cox sexually assaulted, sexually harassed and racially discriminated against him.

237.     On February 13, 2020, AFGE members Annette Wells, Judith Weinberg and Stephanie Graf  filed disciplinary charges against Cox for unlawfully using AFGE-provided limousine services to sexually assault, sexually harass and racially discriminate against Ms. Wells' adult son, Plaintiff John Doe #1, and to frequent strip clubs, bars and procure male prostitutes. *(Exh. 10: Wells, Weinberg and Graf Charges, dated February 13, 2020)*

238.     Wells, Weinberg and Graf demanded that AFGE conduct a forensic accounting of Cox's limousine service invoices to ascertain the value of the union-paid car services that Cox appropriated for his personal use.  The three AFGE members also asked that AFGE file suit against Cox to recover all of his misappropriated CCS Limo expenditures.  *(Ibid.)*

239.     On February 28, 2020,  Defendant Kelley issued a public statement that "the AFGE National Executive Council made a commitment to being transparent with our members and our employees on any development related to the serious allegations of misconduct that have been made against J. David Cox."-*(Exh. 11: AFGE National Secretary Treasurer Everett Kelley's Letter announcing Cox's resignation, dated February 28, 2020).*

240.     The same date that Defendant Everett Kelley made the announcement that the NEC would be "transparent" regarding its response to Cox's misconduct, on February 28, 2020, Defendant Everett Kelley signed a *secret* separation agreement, upon information and belief, paying Cox cash and allowing Cox to resign in lieu of being removed from office for sexual abuse and harassment.

241.     In spite of assuring AFGE members and the public that the NEC would be transparent, to date, Defendant Kelley and the other Defendants have **not** disclosed to AFGE members and the public that Defendant Kelley signed the secret separation agreement with Cox.  Defendants have **not** released Cox's secret separation agreement to AFGE members.

242.     On February 29, 2020, Federal Computer Week (FCW) published an article describing the charges filed against Defendant Cox by Plaintiff Wells. *(Exh. 12: FCW Article, entitled, "AFGE Member Alleges Ex-President Abused her Adult Son for Years," dated February 29, 2020)*

243.     In related case  number 18-1230,  *AFGE v. Eugene Hudson* (KBJ), AFGE filed a September 2018 lawsuit against former National Secretary Treasurer Eugene Hudson falsely

accusing him of "stealing" AFGE emails that were provided to him by another AFGE official, Ryan Gurganious.

244.     Gurganious has stated under oath in that case that he lawfully obtained the allegedly stolen emails from AFGE.  Yet, AFGE seeks to recover the value of the allegedly stolen AFGE resources from the former AFGE official Eugene Hudson in his personal capacity.

245.     While suing Mr. Hudson, who is African American, for purportedly "stealing" emails that were lawfully obtained by Gurganious, AFGE has *not* filed a lawsuit against Cox, who is Caucasian American,  to recover the more than $90,000 in CCS Limo expenditures that Cox misappropriated when he unlawfully used the AFGE-paid car service to go to strip clubs and bars and to procure male prostitutes.

246.      On March 16, 2020, Working Ideal released its public report.  Among other things, the Working Ideal report concluded that Rocky Kabir and Brett Copeland were credible and their sexual abuse and sexual harassment charges against Cox were supported by the evidence.  *(Exh. 1: Working Ideal Report, dated March 16, 2020)*

247.      A third Bloomberg article reported the Working Ideal findings. *(Exh. 8: Bloomberg News article "Report Finds Pattern of Misconduct and Faulty Safeguards at Major Union," dated March 19, 2020).*

248.      In response, Defendant AFGE National Executive Council posted a March 19th letter to the public on the AFGE website commending Working Ideal and its report and praising as courageous heroes former AFGE employees, Mr. Kabir and Mr. Copeland, who came forward with their complaints against Cox.  *(Exh. 13: AFGE National Executive Council Letter posted on the AFGE website on March 19, 2020).*

249.      In the same letter, the NEC assured the public that it would promptly and fully investigate the February 16, 2020, Wells, Weinberg and Graf charges filed against Cox  *(Ibid.)*

250.    Defendant AFGE's EEO policy states that whenever an elected officer is charged with discrimination, Defendants shall retain a neutral firm to conduct an independent investigation of the charges. *(Exh. 1: Working Ideal Report dated March 16, 2020, p. 14) (Exh. 11: AFGE Equal Employment Statement for Employees and Applicants, dated May 2015)*

251.    Wells, Weinberg and Graf charged that while he was the AFGE National President and an elected officer, Cox sexually assaulted, sexually harassed and racially discriminated against Wells' son, Plaintiff John Doe #1. *(Exh. 10: Wells, Weinberg and Graf Charges, dated February 13, 2020)*

252.    Therefore, the AFGE EEO policy required Defendant AFGE to retain a neutral firm to conduct an independent investigation of the February 2020 Wells, Weinberg and Graf discrimination charges filed against Cox.

253.    Nearly four months have passed, and Defendant AFGE has not retained a neutral firm to conduct an independent investigation of the Wells, Weinberg and Graf charges filed against Cox.

254.    Working Ideal determined that Defendant AFGE National Executive Council members had the "formal power to check the President by bringing charges under the Constitution." *(Exh. 1: Working Ideal Report, at p.21-22).* To date, Defendants have failed to do so.

255.    The Working Ideal report exposed structural and systemic weaknesses within AFGE that enabled Cox to wield inordinate, autocratic and unchallenged power.

256.    "These structural weaknesses and lack of reporting information about potential EEO concerns…were particularly problematic in light of the organization's deferential attitude toward the National President's Office. *(Exh. 1: Working Ideal Report, at p. 21)*

257.     "Some described the power of the President as 'absolute' and that Cox was 'beyond reproach'." *(Ibid.)*

258.     Working Ideal concluded that: "[w]itnesses – even those in senior staff positions – expressed the feeling that they were not in a position to stand up to Cox." *(Ibid., at pp. 26-27).*

259.      Working Ideal attorneys found that "[i]ndividuals who worked closely with the National President's office, including … Borer [and] Goldberg, witnessed Cox's verbal abuse and anger." *(Ibid., at p. 18)*

260.     Defendant Borer told Working Ideal attorneys **"that he *suffered a stroke* during an incident in which Cox was verbally abusive"** to him. *(Ibid., at p.25).*

261.     Working Ideal found that "[m]ultiple witnesses relayed accounts of Cox personally 'going after people' he saw as challenging his authority." *(Ibid., at, p.24).*

262.     "In addition, the President also had a role in allocating staff to support each NVP's District and their District events, and this affected whether and how at least some NEC members raised concerns that challenged the President." *(Ibid., at p.21-22)*

263.     During his tenure,  Cox ensured the loyalty of  Defendants Everett Kelley, Eric Bunn, Vincent Castellano, Phil Glover, Danny Doyle, Arnold Scott, Cheryl Eliano, Gerald Swanke, George McCubbin, Joseph Flynn, General Counsel David Borer, Deputy General Counsel Gony Goldberg and Chief of Staff Brian DeWyngaert through a combination of cronyism and fear – rewarding his allies with bonuses and/or  extravagant trips at union members' expense, while threatening to destroy anyone who challenged his authority.

264.     For these reasons, although they were aware of Cox's sexual misconduct, Defendants Everett Kelley, Eric Bunn, Vincent Castellano, Phil Glover, Danny Doyle, Arnold Scott, Cheryl Eliano, Gerald Swanke, George McCubbin, and Joseph Flynn, signed a letter endorsing Cox's 2018 re-election for a third term as president. *(Exh. 2:  J. David Cox, Sr. 2018*

*Campaign Re-election Endorsement Letter)*

265.     Defendants Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin, and Flynn, actively encouraged local presidents and delegates in their District to vote for Cox in 2018. As a result of their strong support, Cox was re-elected National President for a third term.

266.      Fearing Cox's reprisals and wanting to remain in his good graces, Defendants failed to report, document, investigate or make any effort to curb Cox's sexual abuse, sexual harassment, racial discrimination and other misconduct.

267.     Together with Cox, Defendants Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin, Flynn, Borer, Goldberg and DeWyngaert created and maintained a toxic culture a of sexual harassment and racial discrimination at AFGE.

268.     Working Ideal conducted a second part of their investigation into NVP Lannan's sexual harassment complaint against Cox which concluded in approximately May 2020.

269.     To date, at Defendants' direction, Working Ideal has **not** released this second part of the report to AFGE members or to the public.

270.     While Cox has left AFGE, the toxic, discriminatory culture that Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin, Flynn, Borer, Goldberg and DeWyngaert allowed to flourish under Cox's leadership for the past decade, remains.

**General Counsel David Borer And His Deputy General Counsel, Gony Goldberg, Were Aware Of Cox's Sexual, Racial And Fiscal Misconduct And Took No Action To Stop It**

271.     Defendant General Counsel David Borer and Defendant Deputy General Counsel Gony Goldberg, were responsible for handling EEO discrimination complaints. *(Exh. 1: Working Ideal Report, dated March 16, 2020, at  p.14).*

272.     Working Ideal attorneys reported that General Counsel Borer and his team of AFGE attorneys "were seen as an arm of the National President's Office" who represented Cox's interests and *not* the interests of AFGE employees. *(Ibid. at. p.25)*

273.     Defendant Borer and his deputy, Defendant Goldberg, were aware of discrimination complaints filed against Cox by Larry Burnett (2012), Eugene Hudson (2016, 2017), Brett Copeland (2017), Rocky Kabir (2017, 2018, 2019), Jeremy Lannan (2019) and Plaintiff John Doe #1 (2020),

274.     The AFGE National Constitution, and Equal Employment Opportunity ("EEO") policy prohibit sexual abuse and other discrimination. *(Exh. 14: AFGE Equal Employment Opportunity Statement for Employees and Applicants dated May 2015).*

275.     The AFGE EEO policy requires Defendants to retain a neutral investigator to conduct an independent investigation whenever a discrimination complaint is filed against an elected officer. *(Exh. 1: Working Ideal Report dated March 16, 2020, p. 14)*

276.     Defendant Borer and Defendant Goldberg did not investigate or retain a neutral investigator to investigate any of these discrimination complaints filed against Cox.

277.     Bloomberg News reported that when AFGE staff complained about Cox's sexual abuse and harassment to Defendant General Counsel David Borer and Defendant Chief of Staff Brian DeWyngaert, "their response amounted to a 'pat on the head'." *(Exh. 9: Bloomberg News Article "Harassment, Culture of Fear Flourish at Federal Workers Union, Staff Say," dated November 14, 2019)*

278.     Defendant Borer told Working Ideal that he recommended no disciplinary action against Cox for using union resources to frequent strip clubs, bars and to procure male prostitutes because Defendant Borer did not believe that his office "had the ability to address

conduct occurring outside official work activities or hours in the absence of an explicit AFGE policy governing such behavior." *(Ibid., at p. 27)*

279.     This is not true.  General Counsel David Borer is aware that Defendant Everett Kelley recommended that Defendant Cox bring charges against and prosecute AFGE Local President Stephanie Hicks (Birmingham, Alabama Veterans Administration), an African-American woman, for using AFGE resources for personal purposes outside of "official work activities."  Ms. Hicks was sentenced to six months in federal prison, six months of home confinement and five years of supervised probation.  Ms. Hicks was also ordered to pay $83,927 in restitution and a $1,600 fine.

280.     Defendant Cox unlawfully used AFGE resources (Jacqueline Simon and Rocky Kabir) to work in his 2018 reelection campaign at an estimated value of $20,000.

281.     Defendant Cox unlawfully used AFGE resources (CCS Limo Services) to frequent strip clubs, bars and to procure male prostitutes at an estimated value of not less than $90,000, according to former AFGE official Lawrence Tomscha.

282.     The amount of AFGE resources unlawfully used by Defendant J. David Cox is far greater than the amount of AFGE resources allegedly used by Stephanie Hicks.  Yet, to date, Defendants have not prosecuted Cox.

283.     Working Ideal found that the HR Department and the National Vice President for Women and Fair Practices Department were "beholden to Cox" and did not investigate discrimination complaints filed against Cox.  *(Exh. 1:  Working Ideal Report, dated March 16, 2020, at p. 24)*

284.     Working Ideal also found that "[m]ultiple witnesses raised concerns about bringing problems to HR and the General Counsel's Office, given that they were tasked with AFGE's legal defense, or were seen as beholden to Cox."  *(Ibid., at p.25).*

285.     Since 2012, Defendant Borer and his legal staff, including Defendant Goldberg,

have consistently *defended* Cox against those who complained about Cox's sexual, racial

discrimination and other misconduct.

286.     Defendant AFGE has paid, upon information and belief, well over $1 million to

in-house counsel and outside law firms to defend Cox's misconduct.

287.     Additionally, over the years, AFGE has paid undisclosed amounts of money to

silence victims of Cox's sexual abuse through the use of confidential nondisclosure agreements.

**All Defendants Received Mandatory EEOC Anti-Discrimination Training In 2015,
Yet, They Still Permitted Cox To Discriminate Against Plaintiffs With Impunity**

288.     In May 2015, AFGE revised its EEO Policy which prohibits racial, sexual and

other discriminatory misconduct and requires AFGE to hire an outside, neutral firm to

investigate discrimination complaints filed against an elected officer. *(Exh.14: AFGE Equal

Employment Opportunity Statement for Employees and Applicants, dated May 2015)*

289.     In June 2015, Plaintiff Jocelynn Johnson, who is African American, filed a

complaint with the EEOC alleging that Defendant AFGE engaged in racial, sex, religious and

age discrimination. *(Exh. 15: Jocelynn Johnson EEOC Discrimination Complaint, dated June

19, 2015).*

290.     The EEOC investigated and found probable cause for Plaintiff Johnson's

complaint.  In exchange for Plaintiff Johnson's agreement not to sue AFGE, Cox and Plaintiff

Johnson signed an EEOC-approved Mediation Settlement Agreement requiring anti-

discrimination training for AFGE managers.  *(Exh. 16: EEOC Mediation Settlement Agreement

entered into with AFGE President J. David Cox and Jocelynn Johnson, dated August 27, 2015).*

291.     Cox ordered all Defendant AFGE National Executive Council members (including himself) and all AFGE General Counsel and Executive staff to take the EEOC anti-discrimination training.  *(Exh. 1:  Working Ideal Report, dated March 16. 2020, at p. 23)*

292.     Between August 27 and December 31, 2015, all Defendants and all AFGE executive staff received mandatory EEOC anti-discrimination training.

