**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JOHN DOE #1, et al.,** | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 20-1558 (JDB)** |
| **AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, et al.,** | |
| **Defendants.** | |

**MEMORANDUM OPINION**

Jeffrey David Cox resigned as National President of the American Federation of Government Employees ("AFGE") union in February 2020 following allegations of misconduct while in office. Four months later, plaintiffs filed this lawsuit against Cox, AFGE, and thirteen AFGE officials and high-level staff members (the "Individual AFGE Defendants"), asserting claims under both federal and state law. The crux of plaintiffs' complaint is that Cox engaged in discriminatory and sexual misconduct during his tenure as President and that union leadership failed adequately to prevent his behavior and take remedial action against him for his misdeeds.

Three motions are now pending before the Court: (1) plaintiffs' motion to disqualify counsel for the Individual AFGE Defendants; (2) AFGE and the Individual AFGE Defendants' motion to dismiss the second amended complaint for lack of subject-matter jurisdiction and for failure to state a claim; and (3) Cox's motion to dismiss the first and second amended complaints for insufficient service of process and for the reasons spelled out in AFGE and the Individual AFGE Defendants' motion to dismiss. As explained below, the Court will deny plaintiffs' motion to disqualify counsel for the Individual AFGE Defendants, deny Cox's motion to dismiss the first and second amended complaints for insufficient service of process, and grant defendants' motions

1

to dismiss as to all claims against the Individual AFGE Defendants, and nearly all claims against AFGE and Cox.

## Background

At the pleading stage, district courts accept as true a plaintiff's factual allegations, see Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), and thus the Court recites the facts as presented in plaintiffs' second amended complaint.[1]  The Court will provide only some limited background to start, and will detail additional facts as they become relevant.

AFGE is the largest federal employee union in the United States.  Second Am. Compl. ("SAC") [ECF No. 32] ¶ 86.  AFGE is governed by the National Executive Council ("NEC"), which is comprised of several elected officials, including the National President, the National Secretary-Treasurer ("NST"), and several National Vice Presidents, most of whom represent specific geographic districts across the country.   Id. ¶¶ 87, 89.  Ten of the Individual AFGE Defendants in this lawsuit are or were members of the NEC.  Id. ¶ 91.  The other three Individual AFGE Defendants are AFGE's General Counsel, Deputy General Counsel, and Chief of Staff.[2] Id.  ¶¶ 93, 99, 106.  The twelve plaintiffs in this lawsuit are current or former AFGE employees, elected officials for local AFGE unions, AFGE members, employees of AFGE contractors, and family members.[3]  Id. ¶¶ 58–84.

---

[1] Although the second amended complaint references various exhibits, no exhibits are attached.  The Court will therefore rely on the exhibits attached to the first amended complaint.

[2] The Individual AFGE Defendants are: National President Everett Kelley; NST Eric Bunn; National Vice Presidents Vincent Castellano, Phil Glover, Danny Doyle, Arnold Scott, Cheryl Eliano, Gerald Swanke, and George McCubbin; former NST Joseph Flynn; AFGE General Counsel David Borer; AFGE Deputy General Counsel Gony Goldberg; and AFGE Chief of Staff Brian DeWyngaert.  SAC at 2–3.  The second amended complaint does not specify what time periods defendants held those roles.

[3] Plaintiffs Mecca Scott, Valyria Lewis, Jocelyn Johnson, and Rocky Kabir are current or former employees of AFGE.  SAC ¶¶ 61, 67, 72, 76.  Plaintiffs Amber Westbrook and Teresa Freeman are former elected officials for local AFGE-affiliated unions.  Id. ¶¶ 78, 81.  Plaintiffs John Doe #1, Waqas Kalyar, Salim Javed, and Fahim Javed work for or own businesses that provide limousine services to AFGE.  Id. ¶¶ 67, 68, 407, 605.  Plaintiff Annette Wells is an AFGE member and Doe #1's mother.  Id. ¶ 65.  Plaintiff Paul Vaughan is Doe #1's stepfather.  Id. ¶ 66.

Case 1:20-cv-01558-JDB   Document 60   Filed 08/11/21   Page 3 of 67

In fall 2019, news reports began circulating that Cox had sexually harassed multiple AFGE employees during his tenure as National President, id. ¶ 330; Ex. 4 to First Am. Compl. ("FAC") [ECF No. 11-5], and that AFGE had failed for years to address complaints about inappropriate behavior by Cox and other elected union officials, see SAC ¶¶ 333–34; Ex. 9 to FAC [ECF No. 11-10]. Following these reports, Cox took a leave of absence from AFGE, and defendant Kelley assumed Cox's responsibilities as National President on an interim basis. SAC ¶ 332. Shortly thereafter, AFGE retained an outside law firm named Working Ideal to conduct an independent investigation into Cox's misconduct and a systemic evaluation of AFGE's workplace harassment policies. See id. ¶ 335; Ex. 1 to FAC [ECF No. 11-2].

On February 13, 2020, AFGE member and plaintiff Wells filed internal disciplinary charges against Cox under the AFGE National Constitution, asserting that Cox had sexually assaulted, sexually harassed, and racially discriminated against her son, plaintiff Doe #1, for years. SAC ¶ 336; Ex. 10 to FAC [ECF No. 11-11]. Doe #1 had worked for Capitol Chauffeur Service ("CCS"), under CCS's contract with AFGE, and had served as Cox's principal limo driver for over a decade. See SAC ¶¶ 13, 59. Wells also alleged that Cox unlawfully spent AFGE money for personal use by hiring Doe #1 to take Cox to bars and strip clubs and by using the company-provided limo services to abuse Doe #1 and others. See id.

In connection with her charges, Wells demanded that the NEC take various actions, including (1) securing an "independent, outside accounting of all monies and charges paid by . . . Cox for private car services," (2) "find[ing] Mr. Cox guilty for grossly violating his duties by engaging in sexual harassment, sexual abuse and racial discrimination," and (3) "remov[ing] Mr. Cox as President and as an AFGE member by the last date of the NEC February 2020 meeting." Ex. 10 to FAC at 4, 7. Wells also warned that, if the NEC refused her requests, she would file

breach-of-fiduciary-duty claims under section 501(b) of the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA").  Id. at 7–8.  Two weeks later, with the NEC's approval, defendant Kelley entered into a secret separation agreement with Cox, which allowed Cox to resign from office without admitting guilt.  SAC ¶¶ 5, 16.

Plaintiffs filed this lawsuit against AFGE, the Individual AFGE Defendants, and Cox on June 13, 2020, and have since amended their complaint twice to join additional parties and assert additional claims.  In connection with the second amended complaint, the Court also granted plaintiff Wells leave to file two breach-of-fiduciary-duty claims under the LMRDA against all defendants save AFGE.  See Mem. Op. & Order (Oct. 23, 2020) [ECF No. 42] at 2.  That decision did not address the merits of the LMRDA claims, holding only that Wells had satisfied the two statutory prerequisites for bringing suit.  See id. at 3–8.

The second amended complaint spans 139 pages and formally identifies eleven separate counts.  But nearly every count contains several distinct claims, each asserted by a different plaintiff, which rest on a unique set of facts specific to that plaintiff.  All told, the second amended complaint raises two types of federal claims—for breach of fiduciary duty under section 501(b) of the LMRDA and for discrimination under section 1981 of the Civil Rights Act of 1866—as well as a large swath of tort claims under the common law and the D.C. Human Rights Act ("DCHRA").  See SAC ¶¶ 821–945.  Broadly speaking, the non-federal claims rest on allegations of assault, battery, sexual harassment, physical injury, intentional infliction of emotional distress, and discrimination based on race, sex, and religion by Cox and other AFGE officials.

There are now three pending motions before the Court.  First, plaintiffs have moved to disqualify Bredhoff & Kaiser PLLC ("Bredhoff & Kaiser") as counsel for the Individual AFGE Defendants because the same counsel also represents AFGE.  That motion also seeks to bar AFGE

from paying the Individual AFGE Defendants' legal fees in this lawsuit.  Second, AFGE and the Individual AFGE Defendants have moved to dismiss the entire second amended complaint—except for plaintiff Johnson's section 1981 claim against AFGE—for lack of subject-matter jurisdiction and failure to state a claim.  Finally, defendant Cox has moved to dismiss the first and second amended complaints for insufficient service of process.  Cox's motion also incorporates wholesale the AFGE and the Individual AFGE Defendants' motion to dismiss.  All three motions have been fully briefed and are now ripe for consideration.[4]

## Analysis

### I.  Plaintiffs' Motion to Disqualify Counsel for the Individual AFGE Defendants[5]

Plaintiffs have moved to disqualify Bredhoff & Kaiser as counsel for the Individual AFGE Defendants on conflict-of-interest grounds because the same attorneys also represent AFGE.[6]  See Mem. in Supp. of Pls.' Mot. to Disqualify Bredhoff & Kaiser as Counsel for Thirteen Named Defs. & Mot. to Strike Defs.' Nov. 23, 2020 Mot. to Dismiss Filed by Bredhoff & Kaiser ("Pls.' Mot. to

---

[4] In accordance with the parties' request, the Court entered an order on November 9, 2020, referring plaintiffs' claims against Cox to mediation before Magistrate Judge Faruqui.  Order (Nov. 9, 2020) [ECF No. 44].  Two weeks later, Cox filed his motion to dismiss.  See Def. J. David Cox's FRCP 12 Mot. to Dismiss Pls.' Am. Compl. & Second Am. Compl. for Insufficient Service of Process ("Cox's Mot. to Dismiss") [ECF No. 47].  With the parties' consent, Magistrate Judge Faruqui subsequently referred plaintiffs' claims against Cox "to the Circuit Mediation Program under a mediator with labor law expertise."  Min. Order (Feb. 5, 2021).  This Court has not been apprised of any further developments in mediation and will rule on Cox's pending motion to dismiss.

[5] At the outset, plaintiffs argue that this Court must resolve their motion to disqualify before assessing the motion to dismiss filed by Bredhoff & Kaiser on behalf of AFGE and the Individual AFGE Defendants.  See Pls.' Mot. to Disqualify at 10–11.  In Grimes v. District of Columbia, 794 F.3d 83 (D.C. Cir. 2015), the D.C. Circuit explained that "[o]nce a party moves to disqualify an adverse party's counsel, the district court may not entertain a dispositive motion filed by the very counsel alleged to be conflicted until the court has first determined whether that counsel is disqualified."  Id. at 90.  Grimes involved a summary judgment motion, not a motion to dismiss, see id. at 91, and unlike here, the factual question of "whether a conflict exists" was not "intertwined with the legal questions raised in the" dispositive motion, see Mem. of Law in Opp'n to Pls.' Mot. to Disqualify Counsel & for Other Related Relief ("Disqualify Opp'n") [ECF No. 49] at 10 n.3.  Nonetheless, assuming arguendo that Grimes applies here, the Court will dispose of the disqualification motion first.  Because the Court concludes that Bredhoff & Kaiser is not disqualified, the Court will then address AFGE and the Individual AFGE Defendants' motion to dismiss.

[6] Bredhoff & Kaiser does not represent Cox, who has retained his own counsel at his own expense.  See Disqualify Opp'n at 1; see also Notice of Appearance [ECF No. 38] (by Attorney Hans David Leibensperger on behalf of Cox); Notice of Appearance [ECF No. 41] (by Attorney Daniel Ray Francis on behalf of Cox).

Disqualify") [ECF No. 48] at 1.  Plaintiffs argue that dual representation of AFGE and its officials is not permitted in cases like this one where the complaint charges union officials with breaching their fiduciary duties to the union.  Id. at 5–6.  As part of their motion, plaintiffs also request that this Court (1) order the Individual AFGE Defendants "to retain their own legal counsel at their own expense," (2) bar AFGE from paying the Individual AFGE Defendants' "legal fees and costs . . . in defending this litigation," (3) "strike" the motion to dismiss filed by Bredhoff & Kaiser from the record; (4) require the Individual AFGE Defendants "to file their separate responses to Plaintiffs' second amended complaint" within fourteen days, and (5) order Bredhoff & Kaiser "to pay Plaintiffs' attorneys' fees and costs incurred in preparing this motion."  Id. at 1–2.

Bredhoff & Kaiser deny the existence of any conflict of interest, emphasizing that no precedent "prohibit[s] a labor union . . . from lending assistance (through the provision of counsel or otherwise)" to help "present or former union officers and employees . . . secure, at the pleading stage, dismissal of legally defective claims against them. . . ."  Disqualify Opp'n at 6.  The Court finds that Bredhoff & Kaiser's dual representation of AFGE and the Individual AFGE Defendants has been permissible thus far and will deny plaintiffs' motion to disqualify.

### A.  Legal Standard

"A motion to disqualify counsel is committed to the sound discretion of the district court." Ambush v. Engelberg, 282 F. Supp. 3d 58, 61 (D.D.C. 2017) (citing Palumbo v. Tele-Commc'ns, Inc., 157 F.R.D. 129, 131 (D.D.C. 1994)).  Such motions are "subject to particularly strict judicial scrutiny," Konarski v. Donovan, 763 F. Supp. 2d 128, 135–36 (D.D.C. 2011) (citation omitted), because disqualification "negates a client's right to freely choose his counsel" and can be sought "to advance purely tactical purposes," Ambush, 282 F. Supp. 3d at 62 (citations omitted).

**B. Analysis**

Plaintiffs' argument for disqualification rests on the D.C. Circuit's 1962 opinion in <u>Milone</u> <u>v. English</u>, 306 F.2d 814 (D.C. Cir. 1962).  <u>Milone</u> held that "[a]s a general proposition [the] funds of a union are not available to defend officers charged with wrongdoing which, if the charges were true, would be seriously detrimental to the union and its membership."  306 F.2d at 817.  The court reasoned that, in such circumstances, "[c]ounsel who are chosen by and represent officers charged with the misconduct, and who also represent the union, are not able to guide the litigation in the best interest of the union because of the conflict in counsel's loyalties," and thus, "it would be incumbent upon counsel not to represent both the union and the officers."  <u>Id.</u>

Nearly a decade later, however, the D.C. Circuit carved out an exception to this rule in <u>Yablonski v. United Mine Workers of America</u>, 448 F.2d 1175 (D.C. Cir. 1971), holding that dual representation of the union and union officials was permissible at the early stages of the litigation in order "to ascertain the exact nature of the lawsuit and protect the interests of all defendants." <u>Id.</u> at 1177.  The court explained further that "one lawyer can properly represent all defendants if a suit appears groundless, and that separate counsel is only required in a situation where there is a potential conflict between the interests of the union and those of its officers."  <u>Id.</u>  In <u>Yablonski</u>, the court ultimately took issue with counsel's "continued representation" of the union for other reasons not relevant here.  But the D.C. Circuit was careful to note that counsel had already "set about with commendable diligence to delineate the real issues of the lawsuit"—including by filing answers on behalf of the union and the union officials "setting forth all customary general defenses" and "34 pages of interrogatories to develop more fully the scope of the case"—and, despite its ultimate ruling, the court sought "not [to] imply any censure of counsel's actions during this period of joint representation."  <u>Id.</u>

Case 1:20-cv-01558-JDB   Document 60   Filed 08/11/21   Page 8 of 67

This Court finds that Bredhoff & Kaiser's dual representation of AFGE and the Individual AFGE Defendants has been permissible to this point under the exception set forth in <u>Yablonski</u>. Bredhoff & Kaiser has now briefed two sets of issues for the Court: whether plaintiffs have satisfied the statutory prerequisites to file section 501(b) claims under the LMRDA and whether the second amended complaint must be dismissed for lack of jurisdiction or failure to state a claim. These efforts have served, as in <u>Yablonski</u>, "to delineate the real issues of the lawsuit" and "develop more fully the scope of the case" by articulating why plaintiffs' "suit appears groundless" and cannot survive a motion to dismiss.  <u>See id.</u>  Furthermore, because the Court will, as explained below, dismiss <u>all</u> claims against the Individual AFGE Defendants—including plaintiff Wells's breach-of-fiduciary-duty claims—the Court need not decide precisely when Bredhoff & Kaiser might be disqualified from representing those defendants moving forward.

Plaintiffs dispute that <u>Yablonski</u> is applicable for two reasons.  First, plaintiffs contend that "[t]his Circuit subsequently rejected" <u>Yablonski</u>'s approach.  Pls.' Mot. to Disqualify at 7.  But plaintiffs cite only a single, unpublished district court opinion, which interpreted <u>Yablonski</u> to "permit[] dual representation in the initial stages of the suit for the strictly limited purpose of ascertaining whether the complaint does, in fact, charge union officers with breach of fiduciary trust or other wrongdoing which puts their interests directly in conflict with those of the union." <u>See id.</u> at 8 (quoting <u>Vestal v. Hoffa</u>, No. 1237-71, 1972 WL 864, at *4–6 (D.D.C. July 11, 1972)). Not only is this case not controlling, but it also does not advance plaintiffs' case.  The district court in <u>Vestal</u> acknowledged that "dual representation during the preliminary stages of a Section 501 suit" was permissible under <u>Yablonski</u>, <u>Vestal</u>, 1972 WL 864, at *4, but cautioned that such representation should not extend "until such time as the allegations of the complaint are delineated through discovery and tested for legal sufficiency," <u>id.</u> at *7.  Applying that logic, the court

explained that because counsel had already "performed the function of delineating the issues of the suit," and had filed answers on behalf of the union and the union officials, the case had reached a stage where separate counsel was required.  Id. at *5.  That reasoning is consistent with Yablonski.