293.     Between August 27 and December 31, 2015, Defendant Borer, Deputy General Counsel Goldberg and all AFGE attorneys received the mandatory EEOC anti-discrimination training.

294.     Between August 27 and December 31, 2015, Defendant DeWyngaert and his staff, including Human Resources Manager Keith Wright, received the mandatory EEOC anti-discrimination training.

295.     Defendants were aware that they were required to retain a neutral investigator to investigate all discrimination complaints filed against an elected officer.

296.     After taking the mandatory EEOC anti-discrimination training in 2015, Cox sexually harassed Rocky Kabir, Brett Copeland, Plaintiff John Doe # 1, Plaintiff Salim Javed, Plaintiff Waqas Kalyar, Plaintiff Fahim Javed and racially discriminated against Hudson, Plaintiff Johnson, Plaintiff Lewis, Plaintiff Scott and others.

297.     After taking the mandatory EEOC anti-discrimination training in 2015, Defendant Cox,  Defendant Borer, Defendant Goldberg and Defendant DeWyngaert refused to recommend that the NEC hire a neutral investigator to conduct an independent investigation of the various discrimination complaints filed against Cox as required by the EEO policy.

298.      Instead, Defendant Cox, Defendant Borer, Defendant Goldberg and Defendant DeWyngaert quietly negotiated confidential nondisclosure agreements to ensure complaining witnesses' silence, including, among others, Larry Burnett.

299.     National Vice President Dorothy James recently testified under oath that Cox, Defendant General Counsel Borer and Defendant Deputy General Counsel Goldberg did **not** notify the NEC or obtain NEC approval before entering into the confidential nondisclosure agreement with Mr. Burnett.  Ms. James testified that she was unaware of the terms of the Burnett settlement agreement.

300.     In March 2020, Working Ideal attorneys released the first of a two-part report that reached the following conclusions:

1) Brett Copeland's allegations of sexual harassment and racial discrimination by Cox against himself and Rocky Kabir are credible and consistent with other witness statements and documents;

2) Rocky Kabir's allegations are credible and supported by substantial evidence;

3) There is substantial evidence that Cox subjected additional Defendant AFGE employees to conduct of a sexual nature and other misconduct, including racial and religious discrimination, verbal abuse, bullying and belligerent behavior;

4) While Defendant AFGE took some steps to prevent and address harassment and misconduct, its written policies and constitutional procedures – and their implementation – left few checks on the power of the President.  These organizational shortcomings hindered Defendant AFGE's ability to learn the full picture of Cox's misconduct and to hold him accountable;

5) Current and former employees were reluctant to raise concerns about Cox's misconduct due to fears of retaliation and a lack of organizational response when concerns were raised, creating an environment that chilled reporting and made it harder for Defendant AFGE to learn about and respond appropriately to allegations of harassment by Cox." *(Exhibit 1: Working Ideal Report, dated March 16, 2020, pp. 4).*

**Plaintiff John Doe #1**

301.     From in or about 2009 to July 2019, Cox sexually abused, assaulted and harassed Plaintiff John Doe #1.

302.     CCS Limo, a private company owned by Plaintiff Kalyar, provided transportation services, contracting primarily with international unions, including Defendant AFGE, from approximately in or about 1998 to in or about February 2018.

303.     Plaintiff John Doe #1 has been employed as a professional driver for CCS Limo (and its new owner Limo Network) for 12 years, from 2008 to the present.

304.     Beginning in approximately 2009, Cox demanded that Plaintiff Kalyar assign Plaintiff John Doe #1 as Cox's primary driver.

305.     Cox always sat in the back seat of the limo and insisted that Plaintiff John Doe #1 exit the vehicle and come around and open the rear door for him.

306.     Cox initially made small talk with Plaintiff John Doe #1, but he soon began to ask inappropriate and offensive questions about Plaintiff John Doe #1's personal life.

307.     Cox asked Plaintiff John Doe #1 whether he had ever had sex with a man. Plaintiff responded that he had not and that he was a husband and father of six (6) children and that he was not homosexual or bisexual.

308.     Cox regularly boasted to Plaintiff John Doe #1 that he knew Speaker of the House Nancy Pelosi, Senator Chuck Schumer, AFL-CIO President Richard Trumka and other international union leaders.

309.     Cox regularly bragged to Plaintiff John Doe #1: "I have more money than God."

310.     On one occasion, in or about 2010, Plaintiff John Doe #1 picked Cox up from the airport in Washington, D.C., and instead of sitting in the back seat of the limo, Cox sat in the front seat.

311.     While Plaintiff John Doe #1 was driving, Cox reached over and rubbed Plaintiff John Doe #1's groin and crotch area, causing Plaintiff John Doe #1 such alarm that he nearly ran off the road.  Plaintiff John Doe #1 gained control of the limo and angrily rebuffed Cox.

312.     Cox warned Plaintiff John Doe #1 not to tell anyone what Defendant Cox had done to him.

313. Cox threatened to file a complaint against Plaintiff John Doe #1 with his employer and with other international union presidents and told him that he would cut off all of his company's union contracts if Plaintiff told anyone what Cox had done.

314. Plaintiff John Doe #1 did not own a vehicle and relied on his company car that CCS Limo allowed him to take home and use for personal purposes as his only source of transportation.

315. Plaintiff John Doe #1 was in his 30's and needed his job to support his family. Plaintiff John Doe #1 could not afford to lose his job. Plaintiff John Doe #1 did not report Cox's unwanted touching.

316. Cox began to demand that Plaintiff John Doe #1 drive Cox to bars and strip clubs in the CCS vehicles paid for by Defendant AFGE and go inside the bars and strip clubs with him.

317. Plaintiff John Doe #1 drove Cox to strip clubs and bars but told Cox that Plaintiff John Doe #1 preferred to wait for Cox outside of these places in the car.

318. Cox insisted that Plaintiff John Doe #1 join Cox inside the strip clubs and bars. Fearful of Cox's threats, Plaintiff John Doe #1 reluctantly agreed.

319. Once inside the strip clubs and bars, Cox demanded that Plaintiff John Doe #1, a professional driver, drink alcohol with him. Plaintiff John Doe #1 always refused to drink alcohol with Cox.

320. Plaintiff John Doe #1 often complained to his employer, Plaintiff Kalyar, that he did not want to drive Cox in the evenings or when Cox was alone in the vehicle and had been drinking alcohol.

321.     Cox continued to insist that CCS Limo assign Plaintiff John Doe #1 as his primary driver, and Plaintiff Kalyar acquiesced.

322.     On one occasion, Cox insisted that Plaintiff John Doe #1 and Plaintiff Kalyar accompany him to Archibald's strip club on K Street, N. W. in Washington, D. C.

323.     On that occasion, Cox got drunk and as he was leaving Archibald's Cox shouted in a loud voice, "Can anybody get me a straight Black cock?" humiliating Plaintiff John Doe #1.

324.     On another occasion, Cox demanded Plaintiff John Doe #1 drive him and his wife, Lynn Cox, to dinner.  When they arrived, Cox invited Plaintiff John Doe #1 to join Cox and his wife for dinner at the Washington Court Hotel.  Plaintiff John Doe #1 said he preferred to wait in the car, but Cox insisted. Plaintiff John Doe #1 reluctantly agreed.

325.     Plaintiff John Doe #1 excused himself to go to the restroom, and Cox followed him into the men's room, rushed up to him and kissed him on the mouth.

326.     Plaintiff John Doe #1 pushed Cox away and immediately left the restaurant shocked and appalled.

327.     Cox regularly began to sit in the front seat of the limo instead of in the back seat of the limo, and Cox demanded that Plaintiff John Doe #1 allow Cox to perform oral sex on Plaintiff John Doe #1 in the limo.  Plaintiff John Doe #1 acquiesced and allowed Cox to perform oral sex on Plaintiff John Doe # 1 in the limo on numerous occasions.

328.     Cox repeatedly threatened Plaintiff John Doe #1.  Cox told  Plaintiff John Doe #1 that if Plaintiff John Doe #1 did not allow Cox to perform fellatio on Plaintiff John Doe #1 in the limo, then Cox would cancel Defendant AFGE's contract with CCS Limo and tell all his union leader friends to do the same.  In that way, Cox threatened Plaintiff John Doe #1's livelihood, forcing Plaintiff John Doe #1 to allow Cox to perform fellatio on Plaintiff John Doe #1.  So, Plaintiff John Doe #1 acquiesced to Cox's demands.

329.     Cox thereby repeatedly sexually assaulted Plaintiff John Doe #1 by forcing him, under threat of losing his job, to allow Cox to perform oral sex on Plaintiff John Doe #1 against his will and without his consent.

330.     On another occasion, Cox booked a CCS vehicle to pick him up from his residence and take him to the airport. Cox specifically asked CCS Limo to send Plaintiff John Doe #1.

331.     Upon arriving at Cox's residence, Cox called and asked Plaintiff John Doe #1 to come upstairs to his apartment and help him bring his luggage down to the limo.

332.     When Plaintiff John Doe #1 entered Cox's apartment, Cox demanded Plaintiff John Doe #1 allow Cox to perform fellatio on Plaintiff John Doe #1.

333.     Cox again threatened Plaintiff John Doe #1 that if he did not allow Defendant to perform oral sex on Plaintiff, Cox would file a complaint with Plaintiff's employer against him and demand that he be terminated.   Plaintiff John Doe #1 acquiesced.

334.     On another occasion, Cox offered Plaintiff John Doe #1 $2,000 if he would agree to have sex with a woman in front of Cox while he masturbated and watched. Plaintiff John Doe #1 refused.

335.     Plaintiff John Doe #1 asked his supervisor not to assign him to Cox, but he did not report Cox's sexual assaults and sexual harassment because of his ongoing fear of Cox's threats.

336.     During Plaintiff John Doe #1's employment, other CCS Limo drivers were aware of Cox's sexually predatory propensities.

337.     It became a joke among the CCS Limo drivers who would often say – "Hey, [ John Doe #1] Cox just called for a driver, you want to pick him up?" and they all would laugh and mock Plaintiff.

338.     Working Ideal attorneys reported that Defendant Cox used racial and religious slurs. *(Exh. 1: Working Ideal Report  at p. 16).*

339.     Defendant Cox regularly addressed National Secretary Treasurer Eugene Hudson, who is African American and the union's second highest-ranking officer at the time, using the racial slurs "boy" and "son" over Mr. Hudson's strong objections**.**

340.     Defendant Cox referred to Mr. Hudson's staff assistant, Willie Hope, who is African American, and President Obama, using the racial slur "boy."

341.     Defendant Cox often referred to his Confidential Secretary Mr. Kabir, a person of color, using the racially pejorative terms "boy" and "son" over Mr. Kabir's objections.

342.     Defendant Cox often called Plaintiff John Doe #1, who is African American, the racial slur "boy" by saying, "Isn't that right, boy?" or when he got out of the car, Cox would say "Thank you, boy" and then laugh.

343.     CCS Limo employed several Pakistani drivers, and Plaintiff John Doe #1 heard Cox refer to the Pakistani drivers as "sand niggers," remarking that he did not want those "sand niggers" driving him around.

344.     On another occasion, Cox took Plaintiff John Doe #1 to a restaurant, drank alcohol and said loudly: "You know we white folks are going to hang you black people."

345.     Combined with his constant sexual harassment and sexual assaults, Cox's racist remarks created a hostile, shocking and humiliating work environment for Plaintiff John Doe #1.

346.     Defendant Cox's misconduct caused Plaintiff John Doe #1 tremendous physical distress leading to stroke-level high blood pressure and other life-threatening illnesses and emotional distress.

347.     Around this time, due to the physical and emotional stress of Defendant Cox's

sexual and racial abuse and harassment, Plaintiff John Doe #1's marriage fell apart resulting in divorce.

348.     On or about July 28, 2010, at 2:00 a.m., Plaintiff John Doe #1 was rushed to the Emergency Room at the Holy Cross Hospital located in Silver Spring, MD because of shortness of breath. X-rays showed his lungs were filled with fluid.

349.     Because of his physical symptoms, including the fact that his blood pressure was dangerously high - 230/140, (stroke level) — Plaintiff John Doe #1 was admitted to the hospital.

350.     The next day, Plaintiff John Doe #1 had to undergo dialysis treatment. He was ultimately discharged from Holy Cross Hospital on or about July 31, 2010.

351.     In or about August 2010, Plaintiff John Doe #1 suffered total kidney failure and was on dialysis treatment for about eight (8) months until his condition improved.

352.     Before driving for Defendant Cox, Plaintiff John Doe #1 had no prior kidney problems or family history of kidney problems.

353.     In or about January 2016, Plaintiff John Doe #1's kidneys failed again, and he was put back on dialysis, however, this time he remained on dialysis for 1½ years.

354.     Plaintiff John Doe #1 received dialysis for his failing kidneys while he continued driving the limo for Cox who continued to demand him as his driver.

355.     Defendant Cox became aware that Plaintiff John Doe #1 had gotten sick again and told Plaintiff that he was once a nurse so he understood his medical ailments, leading Plaintiff John Doe #1 to believe that Cox would stop sexually harassing him.