Of course, this case is not as far along as either Vestal or Yablonski.  No answers have been filed and discovery has not begun.  Indeed, this Court has not—at any time prior to this opinion—examined whether the second amended complaint in fact states any breach-of-fiduciary-duty claims against the Individual AFGE Defendants.  Hence, the Court sees no merit to plaintiffs' contentions that Yablonski has been "rejected" or that Vestal supports a different outcome here.

Plaintiffs also assert that this case now falls outside the exception identified in Yablonski because "[t]he legal sufficiency of Plaintiff Wells' [breach-of-fiduciary-duty] claims w[as] carefully examined and upheld by this Court" in its decision granting Wells's motion for leave to file section 501(b) claims.  See Pls.' Reply to Defs.' Opp'n to Pls.' Mot. to Disqualify Counsel ("Pls.' Reply in Supp. of Mot. to Disqualify") [ECF No. 50] at 1.  This argument misconstrues the scope of the Court's October 23, 2020 opinion, which ruled only that Wells had satisfied the "demand and refusal" and "good cause" prerequisites to file suit under section 501(b) of the LMDRA.  See Mem. Op. & Order (Oct. 23, 2020) at 5–6, 8.  The Court's analysis of the "good cause" prerequisite, in particular, was limited to whether a "narrow range of defenses"—such as collateral estoppel or res judicata—barred Wells's claims, see id. at 6–7, and whether Wells's suit had been brought to "harass" defendants, id. at 8.  The "good cause" analysis did not constitute a determination that Wells's claims are legally viable.  As the Court will now rule, for the most part, they are not.

Plaintiffs do not identify—and the Court is not aware of—any case involving breach-of-fiduciary-duty claims where dual representation of a union and the union's officials was prohibited before or at the motion-to-dismiss stage, at which time the facts alleged in plaintiffs' complaint are presumed true.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Indeed, the only other case on which plaintiffs principally rely, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helps of America v. Hoffa, 242 F. Supp. 246 (D.D.C. 1965), is inapposite.  There, a district court disqualified counsel from representing a union after counsel had already filed an answer on behalf of the union treasurer admitting to past expenditures of union funds.  Id. at 255.  Bredhoff & Kaiser has taken no analogous actions to address the "truth or falsity" of Wells's factual allegations here, see Yablonski, 448 F.2d at 1179, and instead has targeted the viability of Wells's charges as a matter of law.

Frankly, the Court might be troubled if the case law did require disqualifying Bredhoff & Kaiser under these circumstances.  None of the claims in this lawsuit against the Individual AFGE Defendants are viable.  An attorney from Bredhoff & Kaiser first entered dual appearances on behalf of AFGE and the Individual AFGE Defendants on July 8, 2020.  Notice of Appearance [ECF No. 20].  Motions to dismiss the second amended complaint were due on November 23, 2020, see Min. Order (Oct. 23, 2020), and yet plaintiffs waited—for no seemingly legitimate reason—until November 25, 2020, to file their disqualification motion, arguing that Grimes obligates this Court to address disqualification first before considering Bredhoff & Kaiser's motion to dismiss.  See Pls.' Mot. to Disqualify at 4–5, 10–11.  Plaintiffs now seek to require each Individual AFGE Defendant to file separate motions at his or her own expense, all to defend against claims that—accepting plaintiffs' factual allegations as true—fail as a matter of law.  Indeed, plaintiffs' requested outcome appears particularly perverse because, for the most part, the

second amended complaint does not distinguish between <u>any</u> of the Individual AFGE Defendants' conduct. Bredhoff & Kaiser makes a compelling argument, then, that "the timing of this motion on the heels of the AFGE Defendants' second comprehensive Motion to Dismiss and long after Plaintiffs' counsel was aware of the putative conflict, strongly suggests that this effort is aimed at . . . a tactical purpose, <u>i.e.</u>, to make it more difficult, expensive, and time-consuming for the 13 Individual AFGE Defendants" to defend this litigation. <u>See</u> Disqualify Opp'n at 3 (quotations omitted). But the Court need not resolve the disqualification motion on this ground because the "caselaw does not compel this contorted path." <u>See</u> <u>id.</u>

In the final section of their reply brief, plaintiffs switch gears, arguing that Bredhoff & Kaiser's "role as counsel for AFGE triggers its own ethical questions" because AFGE had previously retained Bredhoff & Kaiser to investigate internal complaints against Cox and it had "conducted what amounted to a sham investigation." Pls.' Reply in Supp. of Mot. to Disqualify at 9–10. Because plaintiffs did not raise this argument in their initial motion—or even seek initially to disqualify Bredhoff & Kaiser <u>as counsel for AFGE</u>—the argument is waived. <u>See</u> <u>Lindsey v. Dist. of Columbia</u>, 879 F. Supp. 2d 87, 95–96 (D.D.C. 2012) (citing <u>In re Asemani</u>, 455 F.3d 296, 300 (D.C. Cir. 2006)) ("[B]ecause the District raised this argument for the first time in its reply brief, it is waived."). But in any event, plaintiffs cite no legal support for this proposition either, so disqualification is not warranted on this ground.

Plaintiffs' other requests for associated relief do not merit much discussion. Because the Court finds that Bredhoff & Kaiser is not conflicted from representing the Individual AFGE Defendants thus far, there is no reason to strike the motion to dismiss filed by Bredhoff & Kaiser or to require the Individual AFGE Defendants to retain their own legal counsel and file separate responses to plaintiffs' second amended complaint. <u>See</u> Pls.' Mot. to Disqualify at 1–2. The

question whether the Court should bar AFGE from paying the Individual AFGE Defendants' legal fees and costs moving forward is moot because those defendants will be dismissed from this lawsuit. See id. at 2. Moreover, plaintiffs do not articulate any basis to award plaintiffs attorneys' fees or the costs of preparing their motion to disqualify, so the Court will deny that request as well. See id.

## II.    AFGE and Individual AFGE Defendants' Motion to Dismiss

Next, the Court turns to AFGE and the Individual AFGE Defendants' motion to dismiss the entire second amended complaint—except for plaintiff Johnson's section 1981 claim against AFGE—under Rules 12(b)(1) and 12(b)(6) for lack of jurisdiction and failure to state a claim. See Def. AFGE & 13 Individual AFGE Defs.' Rule 12(b)(1) & 12(b)(6) Mot. to Dismiss ("Joint Mot. to Dismiss") [ECF No. 46]. Cox also "joins" this motion "with the consent of the other defendants, in lieu of filing a repetitious pleading." See Cox's Mot. to Dismiss at 1. Hence, to the extent AFGE and the Individual AFGE Defendants' motion addresses plaintiffs' claims against Cox, the Court will analyze the viability of those claims as well.

### A.  Legal Standard

To survive a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), a plaintiff must establish a court's jurisdiction by a preponderance of the evidence. Judicial Watch, Inc. v. Nat'l Archives & Records Admin., 845 F. Supp. 2d 288, 294 (D.D.C. 2012) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)). A court must take all facts alleged in the complaint as true and make all reasonable inferences in plaintiffs' favor. Humane Soc'y of the U.S. v. Vilsack, 797 F.3d 4, 8 (D.C. Cir. 2015). A court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." Gulf Coast Mar. Supply, Inc. v. United States, 867 F.3d 123, 128 (D.C. Cir. 2017) (citation omitted).

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), plaintiff's "complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570).  When "a complaint pleads facts that are 'merely consistent with' a defendant's liability," but goes no further, that complaint "stops short of the line between possibility and plausibility of entitlement to relief."  Id. (quoting Twombly, 550 U.S. at 557).  Put differently, "[a] complaint can establish a facially plausible claim only if it sets forth 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  Owens v. BNP Paribas, S.A., 897 F.3d 266, 272 (D.C. Cir. 2018) (quoting Iqbal, 556 U.S. at 678).

In determining a complaint's plausibility, a court considers "only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice."  Mpoy v. Rhee, 758 F.3d 285, 291 n.1 (D.C. Cir. 2014) (citation omitted).  The court must "accept as true all of the complaint's factual allegations and draw all reasonable inferences in favor of the plaintiffs."  Owens, 897 F.3d at 272.  But the court need not "accept inferences unsupported by facts or legal conclusions cast in the form of factual allegations."  City of Harper Woods Emps.' Ret. Sys. v. Olver, 589 F.3d 1292, 1298 (D.C. Cir. 2009).  The court may also disregard "the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice."  Kaempe v. Myers, 367 F.3d 958, 963 (D.C. Cir. 2004) (citing Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002)).

### B.  Analysis

#### 1.  Claims under the LMRDA (Counts 6 and 7)

Plaintiff Annette Wells brings two sets of claims—set forth in Counts 6 and 7 of the second amended complaint—against all defendants save AFGE for breach of fiduciary duty under section

501(b) of the LMRDA.  Pursuant to Rule 12(b)(6), the Court will dismiss Count 6 in its entirety and Count 7 as it pertains to the Individual AFGE Defendants.  Count 7 may proceed against Cox.

        a.   Count 6

Count 6 alleges that Cox breached his fiduciary duty to AFGE when "he sexually assaulted, sexually harassed, and battered Plaintiff Wells' son, Plaintiff John Doe #1, Plaintiff Rocky Kabir, Plaintiff Salim Javed, and sexually harassed Plaintiffs Kalyar, Fahim Javed and other AFGE staff, contractors, among others."  SAC ¶ 880.  Count 6 also charges that the Individual AFGE Defendants breached their fiduciary duties to AFGE by failing to take action against Cox for his misconduct.  Id. ¶¶ 886–91.  AFGE and the Individual AFGE Defendants seek to dismiss Count 6 for lack of jurisdiction and failure to state a claim.  See Joint Mot. to Dismiss at 6.

This Court has subject-matter jurisdiction over the LMRDA claims in Count 6 because they arise under federal law.  See 28 U.S.C. § 1331.  Although the Court ultimately agrees with defendants that Count 6 fails to state a claim, Count 6 is not so "wholly insubstantial and frivolous" that jurisdiction is lacking, as defendants suggest, see Joint Mot. to Dismiss at 18.  Typically "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction."  Araya v. JPMorgan Chase Bank, N.A., 775 F.3d 409, 414 (D.C. Cir. 2014) (quoting Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998)).  Rather, "[d]ismissal for lack of subject-matter jurisdiction because of the inadequacy of [a] federal claim is proper only when the claim is so insubstantial, implausible, foreclosed by prior decisions of [the Supreme] Court, or otherwise completely devoid of merit as not to involve a federal controversy."  El-Shifa Pharms. Indus. Co. v. United States, 607 F.3d 836, 849–50 (D.C. Cir. 2010) (quoting Steel Co., 523 U.S. at 89).  "This ground for jurisdictional dismissal 'is, as a general matter, reserved for complaints resting on truly fanciful factual allegations,' but also has limited application to claims resting on

insubstantial legal theories." Id. at 850 (quoting Best v. Kelly, 39 F.3d 328, 331 n.5 (D.C. Cir. 1994)). Still, a legal theory is only "so insubstantial to deprive federal courts of jurisdiction if prior [Supreme Court] decisions inescapably render the claims frivolous." Id. (quoting Ord v. Dist. of Columbia, 587 F.3d 1136, 1144 (D.C. Cir. 2009)). Defendants have not identified any prior Supreme Court decisions that "foreclose the subject" of Count 6 or "leave no room for the inference that the question sought to be raised can be the subject of controversy." See id. (quoting Ord, 587 F.3d at 1144). Hence, the Court has federal question jurisdiction over Count 6 and will consider whether Count 6 states any viable claims.

Section 501(a) of the LMRDA sets out the fiduciary duties of union officers and other union representatives, requiring, inter alia, that such persons hold union money or property for the sole benefit of the union and its members, manage union money or property in accordance with the union's own governing rules, and refrain from dealing with the union as an adverse party or on behalf of one. 29 U.S.C. § 501(a). Section 501(b) permits an individual union member to sue union officers who violate their fiduciary duties in order "to recover damages or secure an accounting or other appropriate relief for the benefit of the labor organization." Id. § 501(b).

The D.C. Circuit has not precisely defined the contours of a union officer's fiduciary duties under section 501(a), and other courts of appeals have split on the scope. Some courts have held that section 501(a) only concerns the handling of union money or property. See Gurton v. Arons, 339 F.2d 371, 375 (2d Cir. 1964) ("A simple reading of [section 501] shows that it applies to fiduciary responsibility with respect to the money and property of the union and that it is not a catch-all provision under which union officials can be sued on any ground of misconduct. . . ."). Most courts, however, have taken a "broad view" of the statute, concluding that section 501(a) "appl[ies] to fiduciary responsibilities of union officials . . . in any area of their authority," even

when no "monetary interest of the union is involved."  See, e.g., Stelling v. Int'l Brotherhood of Elec. Workers Local Union No. 1547, 587 F.2d 1379, 1386–87 (9th Cir. 1978) (collecting cases). Under that approach, courts have found that a union official breaches his section 501(a) duties if he fails to comply with the union constitution or other governing rules.  See, e.g., Hawaii Reg'l Council of Carpenters v. Yoshimura, 237 F. Supp. 3d 1029, 1038 (D. Haw. 2017) (section 501(a) breach for recording union meetings in violation of union resolutions); Johnson v. Nelson, 325 F.2d 646, 649–51 (8th Cir. 1963) (section 501(a) breach for refusal to pay counsel fees authorized by union membership vote); Wade v. Teamsters Local 247, 527 F. Supp. 1169, 1177 (E.D. Mich. 1981) (section 501(a) breach for failure to hold monthly membership meetings as required by the union constitution).

The D.C. Circuit has not endorsed either approach.  See Quinn v. DiGiulian, 739 F.2d 637, 653 n.29 (D.C. Cir. 1984) ("This court has three times refused to adopt either view.").  But in its most recent discussion of the topic, it expressed reservation about "adopt[ing] a construction of section 501 that would bring under the scrutiny of the federal courts virtually every aspect of the union's internal affairs, however remote the handling of funds and property, conflicts of interest, and other issues traditionally subject to fiduciary principles."  Id. at 653 n.30.  Other judges have echoed this theme, cautioning that even under a "broad view" of section 501, courts should not "intervene in intra-union affairs at slight provocation or on any invitation," but instead "only with great reluctance."  See Hawaii Reg'l Council of Carpenters, 237 F. Supp. 3d at 1038 (quoting Stelling, 587 F.2d at 1387).  This Court need not define the exact scope of section 501(a) either because, even under a broad interpretation of the statute, Count 6 fails to state a claim against any defendant.

The Court begins with the allegations against Cox.  Wells has not identified any provision of the union constitution, bylaws, or other governing rules that imposed a duty on Cox to refrain from sexual harassment, assault, and battery of AFGE contractors or staff.  To be sure, such misconduct may give rise to tort liability—as is alleged elsewhere in the second amended complaint.  But it cannot be—as plaintiffs' theory suggests—that <u>any</u> tort committed by a union officer against a union affiliate supports a federal cause of action against that officer under the LMRDA.  No court has adopted such a limitless interpretation of section 501, and such an approach is at odds with the concerns expressed by the D.C. Circuit in <u>Quinn</u> and by other courts about meddling in internal union affairs.  Section 501 is <u>not</u> a "catch-all provision under which union officials can be sued on any ground of misconduct."  <u>O'Hara v. Teamsters Union Local No. 856</u>, 151 F.3d 1152, 1161 (9th Cir. 1998) (citation omitted).  Hence, even under a broad view of the statute, Cox cannot be liable under section 501 unless he breached an official duty—pursuant to an AFGE governing document—to abstain from the type of tortious misconduct at issue.  No such duty is alleged, and therefore, Count 6 fails against Cox.

The claims in Count 6 against the Individual AFGE Defendants suffer from the same defect, and plaintiffs make very little effort in their opposition to argue otherwise.  The second amended complaint alleges that these defendants (except, inexplicably, defendant Scott) violated their fiduciary duties in four ways: (1) by "failing to report, document, and investigate complaints filed against Cox for committing sexual harassment, sexual assault, sexual battery, racial discrimination, and other misconduct; and . . . take [] disciplinary or remedial action against Cox," SAC ¶ 885;  (2) "by endorsing Cox's 2018 re-election," <u>id.</u> ¶ 886; (3) "by refusing to process the Mollett Committee of Investigation's February 13, 2020, report," <u>id.</u> ¶ 887;[7] and (4) "by executing

---

[7] The Mollett Committee was established by AFGE in November 2019 to "investigate . . . charges that Cox violated the 'No Politics Rule' by ordering Plaintiff Kabir and AFGE Policy Director Jacqueline Simon to secretly

a secret February 28, 2020, separation agreement permitting Cox to resign from office," id. ¶ 888. But once again the second amended complaint fails to identify an official duty—imposed by an AFGE governing document—that an Individual AFGE Defendant plausibly breached.