356.     Cox stopped demanding that Plaintiff John Doe #1 allow him to perform oral sex on Plaintiff John Doe #1 for about two (2) months and waited for him to get better.

357.     In or about March 2016, Defendant Cox resumed his threats and resumed his demands to perform oral sex on Plaintiff John Doe #1.

358.     In or about June 2017, both of Plaintiff John Doe #1's kidneys failed and were removed.   Plaintiff John Doe #1 was placed back on dialysis treatment.

359.     CCS Limo took their company car from Plaintiff John Doe #1, and he was left with no vehicle to go to his dialysis treatments, rehabilitation, and other medical appointments.

360.     Around this time, with help from his mother, Plaintiff Annette Wells, Plaintiff John Doe #1 purchased his own personal vehicle in or about July 2017.

361.     On or about September 20, 2017, Plaintiff John Doe #1  underwent a kidney transplant from a cadaver at Georgetown Hospital.

362.     During the diagnosis, kidney transplant and his rehabilitation, Plaintiff John Doe #1 was unable to work for 30 days and was forced to move in with his parents, Plaintiffs Wells and Vaughan, who took care of Plaintiff John Doe #1 and assisted him financially with his living and medical expenses.

363.     After his recovery, Plaintiff John Doe #1 returned to work at CCS Limo in or around October 2017 and remained there until February 2018.

364.     In or about February 2018, Plaintiff John Doe #1 left CCS Limo and went to work for another limousine company, Reston Limousine.

365.     In February 2019, Plaintiff John Doe #1 returned to work for CCS Limo, which was now owned by new owner, Plaintiff Fahim Javed, and was operating under the new name Limo Network Nationwide.  Limo Network Nationwide had all of CCS Limo's union clients, including Defendant AFGE.

366.     Limo Network Nationwide asked Plaintiff John Doe #1 to pick up Cox.

367.     Plaintiff John Doe # 1 refused, telling his new employer that he would not drive for Cox under any circumstances because Plaintiff John Doe #1 had an issue with Cox when he was driving for him with CCS Limo.

368.    After hearing Plaintiff John Doe #1's refusal to drive for Cox, Limo Network Nationwide did not assign Plaintiff John Doe #1 to pick up Cox.

369.    For months after Limo Network Nationwide stopped assigning Plaintiff John Doe #1 to pick him up, Cox called Plaintiff John Doe #1 directly on his personal cell phone, harassing him and demanding that he drive for him "off the books," meaning he would pay Plaintiff directly without his supervisors' knowledge.

370.    Plaintiff John Doe #1 told Cox he would not drive for him "off the books" because that would be stealing from his employer, and Plaintiff John Doe #1 wasn't going to do that.

371.    Plaintiff John Doe #1's kidney transplant recently failed, and he currently awaits a second kidney transplant.

372.    At all times relevant, Plaintiff John Doe # 1 was neither contributorily negligent nor did he assume the risk of his injuries or consent to the inappropriate physical contact, sexual assault and sexual harassment by Cox.

373.    By reason of these acts, Plaintiff John Doe #1 has been seriously damaged.

**Plaintiffs Annette Wells and Paul Vaughan**

374.    Plaintiff Wells is Plaintiff John Doe #1's mother and a longstanding AFGE member in good standing. Plaintiff Vaughan is Plaintiff John Doe #1's stepfather.

375.    During the time Cox sexually abused and mentally tortured Plaintiff John Doe #1, Plaintiff Wells noticed her son had become withdrawn and seemed depressed.

376.    During his diagnosis, medical treatment and rehabilitation, Plaintiff John Doe #1 was unable to work and began residing with his parents, Plaintiffs Wells and Vaughan, who took care of him and assisted him financially with his living and medical expenses.

377.     Plaintiff Wells did not learn until early 2020 that the president of her union, AFGE, had been sexually abusing and sexually harassing her son for nearly a decade.

378.     Plaintiff Wells immediately exercised her right as an AFGE member and filed internal disciplinary charges against Cox on February 13, 2020, two weeks before Cox left office as National President.

379.     To date, AFGE has not investigated Plaintiff Wells' charges against Cox causing Plaintiff Wells emotional distress and providing further evidence that the toxic environment that existed under Cox continues unabated after his departure and under Defendants' leadership.

**Plaintiff Waqas "Vic" Kalyar**

380.     Plaintiff Kalyar owned CCS Limo, a company that provided transportation services to international unions, including Defendant AFGE, all over the world. Plaintiff Kalyar's primary AFGE client was Cox, and Plaintiff Kalyar drove Cox for many years.

381.     Plaintiff Kalyar became a close confidante of Cox and often drove Cox after other drivers refused to drive the union president.

382.     Cox often bragged to Plaintiff Kalyar that he was personal friends with Nancy Pelosi and Chuck Schumer.

383.     Cox regularly told Plaintiff Kalyar: "I have more money than God."

384.     On numerous occasions, Cox demanded that Plaintiff Kalyar take Cox to strip clubs, bars and help him procure male prostitutes.

385.     On one occasion, Cox ordered Plaintiff Kalyar to drive Cox, Cox's pastor, Reverend Joey, and Reverend Joey's partner (who is male) from a holiday party at Charlie Palmers' restaurant in Washington, D.C. to Archibald's strip club also in D.C..

386.     Plaintiff Kalyar waited in the car and observed Reverend Joey and his partner come over to the car and explain that they were uncomfortable in the strip club and were leaving.

387.     A bouncer came outside later and told Plaintiff Kalyar that he needed to take Cox out of the strip club or the bouncer would throw Cox out because Cox was intoxicated and obnoxious. Plaintiff Kalyar went inside and convinced Cox to leave.

388.     Once outside, Plaintiff Kalyar went to get the limo, pulled it to the front of the strip club, walked around and opened the rear limo car door for Cox, as he usually demanded.

389.     Instead of getting in the limo, Defendant Cox went to the same big, bouncer who was now standing outside, handed him a $20 bill and shouted in a loud voice for everyone passing by to hear, "I want a straight Black guy so I can suck his cock."

390.     Plaintiff Kalyar then observed Cox begin handing out $20 bills to random people passing on the street shouting, "Can anybody find me a straight Black dick I can suck?"

391.     Plaintiff Kalyar observed Cox hand out approximately $300 worth of $20 bills to random people while repeatedly shouting, "Can anybody find me a straight Black dick that I can suck?"

392.     Plaintiff Kalyar was very embarrassed and humiliated. He kept asking Cox to stop shouting and get into the car, but Cox continued to yell and hand out money to strangers for about a half hour, making the same loud request.

393.      Cox was wearing a white dress shirt that had an AFGE insignia on it and an AFGE jacket, and Plaintiff Kalyar pointed this out to Cox and told him that "someone is going to capture you on video wearing the AFGE labels handing out bills and shouting like this, and you're going to get the union and yourself in trouble. You'd better get in the car now so we can

go, or I'm leaving you here."

394.     Cox then got in the limo, and Plaintiff Kalyar took Cox to his Silver Spring apartment.

395.     Plaintiff Kalyar often observed Cox spend large sums of money on alcohol, strip clubs, bars and male prostitutes while using CCS Limo car transportation services in his official capacity as AFGE National President.

396.     Cox complained to Plaintiff Kalyar that AFGE National Secretary Treasurer Eugene Hudson had questioned him about his unusually large CCS Limo invoices and had asked Cox why he was using the CCS Limo services so late at night.

397.     Cox pressured Plaintiff Kalyar to split the billing amounts charged on CCS limo invoices by billing some of the hours on later CCS Limo invoices to conceal from National Secretary Treasurer Hudson the fact that Cox was running up unusually large personal CCS Limo bills.

398.     Cox also ordered his AFGE staff to charge some of his excessive CCS Limo bills to their AFGE-issued credit cards to conceal Cox's unusually large personal CCS Limo bills from AFGE National Secretary Treasurer Hudson.

399.     Because of the  extreme stress he experienced in dealing with Cox, Plaintiff Kalyar sold his CCS Limo business to Plaintiff Fahim Javed, owner of Limo Network Nationwide ("Limo Network") in or about February 2018.

400.     Plaintiff Fahim Javed assigned his younger brother, Plaintiff Salim Javed, as Cox's primary driver.

401.     On or about June 17, 2018, Cox called Plaintiff Salim Javed and told him he was at the Suburban Hospital in Bethesda, Maryland.

402.     Cox told Plaintiff Salim Javed that his Confidential Secretary Mr. Kabir was not

answering his calls, and he wanted someone to be with him at the hospital.

403.  Cox instructed Plaintiff Salim Javed to pick up Plaintiff Kalyar from his home in Maryland and bring Kalyar to the hospital to be with him.

404.  When Plaintiff Kalyar arrived at the hospital, Cox informed him that he had been drinking, had gone out on his knee scooter riding down the streets near his apartment and that he had fallen onto East West Highway in Silver Spring, MD.

405.  Cox told Plaintiff Kalyar that someone had called an ambulance which took him to Suburban Hospital, and that he wanted to leave the hospital and go home.

406.  When the nurse came to check on Cox, in Plaintiff Kalyar's presence, Cox demanded to be released from the hospital. The nurse told Cox he could not be released in his present condition.

407.  In Plaintiff Kalyar's presence, Cox cursed and screamed at the nurse until she was nearly in tears, and at that time, an Emergency Room doctor entered the room.

408.  In Plaintiff Kalyar's presence, Cox cursed and screamed at the ER doctor, informing the doctor that he knew Nancy Pelosi and Chuck Schumer and that unless the hospital released him, Cox was going to call his personal lawyer, Defendant AFGE General Counsel David Borer, who would make things bad for them.

409.  In Plaintiff Kalyar's presence, four (4) security guards were then called in to hold Cox down so he could be given an injection to make him pass out.

410.  After Cox passed out, Plaintiff Salim Javed took Plaintiff Kalyar back to his home.

411.  When he came to, Cox called Plaintiff Salim Javed and ordered him to pick him up at Suburban Hospital at 5:30 a.m. to take him to his apartment, wait for him and at 9:30 a.m. then take him to the rest of his day's scheduled meetings.

412.     When Cox received the CCS invoice that included the trip to Suburban Hospital, he was infuriated.   Cox called Plaintiff Kalyar demanding that he delete this billing from the invoice showing Cox's pickup from the Suburban Hospital.

413.     Plaintiff Kalyar told Cox he could not change Limo Network's bill because it was no longer his company.

414.     Cox then told Plaintiff Kalyar to change the invoice to read "as-directed" and instead of showing the pick-up point as Suburban Hospital in Bethesda, MD and to combine that billing entry on the invoice with the rest of Cox's modified AFGE itinerary.  Plaintiff Kalyar again refused.

415.     Cox insisted that Plaintiff Kalyar instruct the new owners to change the billing details to delete the Suburban Hospital run. Plaintiff Kalyar agreed but did not do so.

416.     Plaintiff Kalyar's out of town drivers also often refused to pick up Cox because of his sexual misconduct, threats, cursing and bullying.

417.     On one occasion, a contract driver who was Muslim picked Cox up in New York, and Cox ordered the driver to take him to a strip club and insisted that he go inside with him.

418.     The driver drove to the strip club as ordered and informed Plaintiff Kalyar that he was quitting the company the following day.

419.     In Las Vegas, Cox invited a CCS Limo subcontract driver to come up to his hotel room. The driver refused, and Cox cursed and verbally abused the driver.

420.     The next day, the Las Vegas driver informed Plaintiff Kalyar that he was quitting the company.

421.     Plaintiff Kalyar observed Cox's repeated sexual harassment, verbal abuse and regular use of religious slurs toward Mr. Rocky Kabir.

422.     Plaintiff Kalyar often heard Cox call him and Mr. Kabir a "Goddamned Muslim" or a "Fucking Muslim."

423.      Cox told Plaintiff Kalyar: "I'm surrounded by these Goddamned Jews and these Goddamned Muslims."

424.      Cox also demanded that Plaintiff Kalyar perform personal duties for him, including helping him procure male prostitutes and working on Defendant's Cox's 2018 re-election campaign.

425.      Cox repeatedly threatened Plaintiff Kalyar that if he did not do what Cox "needed," Cox would terminate his contract with AFGE and use his contacts to have all of CCS Limo's other international union contracts severed.

### Plaintiff Fahim Javed

426.      In or about February 2018, Plaintiff Fahim Javed acquired CCS Limo from Plaintiff Kalyar, assumed all of its clients, including AFGE and started serving them under his business, Limo Network.

427.     CCS Limo's clients were international unions, including the Machinists, AFL-CIO, Postal Workers, LIUNA, among others, and their presidents and top officials.

428.     Plaintiff Kalyar worked with Plaintiff Fahim Javed to transition the billing, bookings, hiring subcontractor drivers and driving for Limo Network.

429.     Plaintiff Fahim Javed met Cox for the first time in mid-2018 and drove Cox about 10 times over the period February 2018 through October 2019.

430.     After one (1) or two (2) trips, Cox asked Plaintiff Fahim Javed "what kind of sex" he liked and other sexually inappropriate questions.

431.     On one occasion, Plaintiff Fahim Javed picked Cox up from Reagan Airport, and Defendant started talking about sex, asking him how many times a week he "fucked" and what

type of girls he liked to "fuck," how big was his "dick" and how long he lasted when he "fucked."

432.	Cox stated to Plaintiff Fahim Javed, "I heard you Middle Eastern guys have big dicks," and "You fucking Muslims are lucky, you can have and fuck four wives." as well as many other racist and offensive comments.

433.	Plaintiff Fahim Javed found Cox's comments about sex and his faith very offensive and perceived Cox as sexually depraved, bullying, mean-spirited, foul-mouthed and extremely disrespectful.

434.	Most of Cox's bookings with Limo Network were from or to airports in Washington, D. C. and to and from other airports in various cities.