Plaintiffs assert, without much specificity, that the Individual AFGE Defendants' failure to report, document, and investigate Cox's misconduct violated "the AFGE Constitution and the AFGE EEO Policy."  Pls.' Opp'n to the Mot. to Dismiss Filed by All Defs. (Except Def. J. David Cox) ("Pls.' Opp'n to Joint Mot.") [ECF No. 52] at 16.[8]  To be sure, the AFGE Constitution does authorize a formal process for filing disciplinary charges against a national officer.  See AFGE Const., art. XIII, sec. 7, available at https://www.afge.org/common-pages/constitution/.  That process dictates that "[c]harges filed against a national officer of AFGE must be filed in writing with the National President," and served on the officer, id., sec. 7(a), after which time the National President "shall" appoint a "committee" to investigate the charges, id., sec. 7(b).  And in Count 6, Wells references four "complaints" of misconduct against Cox from 2014 to 2018 from plaintiff Rocky Kabir, former AFGE employee Brett Copeland, and two unnamed hotel employees.  SAC ¶ 886.  But Wells does not allege that any of these complainants filed written charges.  Nor does she identify the source of any Individual AFGE Defendant's duty to investigate such "complaints," when no "committee" had been appointed.  Indeed, none of these complainants even appear

---

work on his 2018 re-election campaign."  SAC ¶ 672.  On February 13, 2020, "the Mollett Committee found probable cause that Cox ordered Plaintiff Kabir to . . . work on his campaign in violation of the 'No Politics Rule.'"  Id. ¶ 677; see also Ex. 18 to FAC [ECF No. 11-19] at 1.  The Committee then forwarded its report to the NEC and "referred" the charges "to the NEC for decision on the basis of the investigation file."  Ex. 18 to FAC at 1.  The NEC ultimately "voted not to process" the charges and instead "authorized Defendant Kelley to sign a secret . . . separation agreement permitting Cox to resign in lieu of being removed from office for misconduct."  SAC ¶ 680.

[8] The second amended complaint and plaintiffs' opposition brief cite repeatedly to the AFGE Constitution, even though it is not attached as an exhibit to any version of the complaint.  See, e.g., SAC ¶¶ 4, 23, 28, 30–31, 40, 84, 87, 92, 95, 97, 100, 102, 106, 132, 137, 140, 142, 145, 146, 149, 151, 376, 404, 678, 684, 727, 774, 813–14, 840, 875–76, 878.  In light of these repeated citations and because the AFGE Constitution "is a verifiable public document[,] [it] may be considered by the Court without converting [AFGE and the Individual AFGE Defendants'] motion to dismiss into a motion for summary judgment."  See Hollie v. Smith, 813 F. Supp. 2d 214, 219 n.6 (D.D.C. 2011).

eligible to file charges under the AFGE Constitution.  <u>See</u> AFGE Const., art. XIII, sec. 7(a) ("Charges may be filed solely by a member of AFGE in good standing.").

Wells's reliance on the "AFGE EEO Policy" fares no better, even assuming this policy qualifies as a union governing document.  It applies to "staff member[s] of AFGE" and "applicants for employment" and addresses workplace harassment issues.  Ex. 14 to FAC [ECF No. 11-15] at 1.  The policy instructs that an individual who experiences workplace harassment may file a formal or informal complaint.  An informal complaint should be made through an individual's "immediate supervisor," and "[s]upervisors, in turn, shall take appropriate action to remedy the informal complaint."  <u>Id.</u> at 3.  A "formal complaint," which is made pursuant to a written form, "will result in an investigation," and "[if] the formal complaint names an elected officer . . . a[] neutral investigator will be hired."[9]  <u>Id.</u>  The two hotel employee complainants are not covered by this policy, and neither Kabir nor Copeland is alleged to have filed a "formal complaint" against Cox.  Ex. 1 to FAC at 12; SAC ¶ 886.  Furthermore, Wells does not identify any of the Individual AFGE Defendants as an "immediate supervisor," obligated to take "appropriate action," under the informal complaint mechanism.

The second amended complaint does describe various other "complaints" of misconduct against Cox besides the four specifically referenced in Count 6.  But, although Count 6 (like all other counts) "reallege[s] and incorporate[s] by reference each allegation contained in the foregoing paragraphs," SAC ¶ 894, there are 124 pages—and 873 paragraphs—of allegations that precede Count 6 in the second amended complaint.  The Court will not consider whether the proper

---

[9] At various points in the second amended complaint, plaintiffs appear to confuse the procedures under the AFGE Constitution and the AFGE EEO policy, arguing that the filing of internal disciplinary charges against a national officer under the AFGE Constitution required AFGE to hire a neutral investigator to investigate those charges.  <u>See, e.g.</u>, SAC ¶¶ 20–21; 352–353. That requirement, however, appears nowhere in the AFGE Constitution and is only triggered by a formal complaint pursuant to the AFGE EEO policy.  <u>See</u> Ex. 14 to FAC at 3.

AFGE procedure was followed with respect to every single "complaint" mentioned in the 124 preceding pages, when plaintiffs have not argued with any specificity in either Count 6 or their opposition brief that any defendant's handling of those complaints was deficient pursuant to an AFGE governing document.  As courts have routinely recognized, "[it] is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."  Herron v. Fannie Mae, Civ. A. No. 10-943 (RMC), 2016 WL 1177918, at *15 (D.D.C. Mar. 8, 2016) (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)).  Instead, "a litigant has an obligation to spell out its arguments squarely and distinctly," id., and any "[u]ndeveloped arguments may be deemed waived," Pub. Emps. for Env't Resp. v. EPA, 213 F. Supp. 3d 1, 26 (D.D.C. 2016) (citing Johnson v. Panetta, 953 F. Supp. 2d 244, 250 (D.D.C. 2013)).  Such is the case here with respect to any complaints not directly addressed in Count 6 or plaintiffs' opposition brief.

In sum, Wells has not plausibly alleged that the Individual AFGE Defendants violated any duties under the AFGE Constitution or AFGE's EEO policy to report, document, and investigate complaints of Cox's misconduct or take disciplinary action against him.  Her allegations regarding the Individual AFGE Defendants' endorsement of Cox's re-election, treatment of the Mollett Committee of Investigation report, and execution of Cox's separation agreement fail for the same reason: she cites no union governing document that obligated defendants to do anything different than they did.  See SAC ¶¶ 888–89.

Plaintiffs are not wrong that the Individual AFGE Defendants had the ability to take additional actions to address allegations of misconduct against Cox.  See Pls.' Opp'n to Joint Mot. at 3.  As plaintiffs note, the AFGE Constitution grants the NEC the "power to make rules that govern matters not in conflict with this Constitution," see id. (quoting AFGE Const., art. XIII, sec.

6), and to create committees to "act for it on matters within its jurisdiction," see id. (quoting AFGE Const., art. XIII, sec. 10).  And like Wells, any defendants who were AFGE members could have filed internal disciplinary charges against Cox or attempted to sue him in federal court.  See id. at 5.  But that does not mean that the Individual AFGE Defendants violated their fiduciary duties to AFGE under the LMRDA by failing to take the exact actions that Wells sought.  The union has, pursuant to its own democratic processes, adopted specific procedures for addressing internal complaints of misconduct, and it is not the place of a federal court entertaining a section 501 claim to revise those disciplinary policies upon request.  Therefore, the Court finds that, even under a broad interpretation of section 501, Count 6 does not state a claim against any defendant.[10]

> b.  Count 7

Count 7 rests on allegations that Cox "improperly use[d] CCS Limo services, hotels, and other union resources to frequent bars and strip clubs and to solicit male prostitutes."  SAC ¶ 895. The Individual AFGE Defendants seek to dismiss this claim under Rule 12(b)(6), arguing that although Count 7 "states a cognizable Section 501 claim against Cox," they lacked any oversight responsibilities over Cox's spending.  See Joint Mot. to Dismiss at 21–22.  Cox agrees that this claim "is not a Colorable section 501 claim against any of the 13 individual defendants" but does not challenge the sufficiency of the claim against him.  See Cox's Mot. to Dismiss at 10.

The theory that Cox breached his fiduciary duty to AFGE by improperly expending AFGE resources for his own personal benefit presents a straightforward section 501 claim.  See Nurses Ass'n v. Brown, 160 F. Supp. 3d 13, 15 (D.D.C. 2016) ("Section 501(a) 'makes union officers

---

[10] AFGE and the Individual AFGE Defendants also argue that Count 6 fails because Wells seeks "compensatory and punitive monetary damages sustained as a result of Cox's misconduct" for herself and other AFGE members.  See SAC ¶ 893.  Because section 501(b) only authorizes suit "to recover damages or secure an accounting or other appropriate relief for the benefit of the labor organization," 29 U.S.C. § 501(b) (emphasis added), the Court agrees that Wells cannot recover personal monetary relief under section 501(b).  Nonetheless, because the second amended complaint further requests damages "on behalf of AFGE," see SAC ¶ 893, the improper scope of the relief requested does not provide a basis to dismiss her claims in full.

fiduciaries of union funds and commands that they keep and use those funds solely for the benefit of the organization and its members.'") (quoting <u>Noble v. Sombrotto</u>, 525 F.3d 1230, 1233 (D.C. Cir. 2008)).  Yet, confusingly, even though the header in the second amended complaint describes Count 7 as a claim for relief against both Cox and the Individual AFGE Defendants, Count 7 does not actually contain allegations that Cox "breached his fiduciary duty" under section 501 by improperly spending union funds.  <u>See</u> SAC ¶¶ 894–90 (describing breaches by Individual AFGE Defendants).  Nonetheless, because Cox does not challenge this Count and even affirmatively states that the claim is deficient only as to the Individual AFGE Defendants, the Court will allow Count 7 to proceed against Cox for now.

The allegations in Count 7 against the Individual AFGE Defendants require more discussion, even though they ultimately fail to state a section 501 claim as well.  Wells asserts that those defendants breached their fiduciary duties to the union "by permitting Cox" to use union resources to frequent bars and strip clubs and solicit male prostitutes and by "refus[ing] [her] demand for an accounting" of those expenditures.  <u>See</u> <u>id.</u> ¶¶ 895–96.  At the outset, the Individual AFGE Defendants argue that section 501 only extends liability to union officers "who actually misappropriate union funds for their own benefit," and not to other officers who are responsible for monitoring the union's financial affairs.  <u>See</u> Joint Mot. to Dismiss at 22.  Other district courts have rejected this argument, and this Court does, too.  The text of section 501(a) imposes on union officers not only the duty to "hold" union money "solely for the benefit of the [union]" but also the duty to "manage, invest, and expend" union money "in accordance with its constitution and bylaws and any resolutions of the governing bodies . . . ."  29 U.S.C. § 501(a).  This latter duty can be breached even when no personal benefit is derived.  <u>See, e.g.</u>, <u>Sanders v. Hankerson</u>, 312 F. Supp. 2d 46, 79 (D.D.C. 2004) ("[T]here is no requirement in the statute or case law limiting

liability under Section 501(b) to officers who actually misappropriate union funds for their own benefit."); Dunlop-McCullen v. Pascarella, No. 97Civ.0195(PKL)(DFE), 2002 WL 31521012, at *16 (S.D.N.Y. Nov. 13, 2002) (allowing section 501 claim to proceed based on allegation that union officer failed to supervise union bookkeeper in accordance with officer's responsibilities under union constitution).  Hence, the fact that the Individual AFGE Defendants did not personally benefit from Cox's misuse of funds does not doom Wells's section 501(b) claims against them.

In the alternative, the Individual AFGE Defendants argue that they lacked any responsibility to supervise Cox's expenditures.  See Joint Mot. to Dismiss at 23.  Instead, "the ultimate authority and responsibility for ensuring the proper expenditure of union funds reside[d] in the National President," who at the time in question was Cox.  See id. at 25.  Moreover, according to the Individual AFGE Defendants, the "sole NEC officer with any degree of supervisory authority" over President Cox's expenditures was then-NST Eugene Hudson, Jr.  See Reply Mem. In Supp. of Def. AFGE & 13 Individual AFGE Defs.' Rule 12(b)(1) & Rule 12(b)(6) Mot. to Dismiss All of the Claims Set Out in Pls.' Second Am. Compl. Except for Pl. Jocelynn Johnson's 42 U.S.C. § 1981 Claim Against AFGE ("Joint Reply in Supp. of Mot. to Dismiss") [ECF No. 54] at 14–15; see also Joint Mot. to Dismiss at 24–25 & n.12.  Hudson is not a defendant in this lawsuit, and is, in fact, represented by plaintiffs' counsel in other pending litigation against AFGE.  See Joint Mot. to Dismiss at 25 n.12.

The AFGE Constitution does establish that the NEC had some general supervisory authority over Cox and some specific authority over AFGE's financial affairs.  For instance, article IX, section 1 broadly states that "[t]he National President . . . shall exercise supervision of the affairs of the Federation subject to the approval of the National Executive Council."  And article XIII, section 9 directs that "[n]o money of the AFGE shall be expended unless authorized by the

NEC or specifically provided for by act of National Convention."  But whereas article IX, sec. 7 designates that the NEC is collectively responsible for "approv[ing] allocations of funds" in the AFGE budget, ultimately the authority resides with the National President to approve individual expenditures and the NST to disburse union funds, see AFGE Const., art. X, sec. 3 ("The NST shall disburse monies of AFGE in payment of obligations incurred on behalf of the Federation after such obligations are approved by the National President.").[11]

The second amended complaint concedes, in several places, that NST Hudson "was responsible for reviewing and approving all expense vouchers submitted by" Cox.  SAC ¶¶ 157, 178, 195.  Nonetheless, plaintiffs argue that the NEC's broad governing powers under the AFGE Constitution gave the NEC members "absolute unfettered authority to review, question, and disapprove Cox's annual proposed budgets [and] his AFGE expense vouchers . . . and to monitor and correct his misconduct."  See Pls.' Opp'n to Joint Mot. at 3; see, e.g., AFGE Const., art. XIII, sec. 1 (The NEC "shall devise and initiate, whenever necessary, legislative polices consistent with the objectives of the Federation."); id., art. XIII, sec. 6 ("The NEC shall have the power to make rules that govern matters not in conflict with this Constitution. . . ."); id., art. XIII, sec. 10 ("The NEC, during the interim between national conventions, is authorized to constitute itself a standing committee of the NEC with respect to any matter within [its] jurisdiction. . . .").

It is clear that the NEC members had the authority to allocate funds in the AFGE annual budget and audit the NST's accounts.  See AFGE Const., art. XIII, sec. 9 & art. IX, sec. 9.  But the second amended complaint is devoid of any allegations that Cox's "annual proposed budgets"

---

[11] Pursuant to the AFGE Constitution, the NEC also has some mandatory involvement in auditing the NST's accounts.  See AFGE Const., art. IX, sec. 9 ("The National President, with the advice and consent of the NEC, shall retain a certified accountant to audit the accounts of the NST" each year "and at all times as the National President or the NEC shall deem necessary.").  The second amended complaint does not allege that the Individual AFGE Defendants failed to participate in any annual audit or that any auditor informed the NEC that Cox had misused AFGE funds.

for hotels or limo services were questionable in any way that might have rendered the NEC's approval of those budgets unreasonable, or even suspect.  See Pls.' Opp'n to Joint Mot. at 3. Rather, Count 7 targets how Cox actually used union-funded hotels and limo services for his personal benefit—meaning, how he expended union funds that had already been generally allocated for such services.  See SAC ¶ 895.

Moreover, had the NEC members known that Cox was misusing AFGE funds, it is conceivable that they might have had some responsibility to further audit the NST's accounts or investigate the matter.  See, e.g., United States v. Local 1804-1, Int'l Longshoremen's Ass'n, 812 F. Supp. 1303, 1339 (S.D.N.Y. 1993) ("Under section 501(a) of the LMRDA, a union officer has an affirmative duty to investigate allegations of corruption by other union officers and to take such reasonable steps as necessary to redress such corruption.").  But the only NEC member who is alleged to have had any actual knowledge of Cox's improper expenditures was NST Hudson.[12]

---

[12] Though not mentioned in plaintiffs' opposition brief or Count 7, the background section of the second amended complaint does recount one instance where Cox's use of "personal limousine services" was purportedly brought to the NEC's attention by AFGE member and Local 2341 President Lawrence Tomscha. SAC ¶ 197.  On January 1, 2018, Tomscha sent a letter to Cox via e-mail, cc'ing the NEC.  See Ex. 6 to FAC [ECF No. 11-7].  The letter reads:

> Dear President Cox:
>
> A. By the AFGE budget admission you spent membership dues for a personal limousine for 90 thousand dollars and spent membership dues for a trip to Israel costing over 400 thousand dollars.
>
> B. The membership of AFGE Local voted to return their monies in their account hearing about A above. They contributed over the last 10 years 250 thousand dollars to National Office and 80 thousand to Council 236. The money was spent but the Local 2341 members received no benefit from the taxation imposed. Revolutionary war, no taxation without representation.
>
> Challenge to NEC or any bright one? Why is A believed as an approved expenditure and B is not?
>
> Feeling ambitious? Comment on: is B conduct unbecoming a Local's membership?

Id.  The second amended complaint characterizes the letter as a "complaint that Cox violated AFGE policy and rules" through his limousine use. SAC ¶ 198.  The letter—which is attached as an exhibit to the first amended complaint— does not assert that Cox violated any AFGE policy or rules; it merely questions the general allocation of funds for limousine services in the annual AFGE budget.  See Kaempe, 367 F.3d at 963 (explaining that a court need not "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint").  Furthermore, the letter does not suggest that Cox used AFGE-funded limousines for an impermissible purpose, such as attending bars

See SAC ¶¶ 159–60 ("NST Hudson noticed that Cox was regularly submitting unusually large requests for reimbursement for CCS Limo invoices" and "questioned Cox about the unusually large . . . invoices."); see also id. ¶¶ 179–80, 196.  Hudson is not a defendant in this case.  Wells does not allege that NST Hudson conveyed his concerns to any of the Individual AFGE Defendants, nor does she seek to hold NST Hudson responsible for failing to address Cox's misconduct and alert the full NEC.