435.	Cox often cursed at Plaintiff Fahim Javed's drivers, belittling them with abusive and foul language.

436.	Cox would then call Plaintiff Fahim Javed and, as usual, threaten to cancel his company's contract, telling Plaintiff that he knew all the other international union leaders and that he would tell them to take away their business from him. Cox made these threats while cursing and shouting at Plaintiff Fahim Javed.

437.	Although he found Cox's behavior deplorable, Plaintiff Fahim Javed tried to ignore Cox's abuse because he feared losing the business. He and his family had invested substantially to obtain CCS Limo's clients, especially union clients, and he could not afford to lose them.

438.	In or about June 2018, Cox telephoned Plaintiff Fahim Javed several times demanding his Limo services on a date that AFGE had not previously booked.

439.	Cox informed Plaintiff Fahim Javed that he was hungry and asked him to

bring him a chicken Caesar salad. Plaintiff responded that his company only provided transportation services – not food delivery.   Plaintiff Fahim Javed suggested that Cox call a food delivery service.

440.     Cox telephoned Plaintiff Fahim Javed back several times demanding that Plaintiff bring him a chicken Caesar salad, complaining that Plaintiff was not "helping" him and that if he didn't bring him the food he wanted, he would take all union business away from Plaintiff's company.

441.     Plaintiff Fahim Javed called Shannon Harvey, Cox's Executive Assistant, and told her that Cox was demanding that he bring him food.

442.     Ms. Harvey told Plaintiff Fahim Javed that she would call Cox. Ms. Harvey telephoned back and told Plaintiff Fahim Javed that she had offered to order the food for Cox and have it delivered to his apartment, but Cox refused and informed her he did not need food.

443.     Cox telephoned Plaintiff Fahim Javed repeatedly and instructed Plaintiff Fahim Javed that he didn't ask Ms. Harvey for food and that he wanted Plaintiff Fahim Javed to bring food to him.

444.     Plaintiff Fahim Javed telephoned Ms. Harvey again, and she informed him that she was calling the police.  Ms. Harvey told Plaintiff Fahim Javed: "He sounds violent, so don't go there because he might hurt you."

445.     Three months later, in or about September 2018, Plaintiff Fahim Javed picked up Defendant Cox at Reagan Airport. As soon as he got in the SUV, Cox told Plaintiff Fahim Javed, "I remember you. You did not come to my house when I needed you a few months ago." Plaintiff Fahim Javed again explained that it was against company policy to deliver food.

446.     Inebriated, Cox got in the back seat of the car and swung his fist to punch Plaintiff Fahim Javed in the face. Plaintiff dodged the blow, but Cox struck Plaintiff Fahim Javed's shoulder instead.

447.     Plaintiff Fahim Javed saw a police officer and flagged him down for assistance with  Cox, who was shouting and cursing at him. The officer asked Cox to calm down, and he agreed. As Plaintiff Fahim Javed was driving on the Memorial Bridge, Cox, while continuing to shout and curse at him for not coming to his place when he "needed" him, Cox suddenly began to open the car door while Plaintiff Fahim Javed was driving in traffic. Plaintiff had to slam on the brakes, barely avoiding an accident.

448.     In or about February 2019, Cox requested a "personal pickup" from his Silver Spring, Maryland apartment to take him to the airport.

449.     This personal limousine pickup had not been booked by Defendant AFGE, but had been booked directly by Cox himself.

450.     Upon Plaintiff Fahim Javed's arrival, Cox was with a person that he described as his "roommate." In front of the roommate, Cox started speaking about sex. Defendant stated to Plaintiff that his roommate "had a big cock."

451.     Plaintiff Fahim Javed found Cox's remarks highly offensive but did not verbally object for fear of antagonizing Cox.

452.     This was the first time that Cox had made lewd, sexual comments to Plaintiff Fahim Javed in front of another person.

453.     A few weeks later, on or about April 14, 2019, Plaintiff Fahim Javed picked Cox up from the Reagan Airport, and Cox told him that he and his same roommate/friend "fuck girls together."

454.     Cox stated to Plaintiff Fahim Javed that he enjoyed watching his

roommate/friend "fuck girls," and that Defendant thought Plaintiff Fahim Javed would also love seeing Cox's roommate/friend "fucking girls with his big cock."

455.     While Plaintiff Fahim Javed was driving Cox, Defendant touched his shoulder while talking about sex, asked Plaintiff how many times he "fucked," and stated that he gets "horny every night" and likes to "fuck." Defendant asked Plaintiff if he planned to "fuck" tonight.

456.     Plaintiff Fahim Javed's younger brother, Plaintiff Salim Javed, recently told Plaintiff Fahim Javed about the sexual harassment and sexual abuse that Plaintiff Salim Javed endured for almost two (2) years while driving Cox.

457.     Plaintiff Salim Javed told Plaintiff Fahim Javed that he did not tell him about Cox's abuse earlier because Plaintiff Salim Javed was too traumatized, fearful and embarrassed to share the details with him.

### Plaintiff Salim Javed

458.     From in or about February 2018 to on or about October 19, 2019, Cox sexually abused and harassed Plaintiff Salim Javed.

459.     After Plaintiff Fahim Javed purchased CCS Limo from Plaintiff Kalyar, he assigned his younger brother, Plaintiff Salim Javed, as Cox's primary driver.

460.     Plaintiff Salim Javed was in his mid-20's when he started driving Defendant Cox in or about February 2018.

461.     As soon as he began driving for Cox, Cox began talking about sex with Plaintiff Salim Javed, such as "I am sure you have a big cock," "Did you fuck someone last night?" "How long did you last," or "You are young, you must fuck good."

462.     Plaintiff Salim Javed tried to ignore Cox's sexual harassment and inappropriate sexual comments. Plaintiff Salim Javed did not tell anyone at that time about the sexual

harassment he was experiencing at the hands of Cox because he was too embarrassed and found it difficult to discuss.

463.    In or about mid-2018, Cox started insisting that Plaintiff Salim Javed go to restaurants and bars with him during the trips.

464.    Plaintiff Salim Javed informed Cox that he is a Muslim and does not drink alcohol.

465.    Nevertheless, Cox often pressured Plaintiff Salim Javed to go bars and restaurants, keep him company and always insisted that Plaintiff Salim Javed, a professional driver, drink alcohol with him.

466.    Plaintiff Salim Javed went inside the bars and restaurants with Cox about five (5) or six (6) times, at Cox's insistence, but Plaintiff always refused to drink alcohol.

467.    On or about June 17, 2018, Plaintiff Salim Javed was booked to pick up Cox and his Confidential Secretary Mr. Kabir from the airport around 12 p.m. and take them to Defendant's Silver Spring, MD apartment.

468.    After Plaintiff Salim Javed picked up Cox and Mr. Kabir, Cox told Plaintiff Salim Javed that Cox wanted to keep the reserved SUV and Plaintiff Salim Javed as his driver for the whole day.  Cox then ordered Plaintiff Salim Javed to also pick up a friend of  Cox in Washington, D. C. and take them all to a restaurant in Silver Spring, Maryland.

469.    Cox asked Plaintiff Salim Javed to join them inside the restaurant. Plaintiff Salim Javed said he preferred to wait in the car.  Cox insisted, so Plaintiff Salim Javed went inside the restaurant.

470.    Inside the restaurant, Cox again began to talk loudly about sex, and Plaintiff Salim Javed informed him that he was going outside. Defendant insisted that Plaintiff Salim

Javed stay inside the restaurant because Cox had booked the SUV for the whole day and had left his luggage in the SUV.

471.     After leaving the restaurant, Cox directed Plaintiff Salim Javed to take the group to a barbershop and insisted that the driver come inside. When inside the barber shop, Cox told Plaintiff Salim Javed that Cox needed Plaintiff Salim Javed to assist Cox as Cox used the restroom because Cox had a knee problem.

472.     Plaintiff Salim Javed refused, and Cox asked his friend to take him to the restroom instead.

473.     Cox then asked Plaintiff Salim Javed to get his haircut and his beard trimmed. Plaintiff Salim Javed refused, but Cox ordered his barber to cut Plaintiff Salim Javed's hair.

474.     After the haircut, Cox leaned in close to Plaintiff Salim Javed and stated: "You look cute and sexy." Plaintiff was offended and embarrassed.

475.     When they left the barbershop, Cox directed Plaintiff Salim Javed to drive to a bar where Cox ordered alcohol and began speaking to his friend in front of Plaintiff Salim Javed about having sex with men and how Cox liked to have sex with men and the size of male genitalia. This went on until they left the bar, and Cox ordered Plaintiff Salim Javed to drop the group at Cox's Silver Spring, Maryland apartment.

476.     When they arrived, Cox told Plaintiff Salim Javed to park the car and come upstairs. Plaintiff Salim Javed responded, "No. I am going home."

477.     Cox then hugged Plaintiff Salim Javed and stated, "I like you," and Cox kissed Plaintiff Salim Javed on his cheek.

478.     Plaintiff Salim Javed was shocked, humiliated and angered by Cox's unwanted touching of him.

479.    Cox then instructed Plaintiff Salim Javed to wait and to take his friend home when he was ready to go. While waiting, Plaintiff Salim Javed told Mr. Kabir that he was very upset and offended by the day's events, but Plaintiff Salim Javed did not mention that Cox had kissed him. Plaintiff Salim Javed dropped off Cox's friend at his home at around 7 p.m.

480.    Later that evening, Cox called Plaintiff Salim Javed on his personal cell phone multiple times. Cox told Plaintiff Salim Javed that he was at the Suburban Hospital in Bethesda, Maryland and that Cox's Confidential Secretary, Rocky Kabir, was not answering Cox's phone calls.

481.    Cox demanded that Plaintiff Salim Javed pick up Plaintiff Kalyar from his home, bring Plaintiff Kalyar to the Suburban Hospital to be with Cox and wait for Plaintiff Kalyar and take him back home -- which Plaintiff Salim Javed did.

482.    The next day, on or about June 18, 2018, Plaintiff Salim Javed was scheduled to pick Cox up from his Silver Spring apartment. Defendant called Plaintiff Salim Javed and told him he was still at Suburban Hospital and needed a Limo pickup from the Suburban Hospital.

483.    Plaintiff Salim Javed picked Cox up from the hospital at around 5:30 a.m. When they arrived at his apartment building, Cox asked Plaintiff Salim Javed to help him upstairs, and Plaintiff Salim Javed helped Cox upstairs.  Cox's Confidential Secretary Mr. Kabir opened the door.

484.    Cox asked Plaintiff Salim Javed to help him fix his shower chair, saying he could not do it himself because of a knee problem.

485.    Plaintiff Salim Javed fixed the shower chair, and Cox came from his room naked and asked Plaintiff to put his shower chair inside the shower for him.

486.     Plaintiff Salim Javed was shocked.  Plaintiff Salim Javed quickly turned around, told Cox that he would wait for him outside, and Plaintiff Salim Javed then left Cox's apartment.

487.     When Cox came downstairs, Plaintiff Salim Javed took Cox to his scheduled meetings in D. C. During a separate incident, on or about December 1, 2018, Cox began calling Plaintiff Salim Javed on his personal cell phone incessantly. Finally, after several calls, Plaintiff Salim Javed answered. Cox asked Plaintiff Salim Javed to come to Cox's home and get him.

488.     Plaintiff Salim Javed advised him he could not do that because Cox did not have a booking scheduled and that if Cox wanted a ride; he should call the office and arrange a pickup. Cox responded loudly, "No, I want you to come."  Plaintiff Salim Javed refused.

489.     Cox started calling Plaintiff Salim Javed's cell phone nonstop, until Plaintiff Salim Javed answered. Cox told Salim Javed that if he did not come, Cox would make sure that Plaintiff Salim Javed's company did not get any more business from Defendant AFGE or from any other unions.

490.     Plaintiff Salim Javed hung up, and Cox kept calling him on Plaintiff's personal cell phone until around 4 a.m., requiring Plaintiff Salim Javed to put his phone on "silent."

491.     Cox left a threatening voicemail message on Plaintiff Salim Javed's personal cellphone demanding that Plaintiff Salim Javed come to get him and repeated that if Plaintiff Salim Javed  did not come as he ordered, Cox would take away all union business from Plaintiff Salim Javed's company.

492.     Cox left another voicemail saying "[Salim Javed], call me please, I am begging you from all my Goddamn heart."  Plaintiff Salim Javed refused Cox's request.

493.     On or about April 27, 2019, Plaintiff Salim Javed was assigned to pick up Cox at his home and drop him at the Hilton Hotel in Washington, D. C., wait for him and take him back

to his home. After Cox left the Hilton Hotel, he ordered Plaintiff Salim Javed to take him to a bar in Silver Spring, MD, which Plaintiff Salim Javed did.

494.    Cox ordered Plaintiff Salim Javed to come into the bar with him, and as usual, Plaintiff Salim Javed declined. Cox insisted, and when they went into the bar, Cox began talking about sex in a loud voice and put his hand on Plaintiff Salim Javed's shoulder.

495.    Plaintiff Salim Javed was horrified. Many people in the bar were looking at Cox talking loudly about sex to him.

496.    When they left the bar, Cox sat in the front seat with Plaintiff Salim Javed and stated: "I'm horny." Plaintiff Salim Javed started driving, and Cox reached over and touched him on his shoulder. Plaintiff Salim Javed instructed Cox to "please stop touching me and let me drive."

497.    On or about June 7, 2019, Plaintiff Salim Javed picked Cox up from the airport to be dropped at his Silver Spring apartment. In the car, Cox called Charlie Palmer's Steakhouse in D.C., ordered a table by the window and ordered Plaintiff Salim Javed to take him to the restaurant.

498.    Plaintiff Salim Javed took Cox to Charlie Palmer's restaurant and, as usual, Cox ordered him to come in and join him. Plaintiff Salim Javed told Cox that he was not hungry and would wait for Cox in the car. Cox went inside and started calling Plaintiff Salim Javed on his personal cell phone demanding and pressing  him to come inside the restaurant. Plaintiff Salim Javed refused, but Cox continued to insist.