Plaintiffs' allegations against the Individual AFGE Defendants who were not members of the NEC—namely, defendants Borer, Goldberg, and DeWyngeart—are even more dubious.  For instance, plaintiffs assert, with no citation, that NEC members relied "extensively upon those three [defendants] and their large staffs for advice on how to . . . monitor and evaluate President Cox's budget and expense accounts."  Pls.' Opp'n to Joint Mot. at 7–8.  This proposition does not appear anywhere in the second amended complaint and does not derive from the union constitution or any union governing document, as far as the Court can tell.  Hence, there is no plausible basis to find that these defendants had supervisory authority over Cox's individual expenditures.

The second amended complaint also appears to allege that the Individual AFGE Defendants' refusal of "Wells' demand for an accounting of funds improperly expended by Cox," was itself a separate breach of their fiduciary duties.  See SAC ¶¶ 896–97.  But again, Wells does not identify the source of any obligation to perform an accounting.  In any event, if Wells prevails on her Count 7 claim against Cox, she may secure such an accounting for the benefit of AFGE.  See 29 U.S.C. § 501(b) (authorizing an "accounting" as remedy in a section 501(b) suit).

In closing, the Court notes that two of the Individual AFGE Defendants, Joseph Flynn and Eric Bunn, appear to have served as NSTs for AFGE since Hudson's departure.  See SAC ¶ 89.

---

or strip clubs, or soliciting prostitutes.  The Court does not see, then, how the allocation of funds for limousine services alone was sufficient to put any Individual AFGE Defendant on notice that Cox was misusing those services.

But plaintiffs never highlight this fact anywhere in their opposition brief.  And the second amended complaint does not levy any specific allegations against these two defendants for improperly approving Cox's expense reports or disbursing AFGE funds in their capacities as NSTs.  See AFGE Const., art. X, sec. 3.  Indeed, it is not even clear from the second amended complaint when Flynn and Bunn respectively served as NSTs and whether those timeframes overlapped with the also-undefined time period during which Cox allegedly misspent union funds.  Based on the current record, the Court will dismiss Count 7 as to all Individual AFGE Defendants under Rule 12(b)(6), but allow Count 7 to move forward against Cox.

### 2.  Claims under 42 U.S.C. § 1981 (Count 5)

In Count 5, plaintiffs John Doe #1, Rocky Kabir, Salim Javed, Jocelyn Johnson, Valyria Lewis, Mecca Scott, Waqas Kalyar, and Fahim Javed each assert claims against all defendants under 42 U.S.C. § 1981.  "Section 1981 protects the right to 'make and enforce contracts' free from racial discrimination."  Nanko Shipping, USA v. Alcoa, Inc., 850 F.3d 461, 467 (D.C. Cir. 2017) (quoting 42 U.S.C. § 1981(a)).  "To press a section 1981 claim, a plaintiff must identify rights 'under the existing (or proposed) contract that he wishes to make and enforce.'"  Brown v. Sessoms, 774 F.3d 1016, 1022 (D.C. Cir. 2014) (quoting Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 474 (2006)).  Individual employees can only be held liable for section 1981 violations if they are "'personally involved in the discrimination' by having 'directly participated' in the alleged discriminatory acts."  Richard v. Bell Atl. Corp., 946 F. Supp. 54, 74 (D.D.C. 1996) (quoting Al-Khazraji v. Saint Francis Coll., 784 F.2d 505, 518 (3d Cir. 1986), aff'd 481 U.S. 604 (1987)); see also Mitchell v. Nat'l R.R. Passenger Corp., 407 F. Supp. 2d 213, 227 n.11 (D.D.C. 2005) (collecting cases).  Generally, plaintiffs' section 1981 claims allege that defendants either treated

plaintiffs differently on account of their race or religion, or subjected plaintiffs to a hostile work environment based on those characteristics.

The Court will dismiss all claims alleged in Count 5 for failure to state a claim except for (1) Johnson's wrongful termination claims against AFGE and Cox, which neither defendant seeks to dismiss at this stage, see Joint Mot. to Dismiss at 26, 41; Cox's Mot. to Dismiss at 11, and (2) Kabir's race-based hostile work environment claims against AFGE and Cox.  The Court turns first to plaintiffs' non-race-based discrimination claims.

a.   Non-Race-Based Claims

Count 5 purports to state claims for "racial and/or religious discrimination" against all defendants.  See SAC at 124.[13]  Section 1981 only prohibits discrimination based on race, not religion.  See Lemmons v. Georgetown Univ. Hosp., 431 F. Supp. 2d 76, 93 n.19 (D.D.C. 2006) ("[R]eligious discrimination claims are not cognizable under Section 1981, which is limited to the prohibition on racial discrimination.") (citing Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 609, 613 (1987)); see also Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 576 n.1 (D.C. Cir. 2013) (contrasting section 1981, which covers discrimination based on race, with Title VII, which concerns discrimination based on race, gender, pregnancy, national origin, and religion).  To the extent plaintiffs' section 1981 claims rely on allegations concerning religious discrimination, they are not cognizable and will be dismissed for failure to state a claim.

---

[13] In their opposition brief, plaintiffs profess that Count 5 also alleges discrimination under section 1981 based on national origin and sex.  See, e.g., Pls.' Opp'n to Joint Mot. at 35–36.  These allegations are waived because plaintiffs "may not amend [their] complaint through an opposition brief."  Sai v. Transport. Sec. Admin., 326 F.R.D. 31, 33 (D.D.C. 2018) (quoting Singh v. Dist. of Columbia, 55 F. Supp. 3d 55, 70 (D.D.C. 2014)).  Even so, discrimination based on national origin or sex is not actionable under section 1981.  See Kornyo v. Gonzaga Coll. High School, 308 F. Supp. 3d 212, 216 (D.D.C. 2018) (addressing national origin); Allen-Brown v. Dist. of Columbia, 54 F. Supp. 3d 35, 43 (D.D.C. 2014) (addressing sex).

b.   Race-Based Disparate Treatment Claims

Next, the Court considers plaintiffs' section 1981 claims alleging disparate treatment based on race.  In the context of an employment contract, courts evaluating disparate treatment claims under section 1981 apply the same "three-step McDonnell Douglas framework for establishing racial discrimination under Title VII."  Brown, 774 F.3d at 1022 (quoting Carney v. Am. Univ., 151 F.3d 1090, 1092–93 (D.C. Cir. 1998)).  Hence, the Court will rely on case law interpreting section 1981 and Title VII in its analysis.  Under the McDonnell Douglas framework, plaintiff has the initial burden of establishing a prima facie case of discrimination by showing "that (1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination (that is, an inference that his employer took the action because of his membership in the protected class)."  Brown, 774 F.3d at 1022 (quoting Forkkio v. Powell, 306 F.3d 1127, 1130 (D.C. Cir. 2002)).  Then, "the burden shifts to the employer to articulate 'some legitimate, nondiscriminatory reason' for the employment action, which the plaintiff can rebut by proving, under a preponderance of the evidence standard, that the employer's justification is merely a pretext for discrimination."  Id. at 1022–23 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973)).

At the motion-to-dismiss stage, plaintiff need not plead each element of his prima facie case.  Id. at 1023; see also Ndondji v. InterPark, Inc., 768 F. Supp. 2d 263, 281 (D.D.C. 2011).  Nonetheless, the complaint still must allege facts that, if true, would establish the elements of his claim.  Ndondji, 768 F. Supp. 2d at 281.  Specifically, plaintiff must "allege some facts that demonstrate [his] race was the reason for defendant's actions" and cannot merely "invoke his race in the course of a claim's narrative."  Bray v. RHT, Inc., 748 F. Supp. 3, 5 (D.D.C. 1990), aff'd sub nom. Bray v. Hebble, 976 F.2d 45 (D.C. Cir. 1992).  "[P]laintiff's initial burden 'is not

onerous,'" at this stage, <u>Nanko</u>, 850 F.3d at 467, but "allegations of discrimination" may be "so threadbare . . . that they do not meet even that low burden," <u>L.Xia v. Tillerson</u>, 865 F.3d 643, 659 (D.C. Cir. 2017).

As far as the Court can tell, Scott, Lewis, and Johnson are the only plaintiffs who seek to proceed on a disparate treatment theory under section 1981.

### i.   Mecca Scott

The allegations underlying Mecca Scott's disparate treatment claims are as follows.  Scott is an AFGE National Organizer for District 2, which covers many states in the Northeast.  SAC ¶ 748.  Scott is African-American and "earns $10,000 a year less than" "her counterpart, Cindy Feist, who is Caucasian-American," even though "Scott has worked as an AFGE National Organizer longer than" Feist.  <u>Id.</u> ¶¶ 760–61.  Scott has "received her step increases, as scheduled," but AFGE has denied her requests to "bring her salary comparable to Cindy Feist's."  <u>Id.</u> ¶ 762.  "By contrast, Tracie St. John, who works in Membership and Organizing, has received unusually large pay raises every year since 2014."  <u>Id.</u> ¶ 763.  Scott contends that this evidence, along with other instances of racial discrimination by her coworkers and defendant Swanke, is "sufficient" to "show that [she] is being treated worse than a member of another race who is 'similarly situated.' . . ."  Pls.' Opp'n to Joint Mot. at 36–37.

"A plaintiff can raise an inference of discrimination by showing that she was treated differently from similarly situated employees who are not part of the protected class."  <u>Brown</u>, 774 F.3d at 1022 (citation omitted).  But "[a] plaintiff's assertion that that [she] is similarly situated to other[s] . . . is just a legal conclusion—and a legal conclusion is never enough" to state a claim.  <u>SS & T, LLC v. Am. Univ.</u>, Civ. A. No. 19-721 (JDB), 2020 WL 1170288, at *5 (D.D.C. Mar. 11, 2020) (quoting <u>Bekkem v. Wilkie</u>, 915 F.3d 1258, 1275 (10th Cir. 2019)).  Here, the only factual

allegation that Feist is "similarly situated" to Scott is that Feist is Scott's "counterpart." SAC ¶ 760. This term is fatally nonspecific. Even assuming the term "counterpart" means that Feist and Scott hold the same job title, see Pls.' Opp'n to Joint Mot. at 36, it is not evident whether Feist works in the same district as Scott, works the same hours as Scott, or has any comparable credentials to Scott, such as years of work experience or educational degrees, which often inform pay. Cf. Brown, 774 F.3d at 1023 (concluding that plaintiff sufficiently stated section 1981 claim by "identify[ing] a similarly-situated employee who is not in her protected class and explain[ing] why she has equivalent qualifications") (emphasis added); Dickerson v. Dist. of Columbia, 315 F. Supp. 3d 446, 454 (D.D.C. 2018) (holding that black plaintiff stated a section 1981 claim when he alleged that "a white woman with less education and experience than [him] was selected to fill his position"); see also SS &T, 2020 WL 1170288, at *5 (dismissing disparate treatment claim where plaintiff "d[id] not explain how [other] businesses were similarly situated yet treated differently").

Furthermore, even though Scott has worked in her specific role "longer" than Feist, it is unclear whether Scott has worked at AFGE longer than Feist; and for all the Court knows, "longer" could mean one day or several years. Cf. Nakhid v. Am. Univ., Case No. 19-cv-03268(APM), 2020 WL 1332000, at *2 (D.D.C. Mar. 23, 2020) ("[T]o justify an inference of discrimination the qualifications gap must be great enough to be inherently indicative of discrimination.") (quoting Jackson v. Gonzales, 496 F.3d 703, 707 (D.C. Cir. 2007)). With so little information, the Court cannot find that Scott is similarly situated to Feist.

Scott's allegations regarding St. John are even more tenuous. The complaint does not identify St. John's race. See Mesumbe v. Howard Univ., 706 F. Supp. 2d 86, 93 (D.D.C. 2010) (dismissing section 1981 claim when plaintiff failed to allege the race "of those who allegedly received preferential treatment"). And St. John held entirely different roles than Scott. See SAC

¶ 173 (describing St. John's promotions from administrative assistant, to District Manager, to Supervisory National Representative/Organizer).  In other words, the second amended complaint does not plausibly show that St. John and Scott are similarly situated either.

To be sure, Scott does allege other instances where Swanke made it difficult for her to schedule meetings with him and made a racially insensitive comment about Juneteenth.  See SAC ¶¶ 753–60.  She also states that even though Swanke "reluctantly agreed to allow her to travel," she heard that he initially wanted her to work "only in Colorado because she wouldn't be accepted in the surrounding states of his District because she was Black."  Id. ¶ 756.  The Court will turn back to these allegations when evaluating Scott's hostile environment claim.  But Scott does not explain—and the Court does not see—how these facts plausibly establish disparate treatment based on race.  Indeed, there is no suggestion that Swanke has any control over Scott's salary, which has risen pursuant to scheduled "step increases."  Id. ¶ 762.  And Scott does not purport to have suffered any other "adverse employment action"—except for a lower salary—that might support a disparate treatment claim.  See Ndondji, 768 F. Supp. 2d at 281 ("An adverse employment action is a significant change in employment status, such as a hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." (quoting Douglas v. Donovan, 559 F.3d 549, 549 (D.C. Cir. 2009))).  Hence, the facts alleged in the second amended complaint are insufficient to state a disparate treatment claim by Scott against any defendant under section 1981.

### ii.  Valyria Lewis

Valyria Lewis's disparate treatment claim rests on an entirely different set of allegations.  Lewis, who is African-American, worked at AFGE as a National Representative for over eight years.  SAC ¶ 685.  In 2016, she began working in District 2 under defendant Castellano.  Id. ¶

725.  There were six National Representatives in District 2, three of whom were African-American, and three of whom were Caucasian.  Id. ¶ 726.  In January 2019, Castellano directed all the National Representatives in his District "to file a new type of weekly report that would reflect all activity for every minute of their 40-hour workweek . . . [and] designate the particular local [union] for which the work was done."  Id. ¶ 729.  At the same time, Castellano restricted the National Representatives' ability to travel due to budgetary constraints.  Id. ¶ 732.  According to Lewis, "[t]he only way the National Representatives could file reports 'minute by minute' and designate a particular local union in the manner requested by Castellano would have been to lie on the report" because "National Representatives are field employees who cannot account for 40 hours of consistent work without traveling."  Id. ¶¶ 730, 733.

Lewis and her two African-American coworkers contacted their own union—Communication Workers of America ("CWA")—and CWA "issued a demand to bargain" with AFGE about the new reporting requirement.  Id. ¶¶ 727, 734.  On August 19, 2019, on Castellano's recommendation, Cox issued a "notice" that proposed suspending Lewis and her two African-American coworkers for five days "for refusing to file false weekly reports."  Id. ¶¶ 685, 737.  Cox then issued a three-day suspension to Lewis, but AFGE ultimately "offered" to reduce the suspension to one day after CWA sought to arbitrate the issue. [14]  Id. ¶¶ 739, 741.

Lewis separately filed a grievance with defendant Kelley, alleging that "she was being unfairly assigned to handle all TSA cases" in District 2, in violation of CWA's bargaining agreement with AFGE.  Id. ¶¶ 744–45.  Kelley never responded to her grievance, id. ¶ 746, and in February 2020, Lewis resigned from AFGE, id. ¶ 747.

---

[14] As defendants note, it is not clear if Lewis's one-day suspension was ever imposed.  See Joint Mot. to Dismiss at 40.

Based on these facts, Lewis avers that "she and other African American AFGE employees were treated less favorably than similarly situated Caucasian Americans" in violation of section 1981. Pls.' Opp'n to Joint Mot. at 35. The Court presumes—given this vague contention—that "the similarly situated Caucasian Americans" to whom she refers are the three Caucasian National Representatives in District 2. But the current record does not demonstrate that those Representatives were "similarly situated" to Lewis because they did not do what she did—namely, refuse to abide by the new reporting policy and ask their union to address that policy with AFGE. See De La Fuente v. DNC Servs. Corp., Civ. A. No.: 18-336(RC), 2019 WL 1778948, at *6 (D.D.C. Apr. 23, 2019) ("In the employment context . . . similarly situated employees 'must have . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" (quoting Morris v. Carter Goble Lee, 113 F. Supp. 3d 289, 296 (D.D.C. 2015))); cf. Winston v. Clough, 712 F. Supp. 2d 1, 10 (D.D.C. 2010) (holding plaintiff stated a disparate treatment claim by alleging that he was subject to discipline that "was motivated by [his] race and color" and "that other co-workers outside [his] protected class" engaged in the same behavior for which he was disciplined "yet none was suspended or disciplined for it"). If Lewis was threatened with a suspension for trying to exercise her collective bargaining rights, that is a separate (and perhaps troubling) issue. But the facts alleged do not plausibly raise an inference that Lewis's race was the reason why Cox and Castellano sought to suspend her.

Lewis's allegations against defendant Kelley fare even worse. To the extent those were even intended to support her section 1981 claim, the Court has no basis to conclude that Kelley's failure to respond to her grievance was racially motivated, or that his lack of response constitutes an adverse employment action. Simply "invok[ing] race in the course of a claim's narrative"—as

Lewis has done here—is insufficient to state a section 1981 claim.  See Bray, 748 F. Supp. at 5. The Court will therefore dismiss Lewis's section 1981 claims.