499.    Plaintiff Salim Javed told Cox there was no parking nearby, but Cox kept calling, requesting Plaintiff Salim Javed to come inside the restaurant. Cox told Plaintiff Salim Javed that he did not want to eat alone. Cox reminded Plaintiff Salim Javed that Cox had left his

luggage in the car.  Plaintiff Salim Javed knew he could not leave without Cox, so he went inside.

500.     Cox said to Plaintiff Salim Javed: "I am lonely. No one loves me. I need love.  I have a lot of money. I have more money than God.  I have a nice house, but I don't have no one to love me."

501.     Cox was speaking very loudly, and there were people dining at nearby tables who could hear him.  The other patrons were looking at them, and Plaintiff Salim Javed, embarrassed and uncomfortable, left to get the car.

502.     When they got back in the car, Cox continued to complain that he was very lonely, and that he needed love. Cox then brought up sex again and said to Plaintiff Salim Javed, "You must have a big cock."

503.     Cox kept telling Plaintiff Salim Javed he hadn't had sex for a long time and that he was "horny."

504.     Cox asked Plaintiff Salim Javed, "When was the last time you had sex?" and "Are you going to go fuck someone tonight?" Defendant then started touching Plaintiff Salim Javed's shoulder, which made the driver feel very uncomfortable.  Plaintiff Salim Javed told Cox, "Sir, please stop touching me and let me drive."

505.     On another occasion, Cox told Plaintiff Salim Javed that if he wanted to "fuck someone," he could bring them to Cox's place and have sex with them there.

506.     Cox again asked Plaintiff how big his "cock" was.  Cox told Plaintiff Salim Javed that he had a "small cock," was "fat" and that Cox "couldn't see his own cock" when he stood up.   Cox asked Plaintiff Salim Javed: "How can you handle Ramadan when you guys are not allowed to eat or drink and can't have sex? I can't even sleep without jerking off every night."

507.     Cox often referred to Plaintiff Salim Javed as a "fucking Muslim."

508. Cox continued to sexually harass Plaintiff Salim Javed from approximately February 2019 until October 2019, when Cox took a leave of absence from AFGE after the Bloomberg article appeared.

509. Cox's unwanted touching and sexual harassment of Plaintiff Salim Javed caused Plaintiff Salim Javed stress, embarrassment and severe discomfort.

### Plaintiff Jocelynn Johnson

510. Plaintiff Johnson is an African American woman who worked at Defendant AFGE for 13 years before she was fired for allegedly violating the Defendant AFGE "No Politics Rule" which prohibits AFGE staff from contributing money or in-kind services to the campaigns of Defendant AFGE officers.

511. On or about November 27, 2017, AFGE General Counsel attorney Rushab Sangvhi called to inform Plaintiff Johnson that while he was monitoring social media websites, Mr. Sangvhi saw Plaintiff Johnson's name alongside a $10 contribution to Eugene Hudson's campaign for AFGE President.

512. Plaintiff Johnson denied making the contribution and told Sanghvi that her bank must have made an error or someone had hacked her account.

513. On or about December 6, 2017, the bank confirmed that following an investigation, it concluded that Plaintiff Johnson's account had been erroneously charged for the $10 contribution and that the bank had credited the $10 back to her account. On December 10, 2017, Plaintiff Johnson gave AFGE a copy of the bank's letter.

514. On the afternoon of January 12, 2018, Cox terminated Plaintiff Johnson effective immediately for violating the "No Politics Rule."

515. A few months later, Cox ordered his Confidential Secretary, Rocky Kabir, to violate the same "No Politics Rule" by uploading an endorsement letter signed by eleven (11)

National Vice Presidents: Kelley, Bunn, Castellano, Glover, Doyle, Scott, Eliano, Swanke, McCubbin, Flynn; and Augusta Thomas.

516.      Cox ordered his Confidential Secretary Rocky Kabir to provide these and other campaign services both during and after Mr. Kabir's official AFGE work hours.

517.      Mr. Kabir designed, uploaded and managed Cox's 2018 campaign website *jdavidcox.com*, and Mr. Kabir designed, uploaded and maintained Cox's 2018 election GoFundMe page among other services.

518.      Mr. Kabir estimates that the time he spent outside his official AFGE work hours providing these campaign services to Cox, had he been paid at his official AFGE pay rate, would have cost Cox approximately $20,000. Of course, Cox ordered Mr. Kabir to provide these services to Cox's campaign without compensation.

519.      Defendant Cox's violation of AFGE's "No Politics Rule" was far more egregious than Plaintiff Johnson's alleged $10 donation to Cox's political opponent.

520.      In November 2019, four (4) AFGE Emeritus Officers filed charges against Cox for violating the "No Politics Rule" by ordering Mr. Kabir and AFGE Policy Director Jacqueline Simon to work on his 2018 re-election campaign. *(Exh. 17: Charges Filed by Four Emeritus Officers, dated November 15, 2019).*

521.      In November 2019, AFGE established a Committee, chaired by AFGE National Vice President David Mollett ("Mollett Committee") to investigate the four (4) AFGE Emeritus Officers' charges that Cox violated the "No Politics Rule" by ordering Mr. Kabir and AFGE Policy Director Jacqueline Simon to secretly work on his 2018 re-election campaign. *(Exh. 18: Mollett Committee Report, dated February 13, 2020).*

522.      Defendant Cox did not deny the charges.

523.     On or about January 23, 2020, the Mollett Committee interviewed Ms. Simon, who denied working on Cox's campaign. The Mollett Committee exonerated Ms. Simon of any wrongdoing based solely on her unsubstantiated denial. *(Ibid)*.

524.     Plaintiff Johnson, who is African American, denied making the $10 contribution and produced a letter from her bank corroborating that she had not authorized the $10 campaign contribution that she gave to Defendant AFGE.

525.     Even though Plaintiff Johnson, who is African American, proved, through her bank's letter, that she had not authorized the $10 campaign contribution,  AFGE refused to exonerate Plaintiff Johnson as justice demanded.  Instead, Cox terminated Plaintiff Johnson after 13 years of service as a dedicated AFGE employee.

526.     On February 13, 2020, the Mollett Committee found probable cause that Cox ordered Mr. Kabir to upload the endorsement letter and do other work on his campaign in violation of the "No Politics Rule."

527.     The same date, February 13, 2020, as required by the AFGE National Constitution, the Mollett Committee forwarded its report for a vote by the National Executive Council, which included the following Defendants who signed the 2018 Cox endorsement letter: National Vice Presidents Kelley, Bunn, Castellano, Glover, Doyle, Scott, Eliano, Swanke, and McCubbin.

528.     On February 28, 2020, the National Executive Council voted **not** to process the four Emeritus Officers' charges filed against Cox as recommended by the  February 13, 2020, Mollett Committee report.

529.     Instead, the National Executive Council  authorized Defendant Kelley to sign a **secret** February 28, 2020 separation agreement permitting Cox to resign in lieu of being removed from office for misconduct.

530. Defendants terminated Plaintiff Johnson, who is African American, but did not terminate or even discipline Cox and AFGE Policy Director Jacqueline Simon, both of whom are Caucasian, for violating the same "No Politics Rule."

531. Cox's termination of Plaintiff Johnson was motivated by racial animus, violates 42 U.S.C. 1981 and the AFGE National Constitution and damaged Plaintiff Johnson.

**Plaintiff Valyria Lewis**

532. Plaintiff Lewis is an African American woman who worked at AFGE as a National Representative for 8 years and five months before she resigned in approximately January 2020 following her proposed suspension by Defendant Cox and Defendant Castellano for refusing to file false weekly reports.

533. Plaintiff Lewis worked for Defendant Everett Kelley from 2011 through 2015 as a District 5 National Representative, assigned to TSA locals and other locals as a Trustee.

534. As NVP for District 5, Defendant Everett Kelley assigned Plaintiff Lewis to advise Local 4056 to resolve infighting within the local executive board between Local Secretary Treasurer Martha Perez and Local President Jose Jimenez.

535. After determining that some of the members' concerns were justified, Plaintiff Lewis order Local President Martha Perez to make certain payments owed to Local 4056 members for justifiable reimbursable expenses.

536. Ms. Perez complained to Defendant Kelley who immediately removed Plaintiff Lewis from advising Local 4056.

537. In 2014 or 2015, Defendant Gony Goldberg sent Plaintiff Lewis an email directing Plaintiff Lewis to hold onto any emails exchanged between Plaintiff Lewis and Martha Perez because, Goldberg informed Plaintiff, Ms. Perez had filed an EEO sexual harassment complaint against Defendant Everett Kelley.

538.     Upon information and belief, AFGE settled Martha Perez's sexual harassment complaint against Defendant Kelley by entering into a confidential nondisclosure agreement with Perez.

539.     In December 2015, Plaintiff Lewis, acting as an AFGE Trustee, with sole authority to do so, removed Jamie Dukes for engaging in sexual misconduct in his official capacity as Vice President of Local 2017 in Ft. Gordon, Department of Army in Georgia located in Defendant Everett Kelley's district.

540.     Between December 8 and 11, 2015, Plaintiff Lewis sent Defendant Everett Kelley photos of Dukes' genitalia that Dukes had sent to a woman who had complained to AFGE about Dukes' sexual misconduct.

541.     Plaintiff Lewis informed Kelley that Dukes had also admitted to having sexual relations in the local's union office with the same woman who had complained about Dukes.

542.     In January 2016, after Plaintiff Lewis left District 5, Kelley ordered newly hired, District 5 National Representative and attorney, Chanel White, to **reappoint** Jamie Dukes as President of Local 2017 for Fort Gordon Department of the Army.

543.      In April 2016, Kelley recommended and Cox gave National Representative Chanel White a nearly $20,000 annual pay raise that was significantly higher than what was allowed under the CWA contract. *(Exh. 19:  Memo from Cox to Human Resources Department, dated April 11, 2016)*

544.     The next day, April 12, 2016, upon receiving notification of White's huge raise, CWA Vice President Joseph Corcoran filed a grievance against AFGE for violating the CWA contract, forcing AFGE to retract Chanel White's raise. *(Exh. 19a:  Union Grievance  from Joseph Corcoran to J. David Cox, dated April 12, 2016)*

545.     To circumvent the CWA contract, Defendant Cox, at Defendant Kelley's request, created a position at AFGE for Chanel White that was outside of the CWA contract and gave White the raise anyway.

546.     On or about February 3, 2016,  Fort Gordon officials fired Jamie Dukes for unrelated reasons and notified Kelley that Dukes no longer worked at Fort Gordon.

547.     Kelley was aware that Plaintiff Lewis had removed Dukes for sexual misconduct; Kelley was aware of the photos of Dukes' genitalia that Dukes had sent to the female employee, and Kelley was aware that Dukes had had sexual relations with a woman in the AFGE union offices.

548.      Yet,  Kelley directed Chanel White to **reappoint** Dukes as President of Local 2017.  Thereafter, Kelley personally traveled to the Local 2017 union meeting and convinced the local members to vote to give Dukes a stipend as local president.

549.     In ordering Dukes' reinstatement,  Defendant Kelley allowed Dukes to continue to have access to the Fort Gordon Army base after the Army had removed Dukes, allowing Dukes to continue to have access to sexually abuse women on the base, which Dukes did.

550.      In December 2016, Plaintiff Lewis was contacted by Local 2017 President Ceretta Smith who informed Plaintiff Lewis  that the Department of the Army had determined that Dukes had sexually harassed other women and, for that reason, the Army had banned Dukes from all military installations.

551.     Despite Dukes' misconduct, Defendant AFGE and NVP Kelley allowed Dukes to retain his AFGE membership.

552.     Defendant AFGE and Defendant Kelley allowed Dukes to join AFGE Local 217 which represents the Veterans Administration in Augusta Georgia in Kelley's district.

553.    In May 2018, Local 2017 President Ceretta Smith asked then-NVP District 5 Everett Kelley to prefer charges against Jamie Dukes to prevent him from being able to run for office in the Local 217 Veterans Administration election.

554.    CWA President Gary Harding, in his capacity as a National Representative for District 5, contacted Plaintiff Lewis and informed her that Defendant Kelley had asked Harding to contact Plaintiff Lewis and have her provide Harding with the evidence concerning Dukes' sexual misconduct -- evidence that Plaintiff Lewis had already provided to Kelley

555.    After reviewing this evidence, Defendant Kelley still took no disciplinary or remedial action against Dukes.  Kelley did not prefer charges against Dukes.

556.    In October 2018, AFGE and Kelley permitted Jamie Dukes to run for the position of President of Local 217.  Dukes lost the election in November 2018, but Dukes remains eligible to run for office.

557.    In 2014, Tracie St. John was Defendant Kelley's administrative assistant, earning approximately $45,000 a year.

558.    In 2014 or 2015, then-NVP Everett Kelley recommended that Defendant Cox promote Tracie St. John, who had no prior managerial experience, to the position of District Officer Manager for District 5, at the salary of $71,000 a year – a $26,000 increase over St. John's 2014 salary.

559.    Defendant Cox promoted Ms. St. John as Defendant Kelley requested.

560.    As District Officer Manager for District 5, Ms. St. John supervised approximately 10 employees, including Plaintiff Lewis and all other District 5 staff (with the exception of then-NVP Everett Kelley).

561.    Before being hired as an administrative assistant, Ms. St. John had been a TSA employee at Atlanta Hartfield Jackson Airport.

562.     St. John had no prior management experience.  Yet, after her promotion by Kelley, Ms. St. John supervised Plaintiff Lewis and other more qualified District 5 employees.

563.     Plaintiff Lewis requested a change of duty station from Memphis, Tennessee to Tampa, Florida, which Defendant Kelley denied.