### iii.  Jocelyn Johnson

Johnson's disparate treatment claim is premised on yet another distinct workplace dispute. Johnson, who is African-American, was fired from AFGE for allegedly violating AFGE's "No Politics Rule," which "prohibits AFGE staff from contributing money or in-kind services to the campaigns of AFGE elected officers."  See SAC ¶ 656.  In November 2017, an AFGE attorney informed Johnson that he saw her "name alongside a $10 contribution to Eugene Hudson's campaign for AFGE President" and indicated that "he would have to inform management of what he had discovered."  Id. ¶¶ 657–59.  Johnson denied making the contribution, informing the AFGE attorney that "her bank must have made an error or someone had hacked her account."  Id. ¶ 658. In December 2017, Johnson's bank "concluded that [her] account had been erroneously charged for the $10 contribution."  Id. ¶ 662.  Johnson shared the bank's findings with AFGE's investigator, but in January 2018, following the completion of AFGE's investigation and "internal grievance process," Cox terminated Johnson for violating the "No Politics Rule."  Id. ¶ 663.

Cox subsequently ordered Kabir and AFGE Policy Director Jaqueline Simon to "secretly work on his 2018 campaign."  Id. ¶¶ 670, 672.  Another AFGE employee, Carrie Coleman, also "[r]ecently" "sent a campaign-related email for Defendant George McCubbin to AFGE members using AFGE resources" "in furtherance of McCubbin's 2020 campaign for District 12 [National Vice President]."  Id. ¶¶ 681–82.  Simon and Coleman are Caucasian and were not terminated as a result of their campaign-related conduct.  See id.  ¶ 683.

AFGE posits that Johnson has stated a viable section 1981 claim against AFGE for wrongful termination, see Joint Mot. to Dismiss at 41, and Cox appears to concede the same, see

Cox's Mot. to Dismiss at 11.  The Individual AFGE Defendants, in contrast, argue that Johnson's section 1981 claims against them are deficient because the second amended complaint does not plausibly establish that they "had any personal involvement in her alleged wrongful termination." Joint Mot. to Dismiss at 41.  The Court agrees.

The portion of the second amended complaint that purports to relate to Johnson attributes her wrongful termination solely to Cox.  See SAC ¶ 676 ("Cox terminated Plaintiff Johnson."); id. ¶ 684 ("Cox's termination of Plaintiff Johnson was motivated by racial animus.").  No other Individual AFGE Defendant is identified.  See Joint Mot. to Dismiss at 41.  Elsewhere in the second amended complaint, however, Johnson does allege that "Defendant Borer and Defendant Goldberg discriminated against [her] on the basis of her race by recommending that Defendant Cox terminate [her] while not recommending Defendant Cox terminate" Coleman or Simon.  SAC ¶¶ 70–71.  But instead of substantiating this allegation, plaintiffs' opposition brief spins a different story, asserting that Johnson's termination was a result of "retaliat[ion] by Cox, Borer, and Goldberg" for an EEO complaint that Johnson filed in 2015.  See Pls.' Opp'n to Joint Mot. at 37.

Johnson's retaliation theory is waived because she failed to present it in the second amended complaint.  See Sai, 326 F.R.D. at 33 (citing Singh, 55 F. Supp. 3d at 70).  And the allegations that are contained in the second amended complaint do not state a viable section 1981 claim against Borer or Goldberg.  Johnson's alleged "No Politics Rule" violation was reported to management, kickstarting an official AFGE investigation and internal grievance process, see SAC ¶¶ 657–63, in which Borer and Goldberg ultimately participated, see id. ¶¶ 70–71.  Noticeably absent from the second amended complaint are any comparable allegations with respect to Simon and Coleman.  In fact, the Court has no evidence that Simon and Coleman's alleged "No Politics

Rule" violations were ever brought to Borer and Goldberg's attention to address.[15]   Thus, that Borer and Goldberg made no recommendation to terminate Simon and Coleman, when there is no basis to believe that those matters were before them, does not plausibly establish that Borer and Goldberg's recommendation to terminate Johnson, following a full investigation and internal process by AFGE, was racially motivated.

To be sure, AFGE's enforcement of its "No Politics Rule" may be inconsistent.   For instance, like Simon and Coleman, plaintiff Kabir also appears to have escaped any discipline for participating in Cox's re-election campaign in violation of the "No Politics Rule."   Johnson may have good reason to be frustrated for being terminated pursuant to a rule that is not regularly enforced.   But "favoritism is not synonymous with discrimination," and a decision-making process that is "arbitrary" is not necessarily "racially discriminatory."   See De La Fuente, 2019 WL 1778948, at *8.   The Court will, therefore, dismiss Johnson's section 1981 claims against all Individual AFGE Defendants, while permitting Johnson's section 1981 claims against AFGE and Cox to proceed.

### c.  Race-Based Hostile Work Environment Claims

John Doe #1, Salim Javed, Waqas Kalyar, Fahim Javed, Rocky Kabir, and Mecca Scott assert hostile work environment claims based on race against all defendants under section 1981.[16]

---

[15] It is clear that Simon's alleged involvement in Cox's re-election campaign was ultimately brought to the attention of the Mollett Committee in November 2019, meaning twenty-three months after Johnson was fired.   See SAC ¶ 672.   Neither Borer nor Goldberg sat on that Committee.   See Ex. 18 to FAC at 2.   The second amended complaint states that "the Mollett Committee exonerated Ms. Simon of any wrongdoing based on her unsubstantiated denial," SAC ¶ 674, but the Mollett Committee's February 13, 2020 report, which is cited for that proposition and attached to the first amended complaint, says no such thing.   The report does not suggest that Simon was ever charged with violating the "No Politics Rule," and also relays accounts by several witnesses who were unaware of any "No Politics Rule" violations by Simon.   While the Court accepts as true plaintiffs' allegations that Simon worked on Cox's re-election campaign, plaintiffs' assertion that Simon was "exonerated" by the Mollett Committee is belied by the report attached to the complaint.   See Kaempe, 367 F.3d at 963.

[16] The Court does not perceive Johnson or Lewis to assert hostile work environment claims under section 1981 because their allegations solely pertain to discrete incidents: termination in Johnson's case and suspension in Lewis's.   Plaintiffs' opposition brief does not characterize Johnson or Lewis as asserting racially hostile work

SAC ¶¶ 871–72.  To make out a hostile work environment claim, a plaintiff must allege that "she was subjected to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Ayissi-Etoh, 712 F.3d at 577 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)); see also King v. Holder, 950 F. Supp. 2d 164, 171 (D.D.C. 2013).  "There must be a 'linkage between the hostile behavior and the plaintiff's membership in a protected class' for a hostile work environment claim to proceed."  Douglas-Slade v. LaHood, 793 F. Supp. 2d 82, 101 (D.D.C. 2011) (quoting Na'im v. Clinton, 626 F. Supp. 2d 63, 73 (D.D.C. 2009)).  Title VII case law is once again informative because hostile work environment claims, like disparate treatment claims, under section 1981 and Title VII "are analyzed using the same standards."  See Daniel v. Johns Hopkins Univ., 118 F. Supp. 3d 312, 319 (D.D.C. 2015) (citing Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1114 n.3 (D.C. Cir. 2000)).

"To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance."  Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998)).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  Faragher, 524 U.S. at 788 (internal quotation marks and citation omitted).  As with a disparate treatment claim under section 1981, a plaintiff need not plead a prima facie case in the complaint itself, but to survive a motion to dismiss "the alleged facts must support such a claim."

---

environment claims under section 1981.  See Pls.' Opp'n to Joint Mot. at 35–38.  Any such claims are waived and would also fail as a matter of law.  See Childs-Pierce v. Util. Workers Union of Am., 383 F. Supp. 2d 60, 79 (D.D.C. 2005), aff'd 187 F. App'x 1 (D.C. Cir. 2006) ("[M]ere reference to alleged disparate acts of discrimination against plaintiff cannot be transformed, without more, into a hostile work environment claim.").

See Middlebrooks v. Godwin Corp., 722 F. Supp. 2d 82, 90–91 & n.6 (D.D.C. 2010) (quoting Ervin v. Howard Univ., 562 F. Supp. 2d 58, 70 (D.D.C. 2008)).

       i.   *John Doe #1, Salim Javed, Waqas Kalyar, and Fahim Javed*

A bit more background on John Doe #1, Salim Javed, Waqas Kalyar, and Fahim Javed is helpful at this point. Waqas Kalyar owned CCS Limo, a private company that contracted with AFGE to provide transportation services for over a decade. SAC ¶¶ 67, 406, 530. Fahim Javed acquired CCS Limo in 2018 and began serving AFGE though his own business, Limo Network Nationwide ("Limo Network"). Id. ¶¶ 67, 573. John Doe #1 was "employed as a professional driver for CCS Limo (and its new owner Limo Network) for 12 years." Id. ¶ 407. Doe #1 was initially assigned to be Cox's primary driver. Id. ¶ 408. But "[a]fter Plaintiff Fahim Javed purchased CCS Limo . . . he assigned his younger brother, Plaintiff Salim Javed, as Cox's primary driver." Id. ¶ 605.

The Court need not detail these four plaintiffs' section 1981 claims because, as defendants point out, none of these plaintiffs has the requisite contractual relationship to bring a section 1981 claim against any defendant. See Joint Mot. to Dismiss at 30–32, 34. "[A] plaintiff cannot state a claim under § 1981 unless [he] has (or would have) rights under the existing (or proposed) contract that [he] wishes to make and enforce." Middlebrooks, 722 F. Supp. 2d at 87 (quoting Burnett v. Sharma, 511 F. Supp. 2d 136, 141 (D.D.C. 2007)); see also Domino's Pizza, 546 U.S. at 479–80 ("Section 1981 plaintiffs must identify injuries flowing from a racially motivated breach of their own contractual relationship, not of someone else's.").

None of these plaintiffs has "identif[ied] an impaired 'contractual relationship'" with AFGE, an Individual AFGE Defendant, or Cox "under which the plaintiff has rights." See Domino's Pizza, 546 U.S. at 476. These four plaintiffs were never employed by AFGE. And

although they were employed by (and in some cases owned) businesses that contracted with AFGE, they have not established that they individually had rights under CCS Limo and Limo Network's contracts with AFGE—let alone any contractual relationship with an Individual AFGE Defendant or Cox.  As the First Circuit has persuasively reasoned, "[n]othing in section 1981 provides a personal claim . . . to one who is merely affiliated—as an owner or employee—with a contracting party."  Danco, Inc. v. Wal-Mart Stores, Inc., 178 F.3d 8, 14 (1st Cir. 1999).  In other words, although contracting parties—like CCS Limo and Limo Network—can bring section 1981 claims against AFGE, the affiliates of those contractors—like Doe #1, Waqas, and the Javed brothers—cannot.  See id. (allowing contracting party's section 1981 claim to proceed but dismissing the contracting party's owner's claim); see also Middlebrooks, 722 F. Supp. 2d at 87 (dismissing section 1981 claim by plaintiff who alleged that she "work[ed] as a contractor on behalf of [a company] for [the defendant]" but was never "employed by or had a contract with the [defendant]"); Burnett v. AFGE, 102 F. Supp. 3d 183, 189 (D.D.C. 2015) (dismissing section 1981 claim with prejudice where plaintiff  who worked for a third-party company "concede[d] that because AFGE's contract was with [a third-party]—not with him personally—he d[id] not have cognizable Section 1981 claims" against AFGE); Mehta v. HCA Health Servs. of Fla., Inc., Case No: 8:05-cv-27-T-24TGW, 2005 WL 8160317, at *1, *8 (M.D. Fla. Aug. 9, 2005) (dismissing section 1981 claim against defendant where contract at issue was with the company that plaintiff owned, not plaintiff).

The lone case that plaintiffs cite is actually consistent with this analysis.  See Pls.' Opp'n to Joint Mot. at 34 (citing Brown v. J. Kaz, Inc., 581 F.3d 175, 182 (3d Cir. 2009) (adopting Danco's holding "that an independent contractor may bring a cause of action under section

1981")).  The Court will therefore dismiss Doe #1, Kalyar, and the Javed brothers' section 1981 claims for a hostile work environment against all defendants.

### ii.  Rocky Kabir

Kabir offers the following allegations in support of his racially hostile work environment claim.  He describes himself as "a person of color."  SAC ¶ 445.  He worked as Cox's Confidential Secretary at AFGE for twenty months.  Id. ¶ 478.  Cox "regularly called Plaintiff Kabir 'boy' and 'son' over [Kabir's] objections."  Id. ¶¶ 445, 519.  Kabir found "[b]eing referred to in that manner . . . extremely offensive, racist, and demeaning."  Id. ¶ 519.

In their opening brief, AFGE and the Individual AFGE Defendants assert that, notwithstanding the above allegations, Kabir only alleges religious discrimination.  See Joint Mot. to Dismiss at 27–30.  Their reply brief, however, concedes that Kabir has alleged that he was "subjected to racial epithets made by Cox," but contends that these allegations are insufficient to state a section 1981 claim because it is "'equally plausible' that "'some combination of' religious and racial bias motivated Cox's alleged discriminatory conduct."  See Joint Reply in Supp. of Mot. to Dismiss at 18–19 (quoting Adetoro v. King Abdullah Acad., No. 19-cv-01918, 2020 WL 7122858, at *6 (D.D.C. Dec. 4, 2020)).  The Court is not persuaded.  Although Kabir describes several incidents where Cox made offensive comments about Kabir's religion, these are entirely distinct from the "racial epithets" that Cox directed at Kabir.  See SAC ¶ 520 ("Defendant Cox would often refer to Plaintiff [Kabir] in derogatory ways concerning his faith, such as 'You goddamn Muslim' or 'You're the best Muslim I ever knew.' Cox once asked Plaintiff [Kabir] for his membership card as a Muslim.").  It is not "equally plausible," then, that "racial epithets" directed at Kabir were motivated by Cox's alleged religious bias.  They are—in defendants' own words—"racial epithets."  See Joint Reply in Supp. of Mot. to Dismiss at 18–19.

41

Nonetheless, the Individual AFGE Defendants rightly point out that Kabir has failed to state a section 1981 claim against any of them because he does not allege that they "'directly participated' in the alleged discriminatory acts"—all of which were committed by Cox.  See Richard, 946 F. Supp. at 74 (quoting Al-Khazraji, 784 F.2d at 518); see also Joint Mot. to Dismiss at 27.  But aside from attempting to recast Cox's behavior as religiously motivated, neither AFGE nor Cox tries to explain why Cox's "regular[]" practice of "subject[ing] [Kabir] to racial epithets" is insufficient to state a hostile work environment claim under section 1981.[17]  See Joint Reply in Supp. of Mot. to Dismiss at 18–19; SAC ¶¶ 445, 519.  Any challenge that Kabir's claims are deficient as to Cox or AFGE is consequently waived for lack of development.  See Pub. Emps. for Env't Resp., 213 F. Supp. 3d at 26.  In sum, the Court will dismiss Kabir's section 1981 claims against the Individual AFGE Defendants but will allow Kabir's section 1981 claims—to the extent they allege race-based discrimination—against AFGE and Cox to proceed.

### iii.  Mecca Scott

The allegations that support Scott's hostile work environment claims overlap substantially with the facts that relate to her disparate treatment claims.  After traveling to Denver for an AFGE membership drive in 2013, Scott "applied for a transfer from District 2 to District 11" because "she thought that it would be good for AFGE to demonstrate that there was diversity within AFGE" and "all of the national and [D]istrict 11 AFGE staff were Caucasian."  SAC ¶¶ 748–50.  Scott then transferred to Colorado, even though defendant Swanke, the National Vice President of District 11, objected.  Id. ¶ 751.  Scott initially had difficulty scheduling a meeting with Swanke.  Id. ¶ 752.  When they finally met, Scott informed Swanke that "she could not wait for the weather

---

[17] AFGE's reply brief states that it has "shown at pages 29–30 of [its] opening brief" that Kabir has "not met Section 1981's 'demanding' standard for establishing a [hostile work environment] claim."  Joint Reply in Supp. of Mot. to Dismiss at 19.  But AFGE did not even discuss Kabir's allegations of racial discrimination in its opening brief, see Joint Mot. to Dismiss at 27–30, and therefore has made no showing in this regard.

to break so that she could visit the other states that Swanke had assigned her (Utah, Montana, Wyoming)."  Id. ¶ 753.  Swanke responded: "Actually there's enough work for your ass right here in Colorado."  Id. ¶ 754.  Scott was "deeply offended," and later learned that "Swanke told [her] director, Bill Lyons, that Swanke wanted [her] to work 'only in Colorado because she wouldn't be accepted in the surrounding states of his District because she was Black.'"  Id. ¶¶ 754–55.  When "AFGE members started complaining that Plaintiff Scott was not traveling to other states[,] . . . Swanke reluctantly agreed to allow her to travel to those states."  Id. ¶ 756.

On June 18, 2018, Swanke invited several National Representatives, including Scott, via text message to a dinner meeting.  Id. ¶ 757.  He concluded the text by saying: "Apparently today is something called Juneteenth Holiday.  Not sure what that means other than an excuse to celebrate my birthday from last week."  Id.  Scott responded: "Commemorate Emancipation from slavery in Texas on that day in 1865. See you all soon."  Id. ¶ 758.  Later that night, Swanke replied: "OMG, that's horribly insensitive of me, but thank you.  Full time job keeping straight."  Id. ¶ 759.  Two years later, on a "live AFGE NEC Zoom Meeting," Swanke "apologized for his racially insensitive actions in the past," including his text message to Scott about Juneteenth.  Id. ¶ 770.