564.     Plaintiff Lewis started speaking to other NVP's, and Defendant Eric Bunn and Defendant Vincent Castellano had a National Representative position open.

565.     Both Defendant Bunn and Defendant Castellano, recognizing Plaintiff Lewis' reputation for outstanding work, sought to hire Plaintiff Lewis.

566.     Defendant Bunn offered Plaintiff Lewis a position as National Representative for District 14 in Washington, D. C., and invited Plaintiff Lewis to meet with him to negotiate the terms of her employment in approximately November 2015.

567.     During the meeting, Defendant Bunn's District Officer Manager Michelle Hatton came in to tell Bunn that a woman was on the phone for him.   Defendant Bunn told Ms. Hatton in Plaintiff Lewis' presence,  "Tell the bitch, I'll call her back."

568.     Plaintiff Lewis knew she could not accept the position in good conscience because she was a union representative for  CWA staff employees, and, as such, Plaintiff Lewis would have to file a grievance against Defendant Bunn for using that type of degrading and sexist language referring to women in the workplace.

569.     Plaintiff Lewis realized that filing the grievance against Defendant Bunn as her first act in office would have meant that she would be walking into a hostile work environment on day one.

570.     For that reason, Plaintiff rejected Defendant Bunn's offer of employment and accepted Defendant Castellano's offer.

571.     Defendant Castellano paid Plaintiff Lewis' moving expenses and gave Plaintiff Lewis an increase in salary from Level 2, step 3 to Level 3, step 1.

572.     From in or about January 2016 to February 2020, Plaintiff worked as one of six National Representatives for District 2, headed by Defendant NVP Vincent Castellano.

573.     Three of the six District 2 National Representatives are Black and three are White.

574.     All six of the National Representatives are members of the Federation of National Representatives – Communication Workers of America ("CWA") Local 2385. Their work at AFGE is governed by the negotiated CWA collective bargaining agreement and not the AFGE National AFGE/ Constitution.

575.     For years, Plaintiff Lewis  filed work reports as an AFGE National Representative consistent with her CWA contract.

576.     In January 2019, Defendant Castellano directed Plaintiff Lewis and the rest of the District 2 National Representatives to file a new type of weekly report that would reflect all activity for every minute of their 40-hour workweek and directed Plaintiff Lewis to designate the particular local for which the work was done.

577.     National Representatives are field employees who cannot account for 40 hours of consistent work without traveling.  This was before the COVID-19 pandemic occurred.

578.     President Trump's Executive Orders had restricted AFGE local union leaders' official time, leaving them little time to engage with the Plaintiff and other National Representatives through extended telephone conversations.

579.     In or about January 2019,  Castellano ordered his National Representatives not to travel but to work from home because, he said,  District 2 did not have money to pay for their travel.

580.     The only way the National Representatives could file reports "minute by minute" and designate a particular local union in the manner requested by Castellano would have been to lie on the report in violation of the CWA contract and U.S. Department of Labor regulations.

581.     Plaintiff Lewis and the two African American National Representatives contacted CWA President Gary Harding who issued a demand to bargain challenging the "minute by minute reporting" ordered by Castellano.

582.     In the demand to bargain, CWA demanded "status quo ante" meaning that the parties maintain the status quo until the conclusion of all negotiations.

583.     The negotiations on the union's demand to bargain were set for July 16, 2019.  On or about that date, the federal court issued an order affecting the Trump Executive Orders that impacted federal employees.    As a result, AFGE postponed the negotiations.

584.     On August 19, 2019, on the recommendation of Defendant Castellano, Defendant Cox issued a notice of proposed five-day suspension to Plaintiff Lewis and the two other African American District 2 National Representatives, Frank Womack and David Gonzalez.

585.     On August 28, 2019, CWA filed a formal written opposition to the  proposed suspension as violating Article 14, Section 7 of the AFGE/CWA collective bargaining agreement.

586.     On October 15, 2019, AFGE President Cox issued a three-day suspension to Plaintiff Lewis, and a five-day suspension to Mr. Gonzalez and Mr. Womack.

587.     CWA invoked arbitration on behalf of all three Black National Representatives, Plaintiff Lewis, Mr. Gonzalez and Mr. Womack

588.     AFGE immediately offered to settle by agreeing to reduce Plaintiff Lewis' suspension to one-day.

589.     On October 25, 2019, National Representative David Gonzalez emailed Defendant Castellano and asked whether Castellano wanted Mr. Gonzalez to "falsify" his reports. *(Exh. 20:  Emails from David Gonzalez to NVP Vincent Castellano, dated October 25, 2019)*

590.     Defendant Castellano did not respond to Mr. Gonzalez' email.

591.     On November 6, 2019, Plaintiff Lewis filed a second step grievance with Defendant Kelley in his new role as the Acting National President during Cox's leave of absence that she was being unfairly assigned to handle all TSA cases in the District.

592.     In the grievance, Plaintiff Lewis requested as relief and remedy that Defendant Castellano distribute the TSA cases among all District 2 National Representatives consistent with the CWA collective bargaining agreement.

593.     Defendant Kelley never responded to Plaintiff Lewis' second step grievance.

594.     On or about January 17, 2020, Plaintiff Lewis submitted her letter of resignation effective February 7, 2020.

### Plaintiff Mecca Scott

595.     In 2013, Plaintiff Scott was working in District 2 as a National Organizer. Plaintiff went to Denver, Colorado with other co-workers to conduct an AFGE membership drive.   Plaintiff observed that all of the national and district 11 AFGE staff were Caucasian, but many of the AFGE members were diverse.

596.     Many diverse AFGE members came up to Plaintiff Scott and expressed pleasant surprise to see an African American AFGE representative.

597.     Plaintiff Scott thought that it would be good for AFGE to demonstrate that there was diversity within AFGE, so she applied for a transfer from District 2 to District 11.

598.     Over Defendant Gerald Swanke's objection, Plaintiff transferred to Colorado in September 2014. After arriving, Plaintiff tried on a number of occasions to meet with District 11 NVP Gerald Swanke. He was never available. Plaintiff finally convinced Swanke to meet with her on his way out of town at a diner at the Denver Airport.

599.     During their first meeting, Plaintiff Scott told Swanke that she could not wait for the weather to break so that she could visit the other states that Swanke had assigned her (Utah, Montana, Wyoming).

600.     Swanke responded to Plaintiff Scott: "Actually, there's enough work for your ass right here in Colorado." Plaintiff Scott was deeply offended.

601.     Defendant Swanke told Plaintiff Scott's director, Bill Lyons, that Swanke wanted Plaintiff Scott to work "only in Colorado because she wouldn't be accepted in the surrounding states of his District because she was Black."

602.     Plaintiff Scott stayed in Colorado until AFGE members started complaining that Plaintiff Scott was not traveling to the other states. At that point, Swanke reluctantly agreed to allow her to travel to those states.

603.     On June 18, 2018, at 11:43 a.m.., Defendant Swanke sent a text message inviting National Reps Kaylor Mack, Al Rivera, Lance Stewart and Legislative Political Organizer Tim Snyder (who are all Caucasian) and Plaintiff Scott to attend a dinner meeting. Swanke concluded the invitational text by saying;" Apparently, today is something called Juneteenth Holiday. Not sure what that means other than an excuse to celebrate my birthday from last week."

604.     Plaintiff Scott sent a text back to the group, the same day, at 11:45 a.m. stating: "Commemorate Emancipation from slavery in Texas on that day in 1865. See you all soon."

605.    At 6:58 p.m., on June 18, 2018, Defendant Swanke finally responded: "OMG, that's horribly insensitive of me, but thank you.  Full time job keeping straight."

606.    Plaintiff Scott has worked as an AFGE National Organizer longer than her counterpart, Cindy Feist, who is Caucasian-American.  Yet, Plaintiff Scott, who is African American, earns approximately $10,000 a year less than Feist.

607.    Plaintiff Scott received her step increases, as scheduled.  However, every time Plaintiff Scott has asked for a  salary increase to bring her salary comparable to Cindy Feist's request,  AFGE has denied her requests.

608.    By contrast, Tracie St. John, who also works in Membership and Organizing, has received unusually large pay raises every year since 2014.

609.    Plaintiff Scott has experienced racially discriminatory treatment by her peer, National Organizer Cindy Feist and by Defendant Swanke's administrative assistant, Carrie Coleman, both of whom are Caucasian.

610.    AFGE officials do not provide Plaintiff Scott with the support that she needs to perform her work as a National Organizer in the same manner that they provide support to other similarly situated Caucasian employees.

611.    On or about June 4, 2020,  Plaintiff Scott sent an email to Defendant Kelley complaining about the racial discrimination that she was experiencing in District 11.  Plaintiff Scott informed Kelley that she had reached out to Working Ideal with her complaints of racial discrimination.  *(Exh. 21: Email from Mecca Scott to Everett Kelley, dated June 4, 2020*).

612.    Defendant Kelley never responded to Plaintiff Scott's June 4, 2020, email.

613.     Defendants did not permit Working Ideal attorneys to include Plaintiff Scott's racial discrimination complaint and the racial discrimination complaints of Jocelynn Johnson, Eugene Hudson and others in its March 16, 2020 report.

614.     Two weeks ago, on or about June 11, 2020,  during a live AFGE NEC Zoom Meeting, Defendant Swanke apologized for his racially insensitive actions in the past, including his racially offensive text message that he sent to Plaintiff Scott concerning Juneteenth in 2018.

615.     Since transferring to District 11 in 2014, Plaintiff Scott has experienced discrimination based on her race and has worked in a racially hostile work environment.

### FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS
### Sexual Assault and Battery of Plaintiff John Doe #1 and Plaintiff Salim Javed

616.     Plaintiffs reallege and incorporate by reference each allegation contained in the foregoing paragraphs set forth herein.

617.     The sexual misconduct and actions of Cox, including the sexual assault and battery and sexual harassment of Plaintiffs John Doe #1 and Salim Javed, constitute intentional and offensive actions to which they did not consent.

618.     Defendants are responsible in their official and personal capacities for Cox's sexual assault and battery of Plaintiffs John Doe #1 and Salim Javed.

619.     Defendants knew or should have known of Cox's misconduct.

620.     As a direct and proximate result of the intentional acts of Cox, Plaintiffs John Doe #1 and Salim Javed experienced pain, suffering, mental anguish and emotional distress.

621.     Wherefore, Plaintiffs John Doe #1 and Salim Javed claim compensatory and punitive monetary damages in excess of the jurisdiction of this Court ($75,000.00) against Defendants in an amount to be determined at trial, plus costs and post judgment interest at the

legal rate of ten percent (10%) per annum from the date of judgment, and any further relief that this Honorable Court deems necessary and appropriate.

**SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS**
**For Intentional Infliction of Emotional Distress Upon**
**Plaintiffs John Doe #1, Salim Javed, Kalyar, Fahim Javed, Johnson, Lewis and Scott**

622.     Plaintiffs reallege and incorporate by reference each allegation contained in the foregoing paragraphs set forth herein.

623.     Cox's sexual assault on Plaintiffs John Doe #1 and Salim Javed was intentional, extreme, outrageous and in deliberate disregard for the high degree of probability that Plaintiffs John Doe #1 and Salim Javed would suffer emotional distress as a result.

624.     Cox's sexual harassment of Plaintiffs Kalyar and Fahim Javed was intentional, extreme and outrageous and in deliberate disregard for the high degree of probability that Plaintiffs Kalyar and Fahim Javed would suffer emotional distress as a result.

625.     Cox's conduct in wrongfully terminating Plaintiff Johnson, a 13-year AFGE employee, for allegedly donating $10 to a campaign, was intentional, extreme and outrageous and in deliberate disregard for the high degree of probability that Plaintiff Johnson  would suffer emotional distress as a result.

626.     The decision by Defendant Castellano to recommend Plaintiff. Lewis' suspension and the decision by Defendant Cox to wrongfully suspend Plaintiff  Lewis were intentional, extreme and outrageous and in deliberate disregard for the high degree of probability that Plaintiff Lewis would suffer emotional distress as a result.

627.     Cox's actions were the direct and proximate cause of severe emotional distress to Plaintiffs John Doe #1, Salim Javed, Kalyar, Fahim Javed, Johnson, Lewis and Scott.

628.     As a direct and proximate result of Cox's intentional acts, Plaintiffs John Doe #1,

Salim Javed, Kalyar, Fahim Javed, Johnson, Lewis and Scott experienced pain and suffering,

mental anguish, emotional distress and were otherwise injured and damaged.

629.     Defendants are responsible for Cox's actions that were the direct and proximate

cause of Plaintiffs' severe emotional distress.

630.     Wherefore, Plaintiffs John Doe #1, Salim Javed, Kalyar, Javed, Johnson, Lewis

and Scott claim compensatory and punitive monetary damages in excess of the jurisdiction of

this Court ($75,000.00) against Defendants, in an amount to be determined at trial, plus costs

and post judgment interest at the legal rate of ten percent (10%) per annum from the date of

judgment,  and for any further relief that this Honorable Court deems necessary and appropriate.

### THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS
#### For Intentional Infliction of Emotional Distress Upon
#### Plaintiffs Annette Wells and Paul Vaughan

631.     Plaintiffs reallege and incorporate by reference each allegation contained in the

foregoing paragraphs set forth herein.

632.     Cox's sexual assault and battery of Plaintiff John Doe #1, Plaintiff Wells' and

Plaintiff Vaughan's son, was intentional, extreme, outrageous and in deliberate disregard for the

high degree of probability that Plaintiffs Wells and Vaughan would suffer injury including

emotional distress.

633.     As a direct and proximate result of the intentional acts of Cox, Plaintiffs Wells

and Vaughan had to care for their son financially and medically.

634.     Plaintiff John Doe #1 underwent one kidney transplant surgery as a result of

Cox's second misconduct, and he is scheduled to undergo a second kidney transplant surgery.