On June 4, 2020, "Scott sent an email to defendant Kelley complaining about the racial discrimination she was experiencing in District 11."  Id. ¶ 766.  Kelley never replied.  Id. ¶ 768.  Although Scott also tried to reach out to Working Ideal—the independent firm that AFGE had hired to investigate certain allegations of misconduct by Cox, see Ex. 1 to FAC at 3—"Defendants did not permit Working Ideal attorneys to include Plaintiff Scott's racial discrimination complaint" or complaints by other individuals in a March 16, 2020 report.  See SAC ¶¶ 767, 769.

Scott contends that these allegations—in addition to the ones about her salary and the general fact that "AFGE officials do not provide [her] with the support that she needs . . . in the

same manner that they provide support to other similarly situated Caucasian employees," see id. ¶ 765—are sufficient to state a hostile work environment claim against all defendants.  The Court disagrees.

Scott has not plausibly alleged that the conduct of anyone at AFGE—let alone of any defendant—was "sufficiently severe or pervasive to alter the conditions of [her] employment." See Ayissi-Etoh, 712 F.3d at 577 (quoting Harris, 510 U.S. at 21).  For one, courts in this District have consistently "rejected hostile work environment claims that are based on work-related actions by supervisors"—including the denial of specific opportunities at work.  See Wade v. Dist. of Columbia, 780 F. Supp. 2d 1, 19–20 (D.D.C. 2011) (dismissing hostile work environment claim alleging supervisors had "den[ied] [plaintiff] training opportunities"); see also Swann v. Off. of Architect of Capitol, 73 F. Supp. 3d 20, 32 (D.D.C. 2014) (holding "employment-related actions" like denial of overtime opportunities "are not sufficiently severe or offensive to support a hostile work environment claim"); Nurriddin v. Bolden, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) (finding "removal of important assignments" insufficient to state a hostile work environment claim); Bell v. Gonzales, 398 F. Supp. 2d 78, 92 (D.D.C. 2005) (dismissing hostile work environment claim based on exclusion from opportunities for teaching, travel, and high-profile assignments). Swanke's decision not to let Scott travel for an unspecified time after she moved to Colorado, therefore, does not plausibly establish a hostile work environment claim.

Swanke's comments about Scott traveling and Juneteenth, moreover, are regrettable but not sufficiently severe to state a claim.[18]  His comment to Bill Lyons was not made to Scott.[19]  See

---

[18] In plaintiffs' opposition brief, Scott states that Swanke also "made a racial slur while speaking with her during their first meeting."  Pls.' Opp'n to Joint Mot. at 36.  The only comment from that first meeting that is referred to in the second amended complaint, however, is Swanke's statement that "[a]ctually there's enough work for your ass right here in Colorado."  SAC ¶ 754.  No "racial slur" is alleged.

[19] Scott relies on another second-hand comment by Swanke in her opposition brief, asserting that he is alleged to have "regularly us[ed] the term 'SMB' or 'Simple-Minded Blacks' to refer to" two other African-American AFGE

Nurriddin v. Goldin, 382 F. Supp. 2d 79, 108 (D.D.C. 2005) ("When racial statements are not made directly to a plaintiff, generally a hostile environment cannot be established.").  And "other courts have deemed circumstances that were much worse than this not to qualify as racial harassment."  See, e.g., id. at 109 (discussing cases where no hostile work environment was found even though co-worker told plaintiff "black women were at the bottom.  The white men were first, the white women were right there with them").  At most, Swanke's conduct amounts to two isolated incidents over the span of four years, not pervasive abuse.  See Nagi v. Chao, No. 16-cv-2152 (KBJ), 2018 WL 4680272, at *3 (D.D.C. Sept. 28, 2018) (dismissing hostile work environment claim where "complaint alleges simply and solely that, on two occasions, [plaintiff] faced explicit and implicit racially derogatory comments and materials in the workplace"); Badibanga v. Howard Univ. Hosp., 679 F. Supp. 2d 99, 104 (D.D.C. 2010) (dismissing hostile work environment claim based on "isolated incidents" of supervisors' comments that plaintiff "was easy to replace with an American" and employer "would not hire other Africans"); see also Nurriddin, 674 F. Supp. 2d at 94 (finding "a lack of pervasiveness" when "the alleged events [were] temporally diffuse, spread out over a four-year period").

The allegations against defendants Kelley and AFGE are even less compelling.  The failure to respond to an email and the decision to confine the scope of an outside investigation by a law firm can hardly be labeled severe or pervasive.  And because the Court cannot reasonably infer that any differential between Scott's and Feist's or St. John's salaries is racially motivated, those allegations do not support Scott's hostile work environment claim either.  See Nurriddin, 382 F.

---

officials.  See Pls.' Opp'n to Joint Mot. at 36.  The second amended complaint, however, only alleges one instance where Swanke used "SMB" to refer to Treasurer Hudson during a conversation with defendant Glover and another AFGE official.  See SAC ¶ 119.  There is no evidence that Scott ever heard Swanke use either term, and the allegation is not even contained within the portion of the complaint that relates to Scott.  See id.  Under the circumstances, this allegation does not establish that Scott was subject to severe or pervasive racial discrimination at work.

Supp. 2d at 108 ("[I]ncidents . . . not related to [plaintiff's] race . . . cannot be used to support a hostile work environment claim.").  Moreover, the proposition that Scott does not receive the same support as Caucasian employees is simply too vague to advance her case.

Taken together, Scott's allegations are not sufficient to state a section 1981 claim for hostile work environment against any defendant, and the Court will dismiss those claims in full.

### 3. Non-Federal Claims

The rest of the claims in the second amended complaint are brought under the common law or the DCHRA.  The Court will begin by addressing defendants' jurisdictional arguments under Rule 12(b)(1) before examining whether the remaining claims are viable under Rule 12(b)(6).

### a. Jurisdiction Over Non-Federal Claims

At the outset, the Court can quickly dispense with plaintiffs' contention that the Court has diversity jurisdiction over plaintiffs' non-federal claims under 28 U.S.C. § 1332.  Pls.' Opp'n to Joint Mot. at 33; see also SAC ¶ 52.  Diversity jurisdiction "requires complete diversity of citizenship."  Caterpillar Inc. v. Lewis, 519 U.S. 61, 68 (1996) (emphasis added); see also Amiri v. Gelman Mgmt. Co., 734 F. Supp. 2d 1, 4 (D.D.C. 2010) ("[D]iversity jurisdiction does not exist unless each defendant is a citizen of a different State from each plaintiff.") (quoting Owen Equip. & Erection Co v. Kroger, 437 U.S. 365, 373 (1978)).  The jurisdictional defects here are numerous.

To begin, defendant Flynn and plaintiff Kalyar are both citizens of Maryland.  See SAC ¶¶ 67, 89.[20]  Furthermore, plaintiffs entirely ignore that, as an "unincorporated union," AFGE "has citizenship in every place where one of its members is a citizen."  See Conejo v. AFGE, AFL-CIO,

---

[20] There may be other plaintiffs and Individual AFGE Defendants who reside in the same state, too.  The cover pages to the second amended complaint list plaintiffs and defendants' mailing addresses.  But the Court cannot discern if those addresses accurately denote the parties' residences given the presence of other conflicting allegations within the second amended complaint.  Compare, e.g., SAC at 1 (listing address for plaintiff Salim Javed in Maryland), with id. ¶ 64 (stating plaintiff Salim Javed resides in Virginia).  Hence, the Court will rely on the residences alleged within the second amended complaint, not on the cover pages to that complaint.

Case No. 1:17-cv-1802-RCL, 2020 WL 5051441, at *1 (D.D.C. Aug. 24, 2020) (citing United Steelworkers of Am., AFL-CIO v. R. H. Bouligny, Inc., 382 U.S. 145, 153 (1965)); Decl. of Everett B. Kelley ("Kelley Decl.") [ECF No. 46-2] ¶ 3.  Complete diversity, then, is also lacking because AFGE has members in all fifty states, including Virginia, D.C., Maryland, New Hampshire, Michigan, Georgia, and Colorado, where plaintiffs reside.  See Joint Mot. to Dismiss at 2–3 n.3; see also Kelley Decl. ¶¶ 4–5; SAC ¶¶ 59, 64–68, 75, 77, 80, 84.

In the alternative, plaintiffs rely on 28 U.S.C. § 1367 to establish supplemental jurisdiction over their non-federal claims.  See Pls.' Opp'n to Joint Mot. at 25.  Notwithstanding the fact that "plaintiff bears the burden to establish that jurisdiction is proper," see William Penn Apartments v. Dist. of Columbia Ct. of Apps., 39 F. Supp. 3d 11, 15 (D.D.C. 2014) (citing Araya v. Bayly, 875 F. Supp. 2d 1, 3 (D.D.C. 2012)), plaintiffs' opposition brief hardly addresses this issue, see Pls.' Opp'n to Joint Mot. at 25 (responding to defendants' argument opposing supplemental jurisdiction over any pendent state law claims by stating only that "[t]he issues of fact raised by the complaint, are numerous and cannot, and should not, be determined upon a motion to dismiss").  Nonetheless, even though plaintiffs could be said to have conceded this point, the Court will evaluate whether jurisdiction exists under section 1367.

Section 1367(a) provides that, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  "A two-part test guides the supplemental jurisdiction analysis."  Wisey's #1 LLC v. Nimellis Pizzeria, 952 F. Supp. 2d 184, 188 (D.D.C. 2013).  First, the court assesses whether the federal and non-federal claims "derive from a common nucleus of operative fact."  United Mine Workers v. Gibbs,

383 U.S. 715, 725 (1966).  "If they do, the court has the authority under Article III of the Constitution to hear the [non-federal] claim," Wisey's #1, 952 F. Supp. 2d at 188 (citing Women Prisoners v. Dist. of Columbia, 93 F.3d 910, 920 (D.C. Cir. 1996)), and evaluates whether to decline supplemental jurisdiction based on the factors enumerated in section 1367(c), see City of Chi. v. Int'l Coll. Of Surgeons, 522 U.S. 156, 173 (1997).  But if the court finds that the federal and non-federal claims "do not derive from a common nucleus of operative fact, it cannot exercise supplemental jurisdiction and the claims must be dismissed under Rule 12(b)(1)."  Wisey's #1, 952 F. Supp. 2d at 188.

The Court has original jurisdiction over Counts 5, 6, and 7 because those claims arise under federal law.  See 28 U.S.C. § 1331.  The key question under section 1367(a) is whether the remaining claims in the second amended complaint "derive from a common nucleus of operative fact" with the claims set out in Counts 5, 6, and 7.  "Claims derive from a 'common nucleus of operative fact' only if the plaintiff would ordinarily be expected to try them all in one judicial proceeding."  Taylor v. Dist. of Columbia, 626 F. Supp. 2d 25, 28 (D.D.C. 2009) (quoting Gibbs, 383 U.S. at 725).  "[S]tate law claims do not derive from a common nucleus of operative facts if there is almost no factual or legal overlap between the state and federal claims."  Chelsea Condo. Unit Owners Ass'n v. 1815 A St., Condo. Grp., LLC, 468 F. Supp. 2d 136, 141 (D.D.C. 2007).  And "some background factual overlap" between a state claim and a federal claim is not sufficient to establish a "common nucleus of operative fact" either.  See Wisey's #1, 952 F. Supp. 2d at 189 (emphasis added).

The only claims that AFGE and the Individual AFGE Defendants argue must be dismissed under section 1367(a) are Westbrook and Freeman's claims.  See Joint Mot. to Dismiss at 42. Westbrook and Freeman assert claims for intentional infliction of emotional distress ("IIED")

(Count 2), quid pro quo sexual harassment (Count 8), hostile work environment (Count 9), and negligent hiring, supervision, and retention of Cox (Count 11).  The sexual harassment and hostile work environment claims arise under the DCHRA, and the other claims arise under the common law.  Neither plaintiff has asserted any federal claim.

The allegations in the second amended complaint concerning Westbrook and Freeman are as follows.  Westbrook "endured sexual harassment and retaliation by then-AFGE Local District President Rosendo Rocha" after she was elected to serve as an "AFGE District Woman's Coordinator" in October 2014.  SAC ¶ 78.  Westbrook "filed formal complaints about Rocha's behavior with the named Defendants," but they "took no action."  Id. ¶ 79.  After Westbrook "was elected as AFGE Local 3272 President in December 2017," the sexual harassment and retaliation by Rocha continued.  Id. ¶¶ 79–80.  She "filed additional complaints against Rocha with Defendants AFGE National officers, including Defendant Cox," which were again ignored.  Id.

Freeman was elected as "Interim Vice President of AFGE Local 987 from December 1, 2016 to January 23, 2017."  Id. ¶ 81.  During this time period, Freeman "was sexually harassed by AFGE Trustee Ray Van Schoubroek," who was appointed by Cox with Kelley's approval.  Id. ¶ 82.  After Freeman "filed sexual harassment complaints against Schoubroek with Defendant Cox and Defendant Kelley," Schoubroek "retaliated" against her and "continued to sexually harass her."  Id. ¶ 83.  Cox and Kelley also retaliated against her "by suspending her" from her elected post.  Id. ¶ 84.

The Court does not find that Westbrook or Freeman's claims share a "common nucleus of operative fact" with any federal claim in this case.  Plaintiffs' federal claims rest on allegations of sexual harassment by Cox, misappropriation of funds by Cox, and racial discrimination by Cox, as well as allegations that AFGE and the Individual AFGE Defendants were responsible for Cox's

misconduct.   Westbrook and Freeman's claims, conversely, rest on allegations of sexual harassment and retaliation by two entirely different individuals—Rocha and Schoubroek.  The "events that trigger liability," then, are "completely separate."  See Taylor, 26 F. Supp. 2d at 29 (finding no supplemental jurisdiction under such circumstances); see also Simmons v. Dist. of Columbia, 750 F. Supp. 2d 36, 41 (D.D.C. 2010) (finding no supplemental jurisdiction where "[e]ach claim relies on an independent set of facts that would require independent proof"); Peart v. Latham & Watkins LLP, 985 F. Supp. 2d 72, 80 (D.D.C. 2013) (finding supplemental jurisdiction where state-law claims "stem from the same events as the federal-law claims").  And the simple fact that Rocha and Schoubroek ultimately reported up the chain to Cox (like almost every AFGE leader) does not mean that Westbrook and Freeman's claims overlap legally or factually with the federal claims regarding Cox in this lawsuit.  Westbrook and Freeman's claims therefore must be dismissed for lack of jurisdiction.

The question whether the other plaintiffs' non-federal claims in the second amended complaint share a "common nucleus of operative fact" with the federal claims asserted in this lawsuit presents a more taxing inquiry.  No briefing has been provided on the subject.  And, even excluding Westbrook and Freeman's claims, the second amended complaint purports to state at least thirty sets[21] of non-federal claims and ten sets of federal claims.  Accounting for the fact that each set of claims is actually levied at fourteen or fifteen defendants, the number of total claims tops 500.  Moreover, it is not readily obvious how the Court would assess—for instance—whether any of the non-federal claims have "factual" or "legal overlap" with the claims in Count 6 (over which the Court has original jurisdiction), when all of Count 6 is subject to dismissal precisely because it does not contain any viable claims.

---

[21] In this context, the Court describes a "set" of claims as a single plaintiff's claims against multiple defendants.

But the Court need not busy itself with this analysis.  Even if the Court can exercise supplemental jurisdiction over plaintiffs' non-federal claims under section 1367(a), it will decline to do so under section 1367(c) with respect to any claim that lacks a common nucleus of operative fact with any underlying surviving federal claim in this case.  Cf. Brown v. Gino Morena Enters., 44 F. Supp. 2d 41, 52 (D.D.C. 1999) (declining supplemental jurisdiction under section 1367(c) without addressing section 1367(a) analysis); Dailey v. Park, 468 F. Supp. 2d 209, 214–15 (D.D.C. 2007) (same).  Under section 1367(c), a court may decline supplemental jurisdiction if:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  "Each [sub]section [of] [section] 1367(c) . . . is an independent reason through which a court may decline supplemental jurisdiction." Wisey's #1, 952 F. Supp. 2d at 189 (citing Edmondson & Gallagher v. Alban Towers Tenants Ass'n, 48 F.3d 1260, 1266 (D.C. Cir. 1995)).  Section 1367(c) generally reflects the understanding that "when deciding whether to exercise supplemental jurisdiction, 'a federal court should consider . . . the values of judicial economy, convenience, fairness, and comity.'" Int'l Coll. of Surgeons, 522 U.S. at 173 (quoting Carnegie-Mellon Univ. v Cohill, 484 U.S. 343, 350 (1988)).