Plaintiffs Annette Wells and Paul Vaughan will need to take care of their son again, because he

will not be able work and care for himself.

635.    Defendants are responsible for Cox's actions that were the direct and proximate cause of severe emotional distress to Plaintiffs Wells and Vaughan.

636.    Wherefore, Plaintiffs Wells and Vaughan claim compensatory and punitive monetary damages in excess of the jurisdiction of this Court ($75,000.00) against Defendants, in an amount to be determined at trial, plus costs and post judgment interest at the legal rate of ten percent (10%) per annum from the date of judgment, and for any further relief that this Honorable Court deems necessary and appropriate.

### FOURTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### For Physical Injury Of Plaintiff John Doe #1

637.    Plaintiffs reallege and incorporate by reference each allegation contained in the foregoing paragraphs set forth herein.

638.    At all times relevant hereto, Cox was acting in the course and scope of his employment with and agency for Defendant AFGE when he sexually harassed, sexually assaulted and sexually battered Plaintiff John Doe #1.

639.    Cox regularly and wrongfully committed acts of sexual harassment, sexual assault and battery against Plaintiff John Doe #1 and other Plaintiffs from approximately 2009 through 2019, over a decade.

640.    The actions of Cox, including the assault and battery on Plaintiff John Doe #1, constitute intentional, forcible and offensive touching to which Plaintiff John Doe #1 did not consent.

641.    The actions of Cox, including the assault and battery on Plaintiff John Doe #1, were intentional and unlawful.

642.    Cox regularly and wrongfully committed these unlawful and egregious acts in the CCS Limo Services vehicles procured and paid for by Defendant AFGE under contract,

including the CCS vehicles in which Plaintiff John Doe #1 was sexually assaulted and battered by Cox.

643. From approximately 2012 through 2020, Defendants received reports that Cox sexually harassed and sexually assaulted AFGE employees, contractors and others.

644. From approximately 2012 through 2020, Defendants did not report, investigate or discipline Cox after receiving complaints that Cox sexually harassed and sexually assaulted AFGE employees, contractors and others,

645. Defendant Cox's repeated sexual abuse of Plaintiff John Doe #1 was a proximate cause of Plaintiff John Doe #1 suffering stroke level high blood pressure, life-threatening kidney failure and other medical injury.

646. As a result of this stress, Plaintiff John Doe #1 lost both his kidneys, has undergone one (1) kidney transplant and is scheduled to undergo a second kidney transplant.

647. As a result, Plaintiff John Doe #1 was required to undergo a kidney transplant and endured pain, suffering, physical injury, unnecessary and life-threatening medical care and expenses, mental anguish, emotional distress, lost wages, lost future wages, loss of future earning capacity and was otherwise injured and damaged.

648. Plaintiff John Doe #1 is scheduled to undergo a second kidney transplant surgery, and Plaintiffs Annette Wells and Paul Vaughan will need to take care of him again, because he will not be able to work and care for himself.

649. Defendant Cox is liable for his own actions and misconduct.

650. As the employer of and principal for Cox, Defendant AFGE is liable for the actions of Cox within the course and scope of Cox's employment and agency.

651. As the employer and principal responsible for the actions of its employees and agents including, but not limited to Cox, Defendant AFGE caused Plaintiff John Doe #1 to

experience stress that led to stroke level high blood pressure and subsequent life-threatening

kidney failure, physical injury, pain and suffering, unnecessary and life-threatening medical care

and expenses, mental anguish, emotional distress, lost wages, lost future wages, loss of future

earning capacity and other injuries and damages.

652.    Defendant AFGE and the other Defendants AFGE officials are responsible for

Cox's actions that were the direct and proximate cause of severe physical injury to Plaintiff John

Doe #1.

653.    Wherefore, Plaintiff John Doe #1 claims compensatory and punitive monetary

damages in excess of the jurisdiction of this Court ($75,000.00) against all Defendants in an

amount to be determined at trial, plus costs and post judgment interest at the legal rate of ten

percent (10%) per annum from the date of judgment, and for any further relief that this

Honorable Court deems necessary and appropriate.

### FIFTH  CLAIM FOR RELIEF AGAINST DEFENDANTS
**For Racial And/or Religious Discrimination On Behalf Of Plaintiffs John Doe #1,
Salim Javed, Jocelynn Johnson, Lewis, Scott, Waqas Kalyar And Fahim Javed**

654.    Plaintiffs reallege and incorporate by reference each allegation contained in the

foregoing paragraphs set forth herein.

655.    Cox discriminated against Plaintiffs John Doe #1, Salim Javed,  Johnson, Lewis,

Scott, Kalyar and Fahim Javed on the basis of their race in violation of 42 U.S.C. 1981, which

was the direct and proximate cause of the racial discrimination, pain and suffering and damages

suffered by Plaintiffs John Doe #1 and Salim Javed, Johnson, Lewis, Scott, Kalyar and Fahim

Javed.

656.    Defendants are responsible for Cox's actions that were the direct and proximate

cause of the racial discrimination, pain and suffering and damages suffered by Plaintiffs John

Doe #1, Salim Javed, Johnson,  Lewis, Scott, Kalyar and Fahim Javed.

657.     Wherefore, Plaintiffs John Doe #1, Salim Javed, Johnson, Lewis, Scott,, Kalyar and Fahim Javed claim compensatory and punitive monetary damages in excess of the jurisdiction of this Court ($75,000.00) against Defendants in an amount to be determined at trial, plus costs and post judgment interest at the legal rate of ten percent (10%) per annum from the date of judgment, and for any further relief that this Honorable Court deems necessary and appropriate.

**SIXTH CLAIM FOR RELIEF AGAINST DEFENDANTS**
**Cox, Kelley, Bunn, Castellano, Glover, Doyle, Scott, Eliano, Swanke, McCubbin, Flynn,**
**Borer, Goldberg And DeWyngaert**
**For Breach Of Fiduciary Duty**

658.     Plaintiff realleges and incorporates by reference each allegation contained in the foregoing paragraphs as set forth herein.

659.     Cox served as a constitutional officer of AFGE, authorized to perform the functions of National President of a labor organization and to serve as chairman and presiding officer of the National Executive Council, the governing body of AFGE.  Thus, Cox qualified as an "officer" for purposes of the LMRDA during his time as National President of AFGE.

660.     Defendants Kelley, Bunn, Castellano, Glover, Doyle, Scott, Eliano, Swanke, McCubbin and Flynn, served as constitutional officers of AFGE, authorized to perform the functions of National Vice Presidents of a labor organization and to serve as members of the National Executive Council, the governing body of AFGE,  thus qualified as "officers" for purposes of  the LMRDA during their time as National Vice Presidents of AFGE.

661.     Defendant Borer and Defendant Goldberg served as attorneys of AFGE, authorized to perform the functions of General Counsel of a labor organization, thus qualified as an "attorney" or "agent" for AFGE for purposes of Section 501 of the LMRDA.

662. Defendant DeWyngaert served as a constitutional agent of AFGE, authorized to perform the functions of Chief of Staff of a labor organization, thus qualified as an "agent" for purposes of Section 501 of the LMRDA during his time as Chief of Staff of AFGE.

663. As officers, attorneys and/or agents of AFGE, Defendants Cox, Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin, Flynn, Borer, Goldberg and DeWyngaert occupied a fiduciary relationship to the organization and its members, including Plaintiff Annette Wells, and had a responsibility to act in utmost good faith in managing the affairs of the organization.

664. Cox breached his duties to the labor organization and violated his oath as an AFGE officer that he owed to AFGE, AFGE member Annette Wells and other AFGE members, when the AFGE President sexually harassed, sexually assaulted and battered Plaintiff Wells' son, Plaintiff John Doe #1, Plaintiff Salim Javed, and sexually harassed Plaintiffs Kalyar, Fahim Javed and other AFGE staff, contractors, among others.

665. On information and belief, Cox's breach of his fiduciary duties through his sexual and other misconduct toward Plaintiffs and others was committed deliberately, intentionally, willfully, and in bad faith, with knowledge of the duties required of an officer of a labor organization.

666. Cox's acts constitute a violation of the fiduciary responsibilities of officers of labor organizations in violation of Section 501(a) of the LMRDA, 29 U.S.C. § 401, *et seq.*

667. Cox's acts have greatly damaged AFGE, AFGE member Annette Wells and other AFGE members.

668. Accordingly, Plaintiff Annette Wells seeks on behalf of AFGE, herself and other AFGE members, compensatory and punitive damages for, among other things, AFGE's losses

sustained as a result of Cox's misconduct, reasonable attorneys' fees and any other remedies provided by 29 U.S.C. § 401, *et. seq.*

669.     Defendants Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin, Flynn, Borer, Goldberg and DeWyngaert breached their duties to the labor organization and violated their oaths as AFGE officers when they failed to report, document,  and investigate complaints filed against Cox for committing sexual harassment, sexual assault, sexual battery, racial discrimination, bullying, threats and other misconduct; and, aware of Cox's egregious misconduct, failed to take disciplinary or remedial action against Cox after receiving those complaints.

670.     On information and belief, Defendants Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin, Flynn, Borer, Goldberg and DeWyngaert's breach of their fiduciary duties in failing to report, document,  and investigate complaints filed against Cox for committing sexual harassment, sexual assault, sexual battery, racial discrimination and other misconduct; and by failing to take and disciplinary or remedial action against Cox after receiving those complaints, was committed deliberately, intentionally, willfully, and in bad faith with knowledge of the duties required of an officer of a labor organization.

671.     Aware of sexual harassment and sexual assault complaints filed against Cox by a Myrtle Beach, South Carolina hotel employee in 2014, by a Hotel Caribe employee in 2017, by Brett Copeland in 2017 and by Rocky Kabir in 2017 and 2018, Defendants Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin, and Flynn breached their duties to the labor organization and violated their oaths as AFGE officers by endorsing Cox's 2018 re-election to a third term as AFGE National President and encouraging AFGE members to re-elect Cox.

672.     After National President Everett Kelley publicly called Cox, a "liar," Defendants

Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, and McCubbin breached their duties

to the labor organization and violated their oaths as AFGE officers by refusing to process the

Mollett Committee of Investigation's February 13, 2020, report finding probable cause that Cox

ordered his Confidential Secretary Rocky Kabir to secretly work on Cox's 2018 re-election,

refusing to vote on Cox's guilt and refusing to remove Cox from office for engaging in such

unlawful misconduct.

673.     Defendants Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, and

McCubbin, breached their duties to the labor organization and violated their oaths as AFGE

officers by executing a secret February 28, 2020, separation agreement permitting Cox to

resign from office in lieu of removal for misconduct and, upon information and belief, paying

Cox cash.

674.     Aware of Cox's misconduct as detailed in the March 16, 2020 Working Ideal

report and after publicly calling Cox, a "liar," Defendant Kelley executed the February 28,

2020, separation agreement with Cox, upon information and belief, giving Cox cash in

exchange for Cox's agreement to testify against other AFGE members.

675.     The acts of Cox, Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke,

McCubbin, Flynn, Borer, Goldberg and DeWyngaert constitute a violation of the fiduciary

responsibilities of officers of labor organizations in violation of Section 501(a) of the LMRDA,

29 U.S.C. § 401, *et seq.*

676.     The acts of Cox, Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke,

McCubbin, Flynn, Borer, Goldberg and DeWyngaert have greatly damaged AFGE, AFGE

member Annette Wells and other AFGE members.

677.     On behalf of AFGE, herself and other AFGE members, Plaintiff Annette Wells seeks compensatory and punitive damages for, among other things, AFGE's losses sustained as a result of Defendants Cox, Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin, Flynn, Borer, Goldberg and DeWyngaert's misconduct and breach of their fiduciary duties, reasonable attorneys'' fees and any other remedies provided by 29 U.S.C. § 401, *et. seq.*

678.     Wherefore, Plaintiff Wells claims compensatory and punitive monetary damages in excess of the jurisdiction of this Court ($75,000.00) against Defendants, in an amount to be determined at trial, plus costs and post judgment interest at the legal rate of ten percent (10%) per annum from the date of judgment, and for any further relief that this Honorable Court deems necessary and appropriate.

## SEVENTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### Cox, Kelley, Bunn, Castellano, Glover, Doyle, Scott, Eliano, Swanke, McCubbin, Flynn, Borer, Goldberg and DeWyngaert
### For Breach of Fiduciary Duty

679.     Plaintiffs reallege and incorporate by reference each allegation contained in the foregoing paragraphs as set forth herein.

680.     Defendants Everett Kelley, Eric Bunn, Vincent Castellano, Phil Glover, Danny Doyle, Arnold Scott, Cheryl Eliano, Gerald Swanke, George McCubbin, Joseph Flynn, David Borer, Goldberg and Brian DeWyngaert breached their fiduciary duty to Plaintiff Wells and other AFGE members, by permitting Cox to improperly use CCS Limo services, hotels and other union resources to frequent bars and strip clubs and to solicit male prostitutes.

681.     Defendants Everett Kelley, Eric Bunn, Vincent Castellano, Phil Glover, Danny Doyle, Arnold Scott, Cheryl Eliano, Gerald Swanke, George McCubbin, Joseph Flynn, David Borer, Goldberg and Brian DeWyngaert have refused Plaintiff Wells' demand for an accounting of funds improperly expended by Cox on CCS Limo services, hotels and other union resources, to frequent bars, strip clubs and to solicit male prostitutes.