Section 1367(c)(2) primarily drives the Court's decision here.  Under subsection (2), the "question of whether state law predominates . . . must be answered by looking to the nature of the claims as set forth in the pleading and by determining whether the state law claims are more complex or require more judicial resources to adjudicate." Diven v. Amalgamated Transit Union

Int'l & Local 689, 38 F.3d 598, 602 (D.C. Cir. 1994) (quoting Moore v. DeBiase, 766 F. Supp. 1311, 1319 (D.N.J. 1991)); see also Gibbs, 383 U.S. at 726–27 (If "state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals."). A non-federal claim that "essentially replicate[s]" a federal claim does not substantially predominate. See Lindsay v. GEICO, 448 F.3d 416, 425 (D.C. Cir. 2006). Nor does a non-federal claim that "is intertwined" with—i.e., supported by the same evidence as—a federal claim. See Lieving v. Pleasant Valley Hosp., Inc., Civ. A. No. 3:13-27455, 2014 WL 1513851, at *3 (S.D. W.Va. Apr. 11, 2014).

The Court has already determined that only five federal claims can proceed: Wells's section 501(b) claim against Cox for improperly expending AFGE resources on bars, strip clubs, and prostitutes; Johnson's section 1981 wrongful termination claims against AFGE and Cox; and Kabir's section 1981 hostile work environment claims against AFGE and Cox. The second amended complaint, in turn, contains five types of common law claims—for sexual assault and battery (Count 1), IIED (Counts 2 & 3), physical injury (Count 4), intentional tort (Count 10), and negligent supervision (Count 11)—and raises two types of DCHRA claims—for hostile work environment (Count 9) and quid pro quo sexual harassment (Count 8). All non-federal claims are brought against all defendants by one or more plaintiffs.[22]

---

[22] The second amended complaint is so sprawling that it is difficult to tell which plaintiffs intend to assert which claims. And plaintiffs' opposition brief adds no clarity because it primarily refers to plaintiffs' "pendent state claims" without distinguishing between any specific causes of action. See, e.g., Pls.' Opp'n to Joint Mot. at 25, 31, 34, 37, 38. Based on which specific plaintiffs actually seek relief pursuant to each Count, the Court identifies the following "sets" of non-federal claims in the second amended complaint: sexual assault and battery claims by Doe #1, S. Javed, and Kabir (Count 1); IIED claims by Doe #1, S. Javed, Kabir, Kalyar, F. Javed, Johnson, Lewis, Scott, Westbrook, and Freeman (Count 2); IIED claims by Wells and Vaughan (Count 3); physical injury claims by Doe #1 (Count 4); quid pro quo sexual harassment claims by Doe #1, Kabir, S. Javed, Westbrook, and Freeman (Count 8); hostile work environment claims by Doe #1, Kabir, S. Javed, F. Javed, Kalyar, Johnson, Lewis, Scott, Westbrook, and Freeman (Count 9); intentional tort claims by Doe #1, Kabir, and S. Javed (Count 10); and negligent hiring, supervision, and retention claims by Wells, Johnson, Westbrook, and Freeman (Count 11).

The <u>only</u> non-federal claims that have any meaningful factual or legal overlap with the surviving federal claims are Kabir's racially hostile work environment claims under the DCHRA—which essentially replicate his section 1981 claims[23]—and Johnson's IIED, negligent supervision, and racially hostile work environment claims under the DCHRA—which derive from the same incident as her section 1981 claims.

The other sets of non-federal claims not only require different elements of proof than the surviving federal claims, but also rest on allegations about distinct incidents of harassment, assault, and discrimination based on race, sex, or religion.  <u>See</u> <u>Wisey's #1</u>, 952 F. Supp. 2d at 193 (finding state claims "substantially predominate" where they "require[d] different elements of proof than the federal claims" and involved "several" other witnesses); <u>Cannon v. Dist. of Columbia</u>, 10 F. Supp. 3d 30, 40–41 (D.D.C. 2014), <u>aff'd</u>, 783 F.3d 327 (D.C. Cir. 2015) (finding D.C. law claims "substantially predominate[d]" where only remaining federal claim raised a "narrow . . . question, which has little if anything to do with the nucleus of facts common to plaintiffs' nine D.C. law claims"); <u>cf.</u> <u>Konah v. Dist. of Columbia</u>, 815 F. Supp. 2d 61, 79 (D.D.C. 2011) (exercising supplemental jurisdiction where "all of the plaintiff's claims stem from one incident"); <u>Rundquist v. Vapiano SE</u>, 798 F. Supp. 2d 102, 132 (D.D.C. 2011) (same).[24]

---

[23] <u>See</u> <u>Daniel</u>, 118 F. Supp. 3d at 319 (citing <u>Sparrow</u>, 216 F.3d at 1114 n.3) (explaining that the "same standards" govern hostile work environment claims under section 1981 and the DCHRA).

[24] Had plaintiffs substantively addressed supplemental jurisdiction in their brief, they might have tried to argue that Wells's section 501(b) claim against Cox for improperly using AFGE resources on bars, strip clubs, and prostitutes relates to Doe #1, Kabir, Kalyar, and the Javed brothers' claims for sexual assault, IIED, and sex discrimination because the allegations supporting those claims describe incidents with Cox at bars and strip clubs and involving prostitutes.  But that argument would fail.  In fact, supplemental jurisdiction over this specific category of non-federal claims would not be proper under section 1367(a).  Wells's section 501(b) claim presents a narrow inquiry about whether Cox breached his fiduciary duty to AFGE by misappropriating AFGE funds for non-union purposes.  To prevail on such a claim, Wells would not need to show that any of the misconduct at issue in Doe #1, Kabir, Kalyar, Salim Javed, and Fahim Javed's tort claims transpired.  There is no legal or factual overlap, at least with respect to any operative facts, and "some background factual overlap" is not sufficient to establish supplemental jurisdiction under section 1367(a).  <u>See</u> <u>Wisey's #1</u>, 952 F. Supp. 2d at 189.  The same reasoning applies to Wells's claims in Count 11 for negligent supervision of Cox: whether Cox breached his fiduciary duty to AFGE by improperly spending AFGE funds at bars and strip clubs, and whether defendants breached a duty to Wells by failing to prevent Cox's

Other considerations support declining supplemental jurisdiction as well.  The non-federal claims are significantly more numerous.  See UMC Dev., LLC v. Dist. of Columbia, 401 F. Supp. 3d 140, 158 (D.D.C. 2019) (finding state claims predominated because they were "four times as numerous as [plaintiffs'] federal claims, and provide a far broader basis for relief" (quotation omitted); see also Ganzi v. Wash.-Balt. Reg'l 2012 Coal., 98 F. Supp. 2d 54, 59 (D.D.C. 2000) (concluding common law claims predominated over federal claims "where only one of the seven original claims in the Complaint was [a federal] claim").  So too are the non-federal plaintiffs, given that only three plaintiffs assert federal claims that will progress past this stage.  See Cryer v. InterSols., Inc., Civ. A. No. 06-2032 (EGS), 2007 WL 1191928, at *3 (D.D.C. Apr. 20, 2007) ("[A] huge disparity in numbers between state law plaintiffs and federal law plaintiffs could result in predomination of state law claims.") (citing Lindsay, 448 F.3d at 425 nn.11–12).

Hence, with the exception of Kabir and Johnson's claims that derive from the same incidents as their section 1981 claims, the Court will decline to exercise supplemental jurisdiction over all non-federal claims in this lawsuit because the non-federal claims substantially predominate over the surviving federal ones.  To do otherwise would require the Court to expend a substantial amount of resources wading through dozens of sets of non-federal claims—which arise under an unknown variety of different state laws—that have no meaningful connection to any remaining federal claims in this case.  And it would mean that the Individual AFGE Defendants—who no longer have any federal claims lodged against them—would nonetheless be forced to defend against this bevy of non-federal claims in federal court.  See Clark v. Anderson, No. 4:15-CV-360-A, 2015 WL 3960886, at *3 (N.D. Tex. June 29, 2015) (concluding "it would be highly inappropriate to cause . . . defendants to remain a party to this action simply because

---

sexual abuse of Doe #1, raise both legally and factually distinct issues even though Cox allegedly abused Doe #1 at bars and strip clubs.

plaintiff has alleged state law claims" against them, even though all federal claims against defendants were dismissed under Rule 12(b)(6).  The "values of judicial economy, convenience, fairness, and comity" would not be served by such an outcome.  See Int'l Coll. of Surgeons, 522 U.S. at 173 (quoting Cohill, 484 U.S. at 350).  And again, plaintiffs have made no effort to suggest otherwise.

### b.  Viability of Remaining Non-Federal Claims

All that is left for the Court to decide, then, is whether the remaining non-federal claims are viable under Rule 12(b)(6).  The Court will address each claim in turn, concluding that only Kabir's racially hostile work environment claims against AFGE and Cox under the DCHRA may move forward.

### i.  Kabir's Racially Hostile Work Environment Claims (Count 9)

In Count 9, Kabir alleges that all defendants violated the DCHRA by subjecting him to a racially hostile work environment.  The same standards for employer liability apply to hostile work environment claims brought under section 1981 and the DCHRA.  See Daniel, 118 F. Supp. 3d at 319 (citing Sparrow, 216 F.3d at 1114 n.3).  Consequently, the Court will not dismiss Kabir's racially hostile work environment claim against AFGE in Count 9 for the same reasons that the Court declined to dismiss his racially hostile work environment claim against AFGE in Count 5.

The standards to hold individual employees liable for section 1981 violations and DCHRA violations, however, differ somewhat.  Recall that individual employees can only be held liable under section 1981 if they are "'personally involved in the discrimination' by having 'directly participated' in the alleged discriminatory acts."  See Richard, 946 F. Supp. at 74 (quoting Al-Khazraji, 784 F.2d at 518).  Under the DCHRA, however, an individual may be held liable for aiding and abetting a DCHRA violation.  See D.C. Code § 2-1402.62 ("It shall be an unlawful

discriminatory practice for any person to aid, abet, invite, compel, or coerce the doing of any of the acts forbidden under the [DCHRA].”); Wallace v. Skadden, Arps, Slate, Meagher & Flom, 715 A.2d 873, 888 (D.C. 1996).

The different standards have no impact here.  Just as Kabir has not established that any of the Individual AFGE Defendants “directly participated” in Cox’s use of racial epithets, he has not shown that the Individual AFGE Defendants “aided and abetted” Cox in repeatedly directing those epithets at Kabir.  Conversely, Kabir has adequately pled that Cox aided and abetted a DCHRA violation because Cox’s comments are the very subject of Kabir’s claim.  Hence, Kabir’s racially hostile work environment claims under the DCHRA will be dismissed against the Individual AFGE Defendants but may proceed against AFGE and Cox.

### ii.  Johnson’s Racially Hostile Work Environment Claims (Count 9)

Like Kabir, Johnson alleges that all defendants subjected her to a racially hostile work environment in violation of the DCHRA by wrongfully terminating her.  SAC ¶¶ 915–27.  These claims fail because, as the Court has already explained, Johnson’s wrongful termination amounts to a discrete incident that does not support a hostile work environment claim.  See Childs-Pierce, 383 F. Supp. 2d at 79.

### iii.  Johnson’s IIED Claims (Count 2)

Next, the Court turns to Johnson’s IIED claims against all defendants in Count 2.  In support of these claims, Johnson references “Cox’s conduct in wrongfully terminating [her],” and defendants’ decisions not to terminate Coleman and Simon for their alleged “No Politics” rule violations. SAC ¶¶ 830, 843.  Johnson also relies on defendants’ decision not to pursue certain internal disciplinary charges against AFGE actors, including Cox.  See id. ¶¶ 834, 837.

As a preliminary matter, Johnson does not mention Count 2 in her opposition, let alone attempt to respond to defendants' arguments for dismissal. To be sure, Johnson refers broadly to her "pendent state law claims" in a single sentence, see Pls.' Opp'n to Joint Mot. at 38, but the phrase "intentional infliction of emotional distress" (or even "IIED") does not appear once in plaintiffs' opposition brief. Dismissal is warranted on this ground alone. See Nat'l Sec. Couns. v. CIA, 898 F. Supp. 2d 233, 268 (D.D.C. 2012) ("[T]he Court may treat the plaintiff's failure to oppose the defendant's 12(b)(6) arguments as a decision to concede those arguments."); see also Buggs v. Powell, 293 F. Supp. 2d 135, 141 (D.D.C. 2003) ("It is understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." (citing FDIC v. Bender, 127 F.3d 58, 67–68 (D.C. Cir. 1997)). Nonetheless, despite this substantial shortcoming on Johnson's part, the Court will briefly examine whether she has stated any viable IIED claims.

To state a claim for IIED under D.C. law,[25] "a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) either intentionally or recklessly (3) causes the plaintiff severe emotional distress." Kassem v. Wash. Hosp. Ctr., 513 F.3d 251, 255 (D.C. Cir. 2008) (quoting Larijani v. Georgetown Univ., 791 A.2d 41, 44 (D.C. 2002)). To be actionable, conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Homan v. Goyal, 711 A.2d 812, 818 (D.C. 1998) (quoting Drejza v. Vaccaro, 650 A.2d 1308, 1312 n.10 (D.C. 1994)). This is a "very demanding standard," "[e]specially in the

---

[25] Johnson does not indicate which state's law should apply to her common law claims. In their opening brief, defendants assumed that D.C. law applies, see Joint Mot. to Dismiss at 38, 41 (citing cases applying D.C. law), and plaintiffs did not contest this assumption. Moreover, because Johnson and AFGE both reside in Washington, D.C., see SAC ¶¶ 70, 85, it is appropriate to apply D.C. law.

employment context." Islar v. Whole Foods Mkt. Grp., Inc., 217 F. Supp. 3d 261, 268 (D.D.C. 2016) (quoting Brown v. Children's Nat'l Med. Ctr., 773 F. Supp. 2d 125, 137 (D.D.C. 2011)). "'[G]enerally employer-employee conflicts do not rise to the level of outrageous conduct' required to satisfy the first element of an IIED claim." Kassem, 513 F.3d at 255 (quoting Duncan v. Children's Nat'l Med. Ctr., 702 A.2d 207, 211–12 (D.C. 1997)).

Johnson's purportedly "wrongful" termination is neither extreme nor outrageous. See Elliott v. Healthcare Corp., 629 A.2d 6, 9 (D.C. 1993) ("Mere discharge of an employee is not 'conduct that goes beyond all possible bounds of decency and [is] regarded as atrocious and utterly intolerable in a civilized society.'" (quoting Schoen v. Consumers United Grp., Inc., 670 F. Supp. 367, 379 (D.D.C. 1986))); Crowley v. N. Am. Telecomms. Ass'n, 691 A.2d 1169, 1172 (D.C. 1997) (affirming dismissal of IIED claim of employee who alleged he "was subjected to contempt, scorn and other indignities in the workplace by his supervisor and an unwarranted evaluation and discharge"). Nor does defendants' failure to investigate charges levied by Johnson against AFGE officials state a claim for IIED. See King v. Kidd, 640 A.2d 656, 670 (D.C. 1993) (ordering dismissal of IIED claim based on supervisor's failure to respond to employee's sexual harassment complaints).

Furthermore, because no defendant can be held directly liable for intentionally inflicting Johnson with emotional distress, any theory of vicarious liability—to the extent Johnson intended to proceed on one—fails as well. See Crawford v. Signet Bank, 179 F.3d 926, 929 (D.C. Cir. 1999) ("In the absence of agent liability . . . none can attach to the principal."); see also Young v. 1st Am. Fin. Servs., 977 F. Supp. 38, 41 (D.D.C. 1997) ("[V]icarious liability is not an independent cause of action, but rather is a legal concept used to transfer liability from an agent to a principal at trial."). In sum, all of Johnson's IIED claims will be dismissed under Rule 12(b)(6).

*iv.  Johnson's Negligent Supervision Claims (Count 11)*

Johnson has also conceded that her negligent supervision claims in Count 11 are deficient by failing to address them in her opposition brief.  See Nat'l Sec. Couns., 898 F. Supp. 2d at 268; Buggs, 293 F. Supp. 2d at 141.  Nonetheless, the Court will briefly examine those claims as well to ensure they have no merit.

Count 11 purports to state claims by Johnson against all defendants for "Negligent Hiring, Supervision [a]nd Retention [o]f Defendant Cox."  See SAC ¶¶ 932–45.  In Johnson's case, the alleged harm that she suffered is once again that she was wrongfully terminated based on her race.  See Pls.' Opp'n to Joint Mot. at 38 (describing Johnson's pendent state law claims as "arising out of her alleged wrongful termination").  As far as the Court can tell, then, the thrust of her negligent supervision claim is that defendants knew of Cox's propensities to racially discriminate and failed to take appropriate steps to prevent his misconduct and discipline him.  See id.

"The tort of negligent supervision 'allows a plaintiff to hold employers directly liable for their failure to properly supervise their personnel.'"  Jackson v. Starbucks Corp., Civ. A. No. 19-1487 (RC), 2021 WL 1317883, at *3 (D.D.C. Apr. 8, 2021) (quoting James v. Dist. of Columbia, 869 F. Supp. 2d 119, 121 (D.D.C. 2012)).  To state such a claim under D.C. law, a plaintiff must demonstrate that "the employer breached a duty to [the] plaintiff to use reasonable care in the supervision . . . of an employee which proximately caused harm to plaintiff."  Id. (quoting Phelan v. City of Mount Rainier, 805 A.2d 930, 940 (D.C. 2002)).  This requires that plaintiff show that defendants "knew or should have known [their] employee behaved in a dangerous or otherwise incompetent manner" but "failed to adequately supervise the employee."  Dist. of Columbia v. Tulin, 994 A.2d 788, 794 (D.C. 2010) (quoting Giles v. Shell Oil Corp., 487 A.2d 610, 613 (D.C. 1985)).  Importantly, a claim of negligent supervision must be based on a "common law cause[]

of action or dut[y] otherwise imposed by the common law," and not a duty imposed by a statute, such as section 1981 or the LMRDA.  See Griffin v. Acacia Life Ins. Co., 925 A.2d 564, 576 (D.C. 2007).