682.     The acts of Defendants Everett Kelley, Eric Bunn, Vincent Castellano, Phil Glover, Danny Doyle, Arnold Scott, Cheryl Eliano, Gerald Swanke, George McCubbin,  Joseph Flynn, David Borer, Goldberg and Brian DeWyngaert constitute a violation of the fiduciary responsibilities of officers of labor organizations in violation of Section 501(a) of the LMRDA, 29 U.S.C. § 401, *et seq.*

683.     On behalf of AFGE, herself, and other AFGE members, Plaintiff Wells seeks injunctive relief in the form of an Order directing Defendants to conduct an independent accounting of Cox's use of union resources to frequent bars, strip clubs and solicit male prostitutes and to order AFGE to retain an outside, neutral law firm selected by Plaintiffs to investigate the February 13, 2020, charges filed by Wells, Weinberg and Graf against Cox,  and for other relief as the Court deems necessary.

684.     On behalf of AFGE, herself and other AFGE members, Plaintiff Annette Wells seeks compensatory and punitive damages for, among other things, AFGE's losses sustained as a result of  Defendants Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin, Flynn, Borer, Goldberg and DeWyngaert's misconduct and breach of their fiduciary duties, reasonable attorneys'' fees and any other remedies provided by 29 U.S.C. § 401, *et. seq.*

685.     Wherefore, Plaintiff Wells, on behalf of AFGE, herself and other AFGE members, seeks damages in an amount to be determined at trial, plus costs and post judgment interest at the legal rate of ten percent (10%) per annum from the date of judgment, and for any further relief that this Honorable Court deems necessary and appropriate.

**EIGHTH CLAIM FOR RELIEF AGAINST DEFENDANTS**
**Sexual Harassment, *Quid Pro Quo***

686.     Plaintiffs John Doe #1 and Salim Javed reallege and incorporate by reference each allegation contained in the foregoing paragraphs set forth herein.

687.     Defendant Cox's acts occurred during Plaintiffs John Doe #1 and Salim Javed's employment, and John Doe #1 and Salim Javed were unlawfully subjected to *quid pro quo* sexual harassment and abuse by Cox.

688.     As a result of Plaintiff John Doe #1's and Plaintiff Salim Javed's rebuffs to Cox's sexual harassment and abuse, they suffered adverse effects to the terms and conditions of their employment.

689.     As a result of Cox's sexual harassment and abuse, Plaintiffs suffered damages including, but without limitation, deprivation of income and benefits, loss of opportunity, severe emotional distress, personal injury (in the case of Plaintiff John Doe #1) pain, suffering, mental anguish, humiliation and damage to reputation and career.

690.     By failing to report, document, investigate sexual harassment complaints filed against Cox over a period of years and failing to discipline Cox for his sexual and other misconduct, Defendants AFGE, Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin, Flynn, Borer, Goldberg and DeWyngaert are responsible for Cox's sexual harassment and abuse of Plaintiffs #1 and Salim Javed.

691.     Wherefore Plaintiffs John Doe #1 and Salim Javed claim compensatory and punitive monetary damages in excess of the jurisdiction of this Court ($75,000.00) against Defendants in an amount to be determined at trial, plus costs and post judgment interest at the legal rate of ten percent (10%) per annum from the date of judgment, and for any further relief that this Honorable Court deems necessary and appropriate.

### NINTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### Hostile Work Environment Based On Sex, Race and Religion

692.     Plaintiffs John Doe #1, Salim Javed, Fahim Javed, Kalyar, Johnson, Lewis, and Scott,  reallege and incorporate by reference each allegation contained in the foregoing paragraphs set forth herein.

693.     Cox's persistent, frequent and pervasive sexual harassment and racial and religious discrimination created an atmosphere in which Plaintiff John Doe #1,  Plaintiff Salim Javed and Plaintiffs Kalyar, Fahim Javed, Johnson, Lewis and Scott performed their duties that was hostile, abusive, humiliating and degrading.

694.     Cox subjected these Plaintiffs to a hostile work environment permeated with harassment based on sex, race and religion sufficiently severe and pervasive to alter the conditions of Plaintiffs' employment in violation of the District of Columbia Human Rights Act of 1977, Title 2, Chapter 14 – Human Rights District of Columbia Code, *et seq.*

695.     By failing to report, document, investigate racial discrimination complaints filed against Cox over a period of years and failing to discipline Cox for his racial discriminatory behavior and other misconduct, Defendants AFGE, Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin, Flynn, Borer, Goldberg and DeWyngaert are responsible for Cox's racial and religious discrimination against Plaintiffs and Cox's creation of a hostile work environment at AFGE.

696.     As a result of Defendants' creation of a hostile work environment, these Plaintiffs suffered damages including, but without limitation, deprivation of income and benefits, loss of opportunity, severe emotional distress, personal injuries, pain, suffering, mental anguish, humiliation and damage to reputation and career.

697.     Wherefore Plaintiffs John Does # 1. Salim Fayed,  Kalyar, Fahim Javed, Johnson, Lewis and Scott claim compensatory and punitive monetary damages in excess of the jurisdiction of this Court ($75,000.00) against Defendants in an amount to be determined at trial, plus costs and post judgment interest at the legal rate of ten percent (10%) per annum from the date of judgment, and for any further relief that this Honorable Court deems necessary and appropriate.

## TENTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### Intentional Tort

698.     Plaintiff John Doe #1 and Plaintiff Salim Fayed reallege and incorporate by reference each allegation contained in the foregoing paragraphs set forth herein.

699.     Defendant J. David Cox's intentional, persistent, frequent and tortious misconduct caused injury to Plaintiffs John Doe #1 and Salim Javed in violation of the District of Columbia intentional tort statute.

700.     By failing to report, document, investigate sexual harassment complaints filed against Cox over a period of years and failing to discipline Cox for his sexual and other misconduct, Defendants AFGE, Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin, Flynn, Borer, Goldberg and DeWyngaert are responsible for Cox's  intentional, persistent, frequent and tortious misconduct that caused injury to Plaintiffs John Doe #1 and Salim Javed.

701.     Wherefore Plaintiff John Doe #1 and Plaintiff Salim Javed claim compensatory and punitive monetary damages in excess of the jurisdiction of this Court ($75,000.00) against Defendants in an amount to be determined at trial, plus costs and post judgment interest at the legal rate of ten percent (10%) per annum from the date of judgment, and for any further relief that this Honorable Court deems necessary and appropriate.

## ELEVENTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### Negligent Hiring, Supervision And Retention Of Defendant Cox

`

702.     Plaintiffs reallege and incorporate by reference each allegation contained in the foregoing paragraphs as set forth herein.

703.     For years, Defendants knew or reasonably should have known of Cox's propensities to sexually batter, sexually assault, sexually harass, discriminate on the basis of

race threaten, harm and otherwise mentally, emotionally, physically injure AFGE members, employees, agents, contractors and others.

704.     For years, Defendants knew that Cox was being placed in a position of employment where he would have unfettered access to vulnerable AFGE staff and contractors without direct supervision, oversight or monitoring.

705.     Cox engaged in unlawful sexual harassment, sexual assault, sexual battery, racial discrimination, threatening, bullying, cursing and retaliation against others before his contact with Plaintiffs, a fact that was known to Defendants who took no remedial action.

706.      Defendants had a duty of care to Plaintiffs, when hiring, retaining, supervising and evaluating Cox, to timely, adequately, and appropriately report, investigate, heed and act on all reasonable suggestions, complaints and information that Cox had the propensity to, and/or had actually, threatened, inappropriately sexually harassed, sexually assaulted and battered, racially discriminated and retaliated against and otherwise mentally, physically and emotionally injured AFGE employees, contractors and others.

707.     Defendants continued to permit Cox unfettered access to vulnerable AFGE staff and contractors without supervision, training or discipline.

708.     Defendants had a duty of care to Plaintiffs to ensure the safety of its employees, contractors and others, including Plaintiffs from being discriminated against, sexually harassed, assaulted, and battered, cursed, threatened, and retaliated against by AFGE members, employees, agents and/or contractors, including Cox.

709.     Sexual harassment, sexual assaults, sexual batteries, physical injury, unwanted sexual touching, racial and religious discrimination, threats and retaliation of the sort suffered by Plaintiffs were entirely preventable had Defendants timely, adequately and appropriately

reported and investigated the complaints filed against Cox and intervened by taking disciplinary action against Cox.

710.     Defendants failed to investigate numerous complaints that Cox discriminated against, harassed, assaulted, battered, threatened, bullied, inappropriately touched and retaliated against AFGE staff and contractors from in or about 2012 through 2020 and failed to properly supervise and discipline Cox.

711.     In breach of its duty of care, AFGE negligently retained Cox as National President when AFGE knew or should have known of Cox's propensity to discriminate against, harass, sexually assault, batter, physically injure, threaten and otherwise harm and injure vulnerable AFGE members, employees, agents and/or contractors, including Plaintiffs.

712.     In breach of their duty of care, Defendants were negligent in supervising Cox by:

1)  failing to stop Defendant Cox from ordering CCS Limo and Limo Networks Nationwide drivers and AFGE staff and contractors to frequent bars and strip clubs and to assist him in procuring male prostitutes for his sexual enjoyment;

2)  failing to stop Defendant Cox from using AFGE expense accounts to procure hotel rooms, go to bars, strip clubs and hire prostitutes, misuse AFGE-paid CCS Limo services to sexually assault, batter, harass and threaten CCS Limo and Limo Networks Nationwide drivers; and

3)  failing to stop Defendant Cox from engaging in racial discrimination after receiving numerous complaints about his misconduct.

713.     Defendants' negligent and careless acts and omissions include:

1)   failing to establish reasonable criteria for the use of AFGE resources, including AFGE staff, AFGE contractors, CCS Limo drivers, Limo Network Nationwide drivers, hotel rooms and other resources provided by Cox in his capacity as National President;

2)   failing to report and investigate Cox's repeated incidents of sexual misconduct, racial discrimination, public inebriation, threatening, bullying and retaliatory misconduct;

3)   failing to implement and enforce AFGE's policies and procedures, including EEO written policies, by retaining a neutral, outside, independent investigator to investigate such charges filed against Cox by AFGE staff, contractors and others from in or about 2012 through 2020;

4) failing to exercise reasonable care to detect when Cox's actions were adverse and detrimental;

5) failing to investigate and process disciplinary charges against Cox after receiving complaints about his misconduct described here and being otherwise careless and negligent.

714.    As the employer/principal responsible for the actions of its employees/agents, Defendant AFGE and the other Defendants' negligent hiring, negligent retention, negligent supervision and negligent failure to discipline Defendant Cox was a proximate cause of Plaintiffs' pain, suffering, severe mental anguish, physical injury, unnecessary medical care and expense, lost wages, lost future wages, loss of future earning capacity and other injuries and damages.

715.    Wherefore, Plaintiffs seek damages in an amount to be determined at trial, plus costs and post judgment interest at the legal rate of ten percent (10%) per annum from the date of judgment, and for any further relief that this Honorable Court deems necessary and appropriate.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for relief and judgment against Defendants jointly and severally, as follows:

a.    Enter Judgment declaring that AFGE, Cox, Kelley, Bunn, Castellano, Glover, Doyle, Eliano, Swanke, McCubbin, Flynn, Borer, Goldberg and DeWyngaert violated the District of Columbia Human Rights Act of 1977, Title 2, Chapter 14 – Human Rights District of Columbia Code, *et seq,* and D.C. Law 22-311, the Sexual Abuse Statute of Limitations Amendment Act of 201 and the District of Columbia statutes;  42 U.S.C. 1981; Title I- § 101(a)(2) and (5) of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C.A. § 411(a)(2) and (5), Title V- § 501(b) of the LMRDA; 29 U.S.C.A. § 501(b) and the common law of the District of Columbia.

b.    Require Defendants and all others in active concert or participation with Defendants, to reimburse Plaintiffs for all lost wages and benefits and interest thereon.

c.    Require Defendants and all others in active concert or participation with Defendants, to pay Plaintiffs' litigation costs and reasonable attorneys' fees.

d.      Require Defendants and all others in active concert or participation with Defendants, to reimburse Plaintiffs for their pain and suffering.

e.      Require Defendants and all others in active concert or participation with Defendants, to pay punitive damages to Plaintiffs.

f.      Grant Plaintiff Annette Wells' *ex parte* application to file a Complaint in this Court pursuant to Section 501 of the LMRDA on behalf of herself and other AFGE members to obtain the relief requested in the February 13, 2020 Wells/Weinberg/Graf charges.

g.      Require Defendants and all others in active concert or participation with Defendants, to account for and pay over to AFGE all AFGE union resources improperly used by Cox for his personal use or to promote his 2018 candidacy, including, but not limited to, Cox's use of the CCS Limo and Limo Network car services paid and provided to Cox by AFGE to go to strip clubs and bars, to procure male prostitutes and to sexually harass and sexually assault Plaintiff John Doe #1 and Salim Javed, and to sexually harass Plaintiffs Kalyar and Fahim Javed.

h.      Require AFGE to pay and retain an independent attorney to oversee and monitor policy changes and require AFGE to allow Plaintiffs to select the lawyer retained to oversee and monitor the implementation of those and other policy changes.

i.      Require Defendants and all others in active concert or participation with Defendants, to account for and pay over to AFGE all AFGE union resources improperly used by Cox for his personal use or to promote his 2018 candidacy, including, but not limited to, Cox's unlawful use of the services of AFGE employees, Rocky Kabir and Jacqueline Simon, to promote Cox's 2018 AFGE campaign for National President in violation of the LMRDA and the AFGE National Constitution; and

j.      Award such other relief deemed just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable under Counts One through Eleven.

Respectfully submitted,

/s/ Marlene (Kemi) Morten
Marlene (Kemi) Morten, D.C. Bar 272575
3825 South Capitol Street, S. W.
Washington, D. C. 20032
202-379-4806/*kemimorten@gmail.com*

/s/ Donna Clancy
Donna Clancy
The Clancy Law Firm, P.C.
Application to be filed for Admission *pro hac vice*
40 Wall Street, 61st Floor
New York, NY 10005
(212) 747-1744
dhc@dhclancylaw.com

*Counsel for Plaintiffs*

June 26, 2020