For one, it is an odd proposition to suggest that Cox could be held liable for negligently failing to supervise himself.  But the bigger problem is that Johnson fails to predicate her negligent supervision claims on any common law cause of action or common law duty owed to her.  See id. The only common law cause of action that Johnson even alleges in the second amended complaint is IIED, but the Court has already concluded that Johnson failed to state a valid IIED claim.[26]  And while AFGE owed some common law duties to Johnson as an AFGE employee, those duties did not encompass preventing Cox from racially discriminating against her.  Cf. id. at 576 (listing common law duties and concluding an employer had no common law duty to protect employees from sexual harassment); see also Ware v. Hyatt Corp., Civ. A. No. 12-0395 (ABJ), 2013 WL 12321372, at *17 (D.D.C. Mar. 27, 2013) ("Since the duty not to discriminate is a purely statutory creation, imposing common law liability for negligent supervision claims based on failure to prevent discrimination" is not viable under D.C. law.); Uzoukwu v. Metro. Wash. Council of Gov'ts, 983 F. Supp. 2d 67, 95–96 (D.D.C. 2013) (dismissing negligent supervision claim alleging that employer had a duty to prevent racial harassment).  Hence, the Court will dismiss Johnson's negligent supervision claims in Count 11 under Rule 12(b)(6).

*** *** ***

---

[26] It is conceivable that Johnson might rely on the "tort of wrongful termination" as a basis for her negligent supervision claims.  But "that cause of action is inapt in this case" because in D.C. that tort is only available where "the discharge violates 'a clear mandate of public policy.'"  Akinsinde v. Not-For-Profit Hosp. Corp., Civ. No. 16-cv-00437 (APM), 2018 WL 6251348, at *5 (D.D.C. Nov. 29, 2018) (quoting Dist. of Columbia v. Beretta, USA Corp., 872 A.2d 633, 645 (D.C. 2005)).  Johnson has not argued that is the case here.

To recap, after evaluating all claims in the second amended complaint under Rules 12(b)(1) and/or 12(b)(6), the Court concludes that the entire complaint must be dismissed except for the following claims: Wells's claim against Cox for misappropriating AFGE resources under section 501(b) (Count 7); Johnson's wrongful termination claims against AFGE and Cox under section 1981 (Count 5); and Kabir's racially hostile work environment claims against AFGE and Cox under section 1981 and the DCHRA (Counts 5 and 9).[27]

## III.   Defendant Cox's Motion to Dismiss for Insufficient Service of Process

Finally, the Court considers Cox's motion to dismiss the first and second amended complaints for insufficient service of process under Rule 12(b)(5).  Cox advances three grounds for dismissal: (1) service of the first amended complaint was untimely; (2) service of the first amended complaint was incomplete because the exhibits to the complaint were not attached; and (3) service of the second amended complaint was never made.  Because none of these alleged defects requires dismissal under Rule 12(b)(5), the Court will deny Cox's motion.

---

[27] The Court will not proceed to analyze in detail the viability of the non-federal claims over which it will decline supplemental jurisdiction.  But even if the Court had determined that exercising supplemental jurisdiction over those claims was proper, it would dismiss the vast majority of them under Rule 12(b)(6).  A few glaring defects bear mention.  As a preliminary matter, plaintiffs do not mention Counts 2, 3, 4, 10, and 11 in their opposition brief, thereby conceding defendants' arguments leveled against those Counts.  See Nat'l Sec. Couns., 898 F. Supp. 2d at 268; Buggs, 293 F. Supp. 2d at 141.  Although Count 1 may state viable claims against Cox for sexual assault and battery, plaintiffs do not plausibly allege that AFGE or the Individual AFGE Defendants could be held vicariously liable for Cox's actions under the controlling standard set forth by the D.C. Court of Appeals in Boykin v. Dist. of Columbia, 484 A.2d 560, 561 (D.C. 1984).  Doe #1, Salim Javed, Fahim Javed, and Kalyar's DCHRA claims in Count 8 and 9, see SAC ¶¶ 901–27, are not actionable because those plaintiffs were not employed by AFGE.  See D.C. Code §§ 2-1402.11 (making it unlawful for employers to discriminate against employees with respect to their "compensation, terms, conditions, or privileges of employment," based on employees' protected status) (emphasis added).  Kabir's quid pro quo sexual harassment claims in Count 8 are also not viable because Kabir has not demonstrated that his forced resignation (for unspecified reasons), see SAC ¶ 316, qualified as a "tangible employment action" that "resulted from a refusal to submit to [Cox's] sexual demands."  See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753–54 (1998).  Scott and Lewis's racially hostile work environment claims in Count 9 fail for the same reasons addressed in the Court's analysis of their hostile work environment claims in Count 5.  Lastly, the claims in Counts 8 and 9 against the Individual AFGE Defendants are deficient for the same reasons stated in the Court's analysis of Kabir's claims against those defendants in Count 9.

## A.  Legal Standard

Rule 12(b)(5) governs motions to dismiss for insufficient service of process.  "[T]he party on whose behalf service is made has the burden of establishing its validity when challenged; to do so, [that party] must demonstrate that the procedure employed satisfied the requirements of the relevant portions of Rule 4 and any other applicable provision of law."  Anderson v. Gates, 20 F. Supp. 3d 114, 119 (D.D.C. 2013) (quoting Light v. Wolf, 816 F.2d 746, 751 (D.C. Cir. 1987)). "[U]nless the procedural requirements for effective service of process are satisfied, a court lacks authority to exercise personal jurisdiction over the defendant."  Candido v. Dist. of Columbia, 242 F.R.D. 151, 160 (D.D.C. 2007) (citing Gorman v. Ameritrade Holding Corp., 293 F.3d 506, 514 (D.C. Cir. 2002), overruled on other grounds by Erwin-Simpson v. AirAsia Berhad, 985 F.3d 883 (D.C. Cir. 2021)).  "Failure to effect proper service is thus a 'fatal' jurisdictional defect, and is grounds for dismissal."  Jouanny v. Embassy of France in the U.S., 220 F. Supp. 3d 34, 38 (D.D.C. 2016) (quoting Tom Sawyer Prods., Inc. v. Progressive Partners Achieving Sols., 550 F. Supp. 2d 23, 26 (D.D.C. 2008)).  Although notice of the complaint "cannot by itself validate an otherwise defective service," Freedom Watch, Inc. v. OPEC, 766 F.3d 74, 81 (D.C. Cir. 2014) (citation omitted), "[i]n certain circumstances in which service of process was 'in substantial compliance with the formal requirements of the Federal Rules,' courts have considered actual notice in sustaining the adequacy of service despite a minor, nonprejudicial defect," id. (quoting Prewitt Enters., Inc. v. OPEC, 353 F.3d 916, 924 n.14 (11th Cir. 2003)).

## B.  Analysis

Cox's main argument is that the first amended complaint should be dismissed because service occurred outside the ninety-day time period designated in Rule 4(m).  See Cox's Mot. to Dismiss at 4.  The first amended complaint was filed on June 26, 2020.  A summons was issued

on June 29, 2020.  But Cox was not served until October 1, 2020.  <u>See</u> Ex. 1 to Cox's Mot. to Dismiss [ECF No. 47-2] ¶ 6.[28]  That means that service was made ninety-seven days after the filing of the first amended complaint, <u>i.e.</u>, seven days late.  This short lapse in time, standing alone, does not merit dismissal now.

Rule 4(m) dictates that a district court "must extend" the ninety-day period "if the plaintiff shows good cause for the failure" to timely serve.  Fed. R. Civ. P. 4(m).  "Good cause exists 'when some outside factor . . . rather than inadvertence or negligence, prevented service,' for example, a defendant's intentional evasion of service."  <u>Mann v. Castiel</u>, 681 F.3d 368, 374 (D.C. Cir. 2012) (quoting <u>Lepone–Dempsey v. Carroll Cnty. Comm'rs</u>, 476 F.3d 1277, 1281 (11th Cir. 2007)).  But even if plaintiff fails to show "good cause," "[t]he Advisory Committee note for Rule 4(m) instructs that the district court has discretion to extend the time for effecting and filing proof of service."  <u>Id.</u> (citing Fed. R. Civ. P. 4(m) advisory committee's note to 1993 amendment).  In deciding whether to excuse a delay in service, courts consider a variety of factors, including "(1) the danger of prejudice to the party opposing the modification, (2) the length of delay and its potential impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the movant, and (4) whether the movant acted in good faith."  <u>Arora v. Buckhead Fam. Dentistry</u>, 263 F. Supp. 3d 121, 132 (D.D.C. 2017) (quoting <u>In re Vitamins Antitrust Class Actions</u>, 327 F.3d 1207, 1209 (D.C. Cir. 2003)).

Plaintiffs argue that "good cause" exists for this delay because they "diligently attempted to locate [Cox]" but he "studiously and successfully evaded service of process for three months."

---

[28] Cox is correct that no proof of service has been filed on the docket.  <u>See</u> Cox's Suppl. Reply in Supp. of Mot. to Dismiss [ECF No. 58] at 5.  Rule 4(l) provides that "[u]nless service is waived, proof of service must be made to the court;" however, "[f]ailure to prove service does not affect the validity of service."  <u>See</u> Fed. R. Civ. P. 4(l)(1) & (3).  The Court will order that plaintiffs file proof of service of the first amended complaint, as required by Rule 4(l).  But because Cox has conceded that he was served with that complaint on October 1, 2020, <u>see</u> Ex. 1 to Cox's Mot. to Dismiss ¶ 6, the Court will presume that service was made on that date for the purpose of assessing his motion.

Pls.' Opp'n to Mot. to Dismiss Filed by Def. J. David Cox ("Opp'n to Cox's Mot.") [ECF No. 51] at 3–4.  According to plaintiffs, they first retained a private process server in July 2020, who after three unsuccessful attempts to serve Cox at his North Carolina home "reported to undersigned counsel his belief that Defendant Cox was evading service."  Id. at 2.  No documentation—such as an affidavit from the process server—has been offered to substantiate that allegation.  Plaintiffs then describe attempts to effect service through the local sheriff's office in August and September 2020.  Specifically, a deputy sheriff went to Cox's home on three occasions, but no one answered the door, id., even though two cars registered to Cox—a Ford Mustang and a Ford Explorer—were parked in the driveway, Aff. (Jan. 5, 2021) [ECF No. 57] at 4.  Plaintiffs do attach proof that these attempts were made, as well as an "Affidavit of Service" from the sheriff's office, stating that it "[a]ppears defendant is avoiding service," see id. at 1.  But plaintiffs do not address Cox's sworn declaration that his "primary" vehicle is a Ford Ranger and that "[a]t no time while [he] was physically present in [his] home . . . was [he] aware of an attempt to serve [him] being made."  Def. J. David Cox's Third Decl. [ECF No. 58-1] ¶¶ 8, 13.  And the "Affidavit of Service" appears somewhat questionable because a nearly identical version was created two weeks earlier without the "avoiding service" language.  Compare Aff. (Jan. 5, 2021) at 1, with Ex. 1 to Opp'n to Cox's Mot. [ECF No. 51-1] at 2.

Cox has the better of this dispute.  On this record, the Court cannot find that Cox purposefully evaded service because it lacks sufficient evidence that Cox was actually home for the servers' attempts or aware of plaintiffs' service efforts.  Consequently, "good cause" does not exist for plaintiffs' tardiness.  Nonetheless, the Court will exercise its discretion to excuse plaintiffs' seven-day delay in effecting service on Cox under Rule 4(m).  See Mann, 681 F.3d at 374.  Cox correctly points out that plaintiffs could have attempted service by certified mail in

accordance with Rule 4(e) and North Carolina Rule of Civil Procedure 4(j)(1).  See Cox's Mot. to

Dismiss at 7–8.  But plaintiffs did make reasonable and persistent attempts to complete service

before the ninety-day deadline.  And Cox identifies no prejudice that will result from excusing

plaintiffs' delay; nor does he suggest that plaintiffs have acted in bad faith.  See Mann, 681 F.3d

at 374; see also Arora, 263 F. Supp. 3d at 132–33 (excusing fifteen-day delay where plaintiff did

not "ignore[] his obligation to effect service within ninety days of filing the complaint" and the

"brief delay . . . had [no] effect on this proceeding or on [defendant's] substantive or procedural

rights").

Next Cox argues that service of the first amended complaint was defective because the

exhibits were not attached.  Cox's Mot. to Dismiss at 5.  Under Rule 10(c), "[a] copy of a written

instrument that is an exhibit to a pleading is a part of the pleading for all purposes."  Fed. R. Civ.

P. 10(c).  Rule 4(c)(1), in turn, requires service of "a copy of the complaint."  Fed. R. Civ. P.

4(c)(1).  Interpreting these rules together, some courts have held that "if a plaintiff fails to serve a

document attached to his complaint, he fails to serve the complete pleading, and service is

improper."  See Agency Funding, LLC v. Fillweber, Civ. No. 3:10cv00027, 2011 WL 39085, at

*1 (W.D. Va. Jan. 5, 2011); see also Sanchez-Velazquez v. Mun. of Carolina, Civ. No. 11-1586

(SEC), 2012 WL 6726475, at *3 (D.P.R. Dec. 27, 2012).  But other courts have rejected this same

argument offhand.  See Warner v. Hamburgh Prods., LLC, No. 12-13290, 2013 WL 2048635, at

*3 (E.D. Mich. May 14, 2013) (concluding that a Rule 12(b)(5) dismissal in this context made "no

sense in light of Plaintiff's . . . substantial compliance with Rule [4](c)(1), and Defendant's

inability to show lack of notice or prejudice").

Plaintiffs regrettably do not address this argument in their opposition.  But in light of

plaintiffs' "substantial compliance" with Rule 4(c)(1)'s requirements and the absence of any

prejudice to Cox, the Court will not dismiss the action based on what it considers a "minor, nonprejudicial defect." See Freedom Watch, 766 F.3d at 81.  Cox acknowledges that he was served with an otherwise complete copy of the first amended complaint on October 1, 2020.  Decl. of Jeffrey David Cox (Nov. 23, 2020) [ECF No. 47-2] ¶ 6.  That complaint spans 104 pages and thus provides ample notice to Cox of the allegations against him, even without the exhibits attached. He did not—until filing this motion—notify plaintiffs that any exhibits were missing.  Opp'n to Cox's Mot. at 3.  And he also does not attest that he lacks actual notice of the exhibits.  Indeed, he has been in mediation with plaintiffs regarding this lawsuit for months and has also prepared a motion to dismiss advancing numerous arguments that "support dismissal of the allegations" against him.  See Cox's Mot. to Dismiss at 10.  Hence, service of the first amended complaint under these circumstances was adequate.  See Warner, 2013 WL 2048635, at *3; see also Delwood Equip. & Fabrication Co. v. Matec in Am., Civ. A. No. 2:16-cv-01843, 2017 WL 190096, at *2 (S.D. W. Va. Jan. 17, 2017) (declining to dismiss for insufficient service of process where copy of the complaint served lacked a copy of agreement "purportedly attached as an exhibit").

In his final Rule 12(b)(5) challenge, Cox contends that the second amended complaint should be dismissed against him because "to date [it] has not been formally served."  Cox's Mot. to Dismiss at 4.  Local Civil Rule 5.4(b)(6) provides that "[a]n attorney . . . who obtains a CM/ECF password consents to electronic service of all documents, subsequent to the original complaint, that are filed by electronic means pursuant to Fed. R. Civ. P. 5(b)(2)(E)."  Attorneys Leibensperger and Francis entered appearances electronically on behalf of Cox on October 20 and 22, 2020, see Notice of Appearance (Oct. 20, 2020); Notice of Appearance (Oct. 22, 2020), and necessarily obtained CM/ECF passwords in the process, see Local Civ. R. 5(b)(1).  By doing so, Attorneys Leibensperger and Francis consented to "electronic service of all documents, subsequent to the

original complaint, that are filed by electronic means," including the second amended complaint, which the Court granted plaintiffs leave to file on October 23, 2020. See Mem. Op. & Order (Oct. 23, 2020) at 9. Service of the second amended complaint was, therefore, effected on October 23, 2020 through CM/ECF.

In sum, the Court will deny Cox's motion to dismiss the first and second amended complaints under Rule 12(b)(5).

## Conclusion

For the reasons explained above, the Court will deny plaintiffs' motion to disqualify counsel for the Individual AFGE Defendants, deny Cox's motion to dismiss the first and second amended complaints for insufficient service of process, dismiss all claims against the Individual AFGE Defendants, and dismiss nearly all claims against AFGE and Cox. The only claims that are not subject to dismissal and hence remain are Wells's breach-of-fiduciary duty claim against Cox under 29 U.S.C. § 501(b) (Count 7); Johnson's wrongful termination claims against AFGE and Cox under 42 U.S.C. § 1981 (Count 5); and Kabir's racially hostile work environment claims against AFGE and Cox under section 1981 and the DCHRA (Counts 5 & 9). A separate Order will issue on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: August 11, 2021